**KOPELOWITZ OSTROW P.A.**
Jeff Ostrow (*pro hac vice* forthcoming)
ostrow@kolawyers.com
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Telephone: 954-332-4200
Counsel for Plaintiffs and the Putative Classes

(*Additional Counsel Listed on Signature Page*)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STEPHEN WHARTON, ROBERT FORST, SUSAN SOLIZ, JOSEPH EIGNER, JUAN ABREU, MARCUS HENDERSON, and ALICEA ROBINSON,** on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>v.<br><br>**EPISOURCE, LLC, CAREPLUS HEALTH PLANS, INC., SCAN HEALTH PLANS, MOLINA HEALTHCARE OF CALIFORNIA, INNOVACARE, INC., HUMANA, INC., ARCHWELL HEALTH MSO, LLC, and BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE COMPANY,**<br><br>                              Defendants. | Case No. 2:25-cv-05330<br><br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Stephen Wharton, Robert Forst, Susan Soliz, Joseph Eigner, Juan Abreu, Marcus Henderson, and Alicea Robinson (collectively "Plaintiffs"), individually, and on behalf of all similarly situated persons, allege the following against Defendants, Episource, LLC ("Episource"), Careplus Health Plans, Inc. ("Careplus"), SCAN Health Plan ("SCAN"), Molina Healthcare of California ("Molina"), InnovaCare, Inc. ("Innovacare"), Humana, Inc. ("Humana"), Archwell Health MSO, LLC ("Archwell"), and Blue Shield of California Life & Health Insurance Company ("Blue Shield") (collectively "Defendants"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

## I.    INTRODUCTION

1.    Plaintiffs bring this class action against Defendants for their failure to properly secure and safeguard Plaintiffs and other similarly situated persons' personally identifiable information ("PII") and protected health information ("PHI"), including names, Social Security numbers, addresses, dates of birth, phone numbers, email addresses, medical information (*e.g.*, medical record numbers, doctors, diagnoses, medicines, test results, images, care and treatment), and health insurance information ("Private Information"), from criminal hackers.

2.    Episource, which is based in Gardena, California, provides risk adjustment services, software, and solutions for health plans and provider groups that serve payers and providers across the country, including Careplus, SCAN, Molina, Innovacare, Humana, Archwell, Blue Shield (collectively "Clients").

3.    Careplus is a Medicare Advantage provider offering a variety of plans, including HMO, HMO D-SNPs, HMO C-SNPs, and HMO-POS options.

4.    SCAN is a non-profit organization that offers Medicare Advantage plans in California, Arizona, Nevada, and Texas.

5.    Molina is a managed care company that provides government-sponsored healthcare services, primarily through Medicaid and Medicare programs.

6.    Innovacare is a provider of managed healthcare services in North America that offers Medicare Advantage plans, Physician Practice Services, Medicaid, Clinical Services, and Population Health Management.

7.    Humana is a health insurance company based in Louisville, Kentucky.

8.    Archwell is a national organization focused on providing comprehensive healthcare services to seniors aged 60 and over.

9.    Blue Shield is a provider of both employer and individual & family HMO and PPO health insurance plans, based in California.

10.    On or about June 10, 2025, Episource filed official notice of a hacking incident with the Office of the Texas Attorney General. Under state and federal law, organizations must report breaches involving PHI within at least 60 days.

11.    On or about June 6, 2025, Episource also sent out data breach letters ("Notice") to individuals whose information was compromised as a result of the hacking incident.

12.    According to the Notice sent to Plaintiffs and "Class Members" (defined below), unusual activity was detected on some of Episource's computer systems on or around February 6, 2025. In response, Episource stopped the activity and began investigating. The investigation revealed that between January 27, 2025, and February 6, 2025, an unauthorized party had access to certain company files containing the Private Information that Episource stored on behalf of its Clients ("Data Breach"). Yet, Episource waited *four months* to notify its Clients, their patients, and the public that they were at risk.

13.    As a result of this delayed response, Plaintiffs and Class Members had no idea for four months that their Private Information had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

14.    The Private Information compromised in the Data Breach contained highly sensitive patient data, representing a gold mine for data thieves. The data included, but is not limited to, Social Security numbers, sensitive medical information including diagnoses, medicines, images, and treatment information, as well as health insurance information that Episource collected and maintained on behalf of its Clients' patients.

15.    Armed with the Private Information accessed in the Data Breach (and a head start), data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, and giving false information to police during an arrest.

16.    There has been no assurance offered by Defendants that all personal data or copies of data have been recovered or destroyed, or that Defendants have adequately enhanced their data security practices to avoid a similar breach in the future.

17.    Therefore, Plaintiffs and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses

incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

18.    Plaintiffs bring this class action lawsuit to address Defendants' inadequate safeguarding of Class Members' Private Information that they collected and maintained, and their failure to provide timely and adequate notice to individuals impacted by the Data Breach, such as Plaintiff and Class Members, of the types of information that were accessed, and that such information was subject to unauthorized access by cybercriminals.

19.    The potential for improper disclosure and theft of Plaintiffs and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take necessary steps to secure the Private Information left them vulnerable to an attack.

20.    Upon information and belief, Defendants failed to properly monitor and implement security practices. Had Defendants properly monitored their networks, and those belonging to third-party vendors, the Data Breach would have been discovered sooner.

21.    Plaintiffs and Class Members' identities are now at risk because of Defendants' negligent conduct, as the Private Information that Defendants collected and maintained on behalf of individuals is now in the hands of data thieves and other unauthorized third parties.

22.    Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

## II.    PARTIES

23.    Plaintiff Stephen Wharton is, and at all times mentioned herein was, an individual citizen of the State of Arizona.

24.    Plaintiff Robert Frost is, and at all times mentioned herein was, an individual citizen of the State of Florida.

25.    Plaintiff Susan Soliz is, and at all times mentioned herein was, an individual citizen of the State of California.

26.    Plaintiff Joseph Eigner is, and at all times mentioned herein was, an individual citizen of the State of Washington.

27.    Plaintiff Juan Abreu is, and at all times mentioned herein was, an individual citizen of the State of Florida.

28.    Plaintiff Marcus Henderson is, and at all times mentioned herein was, an individual citizen of the State of Illinois.

29.    Plaintiff Alicea Robinson is, and at all times mentioned herein was, an individual citizen of Arizona.

30.    Episource is a medical coding and risk adjustment service company incorporated in California with its principal place of business at 500 West 190th Street, 4th Floor, Gardena, California 90248 in Los Angeles County.

31.    Careplus is a corporation organized under the laws of Florida, with its principal place of business located at 500 W. Main Street Louisville, Kentucky, 40202. Careplus' registered agent is CT Corporation System, located at 1200 South Pine Island Road, Plantation, Florida, 33324.

32.    SCAN is a non-profit corporation organized under the laws of California, with its principal place of business located at 3800 Kilroy Airport Way, Suite 100, Long Beach, California, 90806.

33.    Molina is a corporation organized under the laws of California, with its principal place of business located at 200 Oceangate, Suite 100, Long Beach, California, 90802.

34.    Innovacare is a corporation maintaining its principal place of business at 173 Bridge Plaza North, Fort Lee, New Jersey, 07024.

35.    Humana is a corporation organized under the laws of Delaware, with its principal place of business at 500 West Main Street, Louisville, Kentucky, 40202.

36.    Archwell is a limited liability company organized under the laws ofDelaware, with its principal place of business located at 102 Woodmont Blvd Ste 600, Nashville, Tennessee, 37205. Archwell's registered agent is CT Corporation System, located at 3800 N Central Ave Ste 460, Phoenix, Arizona 85012.

37.    Blue Shield is a corporation organized under the laws of California, with its principal place of business located at 601 12th Street, 20th Floor, Oakland, California, 94607.

### III.    JURISDICTION AND VENUE

38.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

39.    This Court has jurisdiction over Defendants because Episource operates in and/or is incorporated in this District.

40.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and because Episource has harmed Class Members residing in this District.

### IV.    FACTUAL ALLEGATIONS

**A. Defendants' Business and Collection of Plaintiffs and Class Members' Private Information**

41.    Episource is a medical coding and risk adjustment service company. Founded in 2006, Episource is a complete risk adjustment platform that provides

7

advanced analytics, coding solutions, and compliance tools to a broad range of healthcare payers and providers located across the United States. Episource is a wholly owned subsidiary of Optum. Episource employs more than 3,400 people and generates approximately $1.1 billion in annual revenue.

42.    Episource contracts and provides services to Clients.

43.    In the ordinary course of their business practices, Episource and Clients require that Plaintiffs and Class Members provide them with their Private Information.

44.    In its privacy policy, Episource promises the public that it will not share this Private Information with third parties:

> We maintain administrative, technical, and physical safeguards designed to protect the Information that you provide on our Online Services. These safeguards vary based on the sensitivity of the Information that is being collected, used, and stored.[1]

45.    The Clients each maintain a similar privacy policy that provides assurances to patients and policyholders that the Private Information they maintain will be safeguarded.

46.    Due to the highly sensitive and personal nature of the information Defendants acquire and store, Defendants, upon information and belief, promise to, among other things: keep individuals' Private Information private; comply with industry standards related to data security and the maintenance of individuals' Private Information; inform individuals' of their legal duties relating to data security and comply with all federal and state laws protecting individuals' Private Information; only use and release individuals' Private Information for reasons that

---

[1] https://www.episource.com/privacy/ (last visited on June 12, 2025).

relate to the services they provide; and provide adequate notice to patients if their Private Information is disclosed without authorization.

47.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs and Class Members' Private Information, Defendants assumed legal and equitable duties they owed to them and knew or should have known that they were responsible for protecting Plaintiffs and Class Members' Private Information from unauthorized disclosure and exfiltration.

48.     Plaintiffs and Class Members relied on Defendants to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

**B. The Data Breach and Defendants' Inadequate Notice to Plaintiffs and Class Members**

49.     According to Episource's Notice, it learned of unauthorized access to its computer systems on February 6, 2025, with such unauthorized access having taken place between January 27, 2025, and February 6, 2025.

50.     Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including names, Social Security numbers, addresses, dates of birth, phone numbers, email addresses, medical information, and health insurance information, relating to Clients' patients and policyholders.

51.     On or about June 6, 2025, roughly four months after Episource learned that the Class's Private Information was first accessed by cybercriminals, Episource finally began to notify Clients and Class Members that its investigation determined that their Private Information was seen and taken.

52.     Episource delivered Data Breach Notification Letters to Plaintiffs and Class Members, alerting them that their highly sensitive Private Information had been exposed in a "Data Breach."

53.     Omitted from the Notice are crucial details like the root cause of the Data Breach, the vulnerabilities exploited, the criminals responsible for the breach, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

54.     Thus, Episource's purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiffs and Class Members' ability to mitigate the harms resulting from the Data Breach was and is severely diminished.

55.     In addition, the Notice offers no substantive steps to help victims like Plaintiffs and Class Members to protect themselves other than providing two year(s) of credit monitoring – an offer that is woefully inadequate considering the lifelong increased risk of fraud and identity theft Plaintiffs and Class Members now face as a result of the Data Breach

56.     Episource had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep Plaintiffs and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

57.     Plaintiffs and Class Members provided their Private Information to Episource, either directly or as a result of their interactions with Episource's Clients, with the reasonable expectation and mutual understanding that Episource would

comply with its obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

58.    Episource's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

59.    Episource knew or should have known that its electronic records would be targeted by cybercriminals.

### C. The Healthcare Sector is Particularly Susceptible to Data Breaches

60.    Episource was on notice that companies in the healthcare industry are susceptible targets for data breaches.

61.    In August 2014, after a cyberattack on Community Health Systems, Inc., the Federal Bureau of Investigation ("FBI") warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[2]

62.    The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[3]

---

[2] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), *available at* https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited on June 12, 2025).

[3] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n. (Oct. 4, 2019), *available at*: https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited on June 12, 2025).

11

63.    The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[4] In 2022, the largest growth in compromises occurred in the healthcare sector.[5]

64.    Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident … came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[6]

65.    Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[7]

66.    Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and

---

[4]    Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2019/01/ITRC_2018-EOY-BREACH-REPORT-KEY-FINDINGS.pdf (last visited on June 12, 2025).
[5]    Identity Theft Resource Center, *2022 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited on June 12, 2025).
[6]    Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited on June 12, 2025).
[7]    *Id.*

insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[8]

67.    Moreover, third-party vendors like Episource are an especially common target for hackers. In 2023, approximately 29-percent of all data breaches resulted from a "third-party attack vector," and as much data breach reporting does not specify the attack vector, "the actual percentage of breaches occurring via third parties was probably higher."[9]

68.    As providers of healthcare-related services, Defendants knew, or should have known, the importance of safeguarding the Private Information, including PHI, entrusted to it, and of the foreseeable consequences if such data were to be disclosed. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to the unauthorized exposure of their Private Information to criminal actors. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the Data Breach or the foreseeable injuries it caused.

### D. Defendants Failed to Comply with HIPAA

69.    Title II of HIPAA contains what are known as the Administration Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that HHS create rules to streamline the standards for handling PHI similar to the data Defendant left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

70.    Defendants' Data Breach resulted from a combination of insufficiencies that indicate Defendants failed to comply with safeguards mandated

---

[8] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited on June 12, 2025).
[9] *Global Third-Party Cybersecurity Breaches*, SECURITYSCORECARD (2024), *available online at*: https://securityscorecard.com/reports/third-party-cyber-risk/ (last visited on June 12, 2025).

by HIPAA regulations and industry standards. First, it can be inferred from the Data Breach that Defendants either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiffs and Class Members' PHI.

71. Plaintiffs and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by CFR § 160.103.

72. 45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

73. 45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

74. Plaintiffs and Class Members' Private Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

75. Plaintiffs and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

76. Based upon Episource's Notice to Plaintiffs and Class Members, Episource reasonably believes that Plaintiffs and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

77. Plaintiffs and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart

E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

78.    Episource reasonably believes that Plaintiffs and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

79.    Plaintiffs and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

80.    Plaintiffs and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

81.    Episource reasonably believes that Plaintiffs and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

82.    It is reasonable to infer that Plaintiffs and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

83.    It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

15

84.     After receiving notice that they were victims of the Data Breach (which required the filing of a data breach report in accordance with 45 CFR § 164.408(a)), it is reasonable for recipients of that notice, including Plaintiffs and Class Members in this case, to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

85.     In addition, Episource's Data Breach could have been prevented if Episource had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its Clients and their patients and/or policyholders.

86.     Episource's security failures also include, but are not limited to:

a.  Failing to maintain an adequate data security system to prevent data loss;

b.  Failing to mitigate the risks of a data breach and loss of data;

c.  Failing to ensure the confidentiality and integrity of electronic protected health information Episource creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f.  Failing to identify and respond to suspected or known security incidents;

g. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i. Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j. Failing to ensure compliance with HIPAA security standard rules by Defendants' workforce, in violation of 45 CFR 164.306(a)(94); and

k. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

87.    The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414 also required Episource to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***" (emphasis added).

88.    Because Episource has failed to comply with HIPAA, while monetary relief may cure some of Plaintiffs and Class Members' injuries, injunctive relief is also necessary to ensure Episource's approach to information security is adequate and appropriate going forward. Episource still maintains the PHI and other highly sensitive PII of its Clients' patients, including Plaintiffs and Class Members. Without the supervision of the Court through injunctive relief, Plaintiffs and Class Members' Private Information remains at risk of subsequent data breaches.

### E. Episoure Failed to Comply with FTC Guidelines

89.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

90.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[10] . The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

91.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, and monitor their networks for suspicious activity.

---

[10] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (October 2016), *available at*  https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf  (last visited on June 12, 2025).

92.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45 *et seq*. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

93.     Such FTC enforcement actions include those against businesses that fail to adequately protect customer data, like Episource here. *See, e.g.*, *In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTCA.").

94.     Section 5 of the FTCA, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Episource of failing to use reasonable measures to protect Private Information they collect and maintain from consumers. The FTC publications and orders described above also form part of the basis of Episource's duty in this regard.

95.     The FTC has also recognized that personal data is a new and valuable form of currency.  In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable.  Data is currency. The larger the data set, the greater potential for analysis and profit."[11]

---

[11] FTC Commissioner Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), *transcript available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited on June 12, 2025).

96.     As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

97.     Defendants were at all times fully aware of their obligation to protect the Private Information of Plaintiffs and Class Members, yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so.

### F. Defendants Failed to Comply with Industry Standards

98.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

99.     The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[12]

100.    The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

---

[12] *The 18 CIS Critical Security Controls*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls/cis-controls-list (last visited on June 12, 2025).

a. Control who logs on to your network and uses your computers and other devices.
b. Use security software to protect data.
c. Encrypt sensitive data, at rest and in transit.
d. Conduct regular backups of data.
e. Update security software regularly, automating those updates if possible.
f. Have formal policies for safely disposing of electronic files and old devices.
g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

101. Further still, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[13]

---

[13] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations (last visited June 12, 2025).

102.    Defendants failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs and Class Members' Private Information, resulting in the Data Breach.

### G. Defendants Breached Their Duty to Safeguard Plaintiffs and Class Members' Private Information

103.    In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, those belonging to third-party vendors, and their protocols adequately protected the Private Information of Class Members

104.    Defendants breached their obligations to Plaintiffs and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.    Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect the Private Information in their possession;

c. Failing to properly monitor their own data security systems for existing intrusions;

d. Failing to sufficiently train their employees regarding the proper handling of the Private Information in their possession;

e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

f. Failing to adhere to HIPAA and industry standards for cybersecurity as discussed above; and

g. Otherwise breaching their duties and obligations to protect Plaintiffs and Class Members' Private Information.

105.  Defendants negligently and unlawfully failed to safeguard Plaintiffs and Class Members' Private Information by allowing cyberthieves to access unsecured and unencrypted Private Information belonging to Plaintiffs and Class Members.

106.  Had Defendants followed industry guidelines and adopted security measures recommended by experts in the field, they could have prevented the Data Breach and ultimately the theft of Plaintiffs and Class Members' confidential Private Information.

107.  Accordingly, Plaintiffs and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendants.

### H. Plaintiffs and Class Members are at a Significantly Increased and Substantial Risk of Fraud and Identity Theft as a Result of the Data Breach.

108.    The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiffs and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[14] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

109.    Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

110.    Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal

---

[14] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on June 12, 2025).

information through means such as spam phone calls and text messages or phishing emails.

111. In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

112. Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

113. One such example of how malicious actors may compile Private Information is through the development of "Fullz" packages.

114. Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

115. The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in

the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

116.    For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[15] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

117.    Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

---

[15] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited June 12, 2025).

118.   The Identity Theft Resource Center documents the multitude of harms caused by fraudulent use of PII in its 2023 Consumer Impact Report.[16] After interviewing over 14,000 identity crime victims, researchers found that as a result of the criminal misuse of their PII:

- 77-percent experienced financial-related problems;
- 29-percent experienced financial losses exceeding $10,000;
- 40-percent were unable to pay bills;
- 28-percent were turned down for credit or loans;
- 37-percent became indebted;
- 87-percent experienced feelings of anxiety;
- 67-percent experienced difficulty sleeping; and
- 51-percent suffered from panic of anxiety attacks.[17]

119.   PHI is also especially valuable to identity thieves.   As the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[18]

120.   Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

121.   While credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[19]

---

[16] *2023 Consumer Impact Report* (Jan. 2024), IDENTITY THEFT RESOURCE CENTER, *available online at*: https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-1.pdf   (last visited on June 12, 2025).
[17] *Id* at pp 21-25.
[18] Federal Trade Commission, *Warning Signs of Identity Theft, available at*: https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited on June 12, 2025).
[19] *Data Breaches: In the Healthcare Sector,* CENTER FOR INTERNET SECURITY, *available at*: https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited on June 12, 2025).

122.   PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

123.   Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[20]

124.   The ramifications of Defendants' failure to keep individuals Private Information secure are long lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

125.   Here, not only was sensitive medical information compromised, but Social Security numbers were compromised too. The value of both PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

126.   It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI

---

[20] Michael Ollove, "*The Rise of Medical Identity Theft in Healthcare*," KAISER HEALTH NEWS (Feb. 7, 2014), *available at*: https://kffhealthnews.org/news/rise-of-indentity-theft/ (last visited on June 12, 2025).

is stolen and when it is misused. According to the U.S. Government Accountability
Office, which conducted a study regarding data breaches:[21]

> [L]aw enforcement officials told us that in some cases,
> stolen data may be held for up to a year or more before
> being used to commit identity theft. Further, once stolen
> data have been sold or posted on the Web, fraudulent use
> of that information may continue for years. As a result,
> studies that attempt to measure the harm resulting from
> data breaches cannot necessarily rule out all future harm.

127.   PII and PHI are such valuable commodities to identity thieves that once
the information has been compromised, criminals often trade the information on the
dark web for years.

128.   As a result, Plaintiffs and Class Members are at an increased risk of
fraud and identity theft, including medical identity theft, for many years into the
future. Thus, Plaintiffs and Class Members have no choice but to vigilantly monitor
their accounts for many years to come.

### I. *Plaintiffs and Class Members' Damages*

*Plaintiff Stephen Wharton's Experience*

129.   Plaintiff Wharton indirectly provided Defendants with his Private
Information, including his Social Security number.

130.   Plaintiff Wharton provided Private Information, directly or indirectly,
to Defendants on the condition that it be maintained as confidential and with the
understanding that Defendants would employ reasonable safeguards to protect his
Private Information.

---

[21] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf (last visited on June 12, 2025).

131.  On or about June 6, 2025, Plaintiff Wharton received the Notice, which told him that his Private Information had been involved during the Data Breach.

132.  The Notice offered Plaintiff Wharton only two years of credit monitoring services. Two years of credit monitoring is not sufficient given that Plaintiff Wharton will now experience a lifetime of increased risk of identity theft, including but not limited to, potential medical fraud.

133.  Plaintiff Wharton suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring his accounts for fraud.

134.  Had Plaintiff Wharton known that said Defendants did not utilize reasonable data security measures, Plaintiff Wharton would not have entrusted his Private Information to said Defendants or would have paid less for those treatments and services.

135.  Plaintiff Wharton suffered actual injury in the form of having his Private Information compromised and/or stolen as a result of the Data Breach.

136.  Plaintiff Wharton suffered actual injury in the form of damages to and diminution in the value of his Personal Information – a form of intangible property that Plaintiff Wharton entrusted to Defendants and which was compromised in, and as a result of, the Data Breach.

137.  Plaintiff Wharton suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by his Private Information being placed in the hands of criminals.

138.  Plaintiff Wharton has a continuing interest in ensuring that his Private Information, which remains in the possession of Defendants, is protected and safeguarded from future breaches. This interest is particularly acute, as Episource's systems have already been shown to be susceptible to compromise and are subject

to further attack so long as Episource fails to undertake the necessary and appropriate security and training measures to the Private Information.

139.   As a result of the Data Breach, Plaintiff Wharton made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial and medical accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered to him in the Notice. Plaintiff Wharton has spent several hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities.

140.   As a result of the Data Breach, Plaintiff Wharton has suffered anxiety as a result of the release of his Private Information, which he believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using his Private Information for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Wharton is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on his life.

141.   Plaintiff Wharton also suffered actual injury from having his Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of his Private Information, a form of property that Defendants obtained from Plaintiff Wharton; (b) violation of his privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud he now faces.

142.   As a result of the Data Breach, Plaintiff Wharton anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

143.    As a result of the Data Breach, Plaintiff Wharton faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed.

144.    Furthermore, Plaintiff Wharton's sensitive Private Information remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff Wharton to the prospect of additional harm.

*Plaintiff Robert Forst's Experience*

145.    Plaintiff Forst is a current policyholder of Careplus.

146.    Upon information and belief, one of Episource's health plan Clients, Careplus, entrusted Episource with Plaintiff Forst's Private Information as part of its business arrangement with Episource.

147.    As a condition of receiving services from Careplus, Plaintiff Forst was required to provide his Private Information to Careplus, which it then provided to Episource, including but not limited to Plaintiff Forst's name, date of birth, health insurance information, demographic information, Social Security number, and financial information.

148.    Plaintiff Forst typically takes measures to protect his Private Information and is very careful about sharing his Private Information. Plaintiff Forst has never knowingly transmitted Private Information over the internet or other unsecured sources.

149.    Plaintiff Forst stores any documents containing his Private Information in a safe and secure location, and he diligently chooses unique usernames for his passwords and online accounts.

150.    In entrusting his Private Information to Defendants, Plaintiff Forst believed that, as part of the payments for services, Defendants would adequately safeguard that information. Had Plaintiff Forst known that said Defendants did not utilize reasonable data security measures, and that Careplus did not ensure that third-

party vendors utilized reasonable data security measures, Plaintiff Forst would not have entrusted his Private Information to said Defendants or would have paid less for those treatments and services.

151.   As a direct and proximate result of the Data Breach permitted to occur by Defendants, Plaintiff Forst has suffered, and imminently will suffer, injury-in-fact and damages, including the unauthorized disclosure of the Private Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale; Plaintiff Forst has been and will be forced to expend considerable time and effort to monitor his accounts and credit files, changing his online account passwords, verifying the legitimacy of and researching the Data Breach, to protect himself from identity theft and fraudulent misuse of her Private Information, disclosed as a result of the Data Breach.

152.   In addition, because of the Data Breach, Plaintiff Forst also suffered diminution in the value of his Private Information, a form of intangible property that he entrusted to Defendants, for the sole purpose of obtaining medical services.

153.   Furthermore, the Data Breach has caused Plaintiff Forst significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Private Information.

154.   He fears for her personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of his Private Information. He is experiencing feelings of anxiety and stress because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

155.   Plaintiff Forst was highly disturbed by the Data Breach's nature and the thought of cybercriminals accessing his highly sensitive Private Information and the harm caused by the Data Breach.

156.   Since the Data Breach occurred, Plaintiff Forst has experienced a significant uptick in spam calls.

157.   As a result of the Data Breach, Plaintiff Forst faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed.

158.   Furthermore, Plaintiff Forst's sensitive Private Information remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff Forst to the prospect of additional harm.

*Plaintiff Susan Soliz's Experience*

159.   Plaintiff Soliz is a current policyholder of SCAN.

160.   Upon information and belief, one of Episource's health plan Clients, SCAN, entrusted Episource with Plaintiff Soliz's Private Information as part of its business arrangement with Episource.

161.   Plaintiff Soliz suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her medical accounts for fraud.

162.   Had Plaintiff Soliz known that said Defendants did not utilize reasonable data security measures, and that SCAN did not ensure that third-party vendors utilized reasonable data security measures, Plaintiff Soliz would not have entrusted her Private Information to said Defendants or would have paid less for those treatments and services.

163.   Plaintiff Soliz suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach.

164.    Plaintiff Soliz suffered actual injury in the form of damages to and diminution in the value of her personal, health, and financial information – a form of intangible property that Plaintiff entrusted to Defendants for the purpose of receiving healthcare services from Defendants and which was compromised in, and as a result of, the Data Breach.

165.    Plaintiff Soliz suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

166.    Plaintiff Soliz has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendants, is protected and safeguarded from future breaches. This interest is particularly acute, as Episource's systems have already been shown to be susceptible to compromise and are subject to further attack so long as Episource fails to undertake the necessary and appropriate security and training measures to the Private Information.

167.    As a result of the Data Breach, Plaintiff Soliz made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial and medical accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered to her in the Notice. Plaintiff Soliz has spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

168.    As a result of the Data Breach, Plaintiff Soliz has suffered anxiety as a result of the release of her Private Information, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her PII and PHI for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Soliz is very concerned about this increased,

substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

169.   Plaintiff Soliz also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her Private Information, a form of property that Defendants obtained from Plaintiff Soliz through her health plan; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

170.   As a result of the Data Breach, Plaintiff Soliz anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

171.   Since the Data Breach occurred, Plaintiff Soliz has experienced a significant uptick in spam calls. Furthermore, since the Data Breach occurred, Plaintiff Soliz experienced a fraudulent transaction on her bank account, that she reasonably believes was the result of this Data Breach.

172.   As a result of the Data Breach, Plaintiff Soliz faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed.

173.   Furthermore, Plaintiff Soliz's sensitive Private Information remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff Soliz to the prospect of additional harm.

*Plaintiff Joseph Eigner's Experience*

174.   Plaintiff Eigner is a current policyholder of Molina.

175.   Upon information and belief, one of Episource's health plan Clients, Molina, entrusted Episource with Plaintiff Eigner's Private Information as part of its business arrangement with Episource.

176.   As a condition of receiving services from Molina, Plaintiff Eigner was required to provide his Private Information to Molina, which it then provided to Episource, including but not limited to Plaintiff Eigner's name, date of birth, health insurance information, demographic information, Social Security number, and financial information.

177.   On June 6, 2025, Episource sent Plaintiff Eigner a Notice informing him that his Private Information was compromised in the Data Breach.

178.   Plaintiff Eigner typically takes measures to protect his Private Information and is very careful about sharing his Private Information. Plaintiff Eigner has never knowingly transmitted Private Information over the internet or other unsecured sources.

179.   Plaintiff Eigner stores any documents containing his Private Information in a safe and secure location, and he diligently chooses unique usernames for his passwords and online accounts.

180.   In entrusting his Private Information to Defendants, Plaintiff Eigner believed that, as part of the payments for services, Defendants would adequately safeguard that information. Had Plaintiff Eigner known that said Defendants did not utilize reasonable data security measures, and that Molina did not ensure that third-party vendors utilized reasonable data security measures, Plaintiff Eigner would not have entrusted his Private Information to said Defendants or would have paid less for those treatments and services.

181.   As a direct and proximate result of the Data Breach permitted to occur by Defendants, Plaintiff Eigner has suffered, and imminently will suffer, injury-in-fact and damages, including the unauthorized disclosure of the Private Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold

for such purposes and posted on the dark web for sale; Plaintiff Eigner has been and will be forced to expend considerable time and effort to monitor his accounts and credit files, changing his online account passwords, verifying the legitimacy of and researching the Data Breach, to protect himself from identity theft and fraudulent misuse of her Private Information, disclosed as a result of the Data Breach.

182.   In addition, because of the Data Breach, Plaintiff Eigner also suffered diminution in the value of his Private Information, a form of intangible property that he entrusted to Defendants, for the sole purpose of obtaining medical services.

183.   Furthermore, the Data Breach has caused Plaintiff Eigner significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Private Information.

184.   He fears for his personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of his Private Information. He is experiencing feelings of anxiety and stress because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

185.   Plaintiff Eigner was highly disturbed by the Data Breach's nature and the thought of cybercriminals accessing his highly sensitive Private Information and the harm caused by the Data Breach.

186.   Since the Data Breach occurred, Plaintiff Eigner has experienced a significant uptick in spam calls.

187.   As a result of the Data Breach, Plaintiff Eigner faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed.

188.   Furthermore, Plaintiff Eigner's sensitive Private Information remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff Eigner to the prospect of additional harm.

*Plaintiff Juan Abreu's Experience*

189.   Plaintiff Abreu is a current patient of Innovacare.

190.   Upon information and belief, one of Episource's health plan Clients, Innovacare, entrusted Episource with Plaintiff Abreu's Private Information as part of its business arrangement with Episource.

191.   As a condition of receiving services from Innovacare, Plaintiff Abreu was required to provide his Private Information to Innovacare, which it then provided to Episource, including but not limited to Plaintiff Abreu's name, date of birth, health insurance information, demographic information, Social Security number, and financial information.

192.   On June 6, 2025, Episource sent Plaintiff Abreu a Notice informing him that his Private Information was compromised in the Data Breach.

193.   Plaintiff Abreu typically takes measures to protect his Private Information and is very careful about sharing his Private Information. Plaintiff Abreu has never knowingly transmitted Private Information over the internet or other unsecured sources.

194.   Plaintiff Abreu stores any documents containing his Private Information in a safe and secure location, and he diligently chooses unique usernames for his passwords and online accounts.

195.   In entrusting his Private Information to Defendants, Plaintiff Abreu believed that, as part of the payments for services, Defendants would adequately safeguard that information. Had Plaintiff Abreu known that said Defendants did not utilize reasonable data security measures, and that Innovacare did not ensure that

third-party vendors utilized reasonable data security measures, Plaintiff Abreu would not have entrusted his Private Information to said Defendants or would have paid less for those treatments and services.

196.    As a direct and proximate result of the Data Breach permitted to occur by Defendants, Plaintiff Abreu has suffered, and imminently will suffer, injury-in-fact and damages, including the unauthorized disclosure of the Private Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale; Plaintiff Abreu has been and will be forced to expend considerable time and effort to monitor his accounts and credit files, changing his online account passwords, verifying the legitimacy of and researching the Data Breach, to protect himself from identity theft and fraudulent misuse of her Private Information, disclosed as a result of the Data Breach.

197.    In addition, because of the Data Breach, Plaintiff Abreu also suffered diminution in the value of his Private Information, a form of intangible property that he entrusted to Defendants, for the sole purpose of obtaining medical services.

198.    Furthermore, the Data Breach has caused Plaintiff Abreu significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Private Information.

199.    He fears for his personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of his Private Information. He is experiencing feelings of anxiety and stress because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

200.    Plaintiff Abreu was highly disturbed by the Data Breach's nature and the thought of cybercriminals accessing his highly sensitive Private Information and the harm caused by the Data Breach.

201.    As a result of the Data Breach, Plaintiff Abreu faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed.

202.    Furthermore, Plaintiff Abreu's sensitive Private Information remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff Abreu's to the prospect of additional harm.

*Plaintiff Marcus Henderson Experience*

203.    Plaintiff Henderson is a current policyholder of Humana.

204.    Upon information and belief, one of Episource's health plan Clients, Humana, entrusted Episource with Plaintiff Henderson's Private Information as part of its business arrangement with Episource.

205.    As a condition of receiving services from Humana, Plaintiff Henderson was required to provide his Private Information to Humana, which it then provided to Episource, including but not limited to Plaintiff Henderson's name, date of birth, health insurance information, demographic information, Social Security number, and financial information.

206.    Plaintiff Henderson typically takes measures to protect his Private Information and is very careful about sharing his Private Information. Plaintiff Henderson has never knowingly transmitted Private Information over the internet or other unsecured sources.

207.    Plaintiff Henderson stores any documents containing his Private Information in a safe and secure location, and he diligently chooses unique usernames for his passwords and online accounts.

208.   In entrusting his Private Information to Defendants, Plaintiff Henderson believed that, as part of the payments for services, Defendants would adequately safeguard that information.

209.   Had Plaintiff Henderson known that said Defendants did not utilize reasonable data security measures, and that Humana did not ensure that third-party vendors utilized reasonable data security measures, Plaintiff Henderson would not have entrusted his Private Information to said Defendants or would have paid less for those treatments and services.

210.   As a direct and proximate result of the Data Breach permitted to occur by Defendants, Plaintiff Henderson has suffered, and imminently will suffer, injury-in-fact and damages, including the unauthorized disclosure of the Private Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale; Plaintiff Henderson has been and will be forced to expend considerable time and effort to monitor his accounts and credit files, changing his online account passwords, verifying the legitimacy of and researching the Data Breach, to protect himself from identity theft and fraudulent misuse of her Private Information, disclosed as a result of the Data Breach.

211.   In addition, because of the Data Breach, Plaintiff Henderson also suffered diminution in the value of his Private Information, a form of intangible property that he entrusted to Defendants, for the sole purpose of obtaining medical services.

212.   Furthermore, the Data Breach has caused Plaintiff Henderson significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Private Information.

213.   He fears for his personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of his Private Information. He is experiencing feelings of anxiety and stress because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

214.   Plaintiff Henderson was highly disturbed by the Data Breach's nature and the thought of cybercriminals accessing his highly sensitive Private Information and the harm caused by the Data Breach.

215.   Since the Data Breach occurred, Plaintiff Henderson has experienced a significant uptick in spam calls.

216.   As a result of the Data Breach, Plaintiff Henderson faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed.

217. Furthermore, Plaintiff Henderson's sensitive Private Information remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff Henderson to the prospect of additional harm.

*Plaintiff Alicea Robinson's Experience*

218.   Plaintiff Robinson is a current patient of Archwell.

219.   Upon information and belief, one of Episource's health plan Clients, Archwell, entrusted Episource with Plaintiff Robinson's Private Information as part of its business arrangement with Episource.

220.   Plaintiff Robinson suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her medical accounts for fraud.

221.   Had Plaintiff Robinson known that said Defendants did not utilize reasonable data security measures, and that Archwell did not ensure that third-party

vendors utilized reasonable data security measures, Plaintiff Robinson would not have entrusted her Private Information to said Defendants or would have paid less for those treatments and services.

222.   Upon information and belief, on or around June 6, 2025, Episource sent Plaintiff Robinson a Notice informing her that her Private Information was compromised in the Data Breach.

223.   Plaintiff Robinson suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach.

224.   Plaintiff Robinson suffered actual injury in the form of damages to and diminution in the value of her personal, health, and financial information – a form of intangible property that Plaintiff Robinson entrusted to Defendants for the purpose of receiving healthcare services from Defendants and which was compromised in, and as a result of, the Data Breach.

225.   Plaintiff Robinson suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

226.   Plaintiff Robinson has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches. This interest is particularly acute, as Episource's systems have already been shown to be susceptible to compromise and are subject to further attack so long as Episource fails to undertake the necessary and appropriate security and training measures to the Private Information.

227.   As a result of the Data Breach, Plaintiff Robinson made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial and medical accounts for any indications of actual or attempted identity theft or fraud, and researching the credit

monitoring offered by Defendant. Plaintiff Robinson has spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

228.   As a result of the Data Breach, Plaintiff Robinson has suffered anxiety as a result of the release of her Private Information, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her PII and PHI for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Robinson is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

229.   Plaintiff Robinson also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her Private Information, a form of property that Defendants obtained from Plaintiff Robinson through her health plan; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

230.   As a result of the Data Breach, Plaintiff Robinson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

231.   Since the Data Breach occurred, Plaintiff Robinson has experienced a significant uptick in spam calls, text messages, and email. Furthermore, since the Data Breach occurred, Plaintiff Robinson experienced a fraudulent transaction on her bank account, that she reasonably believes was the result of this Data Breach.

232.   As a result of the Data Breach, Plaintiff Robinson faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed.

233. Furthermore, Plaintiff Robinson's sensitive Private Information remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff Robinson to the prospect of additional harm.

## V.   CLASS ACTION ALLEGATIONS

234. Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

235. Specifically, Plaintiffs propose the following Nationwide Class (referred to herein as the "Class"), subject to amendment as appropriate:

**Nationwide Class**

All individuals in the United States who had Private Information impacted as a result of the Data Breach, including all who were sent a notice of the Data Breach.

**California Subclass**

All residents in the State of California who had Private Information impacted as a result of the Data Breach, including all who were sent a notice of the Data Breach.

236. Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which they have controlling interests, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

237. Plaintiffs reserve the right to modify or amend the definitions of the proposed Class, as well as the addition of any subclasses, before the Court determines whether certification is appropriate.

238. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

239.  <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, the Class consists of 5,418,666 Class Members, whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

240.  <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.  Whether Defendants engaged in the conduct alleged herein;

b.  Whether Defendants' conduct violated the FTCA and/or HIPAA;

c.  When Defendants learned of the Data Breach;

d.  Whether Defendants' response to the Data Breach was adequate;

e.  Whether Defendants unlawfully lost or disclosed Plaintiffs' and Class Members' Private Information;

f.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g.  Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.  Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

i.  Whether Defendants owed a duty to Class Members to safeguard their Private Information;

j.      Whether Defendants breached their duty to Class Members to safeguard their Private Information;

k.      Whether hackers obtained Class Members' Private Information via the Data Breach;

l.      Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

m.      Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

n.      Whether Defendants knew or should have known their data security systems and monitoring processes were deficient;

o.      What damages Plaintiffs and Class Members suffered as a result of Defendants' misconduct;

p.      Whether Defendants' conduct was negligent;

q.      Whether Defendants were unjustly enriched;

r.      Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

s.      Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t.      Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

241.    _Typicality_. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiffs' claims are typical of those

of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Defendants. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

242. <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

243. <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

244. <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish

incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

245.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

246.   Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant Episource.

## CLAIMS FOR RELIEF

## COUNT I
### NEGLIGENCE
### (AGAINST EPISOURCE ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)

247.   Plaintiffs restate and reallege all of the allegations stated above as if fully set forth herein, and bring this claim solely against Episource.

248.   Episource knowingly collected, came into possession of, and maintained Plaintiffs and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

249.   Episource's duty also included a responsibility to implement processes by which it could detect and analyze a breach of its security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

250.    Episource knew or should have known of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security. Episource was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

251.    Episource owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to it. This included the following:

a.    To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in their possession;

b.    To protect the Private Information in its possession using reasonable and adequate security procedures and systems compliant with industry standards;

c.    To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d.    To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to HIPAA and the FTCA;

e.    To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f.    To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

252.    Episource had a duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as

interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

253. Episource's duty also arose because it is bound by industry standards to protect the confidential Private Information entrusted to it.

254. Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Episource, and Episource owed them a duty of care to not subject them to an unreasonable risk of harm.

255. Episource, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs and Class Members' Private Information within its possession.

256. Episource, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

257. Episource, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

258. Episource breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Episource include, but are not limited to, the following:

> a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.   Failing to adequately monitor the security of its networks and systems;

c.   Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d.   Allowing unauthorized access to Class Members' Private Information;

e.   Failing to comply with the FTCA;

f.   Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g.   Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

259.   Episource acted with reckless disregard for the rights of Plaintiffs and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiffs and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

260.   Episource had a special relationship with Plaintiffs and Class Members. Plaintiffs and Class Members' willingness to entrust Episource with their Private Information was predicated on the understanding that Episource would take adequate security precautions to protect such Information from unauthorized access and theft.

261.   Episource's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

262.    As a result of Episource's ongoing failure to notify Plaintiffs and Class Members regarding exactly what Private Information has been compromised, Plaintiffs and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

263.    Episource's breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

264.    As a result of Episource's negligence and resulting breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

265.    Episource also had independent duties under state laws that required it to reasonably safeguard Plaintiffs and Class Members' Private Information and promptly notify them about the Data Breach.

266.    As a direct and proximate result of Episource's negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

267.    The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

268.    Additionally, pursuant to Section 5 of the FTCA, Episource had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and Class Members.

269.    Likewise, pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., Episource had a duty to implement reasonable safeguards to protect Plaintiffs and Class Members' Private Information. Specifically, pursuant to HIPAA, Episource had a duty to render the electronic PHI it maintained unusable, unreadable, or

indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

270.    Episource breached its duties to Plaintiffs and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs and Class Members' Private Information.

271.    Specifically, Episource breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

272.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Episource's duty in this regard.

273.    Episource also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

274.    It was reasonably foreseeable, particularly given the growing number of data breaches leading to the compromise of Private Information, that the failure to reasonably protect and secure Plaintiffs and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party

gaining access to Episource's networks, databases, and computers that stored Plaintiffs and Class Members' unencrypted Private Information.

275.    Plaintiffs and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect.

276.    Plaintiffs and Class Members' Private Information constitutes personal property that was stolen due to Episource's negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

277.    As a direct and proximate result of Episource's negligence, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

278.    As a direct and proximate result of Episource's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

279.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Episource to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT II**
**NEGLIGENCE**
**(AGAINST THE CLIENT DEFENDANTS ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)**

280.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, and bring this claim against Careplus, SCAN,

Molina, Innovacare, Humana, Archwell, and Blue Shield (the "Defendants" for purposes of this Count).

281.   Defendants engaged Episource for medical coding and risk adjustment services and shared their customers' and patients' – *i.e.*, Plaintiffs' and Class Members' – non-public Private Information with Episource.

282.   Defendants had full knowledge of the sensitivity of the Private Information at issue, and the types of harm that Plaintiffs and Class Members could and would suffer the Private Information was ever wrongfully disclosed.

283.   By assuming the responsibility to collect and store this data, Defendants had duties of care to Plaintiffs and Class Members to use reasonable means to secure and to prevent disclosure of the Private Information entrusted to it, and to safeguard it from theft.

284.   Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

285.   Defendants also had a duty Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq.*, to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

286.   Specifically, pursuant to HIPAA, Defendants had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

287.    Defendants breached their duties to Plaintiffs and Class Members under the FTCA and HIPAA by not complying with industry standards and other requirements discussed herein, and by failing to provide fair, reasonable, or adequate computer systems and data security monitoring practices that were adequate to safeguard Plaintiffs' and Class Members' Private Information.

288.    Defendants owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and those belonging to their vendors, adequately protected the Private Information.

289.    Defendants' duty to use reasonable security measures arose as a result of the special relationship that existed between them, on the one hand, and Plaintiffs and Class Members, on the other hand. That special relationship arose because Plaintiffs and the Class entrusted Defendants with their confidential Private Information, a necessary part of receiving services from Defendants.

290.    Defendants also had a duty to exercise appropriate clearinghouse practices to remove former customer and patient Private Information they were no longer required to retain pursuant to regulations.

291.    Moreover, Defendants had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach, which they failed to do.

292.    Defendants had, and continue to have, duties to adequately disclose that Plaintiffs' and Class Members' Private Information within Episource's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

293.    Defendants breached their duties, pursuant to the FTCA, HIPAA, and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information with which they were entrusted. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

      a.    Failing to adequately vet, audit, monitor, or ensure the integrity of vendor data security practices;

      b.    Allowing unauthorized access to Class Members' Private Information;

      c.    Failing to keep Class Members' Private Information in encrypted format;

      d.    Failing to remove former customers' Private Information that was no longer required to be retained pursuant to regulations; and

      e.    Failing to timely and adequately notify Class Members about the Data Breach and its scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

294.    Defendants' conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class if such Information was not protected.

295.    Plaintiffs and Class Members were within the class of persons the provisions of the FTCA and HIPAA were intended to protect, and the type of harm that resulted from the Data Breach was the type of harm they were intended to guard against.

296.  A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Episource's inadequate security practices.

297.  It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large corporations.

298.  Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if the Private Information was wrongfully disclosed.

299.  Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the Private Information and providing sensitive data to vendors who do not adequately protect the data, the critical importance of providing adequate security of that data, and the necessity for encrypting the data stored on their systems.

300.  It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information, instead placing it in the hands of a vendor that does not adequately safeguard sensitive data, would result in one or more types of injuries to Class Members.

301.  Plaintiffs and the Class had no ability to protect their Private Information that was in, and possibly remains in, Episource's possession, and which Defendants handed over to Episource.

302.  Defendants were in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach, including through properly vetting their vendors to ensure such vendors adequately protect Private Information.

303.   But for Defendants' wrongful and negligent breaches of duties owed to Plaintiffs and the Class, the Private Information of Plaintiffs and the Class would not have been compromised.

304.   There is a close causal connection between Defendants' failure to ensure the protection of Plaintiffs' and Class Members' Private Information, and the harm or risk of imminent harm suffered by Plaintiffs and the Class. Plaintiffs' and Class Members' Private Information was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in ensuring that Private Information is adequately safeguarded.

305.   As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised Private Information; (ii) invasion of privacy; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' (including Episource's) possession and is subject to further unauthorized disclosures so long as Defendants and Episource fail to undertake appropriate and adequate measures to protect the PII.

306.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

307.   Plaintiffs and class members are also entitled to injunctive relief requiring Defendants to: (i) strengthen their data security systems and monitoring procedures; (ii) evaluate, audit, and improve their processes for vetting third-party

vendors and the selection processes for vendors to which they provide sensitive data; (iii) submit to future annual audits of those systems and monitoring procedures; and (iv) continue to provide adequate credit monitoring to all class members.

## COUNT III
### BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
### (AGAINST EPISOURCE ON BEHALF OF PLAINTIFFS
### AND THE NATIONWIDE CLASS)

308.  Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, and bring this claim solely against Episource.

309.   Episource entered into contracts, written or implied, with its Clients to perform services that include, but are not limited to, providing medical coding and risk adjustment services. Upon information and belief, these contracts are virtually identical between and among Episource and its Clients around the country whose customers and patients, including Plaintiffs and Class Members, were affected by the Data Breach.

310.   In exchange, Episource agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiffs and the Class.

311.   These contracts were made expressly for the benefit of Plaintiffs and the Class, as Plaintiffs and Class Members were the intended third-party beneficiaries of the contracts entered into between Episource and its Clients. Defendant Episource knew that if it were to breach these contracts with its Clients, its Clients' policyholders and/or patients—Plaintiffs and Class Members—would be harmed.

312.   Episource breached the contracts it entered into with its Clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiffs Private Information from unauthorized disclosure to third parties, and (iii) promptly

and adequately detecting the Data Breach and notifying Plaintiffs and Class Members thereof.

313.    Plaintiffs and the Class were harmed by Episource's breach of its contracts with its Clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

314.    Plaintiffs and Class Members are also entitled to their costs and attorney's fees incurred in this action.

### COUNT IV
### BREACH OF IMPLIED CONTRACT
### (AGAINST THE CLIENT DEFENDANTS ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)

315.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, and bring this claim against Careplus, SCAN, Molina, Innovacare, Humana, Archwell, and Blue Shield (the "Defendants" for purposes of this Count).

316.    Plaintiffs and Class Members were required to deliver their Private Information to Defendants as part of the process of obtaining insurance products or services provided by Defendants. Plaintiffs and Class Members paid money to Defendants in exchange for products or services and would not have paid for Defendants' products or services, or would have paid less for them, had they known that Defendants' data security practices were substandard.

317.    Defendants solicited, offered, and invited Class Members to provide their Private Information as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their Private Information to Defendants as part of their express contracts for insurance services.

318.    Defendants accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members.

319.   Plaintiffs and the Class entrusted their Private Information to Defendants. In so doing, Plaintiffs and the Class entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

320.   In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations (including FTCA and HIPAA) and were consistent with industry standards.

321.   Implicit in the agreement between Plaintiffs and Class Members and Defendants to provide Private Information was Defendants' obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

322.   The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendants, on the other, is demonstrated by their conduct and course of dealing.

323.   On information and belief, at all relevant times Defendants promulgated, adopted, and implemented written privacy policies whereby they expressly promised Plaintiffs and Class Members that they would only disclose

Private Information under certain circumstances, none of which relate to the Data Breach.

324.    On information and belief, Defendants further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' Private Information would remain protected.

325.    Plaintiffs and Class Members paid money to Defendants and entrusted their inherently valuable Private Information to them with the reasonable belief and expectation that Defendants would use part of the profits resulting therefrom to obtain and implement adequate data security, including costs required to adequately monitor their vendors. Defendants failed to do so.

326.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendants in the absence of the implied contract between them and Defendants to keep their Private Information reasonably secure.

327.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendants in the absence of their implied promise to monitor their computer systems and networks and vendors, including Episource, to ensure that reasonable data security measures were in place to protect the Private Information from compromise.

328.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

329.    Defendants breached the implied contracts they made with Plaintiffs and the Class by failing to safeguard and protect their Private Information, by failing to delete (or require deletion of) Plaintiffs and Class Member's Private Information once the relationship ended, and by failing to provide accurate notice to them that their Private Information was compromised as a result of the Data Breach.

330.   Every contract has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

331.   Defendants breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices, including vendor-monitoring practices, necessary to safeguard the Private Information, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members, and continued acceptance of Private Information and storage of other personal information after Defendants knew, or should have known, of the security vulnerabilities of the data security practices, procedures, and protocols that were exploited in the Data Breach.

332.   As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiffs and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) dissemination of the compromised Private Information on the dark web; (viii) experiencing an increase in spam calls, texts, and/or emails; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

333.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

334.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT V**
**UNJUST ENRICHMENT**
**(AGAINST EPISOURCE ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)**

335.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, and bring this claim solely against Episource.

336.    This Count is pleaded in the alternative to Count IV above.

337.    Plaintiffs and Class Members conferred a benefit on Episource by indirectly providing their Private Information to Episource, through Episource's Clients.

338.    Upon information and belief, Episource funds its data security measures entirely from its general revenue.

339.    As such, a portion of the payments made by Plaintiffs and Class Members indirectly to Episource (through payments made to Episource's Clients) is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Episource.

340.    Episource retained the benefits of its unlawful conduct, including the amounts of payment received indirectly from Plaintiffs and Class Members, which should have been used for adequate cybersecurity practices that it failed to provide.

341.    Episource knew that Plaintiffs and Class Members conferred a benefit upon it, which Episource accepted. Episource profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiffs and Class Members' Private Information and prevented the Data Breach.

342.    If Plaintiffs and Class Members had known that Episource had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Episource.

343.    Due to Episource's conduct alleged herein, it would be unjust and inequitable under the circumstances for Episource to be permitted to retain the benefit of its wrongful conduct.

344.    As a direct and proximate result of Episource's conduct, Plaintiffs and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Episource's possession and is subject to further unauthorized disclosures so long as Episource fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and

(vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

345.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Episource and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Episource from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

346.    Plaintiffs and Class Members may not have an adequate remedy at law against Episource, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT VI**
**UNJUST ENRICHMENT**
**(AGAINST THE CLIENT DEFENDANTS ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)**

347.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, and bring this claim against Careplus, SCAN, Molina, Innovacare, Humana, Archwell, and Blue Shield (the "Defendants" for purposes of this Count).

348.    This Count is pleaded in the alternative to Count IV above.

349.    Plaintiffs and Class Members conferred a monetary benefit on Defendants. Specifically, they paid for products or services and, in so doing, also provided them with their highly valuable Private Information. In exchange, Plaintiffs and Class Members should have received from Defendants the products or services that were the subject of the transaction, as well as adequate data security necessary to safeguard their Private Information.

350.    Defendants knew that Plaintiffs and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendants profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes.

351.    Defendants failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

352.    Defendants acquired the Private Information through inequitable record retention as they failed to investigate and/or disclose the inadequate data security practices previously alleged.

353.    If Plaintiffs and Class Members had known that Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would not have entrusted their Private Information with Defendants nor obtained products or services from them.

354.    Plaintiffs and Class Members have no adequate remedy at law.

355.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendants instead calculated to increase their own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to their own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite security and the safety of their Private Information.

356.   Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

357.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) some Plaintiffs' Private Information being disseminated on the dark web; (viii) experiencing an increase in spam calls, texts, and/or emails; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

358.   Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

359.   Because Plaintiffs and Class Members do not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT VII**
**DECLARATORY JUDGMENT**
**(AGAINST ALL DEFENDANTS ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS)**

360. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

361. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described in this Complaint.

362. Defendants owe a duty of care to Plaintiffs and Class Members, which required them to adequately secure Plaintiffs and Class Members' Private Information.

363. Defendants still possess Private Information regarding Plaintiffs and Class Members.

364. Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information, and the risk remains that further compromises of their Private Information will occur in the future.

365. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

  a. Defendants owe a legal duty to secure individuals' Private Information and to timely notify them of a data breach under the common law, HIPAA, and the FTCA;

  b. Defendants' existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to

72

provide reasonable security procedures and practices that are appropriate to protect individuals' Private Information; and

c.  Defendants continue to breach this legal duty by failing to employ reasonable measures to secure individuals' Private Information.

366.   This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect patient and customer Private Information in their possession, including the following:

a.  Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b.  Order that, to comply with Defendants' explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

i.  engaging (or, in the case of the Clients, requiring that their vendors engage) third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on the systems storing patient and/or policyholder PII and PHI on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

ii.  engaging (or, in the case of the Clients, requiring that their vendors engage) third-party security auditors and internal personnel to run automated security monitoring;

iii.    auditing, testing, and training security personnel regarding any new or modified procedures;

iv.    segmenting their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

v.    conducting regular database scanning and security checks;

vi.    routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

367.   If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach by Defendants. The risk of another such breach is real, immediate, and substantial. If another breach impacts Defendants, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

368.   The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiffs will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

369.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Episource, thus preventing future injury to Plaintiffs, Class Members, and others whose Private Information would be further compromised.

## **COUNT VIII**

## CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### (AGAINST ALL DEFENDANTS ON BEHALF OF PLAINTIFFS AND THE CALIFORNIA SUBCLASS)

370.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

371.    Defendants are "persons" as defined by Cal. Bus. & Prof. Code § 17201.

372.    Defendants violated Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

373.    Defendants' "unfair" acts and practices include:

a.    Defendants failed to implement and maintain reasonable security measures to protect Plaintiffs and Subclass Members' Private Information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach;

b.    Defendants failed to identify foreseeable security risks, remediate identified security risks, and sufficiently improve security following previous cybersecurity incidents, as described herein. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiffs and Subclass Members, whose Private Information has been compromised;

374.    Defendants' failure to implement and maintain reasonable security measures also was contrary to legislatively-declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act, 15 U.S.C. § 45, California's Consumer Records Act, Cal. Civ. Code § 1798.81.5, and California's Consumer Privacy Act, Cal. Civ. Code § 1798.100;

375.  Defendants failed to implement and maintain reasonable security measures to protect Plaintiffs and Subclass Members' Private Information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach.

376.  Defendants failed to identify foreseeable security risks, remediate identified security risks, and sufficiently improve security following previous cybersecurity incidents, as described herein. This conduct, with little if any utility, is unfair when weighed against the harm to Plaintiffs and Subclass Members, whose Private Information has been compromised.

377.  Defendants' failure to implement and maintain reasonable security measures also was contrary to legislatively declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTCA, 15 U.S.C. § 45, California's Consumer Records Act, Cal. Civ. Code § 1798.81.5, and California's Consumer Privacy Act, Cal. Civ. Code § 1798.100.

378.  Defendants' failure to implement and maintain reasonable security measures also resulted in substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not have known Defendants' inadequate security, consumers could not have reasonably avoided the harms that Defendants caused.

379.  Defendants engaged in unlawful business practices by violating Cal. Civ. Code § 1798.82.

380.  Defendants have engaged in "unlawful" business practices by violating multiple laws, including California's Consumer Records Act, Cal. Civ. Code §§

1798.81.5 (requiring reasonable data security measures) and 1798.82 (requiring timely breach notification), the FTCA, 15 U.S.C. § 45, and California common law.

381.   Defendants' unlawful, unfair, and deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs and Class Members' Private Information, which was a direct and proximate cause of the Data Breach.

b. Failing to identify and remediate foreseeable security and privacy risks and sufficiently improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach.

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and Class Members Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach.

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs and Class Members' Private Information, including by implementing and maintaining reasonable security measures.

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and Class Members' Private Information including duties imposed by the FTCA, 15 U.S.C. § 45; and

f. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs and Class Members Private Information, including duties imposed by the FTCA, 15 U.S.C. § 45, California's Consumer Privacy Act, Cal. Civ. Code § 1798.100,

California's Consumer Records Act, Cal. Civ. Code § 1798.80, et seq., and § 1798.81.5, which was a direct and proximate cause of the Data Breach.

382.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of individuals' Private Information.

383.    As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent acts and practices, Plaintiffs and Class Members were injured and suffered monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Defendants' services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Data Breach.

384.    Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair and unlawful business practices or use of their Private Information; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT IX
## CALIFORNIA CONSUMER RECORDS ACT
### Cal. Civ. Code §§ 1798.80, *et seq.*
### (AGAINST ALL DEFENDANTS ON BEHALF OF PLAINTIFFS AND THE CALIFORNIA SUBCLASS)

385.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

386.    "[T]o ensure that personal information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which

requires that any business that "owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information [PII] from unauthorized access, destruction, use, modification, or disclosure."

387.  Defendants are businesses that own, maintain, and license personal information (or "PII"), within the meaning of Cal. Civ. Code §§ 1798.80(a) and 1798.81.5(b), about Plaintiffs and Class Members.

388.  Businesses that own or license computerized data that includes PII are required to notify California residents when their PII has been acquired (or is reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Among other requirements, the security breach notification must include "the types of personal information [PII] that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

389.  Defendants are businesses that own or license computerized data that includes "personal information" [PII] as defined by Cal. Civ. Code § 1798.80.

390.  Plaintiffs and Class Members' PII includes "personal information" as covered by Cal. Civ. Code § 1798.82.

391.  Because Defendants reasonably believed that Plaintiffs and Class Members' PII was acquired by unauthorized persons during the Data Breach, Defendants had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Cal. Civ. Code § 1798.82.

392.  Defendants failed to fully disclose material information about the Data Breach in a timely manner.

393.    By failing to disclose the Data Breach in a timely manner, Defendants violated Cal. Civ. Code § 1798.82.

394.    As a direct and proximate result of Defendants' violations of the Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiffs and Class Members suffered damages, as described above.

395.    Plaintiffs and the Class Members seek relief under Cal. Civ. Code § 1798.84, including actual damages and injunctive relief.

396.    Plaintiffs and the Class Members were injured and have suffered damages, as described above, from Defendants' illegal and unauthorized disclosure and negligent release of their Private Information in violation of Cal. Civ. Code §§56.10 and 56.101, and therefore seek relief under Civ. Code §§ 56.35 and 56.36, which allows for actual damages, nominal statutory damages of $1,000, punitive damages of $3,000, injunctive relief, and attorneys' fees, expenses and costs.

## COUNT X
### CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT
### Cal. Civ. Code §§ 56 *et seq.*
### (AGAINST ALL DEFENDANTS ON BEHALF OF PLAINTIFFS AND THE CALIFORNIA SUBCLASS)

397.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

398.    Plaintiffs are "patients" as defined in Cal. Civ. Code § 56.05(m), and Defendants are "provider[s] of health care," as defined in Cal. Civ. Code § 56.06; thus, Defendants are subject to the requirements of the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56.10(a), (d) and (e), 56.36(b), 56.101(a) and (b).

399.    At all relevant times, Defendants were health care providers because they had the "purpose of maintaining medical information to make the information available to the individual or to a provider of health care at the request of the

individual or a provider of health care, for purposes of allowing the individual to manager his or her information, or for the diagnosis or treatment of the individual."

400.   As a provider of health care or a contractor, Defendants are required by the CMIA to ensure that medical information regarding patients is not disclosed or disseminated or released without patient's authorization, and to protect and preserve the confidentiality of the medical information regarding a patient, under Civil Code §§ 56.06, 56.10, 56.13, 56.20, 56.245, 56.26, 56.35, 56.36, and 56.101.

401.   As a provider of health care or a contractor, Defendants are required by the CMIA not to disclose medical information regarding a patient without first obtaining an authorization under Civil Code §§ 56.06, 56.10, 56.13, 56.20, 56.245, 56.26, 56.35, and 56.104.

402.   Defendants are persons licensed under California under California's Business and Professions Code, Division 2. See Cal. Bus. Prof. Code §§ 4000 *et seq*.

403.   Plaintiffs and California Subclass Members are "patients" as defined in Cal. Civ. Code § 56.05(m) ("'Patient' means a natural person, whether or not still living, who received health care services from a provider of health care and to whom medical information pertains."). Furthermore, Plaintiffs and California Subclass Members, as patients and policyholders of Defendants, had their individually identifiable "medical information," within the meaning of Cal. Civ. Code § 56.05(j), created, maintained, preserved, and stored on Defendants' computer network, and were patients on or before the date of the Data Breach.

404.   Defendants disclosed "medical information," as defined in CMIA, Cal. Civ. Code 196. § 56.05(j), to unauthorized persons without first obtaining consent, in violation of Cal. Civ. Code § 56.10(a). The disclosure of information to unauthorized individuals in the Data Breach resulted from the affirmative actions of Defendants' employees, which allowed the hacker to see and obtain Plaintiffs and

California Subclass Members' medical information.

405.  Defendants negligently created, maintained, preserved, stored, and then exposed Plaintiffs and California Subclass Members' individually identifiable "medical information," within the meaning of Cal. Civ. Code § 56.05(j), including Plaintiffs and California Subclass Members' names, cities, states, zip codes, emails, telephone numbers, dates of birth, gender, patient service dates, patient service locations, and next appointment dates, that alone or in combination with other publicly available information, reveals their identities. Specifically, Defendants knowingly allowed and affirmatively acted in a manner that allowed unauthorized parties to access and actually view Plaintiffs and California Subclass Members' confidential Private Information.

406.  Defendants' negligence resulted in the release of individually identifiable medical information pertaining to Plaintiffs and California Subclass Members to unauthorized persons and the breach of the confidentiality of that information. Defendants' negligent failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiffs and California Subclass Members' medical information in a manner that preserved the confidentiality of the information contained therein, in violation of Cal. Civ. Code §§ 56.06 and 56.101(a).

407.  Defendants also violated Sections 56.06 and 56.101 of the CMIA, which prohibits the negligent creation, maintenance, preservation, storage, abandonment, destruction or disposal of confidential personal medical information.

408.  Plaintiffs and California Subclass Members' medical information was accessed, removed, and actually viewed by a hacker and other unauthorized parties during and following the Data Breach.

409.  Plaintiffs and California Subclass Members' medical information that was the subject of the Data Breach included "electronic medical records" or

"electronic health records" as referenced by Civil Code § 56.101(c) and defined by 42 U.S.C. § 17921(5).

410.   Defendants failed to protect and preserve the integrity of electronic medical information in violation of Cal. Civ. Code § 56.101(b)(1)(A). As a direct and proximate result of Defendants' above-noted wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, and violation of the CMIA, Plaintiffs and California Subclass Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia, (a) present, imminent, immediate and continuing increased risk of identity theft, identity fraud and medical fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (b) invasion of privacy, (c) breach of the confidentiality of the PHI, (d) statutory damages under the CMIA, (e) deprivation of the value of their PHI, for which there is well-established national and international markets, and/or, (f) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

411.   As a direct and proximate result of Defendants' wrongful actions, inaction, omission, and want of ordinary care that directly and proximately caused the release of Plaintiffs and California Subclass Members' Private Information, Plaintiffs and California Subclass Members' personal medical information was viewed by, released to, and disclosed to third parties without Plaintiffs and California Subclass Members' written authorization.

412.   Defendants' negligent failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiffs and California Subclass Members' medical information in a manner that preserved the confidentiality of the information contained therein violated the CMIA.

413.    Plaintiffs and California Subclass Members were injured and have suffered damages, as described above, from Defendants' illegal and unauthorized disclosure and negligent release of their medical information in violation of Cal. Civ. Code §§ 56.10 and 56.101, and therefore seek relief under Civ. Code §§ 56.35 and 56.36, which allows for actual damages, nominal statutory damages of $1,000, punitive damages of $3,000, injunctive relief, and attorneys' fees, expenses and costs

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above, seek the following relief:

a.    An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b.    Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.    An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.    An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e.    An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.  A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.  An award of such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all triable issues.

DATED:  June 26, 2025.         Respectfully submitted,


/s/  *Kristen Lake Cardoso*

Kristen Lake Cardoso (SBN 338762)
Jeff Ostrow*
**KOPELOWITZ OSTROW P.A.**
One West Law Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: 954-332-4200
Fax :954-525-4300
cardoso@kolawyers.com
ostrow@kolawyers.com

Stephen G. Larson (SBN 145225)
Daniel R. Lahana (SBN 305664)
**LARSON LLP**
555 S. Flower Street, 30th Floor
Los Angeles, CA 90071
Tel: 213-436-4888
Fax: 213-623-2000
slarson@larsonllp.com
dlahana@larsonllp.com

Tina Wolfson (SBN 174806)
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Tel: 310-474-9111
Fax: 310-474-8585
twolfson@ahdootwolfson.com

John J. Nelson (SBN 317598)
Gary Klinger*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Tel: 858-209-6941
Fax: 865-522-0049
jnelson@milberg.com

*Counsel for Plaintiffs and the Putative Classes*

*Admitted or motion pro hac vice pending or to be-filed