Stephen G. Larson (SBN 145225)
**LARSON LLP**
555 S. Flower Street, 30th Floor
Los Angeles, CA 90071
Tel: (213) 436-4864
*slarson@larsonllp.com*

Daniel S. Robinson (SBN 244245)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
Tel: (949) 720-1288;
Fax: (949) 720-1292
*drobinson@robinsonfirm.com*

Tina Wolfson (SBN 174806)
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
*twolfson@ahdootwolfson.com*

Daniel L. Warshaw (SBN 185365)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Tel: (818) 788-8300
*dwarshaw@pwfirm.com*

*Interim Co-Lead Counsel and Liaison
Counsel for Plaintiffs and the Putative
Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Episource LLC Data Breach Litigation*<br><br>This Document Relates To: All Actions | Case No.: 2:25-cv-05330-SB-MBK<br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Angela Jo Carter, Anthony Tention, Chonita Gantt, Farreece Grimmett, Frederick Lower, Jose Contreras, Kathleen Desautels, Lesley Wynne Mojaddedi, Maurice Desautels, Melissa Griffith, Michael Alcorn, Nesrin Haddad, Patricia Giles, Paul Lewow, Phoebe Black, Ramon Cotto Rosa, Steve Altes, Larry Thomas, Tyrone Holifield, Wanda Hernandez, William Glenn Johnson, Stephen Dollar, and Stephen Wharton (collectively, "Plaintiffs"), individually and on behalf of the Class defined below of similarly situated persons, allege the following against

Defendant Episource, LLC ("Episource") and Client Defendants Molina Healthcare of California ("Molina"), InnovaCare, Inc. ("InnovaCare"), Humana, Inc. ("Humana"), Archwell Health MSO, LLC ("Archwell"), Blue Shield of California Life & Health Insurance Company ("Blue Shield"), Blue Cross and Blue Shield of Arizona, Inc. ("Blue Cross"), Devoted Health, Inc. ("Devoted"), WellCare Health Plans, Inc. ("WellCare"), The Health Plan of West Virginia ("HPWV"), VNS Choice d/b/a VNS Health Plans ("VNS"), Aetna Inc. ("Aetna"), Triple-S Advantage, Inc. ("Triple-S"), and Elevance Health, Inc. ("Elevance") (collectively, "Client Defendants") (Episource and Client Defendants are collectively referred to as "Defendants"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by counsel as to all other matters:

## **SUMMARY OF THE CASE**

1. This class action arises from Defendants' failure to secure the personally identifiable information ("PII") [1] and protected health information ("PHI") [2] (collectively, "Private Information") of Plaintiffs and putative Class Members, where

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d, *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited September 26, 2025).

Plaintiffs provided their Private Information indirectly to Episource as a condition of receiving care from their medical providers and/or insurance coverage.

2.     Episource "is a leading provider of risk adjustment services, software, and solutions for health plans and provider groups. As an integrated platform, Episource empowers Commercial, Medicare, and Medicaid payers and providers with end-to-end risk adjustment solutions, including risk adjustment analytics, medical record retrieval, medical chart coding, and encounter submissions."[3] In the regular course of its for-profit business, Episource collects patient information from healthcare providers and is fully aware of the sensitivity of the information that it collects and its obligation to maintain that information as confidential and safe from unauthorized access.

3.     On information and belief, Client Defendants are managed care companies, health insurers, health plans, and/or healthcare providers who contracted with Episource for risk adjustment, coding, auditing, or other related services, which required Client Defendants to entrust Episource with PII and PHI of Client Defendants' members or patients, including Plaintiffs and Class Members.

4.     On or about February 6, 2025, Episource found suspicious activity on its computer network and determined that between January 27 and February 6, 2025, an unauthorized actor accessed, viewed, copied, downloaded, and acquired data from its systems containing Plaintiffs and Class Members' Private Information ("Data Breach"), which Episource obtained from the Client Defendants.[4]

5.     The Private Information that the intruders targeted, accessed, viewed, and exfiltrated from Defendants' systems included Plaintiffs' and Class Members' names, addresses, phone numbers, dates of birth, emails, Social Security numbers, health insurance data (such as health plans/policies, insurance companies, member/group ID numbers, and Medicaid-Medicare-government payor ID numbers), and health data

---

[3]     https://rise.episource.com/webinar-unveiling-hidden-health-influencers-through-advanced-analytics (last visited September 26, 2025).

[4] *See Notice of Data Breach*, https://response.idx.us/episource/ (last visited September 26, 2025).

(such as medical record numbers, doctors, diagnoses, medicines, tests results, images, care, and treatment).[5]

6.     Beginning on or about June 6, 2025, Defendants began sending letters entitled "Notice of Data Breach" (the "Notice Letters") to Plaintiffs and Class Members.

7.     Although Episoure provided insufficient information concerning the Data Breach in the Notice Letters, the Data Breach is consistent with a ransomware incident. Ransomware is a type of malicious software, or malware, which prevents a user from accessing their computer files, systems or networks, and demands a ransom for their return.[6] Additionally, the following are all indicators of a ransomware incidents:

     a.     Episoure responded by "shutting of systems." Shutdown is only warranted when ongoing damage (the encryption by ransomware actors) is occurring. All other forms of hacking require at most network disconnection.

     b.     The broad range of data extracted varied widely by individual and included images (which are typically not present in databases), indicating that the affected data were unstructured files and not a structured database.

     c.     Episoure referred to "affected files," which is not terminology used for database breaches.

8.     Based on information and belief, Episoure's forensic investigators affirmatively found indicators of compromise, which almost certainly included packed data for extraction in the form of large, compressed files, which likely will contain all of the extracted data.

//

---

[5] *See* Ex. A.

[6] In support of this conclusion, Sharp Healthcare characterized the Data Breach as a ransomware data breach in its notice to customers. *Episoure Data Breach: a notice to our patients*, https://www.sharp.com/episoure-data-breach (last visited September 26, 2025).

9.     Based on information and belief, the Data Breach occurred through a remote-access portal and credential stuffing of an employee using a compromised account name and password or spear phishing.

10.     Based on Episource's report to United States Department of Health and Human Services, about 5,418,866 individuals have been affected by the Data Breach.[7]

11.     Defendants could have prevented this Data Breach by implementing reasonable, expected, and industry standard data security measures. Instead, they disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to implement these measures to safeguard its current and former clients' customers' Private Information and by failing to take necessary steps to prevent unauthorized disclosure of that information. Defendants' woefully inadequate data security measures made the Data Breach a foreseeable, and even likely, consequence of their negligence.

12.     As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have suffered actual and present injuries, including but not limited to: (a) present, certainly impending, and continuing threats of identity theft crimes, fraud, scams, and other misuses of their Private Information; (b) diminution of value of their Private Information; (c) loss of benefit of the bargain (price premium damages); (d) loss of value of privacy and confidentiality of the stolen Private Information; (e) mitigation expenses and time spent responding to and remedying the effects of the Data Breach; (f) "out of pocket" costs incurred due to actual identity theft; (g) decreased credit scores; (h) anxiety, annoyance, and nuisance; and (i) continued risk to their Private Information, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

13.     Plaintiffs and Class Members would not have provided their valuable

---

[7] OCR Breach Portal, HHS, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited September 26, 2025).

1    Private Information had they known that Defendants would, *inter alia*, make their
2    Private Information Internet-accessible, not encrypt personal and sensitive data
3    elements, and not delete the Private Information they no longer had reason to maintain.

4        14.    Through this lawsuit, Plaintiffs seek to hold Defendants responsible for
5    the injuries they inflicted on Plaintiffs and Class Members due to their impermissibly
6    inadequate data security measures, and seek injunctive relief to ensure the
7    implementation of proper security measures to protect the Private Information that
8    remains in Defendants' possession.

9                        **JURISDICTION AND VENUE**

10       15.    The Court has subject matter jurisdiction over this action under the Class
11    Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5
12    million, exclusive of interest and costs. Upon information and belief, millions of
13    individuals had their Private Information compromised in the Data Breach, many of
14    whom, including several Plaintiffs, have different citizenship from Defendants. Thus,
15    minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

16       16.    This Court has personal jurisdiction over Defendant Episource because it
17    is incorporated in, maintains its principal place of business in, and/or regularly
18    conducts business in this District. The Court likewise has personal jurisdiction over the
19    Client Defendants because, by contracting with Episource, receiving services from
20    Episource, and directing Episource to process and store sensitive data within this
21    District, they purposefully availed themselves of the privilege of conducting activities
22    here and established sufficient minimum contacts with this District.

23       17.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a)(1) because
24    a substantial part of the events giving rise to this action occurred in this District.
25    Moreover, Episource is domiciled in this District, maintains Plaintiffs' and Class
26    Members' Private Information in this District, and has caused harm to Plaintiffs and
27    Class Members in this District.

28

CONSOLIDATED CLASS ACTION COMPLAINT

# PARTIES

## A.    Plaintiffs

18.    Plaintiff David Bartelt is, and at all relevant times has been, a resident and citizen of the State of Wisconsin where he intends to remain. Plaintiff Bartelt is a member of Molina and received medical insurance services from Molina. In exchange for these services, Plaintiff Bartelt provided his Private Information to Molina and his medical providers who Plaintiff Bartelt understands, in turn, provided that information to Episource. Indeed, prior to and at the time of receiving services from Molina, Plaintiff Bartelt reviewed and expressly relied on Privacy Policies and other documents containing statements that Molina would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Bartelt believed, at the time of receiving services from Molina, that they would maintain the privacy and security of his Private Information. Plaintiff Bartelt further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Bartelt a Notice Letter, notifying that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Bartelt's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Bartelt has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

19.    Plaintiff Angela Jo Carter is, and at all relevant times has been, a resident and citizen of the State of Texas where she intends to remain. Plaintiff Carter is a member of Humana and received medical insurance services from Humana. In exchange for these services, Plaintiff Carter provided her Private Information to her Humana and her medical providers, who Plaintiff Carter understands, in turn, provided

7

that information to Episource. Plaintiff Carter believed, at the time of receiving services from Humana, that they would maintain the privacy and security of her Private Information. Indeed, prior to and at the time of receiving services from Humana, Plaintiff Carter reviewed and expressly relied on Privacy Policies and other documents containing statements that Humana would protect the confidentiality of her Private Information, which includes any third parties like Episource who would receive her Private Information. Plaintiff Carter further believes she paid a premium to Defendants for their data security, and she would not have used Defendants' services or provided her Private Information to Defendants had she known that they would expose, or allow to be exposed, her Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Carter a Notice Letter, which indicated that her Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Carter's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Carter has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

20.    Plaintiff Anthony Tention is, and at all relevant times has been, a resident and citizen of the State of Florida where he intends to remain. Plaintiff Tention is a member of Devoted and received medical insurance services from Devoted. In exchange for these services, Plaintiff Tention provided his Private Information to Devoted and his medical providers, who Plaintiff Tention understands, in turn, provided that information to Episource. Plaintiff Tention believed, at the time of receiving services from Devoted, that they would maintain the privacy and security of his Private Information. Indeed, prior to and at the time of receiving services from Devoted, Plaintiff Tention reviewed and expressly relied on Privacy Policies and other documents containing statements that Devoted would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Tention further believes he paid a premium to

CONSOLIDATED CLASS ACTION COMPLAINT

Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Tention a Notice Letter, notifying that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Tention's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Tention has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

21.    Plaintiff Chonita Gantt is, and at all relevant times has been, a resident and citizen of the State of Missouri where she intends to remain. Plaintiff Gantt is a member of ArchWell and otherwise received medical services from ArchWell. In exchange for these services, Plaintiff Gantt provided her Private Information to ArchWell, and her medical providers who Plaintiff Gantt understands, in turn, provided that information to Episource. Plaintiff Gantt believed, at the time of receiving services from ArchWell, that they would maintain the privacy and security of her Private Information. Indeed, prior to and at the time of receiving services from ArchWell, Plaintiff Gantt reviewed and expressly relied on Privacy Policies and other documents containing statements that ArchWell would protect the confidentiality of her Private Information, which includes any third parties like Episource who would receive her Private Information. Plaintiff Gantt further believes she paid a premium to Defendants for their data security, and she would not have used Defendants' services or provided her Private Information to Defendants had she known that they would expose, or allow to be exposed, her Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Gantt a Notice Letter, which indicated that her Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Gantt's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Gantt has been injured

9

and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

22.    Plaintiff Farreece Grimmitt is, and at all relevant times has been, a resident and citizen of the State of Michigan where he intends to remain. Plaintiff Grimmitt is a member of Molina and otherwise received medical insurance services from Molina. In exchange for these services, Plaintiff Grimmitt provided his Private Information to Molina and/or his medical providers, who Plaintiff Grimmitt understands, in turn, provided that information to Episource. Plaintiff Grimmitt believed, at the time of receiving services from Molina, that they would maintain the privacy and security of his Private Information. Indeed, prior to and at the time of receiving services from Molina, Plaintiff Grimmitt reviewed and expressly relied on Privacy Policies and other documents containing statements that Molina would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Grimmitt further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Grimmitt a Notice Letter, which indicated that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Grimmitt's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Grimmitt has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

23.    Plaintiff Frederick Lower is, and at all relevant times has been, a resident and citizen of the State of Alabama where he intends to remain. Plaintiff Lower is a member of Molina and otherwise received medical insurance services from Molina. In exchange for these services, Plaintiff Lower provided his Private Information to Molina and/or his medical providers, who Plaintiff Lower understands, in turn,

1   provided that information to Episource. Plaintiff Lower believed, at the time of
2   receiving services from Molina that they would maintain the privacy and security of
3   his Private Information. Indeed, prior to and at the time of receiving services from
4   Molina, Plaintiff Lower reviewed and expressly relied on Privacy Policies and other
5   documents containing statements that Molina would protect the confidentiality of his
6   Private Information, which includes any third parties like Episource who would receive
7   his Private Information. Plaintiff Lower further believes he paid a premium to
8   Defendants for their data security, and he would not have used Defendants' services or
9   provided his Private Information to Defendants had he known that they would expose,
10  or allow to be exposed, his Private Information, making it available to unauthorized
11  parties. Defendants subsequently sent Plaintiff Lower a Notice Letter, which indicated
12  that his Private Information had been acquired by unauthorized parties during the Data
13  Breach. These unauthorized parties accessed and viewed Plaintiff Lower's Private
14  Information. As a result of the Data Breach and Defendants' actions, Plaintiff Lower
15  has been injured, has suffered financial losses, and is subject to a substantial risk for
16  further identity theft due to Defendants' Data Breach.

17       24.     Plaintiff Jose Contreras is, and at all relevant times has been, a resident
18  and citizen of the State of California where he intends to remain. Plaintiff Contreras is
19  a member of Blue Shield and received medical insurance services from Blue Shield. In
20  exchange for these services, Plaintiff Contreras provided his Private Information to
21  Blue Shield and his medical providers, who Plaintiff Contreras understands, in turn,
22  provided that information to Episource. Plaintiff Contreras believed, at the time of
23  receiving services from Blue Shield, that they would maintain the privacy and security
24  of his Private Information. Indeed, prior to and at the time of receiving services from
25  Blue Shield, Plaintiff Contreras reviewed and expressly relied on Privacy Policies and
26  other documents containing statements that Blue Shield would protect the
27  confidentiality of his Private Information, which includes any third parties like
28  Episource who would receive his Private Information. Plaintiff Contreras further

believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Contreras a Notice Letter, which indicated that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Contreras's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Contreras has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

25.    Plaintiff Kathleen Desautels is, and at all relevant times has been, a resident and citizen of the State of Arizona where she intends to remain. Based on information and belief, Plaintiff Kathleen Desautels is a member of Blue Cross and otherwise received medical insurance services from Blue Cross. In exchange for these services, Plaintiff Kathleen Desautels provided her Private Information to Blue Cross, and her medical providers, who Plaintiff Kathleen Desautels understands, in turn, provided that information to Episource. Plaintiff Kathleen Desautels believed, at the time of receiving services from Blue Cross, that they would maintain the privacy and security of her Private Information. Indeed, prior to and at the time of receiving services from Blue Cross, Plaintiff Kathleen Desautels reviewed and expressly relied on Privacy Policies and other documents containing statements that Blue Cross would protect the confidentiality of her Private Information, which includes any third parties like Episource who would receive her Private Information. Plaintiff Kathleen Desautels further believes she paid a premium to Defendants for their data security, and she would not have used Defendants' services or provided her Private Information to Defendants had she known that they would expose, or allow to be exposed, her Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Kathleen Desautels a Notice Letter, which indicated that her Private

CONSOLIDATED CLASS ACTION COMPLAINT

Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Kathleen Desautels' Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Kathleen Desautels has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

26.    Plaintiff Lesley Mojaddedi is, and at all relevant times has been, a resident and citizen of the State of Texas where she intends to remain. Based on information and belief, Plaintiff Mojaddedi was a member of WellCare and received medical insurance services from WellCare during the relevant time period. In exchange for these services, Plaintiff Mojaddedi provided her Private Information to WellCare, and her medical providers, who Plaintiff Mojaddedi understands, in turn, provided that information to Episource. Plaintiff Mojaddedi believed, at the time of receiving services from WellCare, that they would maintain the privacy and security of her Private Information. Indeed, prior to and at the time of receiving services from WellCare, Plaintiff Mojaddedi reviewed and expressly relied on Privacy Policies and other documents containing statements that WellCare would protect the confidentiality of her Private Information, which includes any third parties like Episource who would receive her Private Information. Plaintiff Mojaddedi further believes she paid a premium to Defendants for their data security, and she would not have used Defendants' services or provided her Private Information to Defendants had she known that they would expose, or allow to be exposed, her Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Mojaddedi a Notice Letter, notifying that her Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Mojaddedi's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Mojaddedi has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

27.    Plaintiff Joseph Andre Maurice Desautels ("Maurice Desautels") is, and
at all relevant times has been, a resident and citizen of the State of Arizona where he
intends to remain. Plaintiff Maurice Desautels is a patient and member of Blue Cross
and otherwise received medical insurance services from Blue Cross. In exchange for
these services, Plaintiff Maurice Desautels provided his Private Information to Blue
Cross, and his medical providers, who Plaintiff Maurice Desautels understands, in turn,
provided that information to Episource. Plaintiff Maurice Desautels believed, at the
time of receiving services from Blue Cross, that they would maintain the privacy and
security of his Private Information. Indeed, prior to and at the time of receiving services
from Blue Cross, Plaintiff Maurice Desautels reviewed and expressly relied on Privacy
Policies and other documents containing statements that Blue Cross would protect the
confidentiality of his Private Information, which includes any third parties like
Episource who would receive his Private Information. Plaintiff Maurice Desautels
further believes he paid a premium to Defendants for their data security, and he would
not have used Defendants' services or provided his Private Information to Defendants
had he known that they would expose, or allow to be exposed, his Private Information,
making it available to unauthorized parties. Episource subsequently sent Plaintiff
Maurice Desautels a Notice Letter, which indicated that his Private Information had
been acquired by unauthorized parties during the Data Breach. These unauthorized
parties accessed and viewed Plaintiff Maurice Desautels's Private Information. As a
result of the Data Breach and Defendants' actions, Plaintiff Maurice Desautels has been
injured, has suffered financial losses, and is subject to a substantial risk for further
identity theft due to Defendants' Data Breach.

28.    Plaintiff Melissa Griffith is, and at all relevant times has been, a resident
and citizen of the State of Ohio where she intends to remain. Plaintiff Griffith is a
member of HPWV and otherwise received medical insurance services from HPWV. In
exchange for these services, Plaintiff Griffith provided her Private Information to
HPWV and/or her medical providers, who Plaintiff Griffith understands, in turn,

CONSOLIDATED CLASS ACTION COMPLAINT

provided that information to Episource. Plaintiff Griffith believed, at the time of receiving services from HPWV, that they would maintain the privacy and security of her Private Information. Indeed, prior to and at the time of receiving services from HPWV, Plaintiff Griffith reviewed and expressly relied on Privacy Policies and other documents containing statements that HPWV would protect the confidentiality of her Private Information, which includes any third parties like Episource who would receive her Private Information. Plaintiff Griffith further believes she paid a premium to Defendants for their data security, and she would not have used Defendants' services or provided her Private Information to Defendants had she known that they would expose, or allow to be exposed, her Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Griffith a Notice Letter, which indicated that her Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Griffith's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Griffith has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

29.    Plaintiff Michael Alcorn is, and at all relevant times has been, a resident and citizen of the State of Illinois where he intends to remain. Plaintiff Alcorn is a member of Molina and otherwise received medical insurance services from Molina. In exchange for these services, Plaintiff Alcorn provided his Private Information to Molina and his medical providers who Plaintiff Alcorn understands, in turn, provided that information to Episource. Indeed, prior to and at the time of receiving services from Molina, Plaintiff Alcorn reviewed and expressly relied on Privacy Policies and other documents containing statements that Molina would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Alcorn believed, at the time of receiving services from Molina, that they would maintain the privacy and security of his Private Information. Plaintiff Alcorn further believes he paid a premium to Defendants for their

data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Alcorn a Notice Letter, notifying that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Alcorn's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Alcorn has been injured, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

30.    Plaintiff Nesrin Haddad is, and at all relevant times has been, a resident and citizen of the State of California where she intends to remain. Plaintiff Haddad is a member of Blue Shield and received medical insurance services from Blue Shield. In exchange for these services, Plaintiff Haddad provided her Private Information to Blue Sheild and her medical providers who Plaintiff Haddad understands, in turn, provided that information to Episource. Plaintiff Haddad believed, at the time of receiving services from Blue Shield, that they would maintain the privacy and security of her Private Information. Indeed, prior to and at the time of receiving services from Blue Shield, Plaintiff Haddad reviewed and expressly relied on Privacy Policies and other documents containing statements that Blue Shield would protect the confidentiality of her Private Information, which includes any third parties like Episource who would receive her Private Information. Plaintiff Haddad further believes she paid a premium to Defendants for their data security, and she would not have used Defendants' services or provided her Private Information to Defendants had she known that they would expose, or allow to be exposed, her Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Haddad a Notice Letter, notifying that her Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Haddad's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff

16

Haddad has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

31.    Plaintiff Patricia Giles is, and at all relevant times has been, a resident and citizen of the State of New York where she intends to remain. Plaintiff Giles was a member of VNS and otherwise received medical insurance services from VNS. In exchange for these services, Plaintiff Giles provided her Private Information to VNS and her medical providers who Plaintiff Giles understands, in turn, provided that information to Episource. Plaintiff Giles believed, at the time of receiving services from VNS, that they would maintain the privacy and security of her Private Information. Indeed, prior to and at the time of receiving services from VNS, Plaintiff Giles reviewed and expressly relied on Privacy Policies and other documents containing statements that VNS would protect the confidentiality of her Private Information, which includes any third parties like Episource who would receive her Private Information. Plaintiff Giles further believes she paid a premium to Defendants for their data security, and she would not have used Defendants' services or provided her Private Information to Defendants had she known that they would expose, or allow to be exposed, her Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Giles a Notice Letter, notifying that her Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Giles's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Giles has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

32.    Plaintiff Paul Lewow is, and at all relevant times has been, a resident and citizen of the State of California where he intends to remain. Plaintiff Lewow is a member of Blue Shield and otherwise received medical insurance services from Blue Shield. In exchange for these services, Plaintiff Lewow provided his Private Information to Blue Shield and/or his medical providers who Plaintiff Lewow

1  understands, in turn, provided that information to Episoure. Plaintiff Lewow believed,
2  at the time of receiving services from Blue Shield, that they would maintain the privacy
3  and security of his Private Information. Indeed, prior to and at the time of receiving
4  services from Blue Shield, Plaintiff Lewow reviewed and expressly relied on Privacy
5  Policies and other documents containing statements that Blue Shield would protect the
6  confidentiality of his Private Information, which includes any third parties like
7  Episoure who would receive his Private Information. Plaintiff Lewow further believes
8  he paid a premium to Defendants for their data security, and he would not have used
9  Defendants' services or provided his Private Information to Defendants had he known
10  that they would expose, or allow to be exposed, his Private Information, making it
11  available to unauthorized parties. Defendants subsequently sent Plaintiff Lewow a
12  Notice Letter, notifying that his Private Information had been acquired by unauthorized
13  parties during the Data Breach. These unauthorized parties accessed and viewed
14  Plaintiff Lewow's Private Information. As a result of the Data Breach and Defendants'
15  actions, Plaintiff Lewow has been injured, has suffered financial losses, and is subject
16  to a substantial risk for further identity theft due to Defendants' Data Breach.

17      33.    Plaintiff Phoebe Black is, and at all relevant times has been, a resident and
18  citizen of the State of North Carolina where she intends to remain. Plaintiff Black is a
19  member of Aetna and received medical insurance services from Aetna. In exchange
20  for these services, Plaintiff Black provided her Private Information to Aetna and her
21  medical providers who Plaintiff Black understands, in turn, provided that information
22  to Episoure. Plaintiff Black believed, at the time of receiving services from Aetna,
23  that they would maintain the privacy and security of her Private Information. Indeed,
24  prior to and at the time of receiving services from Aetna, Plaintiff Black reviewed and
25  expressly relied on Privacy Policies and other documents containing statements that
26  Aetna would protect the confidentiality of her Private Information, which includes any
27  third parties like Episoure who would receive her Private Information. Plaintiff Black
28  further believes she paid a premium to Defendants for their data security, and she

would not have used Defendants' services or provided her Private Information to Defendants had she known that they would expose, or allow to be exposed, her Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Black a Notice Letter, notifyingthat her Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Black's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Black has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

34.    Plaintiff Ramon Cotto Rosa is, and at all relevant times has been, a resident and citizen of Puerto Rico where he intends to remain. Plaintiff Cotto Rosa is a member of Triple-S and otherwise received medical insurance services from Triple-S. In exchange for these services, Plaintiff Cotto Rosa provided his Private Information to Triple-S and/or his medical providers who Plaintiff Cotto Rosa understands, in turn, provided that information to Episource. Plaintiff Cotto Rosa believed, at the time of receiving services from Triple-S, that they would maintain the privacy and security of his Private Information. Indeed, prior to and at the time of receiving services from Triple-S, Plaintiff Cotto Rosa reviewed and expressly relied on Privacy Policies and other documents containing statements that Triple-S would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Cotto Rosa further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Cotto Rosa a Notice Letter, which indicated that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Cotto Rosa's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Cotto Rosa has been injured, has suffered financial

losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

35.    Plaintiff Steve Altes is, and at all relevant times has been, a resident and citizen of the State of California where he intends to remain. Based on information and belief, Plaintiff Altes is a member of Blue Shield and otherwise received medical insurance services from Blue Shield. In exchange for these services, Plaintiff Altes provided his Private Information to Blue Shield and/or his medical providers who Plaintiff Altes understands, in turn, provided that information to Episource. Plaintiff Altes believed, at the time of receiving services from Blue Shield, that they would maintain the privacy and security of his Private Information. Indeed, prior to and at the time of receiving services from Blue Shield, Plaintiff Altes reviewed and expressly relied on Privacy Policies and other documents containing statements that Blue Shield would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Altes further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Altes a Notice Letter, which indicated that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Altes's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Altes has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

36.    Plaintiff Larry Thomas is, and at all relevant times has been, a resident and citizen of the State of Arizona where he intends to remain. Plaintiff Thomas is a member of Banner Health and otherwise received medical insurance services from Banner Health. In exchange for these services, Plaintiff Thomas provided his Private Information to Banner Health and his medical providers who Plaintiff Thomas

understands, in turn, provided that information to Episource. Plaintiff Thomas believed, at the time of receiving services from Banner Health, that they would maintain the privacy and security of his Private Information. Plaintiff Thomas further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Thomas a Notice Letter, notifying that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Thomas's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Thomas has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

37.    Plaintiff Tyrone Holifield is, and at all relevant times has been, a resident and citizen of the State of California where he intends to remain. Plaintiff Holifield is a member of Blue Cross and otherwise received medical insurance services from Blue Cross. On information and belief, Blue Cross and/or CareMore/Elevance provided Plaintiff Holifield's Private Information to Episource. Plaintiff Holifield believed, at the time of receiving services from Blue Cross, that they would maintain the privacy and security of his Private Information. Indeed, prior to and at the time of receiving services from Blue Cross, Plaintiff Holifield reviewed and expressly relied on Privacy Policies and other documents containing statements that Blue Cross would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Holifield further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants sent Plaintiff Holifield a Notice

CONSOLIDATED CLASS ACTION COMPLAINT

Letter, notifying that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Holifield's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Holifield has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

38.    Plaintiff Wanda Hernandez is, and at all relevant times has been, a resident and citizen of the State of Florida where she intends to remain. Plaintiff Hernandez is a member of InnovaCare and received medical and insurance services from InnovaCare. In exchange for these services, Plaintiff Hernandez provided her Private Information to InnovaCare and her medical providers who Plaintiff Hernandez understands, in turn, provided that information to Episource. Plaintiff Hernandez believed, at the time of receiving services from InnovaCare, that they would maintain the privacy and security of her Private Information. Indeed, prior to and at the time of receiving services from InnovaCare, Plaintiff Hernandez reviewed and expressly relied on Privacy Policies and other documents containing statements that InnovaCare would protect the confidentiality of her Private Information, which includes any third parties like Episource who would receive her Private Information. Plaintiff Hernandez further believes she paid a premium to Defendants for their data security, and she would not have used Defendants' services or provided her Private Information to Defendants had she known that they would expose, or allow to be exposed, her Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Hernandez a Notice Letter, notifying that her Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Hernandez's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Hernandez has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

39.    Plaintiff William Glenn Johnson is, and at all relevant times has been, a

22

resident and citizen of the State of California where he intends to remain. Plaintiff Johnson is a member of Blue Shield and otherwise received medical insurance services from Blue Shield. In exchange for these services, Plaintiff Johnson provided his Private Information to Blue Sheild and his medical providers who Plaintiff Johnson understands, in turn, provided that information to Episource. Plaintiff Johnson believed, at the time of receiving services from Blue Shield, that they would maintain the privacy and security of his Private Information. Indeed, prior to and at the time of receiving services from Blue Shield, Plaintiff Johnson reviewed and expressly relied on Privacy Policies and other documents containing statements that Blue Shield would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Johnson further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Johnson a Notice Letter, notifying that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Johnson's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Johnson has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

40.     Plaintiff Stephen Dollar is, and all relevant times has been, a resident and citizen of the State of Illinois where he intends to remain. Based on information and belief, Plaintiff Dollar is a member of Molina and otherwise received medical insurance services from Molina. In exchange for these services, Plaintiff Dollar provided his Private Information to Molina and his medical providers who Plaintiff Dollar understands, in turn, provided that information to Episource. Plaintiff Dollar believed, at the time of receiving services from Molina, that they would maintain the

privacy and security of his Private Information. Indeed, prior to and at the time of receiving services from Molina, Plaintiff Dollar reviewed and expressly relied on Privacy Policies and other documents containing statements that Molina would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Dollar further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Dollar a Notice Letter, notifying that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Dollar's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Dollar has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach

41.    Plaintiff Stephen Wharton is, and at all relevant times has been, a resident and citizen of the State of Arizona where he intends to remain. Based on information and belief, Plaintiff Wharton is a member of Blue Cross and received medical insurance services from Blue Cross, and in exchange for these services, Plaintiff Wharton provided his Private Information to Blue Cross and his medical providers who Plaintiff Wharton understands, in turn, provided that information to Episource. Plaintiff Wharton believed, at the time of receiving services, that they would maintain the privacy and security of his Private Information. Plaintiff Wharton further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Wharton a Notice Letter, notifying that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed

CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiff Wharton's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Wharton has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

### B. **Defendants**[8]

42.    Episource, LLC is a California limited liability company with its headquarters and principal place of business located at 500 West 190th Street, 4th Floor, Gardena, California 90248.

43.    Molina Healthcare of California is a managed care company that provides government-sponsored healthcare services, primarily through Medicaid and Medicare programs. Molina is a corporation organized under the laws of California, with its principal place of business located at 200 Oceangate, Suite 100, Long Beach, California 90802.

44.    InnovaCare, Inc. is a provider of managed healthcare services in North America that offers Medicare Advantage plans, Physician Practice Services, Medicaid, Clinical Services, and Population Health Management. InnovaCare is a corporation maintaining its principal place of business at 173 Bridge Plaza North, Fort Lee, New Jersey 07024.

45.    Humana, Inc. is a health insurance company that offers individual, Medicare, and Medicaid plans. Humana is a corporation organized under the laws of Delaware, with its principal place of business at 500 West Main Street, Louisville, Kentucky 40202.

46.    Archwell Health MSO, LLC is a national organization focused on providing comprehensive healthcare services to seniors aged 60 and over. Archwell is

---

[8] Although Episource identified Client Defendants connected to individuals identified as potential plaintiffs, it refused to identify all Client Defendants. As such, Plaintiffs may seek leave to amend the complaint to include additional Client Defendants in the future.

a limited liability company organized under the laws of Delaware, with its principal place of business located at 102 Woodmont Blvd Ste 600, Nashville, Tennessee, 37205. Archwell's registered agent is CT Corporation System, located at 3800 N Central Avenue Suite 460, Phoenix, Arizona 85012.

47. Blue Shield of California Life & Health Insurance Company is a provider of both employer and individual & family HMO and PPO health insurance plans, based in California. Blue Shield is a corporation organized under the laws of California, with its principal place of business located at 601 12th Street, 20th Floor, Oakland, California 94607.

48. Blue Cross and Blue Shield of Arizona, Inc. is a health insurance provider that offers Medicare Advantage, Medicaid, and commercial health insurance plans across the United States through affiliated and independent Blue Cross and Blue Shield companies. Blue Cross is a corporation organized under the laws of Arizona, with its principal place of business located at 8220 North 23rd Avenue, Phoenix, Arizona 85021.

49. Devoted Health, Inc. is a healthcare company that offers Medicare Advantage plans and provides in-home and virtual care services to its members throughout the United States. Devoted is a corporation organized under the laws of Delaware, with its principal place of business located at 221 Crescent Street, Suite 202, Waltham, Massachusetts 02453.

50. WellCareHealth Plans. Inc. is a managed care company that provides government-sponsored health insurance, including Medicare Advantage, Medicare Prescription Drug Plans, and Medicaid health plans. WellCare is a corporation organized under the laws of Delaware, with its principal place of business located at 8735 Henderson Road, Renaissance One, Tampa, Florida 33634.

51. The Health Plan of West Virginia is a regional managed care organization based in West Virginia that offers Medicare Advantage, Medicaid, and commercial health insurance plans to individuals and employers. HPWV is a corporation organized

under the laws of West Virginia, with its principal place of business located at 1110 Main Street, Wheeling, West Virginia 26003.

52.    VNS Choice d/b/a VNS Health Plans is a New York-based health plan that provides Medicare Advantage, Medicaid, and managed long-term care services through its affiliated nonprofit Visiting Nurse Service of New York. VNS is a not-for-profit corporation organized under the laws of New York, with its principal place of business located at 220 East 42nd Street, New York, New York 10017.

53.    Aetna Inc. is a national health insurance company and subsidiary of CVS Health that provides Medicare Advantage, Medicaid, employer-sponsored, and individual health insurance plans across the United States. Aetna is a corporation organized under the laws of Connecticut, with its principal place of business located at 151 Farmington Avenue, Hartford, Connecticut 06156.

54.    Triple-S Advantage, Inc. is a health insurance company based in Puerto Rico that offers Medicare Advantage plans, Medicaid plans, and commercial health insurance products to individuals and groups. Triple-S is a corporation organized under the laws of Puerto Rico, with its principal place of business located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920.

55.    Elevance Health, Inc. is parent company to various health plans and subsidiaries, including those operating under the Blue Cross and Blue Shield names in multiple states. The company provides health insurance coverage and health-related services to individuals, employers, and participants in government-sponsored programs such as Medicare and Medicaid. Elevance is incorporated in Indiana and has a principal place of business of 220 Virginia Avenue, Indianapolis, Indiana 46204.

## FACTUAL ALLEGATIONS

### A.    The Data Breach

56.    Plaintiffs and Class Members were required to (directly or indirectly) provide Defendants with their sensitive and confidential Private Information, including their names, addresses, phone numbers, dates of birth, emails, Social Security numbers,

health insurance data (such as health plans/policies, insurance companies, member/group ID numbers, and Medicaid-Medicare-government payor ID numbers), health data (such as medical record numbers, doctors, diagnoses, medicines, tests results, images, care, and treatment), and other sensitive information, that at the time of the Data Breach were held by Defendants in its computer systems.

57.     The Notice Letter sent by Episource and the Client Defendants to Plaintiffs and Class Members states:

> We are sorry to tell you about a data security event. This letter is from Episource LLC ("Episource" or "We"). We work with doctors, health plans, and other health companies. This event may have involved your data.
>
> **What Happened**
>
> On February 6, 2025, we found unusual activity in our computer systems [and after conducting an investigation] [w]e learned that a criminal was able to see and take copies of some data in our computer systems. This happened between January 27, 2025 and February 6, 2025…
>
> **What Information Was Involved**
>
> On April 23, 2025, we began informing the customers about what specific data may have been involved. The data that may have been seen and taken was not the same for everyone and includes contact information (such as name, address, phone number and email), plus one or more of the following:
>
> - Health insurance data (such as health plans/policies, Insurance companies, member/group ID numbers, and Medicaid-Medicare-government payor ID numbers)
> - Health data (such as medical record numbers, doctors, diagnoses, medicines, test results, images, care, and treatment)
> - Other personal data such as date of birth
> - Social Security number (in limited instances)

58.     In the Notice Letter, Episource and the Client Defendants offer Plaintiffs and Class Members two years of credit monitoring and provides suggested steps they can take to protect themselves from identity theft (e.g., placing a fraud alert on their credit files and requesting a credit freeze).[9]

//

---

[9] *See id.*

59.     In the context of notice of data breach letters of this type, Episource's and the Client Defendants' use of the phrase "may have involved your data" is misleading legalese. Companies only send notice letters because data breach notification laws require them to do so. And such letters are only sent to those persons who Episource itself has a reasonable belief that such personal information was accessed or acquired by an unauthorized individual or entity. Episource cannot hide behind legalese. By sending a Notice Letter to Plaintiffs and Class Members, it admits that Episource itself has a reasonable belief that Plaintiffs' and Class Members' Private Information was accessed or acquired by cybercriminals.

60.     Indeed, the Identity Theft Research Center's 2024 Annual Data Breach Report notes that, "approximately 70 percent of cyberattack-related breach notices did not include attack information, compared to 58 percent in 2023. In 2019 and previous years, ~100 percent of breach notices included attack vector information." Eva Velasquez, CEO of the Identity Theft Resource Center, remarked that "[w]ith a near-record number of compromises and over 1.3 billion victim notices, often tied to inadequate cyber practices, we are also seeing an increase in notices that provide limited actionable information for victims."[10]

61.     Despite Episource's attempt to obfuscate the details of the Data Breach, it is clear that Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiffs and Class Members, such as encrypting the information or purging it when it is no longer needed, causing the exposure of Private Information.

62.     As evidenced by the Data Breach, the Private Information contained in Defendants' network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

---

[10] Identity Theft Resource Center, *2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices*, ITRC (Jan. 28, 2025), available at https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/ (last accessed Sep. 26, 2025).

63.    Moreover, Defendants could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring their systems for signs of unusual activity or the transfer of large volumes of data, and regularly rotating passwords.

64.    Defendants' failure to implement these standard and reasonable data security practices resulted in the exfiltration of over five million individuals' sensitive personal and health information.

**B.    Episource's Representations about Patients' Private Information**

65.    Episource's privacy policy asserts a commitment to protecting confidentiality, stating, "[w]e afford the same degree of confidentiality to medical and proprietary information stored on Episource systems as is given to medical information stored by Episource systems in any other medium."[11]

66.    Episource's privacy statement on its website outlines a series of technical and procedural safeguards that it claims to have in place to secure information including Private Information.[12] Specifically, Episource claims to take measures include limiting employee access to data based on their specific role within the organization. The company also states that it uses a combination of firewalls, passwords, encryption, and audit trails to protect all stored information. Furthermore, Episource notes that it identifies and logs the time and date of each instance of employee access to its systems. Episource concludes these statements with a general assertion that it has "taken steps to make all information received from and to employees are as secure as possible against unauthorized access and use."[13]

//

//

---

[11] https://uploads.episource.com/s/privacy (last accessed Sep. 26, 2025).
[12] *Id.*
[13] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT

67.    Episoure publicly represents itself as having a "cutting edge cybersecurity program" backed by prestigious third-party certifications.[14]

68.    In a press release from February 2019, Episoure announced that it had achieved Certified status from the Health Information Trust Alliance ("HITRUST").[15] Episoure's Chief Operating Officer at the time described the certification as a result of "innovative tech thoughtfully built into our systems."[16] Episoure noted that the HITRUST certification was a step "beyond HIPAA guidelines" and built upon its existing National Institute of Standards and Technology ("NIST") certification.[17] The HITRUST Common Security Framework ("CSF") is described as the information protection framework for the healthcare industry and requires organizations to meet 740 individual controls to achieve certification.[18]

69.    While Episoure achieved this certification in early 2019, the cyberattack occurred nearly six years later, in early 2025.

70.    On information and belief, each of the Client Defendants also have privacy policies and/or HIPPA notices that they provide to their patients/members, which represent that the Private Information provided to them will be kept confidential and secure.[19]

---

[14]   https://www.biospace.com/episoure-achieves-hitrust-and-nist-certification   (last accessed Sep. 26, 2025).

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *See*, *Notice of Privacy Practices – Molina Healthcare of California*, https://www.molinahealthcare.com/members/ca/mem/hipaa/privacy_full.aspx   (last accessed Sep. 25, 2025); *Notice of Patient Policy*, https://innovacarehealth.com/notice-of-patient-policy/ (last accessed Sep. 25, 2025); *Insurance ACE Notice of Privacy Practices*,   https://assets.humana.com/is/content/humana/GN14474HHpdf   (last accessed   Sep.   25,   2025);   *Notice   of   Privacy   Practices*, https://archwellhealth.com/notice-of-privacy-practice/ (last accessed Sep. 25, 2025); *HIPAA   Notice   of   Privacy   Practices,* https://www.blueshieldca.com/content/dam/bsca/en/member/docs/A52389XLB-0125-REF2361452-Notice-of-Privacy-Practices.pdf (last accessed Sep. 25, 2025);

## C.    Data Breaches are Foreseeable and Preventable

71.    Data breaches are preventable.[20] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[21] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[22]

72.    The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. Data breaches have been on the rise for several years. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. The estimated

_____

*Notice of Privacy Practices*, https://edge.sitecorecloud.io/bluecross-6f8ea2ea/media/project/bcbs-az/azblue/data/media/files/individuals/resources/forms/privacy/hipaa-notice-of-privacy-practices.pdf (last accessed Sep. 25, 2025); *Devoted Health Notice of Privacy Practices*, https://www.devoted.com/privacy-practices/ (last accessed Sep. 25, 2025); *Wellcare Notice of Privacy Practices*, https://share.google/jyeQocNXTsFuRTPBq (last accessed Sep. 25, 2025); *Notice of Privacy Practices*, https://healthplan.org/application/files/1317/5813/8671/Y0038_NOPP26_131_C_2026_Notice_of_Privacy_Practices.pdf (last accessed Sep. 25, 2025); *VNS Health HIPAA Privacy Notice*, https://www.vnshealth.org/corporate-compliance-privacy/privacy-statements/hipaa-privacy-notice/ (last accessed Sep. 25, 2025); *Notice of Privacy Practices*, https://advantage.grupotriples.com/en/notice-of-privacy-practices/ (last accessed Sep. 25, 2025); *Privacy Notice for California Consumers*, https://www.elevancehealth.com/content/dam/elevance-health/documents/508C_FINAL_%203_27_2024_Privacy_Notice_CCPA.pdf (last accessed Sep. 25, 2025); *Notice of Privacy Practices*, https://www.aetna.com/document-library/legal-notices/documents/health-notice-of-privacy-practices.pdf (last accessed Sep. 25, 2025).

[20] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088 (last accessed Sep. 24, 2025).

[21] *Id.* at 17.

[22] *Id.* at 28.

number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1,400 percentage points. The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

73.     In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendants knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

74.     Additionally, as companies became more dependent on computer systems to run their business,[23] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[24]

75.     At all relevant times, Defendants knew, or reasonably should have known, the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

76.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' server(s), amounting to millions of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

---

[23]     https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last accessed Sep. 24, 2025).

[24]     https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last accessed Sep. 24, 2025).

**D.** **Defendants Failed to Comply with Regulatory Requirements and Standards.**

77.    Federal and state regulators have established security standards and issued recommendations to prevent data breaches and the resulting harm to consumers. There are a number of state and federal laws, requirements, and industry standards governing the protection of Private Information.

78.    The Federal Trade Commission ("FTC") has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be considered for all business decision-making.[25]

79.    Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[26]

80.    The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of data being siphoned from the system, and have a response plan in the event of a breach.

81.    The FTC advises companies to not keep information for periods of time longer than needed to authorize a transaction, restrict access to private information, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for suspicious activity on the network, and verify that third-party

---

[25] *Start With Security*, Fed. Trade Comm'n, https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited September 26, 2025).

[26] *Protecting Personal Information: A Guide for Business*, FTC, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited September 26, 2025).

1  service providers have implemented reasonable security measures.[27]

2      82.    The FTC has brought enforcement actions against companies for failing

3  to adequately and reasonably protect consumer data, treating the failure to do so as an

4  unfair act or practice barred by Section 5 of the Federal Trade Commission Act ("FTC

5  Act"), 15 U.S.C. § 45. Orders originating from these actions further elucidate the

6  measures businesses must take to satisfy their data security obligations.

7      83.    Defendants' failure to employ reasonable and appropriate measures to

8  protect against unauthorized access to confidential consumer data constitutes an unfair

9  act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

10     84.    Defendants' failure to verify that it had implemented reasonable security

11 measures constitutes an unfair act or practice prohibited by Section 5 of the FTC Act,

12 15 U.S.C. § 45.

13     85.    Furthermore, Defendants are required to comply with the HIPAA Privacy

14 Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of

15 Individually Identifiable Health Information"), and Security Rule ("Security Standards

16 for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and

17 Part 164, Subparts A and C. The Privacy Rule and the Security Rule set nationwide

18 standards for protecting health information, including health information stored

19 electronically.

20     86.    The Security Rule requires Defendants to do the following:

21         a.    Ensure the confidentiality, integrity, and availability of all

22             electronic protected health information the covered entity or

23             business associate creates, receives, maintains, or transmits;

24         b.    Protect against any reasonably anticipated threats or hazards to the

25             security or integrity of such information;

26         c.    Protect against any reasonably anticipated uses or disclosures of

27             such information that are not permitted; and

28 _____

[27] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT

1          d.      Ensure compliance by its workforce.[28]

2     87.    Under HIPAA's mandate Defendants follow "applicable standards,

3  implementation specifications, and requirements . . . with respect to electronic

4  protected health information," 45 C.F.R. § 164.302, Defendants were required to, at

5  minimum, "review and modify the security measures implemented . . . as needed to

6  continue provision of reasonable and appropriate protection of electronic protected

7  health information," 45 C.F.R. § 164.306(e), and "[i]mplement technical policies and

8  procedures for electronic information systems that maintain electronic protected health

9  information to allow access only to those persons or software programs that have been

10  granted access rights." 45 C.F.R. § 164.312(a)(1).

11     88.    Defendants are also required to follow the regulations for safeguarding

12  electronic medical information pursuant to the Health Information Technology Act

13  ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

14     89.    Both HIPAA and HITECH obligate Defendants to follow reasonable

15  security standards, respond to, contain, and mitigate security violations, and to protect

16  against disclosure of sensitive patient Private Information. *See* 45 C.F.R. §

17  164.306(a)(1) and § 164.306(a)(3); 45 C.F.R. § 164.530(f); 42 U.S.C. § 17902.

18     90.    Defendants have failed to comply with HIPAA and HITECH. They have

19  failed to maintain adequate security practices, systems, and protocols to prevent data

20  loss, failed to mitigate the risks of a data breach and loss of data, and failed to ensure

21  the confidentiality and protection of PHI.

22     **E.    Defendants Failed to Comply with Industry Practices.**

23     91.    Various cybersecurity industry best practices have been published and

24  should be consulted as a go-to resource when developing an organization's

25  cybersecurity standards. The Center for Internet Security ("CIS") promulgated its

26  Critical Security Controls, which identify the most commonplace and essential cyber-

27

28  [28] *Summary of the HIPAA Security Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html (last accessed Sep. 24, 2025).

1   attacks that affect businesses every day and proposes solutions to defend against those

2   cyber-attacks.[29] All organizations collecting and handling Private Information, such as

3   Defendants, are strongly encouraged to follow these controls.

4       92.   Additionally, cybersecurity firms have promulgated a series of best

5   practices that at a minimum should be implemented by sector participants including,

6   but not limited to: installing appropriate malware detection software; monitoring and

7   limiting network ports; protecting web browsers and email management systems;

8   setting up network systems such as firewalls, switches, and routers; monitoring and

9   protecting of physical security systems; protecting against any possible communication

10  system; and training staff regarding critical points.

11      93.   Other best practices include but are not limited to securely configuring

12  business software, managing access controls and vulnerabilities to networks, systems,

13  and software, maintaining network infrastructure, defending networks, adopting data

14  encryption while data is both in transit and at rest, limiting access to sensitive

15  information to only necessary employees, and securing application software.[30]

16      94.   The following frameworks incorporate these data security measures and

17  others and are regularly employed as industry standard practices: the NIST

18  Cybersecurity Framework 2.0 (including without limitation PR.AA-01, PR.AA.-02,

19  PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10,

20  PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06,

21  DE.CM-09, and RS.CO-04), NIST Special Publications 800-53, 53A, or 800-171; the

22  Federal Risk and Authorization Management Program (FEDRAMP); or the Center for

23  Internet Security's Critical Security Controls (CIS CSC), which are well respected

24

25  [29] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021),
    https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited September 26,

26  2025).

27  [30] *See* Center for Internet Security, *Critical Security Controls* (May 2021),
    https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited September 26,

28  2025).

1    authorities in reasonable cybersecurity readiness.

2    95.   Defendants failed to follow these and other industry standards to

3    adequately protect the Private Information of Plaintiffs and Class Members.

4    **F.   The Data Breach Caused Injury to Class Members and Will Result**

5    **in Additional Harm Such as Fraud.**

6    96.   The ramifications of Defendants' failure to secure Plaintiffs' and Class

7    Members' data are severe. Victims of data breaches are much more likely to become

8    victims of identity theft and other types of fraudulent schemes. Moreover, as a result

9    of Episource's delay between detecting the Data Breach in February of 2025, and the

10   Notice Letters sent to affected persons in June of 2025, the risk of fraud for Plaintiffs

11   and Class Members increased exponentially.

12   97.   The FTC defines identity theft as "a fraud committed or attempted using

13   the identifying information of another person without authority."[31] The FTC describes

14   "identifying information" as "any name or number that may be used, alone or in

15   conjunction with any other information, to identify a specific person."[32]

16   98.   A sophisticated black market exists on the dark web where criminals can

17   buy or sell malware, firearms, drugs, and frequently, personal and medical information

18   like the Private Information at issue here.[33] The digital character of Private Information

19   stolen in data breaches lends itself to dark web transactions because it is immediately

20   transmissible over the internet and the buyer and seller can retain their anonymity. The

21   sale of a firearm or drugs on the other hand requires a physical delivery address.

22   Nefarious actors can readily purchase usernames and passwords for online streaming

23   services, stolen financial information and account login credentials, and Social

24

25   _____

26   [31] 17 C.F.R. § 248.201 (2013).

     [32] *Id.*

27   [33] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last accessed

28   Sep. 26, 2025).

Security numbers, dates of birth, and medical information.[34] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[35]

99.    When the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [Private Information] belonging to victims from countries all over the world. One of the key challenges of protecting Private Information online is its pervasiveness. As data breaches in the news continue to show, Private Information about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[36]

100.    Identity thieves can use the Private Information that Defendants failed to keep secure to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud, such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

101.    Theft of PHI, in particular, is gravely serious: "A thief may use your name

---

[34]    *Id.*;    *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last accessed Sep. 26, 2025).

[35] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last accessed Sep. 26, 2025).

[36] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018,
https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited September 26, 2025).

CONSOLIDATED CLASS ACTION COMPLAINT

1   or health insurance numbers to see a doctor, get prescription drugs, file claims with

2   your insurance provider, or get other care. If the thief's health information is mixed

3   with yours, your treatment, insurance and payment records, and credit report may be

4   affected."[37]

5       102.   As indicated by Jim Trainor, second in command at the FBI's cyber

6   security division: "Medical records are a gold mine for criminals—they can access a

7   name, DOB, Social Security and insurance numbers, and even financial information

8   all in one place. Credit cards can be, say, five dollars or more where PHI records can

9   go from $20 say up to—we've even seen $60 or $70."[38] A complete identity theft kit

10  that includes health insurance credentials may be worth up to $1,000 on the black

11  market, whereas stolen payment card information sells for about $1.[39]

12      103.   According to Experian:

13          When a healthcare data breach exposes someone's PHI and/or
            PII, the risk of identity theft and medical identity theft rises.
14

15          • On average, medical identity theft can add up to $20,000 in
              out-of-pocket expenses for a single victim
16          • Consequences of medical identity theft include becoming
              uninsured for both life and health insurance
17          • Victims of medical identity theft may receive the wrong type
              of care due to tampered medical files

18

19

20

21

---

22  [37] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last accessed Sep.

23  23, 2025).

24  [38] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-

25  center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-

26  dat (last accessed Sep. 26, 2025).

    [39] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key

27  findings from The Global State of Information Security® Survey 2015:

28  https://www.pwc.com/ee/et/publications/pub/the-global-state-of-information-
    security-survey-2015.pdf (last accessed Sep. 26, 2025).

- Unpaid medical bills sent to collection agencies can damage credit histories and financial stability[40]

104.   The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can sell for up to $1,000 online."[41]

105.   Social Security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment–even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[42] (emphasis added).

106.   Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[43]

---

[40] Experian, Healthcare Data Breaches and Medical Identity Theft Managing the Rising Risks of a Healthcare Data Breach: https://www.experian.com/data-breach/healthcare-data-breach (last accessed Sep. 26, 2025).

[41]    https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last accessed Sep. 23, 2025).

[42] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (last accessed Sep. 23, 2025).

[43] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Sep. 23, 2025).

107.    The Social Security Administration further stresses that:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[44]

108.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[45]

109.    Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to target them with spam emails or solicitations to deceive the victim into providing the criminal with additional personal information.

110.    Phishing scammers use emails and text messages to trick people into giving them their personal information, including but not limited to passwords, account

---

[44] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited September 26, 2025).

[45] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/assets/gao-07-737.pdf (last accessed September 26, 2025).

numbers, and social security numbers. Phishing scams are frequently successful, and the FBI reported that people lost approximately $18.7 million to such scams in 2023 alone.[46]

111.   Accordingly, providing credit monitoring or reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. Javelin Research reported that "[f]raud-related resolution hours skyrocketed in 2023. The average amount of time consumers spent in 2022 resolving issues stemming from identity fraud clocked in at six hours, but in 2023, fraud resolution hours rose steeply, jumping to a nearly 10-hour average, a major disruption for consumers and financial institutions alike."[47]

112.   Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting credit bureaus to place a fraud alert, reviewing their credit reports, placing a credit freeze on their credit, and correcting their credit reports.[48] The result is that Plaintiffs and Class Members are forced to spend their own personal time, or take time from work, to respond to the Data Breach. Defendants have not offered to compensate them for this loss of time.

113.   As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to

---

[46] *Internet Crime Report*, FEDERAL BUREAU OF INVESTIGATION, (2023), https://www.ic3.gov/annualreport/reports/2023_ic3report.pdf (last visited September 26, 2025).

[47] *Javelin Strategy & Research, 2024 Identity Fraud Study: Resolving the Shattered Identity Crisis* (2024), available at https://javelinstrategy.com/research/2024-identity-fraud-study-resolving-shattered-identity-crisis (last accessed Sep. 24, 2025).

[48] *See* https://www.identitytheft.gov/Steps (last accessed Sep. 23, 2025).

spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm–yet the resource and asset of time has been lost.

114.  Because the information stolen in the Data Breach is immutable and cannot be changed, it can be used to perpetrate fraud and identity theft for the remainder of their lives. Plaintiffs and Class Members now face years of constant surveillance of their financial and medical records, monitoring, and loss of rights.

### G.    Plaintiffs and Class Members Suffered Damages.

115.  Defendants' wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiffs' and Class Members' Private Information, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation.

116.  As a direct and proximate result of Defendants' failure to protect the Private Information, Plaintiffs and the Class have been injured by facing ongoing, imminent, impending threats of identity theft crimes, fraud, scams, and other misuse of this Private Information, resulting in ongoing monetary loss and economic harm, loss of value of Private Information, loss of privacy and confidentiality of the stolen Private Information, illegal sales of the compromised Private Information on the black market, mitigation expenses and time spent on credit monitoring, identity theft insurance, credit freezes/unfreezes, expenses and time spent in initiating fraud alerts, contacting third parties; decreased credit scores, lost work time, and other injuries.

117.  Information regarding an individual's health and medical choices, such as here, are some of the most personal and private types of information that exist. An individual's right to privacy regarding their body, their medical care, and their reproductive choices are some of the most sacrosanct and inviolable rights an individual can possess. Damages relating to an individual's loss of privacy and dignitary harm has also long been recognized as recoverable by courts and in the common law.

//

118.   Because personal data is valuable personal property, market exchanges now exist where internet users like Plaintiffs and Class Members can sell or monetize their own personal data. In 2019, the data brokering industry was worth roughly $200 billion.[49] In fact, the data marketplace is so sophisticated that patients can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[50,51] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[52]

119.   Moreover, the value of Private Information is, in part derived from its confidentiality. Consumers realize the value of Private Information by using it to verify their identities, apply for employment, and secure financial products at favorable rates. When the integrity of this data is compromised, its utility is diminished and its value is lost.

120.   As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. This transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

121.   The unencrypted Private Information of Plaintiffs and Class Members will eventually end up (if it has not already ended up) for sale on the dark web, as that is the *modus operandi* of cybercriminals who obtain sensitive information.

---

[49] Lazarus, David, *Shadowy data brokers make the most of their invisibility cloak*, Los Angeles Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[50] https://www.latimes.com/business/story/2019-11-05/column-data-brokers    (last accessed Sep. 26, 2025).
[51] https://datacoup.com/ (last accessed Sep. 26, 2025).
[52] https://digi.me/what-is-digime/

CONSOLIDATED CLASS ACTION COMPLAINT

122. At all relevant times, Defendants knew, or reasonably should have known, the importance of safeguarding the Private Information of Plaintiffs and Class Members, and the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach, including:

a. theft and misuse of their personal and financial information;

b. the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals and misused via the sale of Plaintiffs' and Class Members' information on the Internet's black market;

c. the untimely and inadequate notification of the Data Breach;

d. the improper disclosure of their Private Information;

e. loss of privacy;

f. ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

g. ascertainable losses in the form of diminution of the value of their Private Information, for which there is a well-established national and international market;

h. the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data Breach; and

46

1                i.      nominal damages.

2        123.   While Plaintiffs' and Class Members' Private Information has been

3   stolen, Defendants continue to hold Plaintiffs' and Class Members' Private

4   Information. Particularly because Defendants have shown an inability to prevent a

5   breach or stop it from continuing even after being detected, Plaintiffs and Class

6   Members have an undeniable interest in ensuring that their Private Information is

7   secure, remains secure, is properly and promptly destroyed, and is not subject to further

8   theft.

9   **H.    Plaintiffs' Experiences**

10  ***Plaintiff David Bartelt***

11       124.    During all times relevant, Plaintiff Bartelt was a member of Molina.

12       125.    Plaintiff Bartelt received a Notice Letter from Episource dated June 6,

13  2025, informing him that his Private Information was specifically identified as having

14  been exposed to cybercriminals in the Data Breach.

15       126.   Plaintiff Bartelt is very careful about sharing his sensitive information.

16  Plaintiff Bartelt would not have allowed Defendants to collect his Private Information

17  had he known the true state of affairs regarding Defendants' data security practices.

18       127.   Plaintiff Bartelt stores any documents containing his Private Information

19  in a safe and secure location.

20       128.   Because of the Data Breach, Plaintiff Bartelt's Private Information is now

21  in the hands of cybercriminals.

22       129.   Plaintiff Bartelt has suffered actual injury from the exposure and theft of

23  his Private Information—including violation of his right to privacy.

24       130.   As a result of the Data Breach, which exposed highly valuable

25  information, Plaintiff Bartelt is now at a present and continuing risk of identity theft

26  and fraud.

27       131.   As a result of the Data Breach, Plaintiff Bartelt has had no choice but to

28  spend numerous hours attempting to mitigate the harms caused by the Data Breach and

addressing the future consequences of the Data Breach. Among other things, Plaintiff Bartelt has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. Specifically, Plaintiff Bartelt discovered a false charge of $900 on his Amazon account earlier this year. Plaintiff Bartelt had to change both bank cards tied to his account as a result of this fraudulent charge. This is time that was lost and unproductive, taking Plaintiff Bartelt away from other activities and money-making opportunities.

132.    The Notice Letter Plaintiff Bartelt received from Episource directed him to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff Bartelt and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

133.    Plaintiff Bartelt fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

134.    Plaintiff Bartelt has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Bartelt's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Bartelt's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Bartelt's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Bartelt, including the difference in value between what Plaintiff

CONSOLIDATED CLASS ACTION COMPLAINT

should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Bartelt's Private Information; and (e) continued risk to Plaintiff Bartelt's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information entrusted to them.

***Plaintiff Angela Jo Carter***

135.    At all relevant times, Plaintiff Carter was a member of Humana.

136.    Plaintiff Carter received a Notice Letter from Episource dated June 6, 2025 informing her that her Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

137.    Plaintiff Carter is very careful about sharing her sensitive information. Plaintiff Carter would not have allowed Defendants to collect her Private Information had she known the true state of affairs regarding Defendants' data security practices.

138.    Plaintiff Carter stores any documents containing her Private Information in a safe and secure location.

139.    Because of the Data Breach, Plaintiff Carter's Private Information is now in the hands of cybercriminals.

140.    Plaintiff Carter has suffered actual injury from the exposure and theft of her Private Information—including violation of her right to privacy.

141.    As a result of the Data Breach, which exposed highly valuable information such as her name, address, phone number, date of birth, health insurance data (such as health plan and policies, insurance companies, member and group ID numbers, and Medicaid-Medicare-government payor ID numbers) and health data (such as medical record numbers, doctors, diagnoses, medicines, test results, care, images, and treatment), Plaintiff Carter is now at a present and continuing risk of identity theft and fraud.

142.   As a result of the Data Breach, Plaintiff Carter has experienced data misuse and identity theft. For example, since the Data Breach, Plaintiff Carter had a medical claim filed on her behalf using her insurance for prefabricated of-the-shelf adjustable joint knee orthosis and sagittal control lumbar-sacral orthosis. Plaintiff Cater does not have knee issues and has never been treated by the company who filed the medical claim on her behalf. Plaintiff Carter has also experienced a notable increase in the number of spam calls she receives since the Data Breach, which she believes are attempts to acquire additional data from her to be used for fraud and identity theft. Plaintiff Carter attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, the fact that she is very careful with her Private Information, and the fact that she has never experienced anything like this prior to the Data Breach.

143.   As a result of the Data Breach, Plaintiff Carter has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Carter has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

144.   The Notice Letter Plaintiff Carter received from Episource specifically directed her to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect

errors." In addition, the Notice Letter advised victims of the Data Breach and how they could place a credit freeze on their file through a credit reporting agency.

145.    Plaintiff Carter fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

146.    Plaintiff Carter has also experienced increased stress as a result of the Data Breach and the resulting misuse of her Private Information. Since the Data Breach, Plaintiff Carter has experienced an increase in her thyroid levels, increased weight gain, and increased blood pressure resulting from the increased stress. Plaintiff Carter has sought counsel services to help with the heightened anxiety and stress.

147.    Plaintiff Carter has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of her valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Carter's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Carter's Private Information that was entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Carter, including the difference in value between what Plaintiff should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Carter's Private Information; and (e) continued risk to Plaintiff Carter's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

### ***Plaintiff Anthony Tention***

148.    At all relevant times Plaintiff Tention was a member of Devoted.

149.    Plaintiff Tention received a Notice Letter from Episource dated June 6, 2025, informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

150. Plaintiff Tention is very careful about sharing his sensitive information. Plaintiff Tention would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

151. Plaintiff Tention stores any documents containing his Private Information in a safe and secure location.

152. Because of the Data Breach, Plaintiff Tention's Private Information is now in the hands of cybercriminals.

153. Plaintiff Tention has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

154. As a result of the Data Breach, which exposed highly valuable information, Plaintiff Tention is now at a present and continuing risk of identity theft and fraud.

155. As a result of the Data Breach, Plaintiff Tention has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Tention has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

156. The Notice Letter Plaintiff Tention received from Episource directed him to take the actions described above. Indeed, the Notice Letter Episource sent to Plaintiff Tention and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition,

the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

157.    Plaintiff Tention fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

158.    Plaintiff Tention has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Tention's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Tention's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Tention's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Tention, including the difference in value between what Plaintiff Tention should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Tention's Private Information; and (e) continued risk to Plaintiff Tention's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information  entrusted to them.

## ***Plaintiff Chonita Gantt***

159.    At all relevant times, Plaintiff Gantt was a member and policyholder of ArchWell.

160.    Plaintiff Gantt received a Notice Letter from Episource dated June 6, 2025, informing her that her Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

161.    Plaintiff Gantt is very careful about sharing her sensitive information. Plaintiff Gantt would not have allowed Defendants to collect her Private Information had she known the true state of affairs regarding Defendants' data security practices.

162.    Plaintiff Gantt stores any documents containing her Private Information in a safe and secure location.

163.    Because of the Data Breach, Plaintiff Gantt's Private Information is now in the hands of cybercriminals.

164.    Plaintiff Gantt has suffered actual injury from the exposure and theft of her Private Information—including violation of her right to privacy.

165.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Gantt is now at a present and continuing risk of identity theft and fraud.

166.    As a result of the Data Breach, Plaintiff Gantt has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Gantt has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting the police regarding the increase in spam calls, contacting her bank regarding fraudulent activity, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, taking Plaintiff Gantt away from other activities.

167.    The Notice Letter Plaintiff Gantt received from Episource directed her to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff Gantt and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

168.    Plaintiff Gantt fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

169.    Plaintiff Gantt has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Gantt's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Gantt's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Gantt's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Gantt, including the difference in value between what Plaintiff Gantt should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Gantt's Private Information; and (e) continued risk to Plaintiff Gantt's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information entrusted to them.

### ***Plaintiff Farreece Grimmitt***

170.    At all relevant times Plaintiff Grimmitt was a member of Molina.

171.    Plaintiff Grimmitt received a Notice Letter from Episource, informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

172.    Plaintiff Grimmitt is very careful about sharing his sensitive information. Plaintiff Grimmitt would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

173.    Plaintiff Grimmitt stores any documents containing his Private Information in a safe and secure location.

174.    Because of the Data Breach, Plaintiff Grimmitt's Private Information is now in the hands of cybercriminals.

175.    Plaintiff Grimmitt has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

176.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Grimmitt is now at a present and continuing risk of identity theft and fraud.

177.    As a result of the Data Breach, Plaintiff Grimmitt has experienced data misuse and identity theft. For example, since the Data Breach, Plaintiff Grimmitt had inquiries on his Credit to get additional lines of credit from his Bank and he had to call his Bank and affirm he didn't apply for anything. Additionally, Plaintiff Grimmitt has had to have his CashApp card closed and resent because he was informed there was fraudulent activity. Plaintiff Grimmitt has also experienced a notable increase in the number of spam calls he receives since the Data Breach which he believes is attempts to acquire additional data from him to be used for fraud and identity theft. Plaintiff Grimmitt attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, the fact that he is very careful with his Private Information, and the fact that he has never experienced anything like this prior to now.

178.    As a result of the Data Breach, Plaintiff Grimmitt has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Grimmitt has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is

CONSOLIDATED CLASS ACTION COMPLAINT

time that was lost and unproductive, and took Plaintiff Grimmitt away from other activities and money-making opportunities.

179. The Notice Letter Plaintiff Grimmitt received from Episource specifically directed him to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff Grimmitt and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Notice Letter advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

180. Plaintiff Grimmitt fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

181. Plaintiff Grimmitt has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Grimmitt's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Grimmitt's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Grimmitt's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendants and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Grimmitt's Private Information; and (e) continued risk to Plaintiff Grimmitt's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

***Plaintiff Frederick Lower***

182.    At all relevant times, Plaintiff Lower was a member of Molina.

183.    Plaintiff Lower received a Notice Letter from Episource dated June 6, 2025, informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

184.    Plaintiff Lower is very careful about sharing his sensitive information. Plaintiff Lower would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

185.    Plaintiff Lower stores any documents containing his Private Information in a safe and secure location. Plaintiff Lower has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source.

186.    Because of the Data Breach, Plaintiff Lower's Private Information is now in the hands of cybercriminals.

187.    Plaintiff Lower has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

188.    As a result of the Data Breach, which exposed highly valuable information such as his Social Security number and medical/health information, Plaintiff Lower is now at a present and continuing risk of identity theft and fraud.

189.    As a result of the Data Breach, Plaintiff Lower has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Lower has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and

unproductive, and took Plaintiff Lower away from other activities and money-making opportunities.

190.   The Notice Letter Plaintiff Lower received from Defendant specifically directed him to take the actions described above.   Indeed, the Notice Letter that Defendant sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Notice Letter advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

191.   Plaintiff Lower fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

192.   Plaintiff Lower has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Lower's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Lower's Private Information that was entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Lower's Private Information; and (e) continued risk to Plaintiff Lower's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

### ***Plaintiff Jose Contreras***

193.   During all times relevant, Plaintiff Contreras was a member of Blue Shield.

194.    Plaintiff Contreras received a Notice Letter from Episource dated June 6, 2025, informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

195.    Plaintiff Contreras is very careful about sharing his sensitive information. Plaintiff Contreras would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

196.    Plaintiff Contreras stores any documents containing his Private Information in a safe and secure location.

197.    Because of the Data Breach, Plaintiff Contreras's Private Information is now in the hands of cybercriminals.

198.    Plaintiff Contreras has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

199.    As a result of the Data Breach, which exposed highly valuable information such as his name, address, phone number, date of birth, health insurance data (such as health plan and policies, insurance companies, member and group ID numbers, and Medicaid-Medicare-government payor ID numbers) and health data (such as medical record numbers, doctors, diagnoses, medicines, test results, care, images, and treatment), Plaintiff Contreras is now at a present and continuing risk of identity theft and fraud.

200.    Shortly after the Data Breach, Plaintiff Contreras started receiving a sharp increase in spam calls and messages. Plaintiff Contreras began receiving 3-6 spam calls per day and multiple phishing text messages per day.

201.    As a result of the Data Breach, Plaintiff Contreras has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Contreras has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of

the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Contreras away from other activities and money-making opportunities.

202.    The Notice Letter Plaintiff Contreras received from Episource specifically directed him to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach they could place a credit freeze on their file through a credit reporting agency.

203.    Plaintiff Contreras fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

204.    Plaintiff Contreras has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Contreras's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Contreras's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Contreras's Private Information; and (e) continued risk to Plaintiff Contreras's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail

to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

***Plaintiff Kathleen Desautels***

205.    At all relevant times, Plaintiff Kathleen Desautels was a member of Blue Cross.

206.    Plaintiff Kathleen Desautels received a Notice Letter from Episource dated June 6, 2025, informing her that her Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

207.    Plaintiff Kathleen Desautels is very careful about sharing her sensitive information. Plaintiff Kathleen Desautels would not have allowed Defendants to collect her Private Information had she known the true state of affairs regarding Defendants' data security practices.

208.    Plaintiff Kathleen Desautels stores any documents containing her Private Information in a safe and secure location.

209.    Because of the Data Breach, Plaintiff Kathleen Desautels's Private Information is now in the hands of cybercriminals.

210.    Plaintiff Kathleen Desautels has suffered actual injury from the exposure and theft of her Private Information—including violation of her right to privacy.

211.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Kathleen Desautels is now at a present and continuing risk of identity theft and fraud.

212.    Shortly after the Data Breach, Plaintiff Kathleen Desautels started to receive an increased number of spam calls and test messages. These emails and text claim to be from healthcare companies, but do not appear to be legitimate. Rather, the emails and text appear to be phishing scams, attempting to get Plaintiff Kathleen Desautels to clink on an external link or provide additional personal information.

213.    As a result of the Data Breach, Plaintiff Kathleen Desautels has had no choice but to spend numerous hours attempting to mitigate the harms caused by the

Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Kathleen Desautels has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, taking Plaintiff Kathleen Desautels away from other activities and money-making opportunities.

214.   The Notice Letter Plaintiff Kathleen Desautels received from Episource specifically directed her to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

215.   Plaintiff Kathleen Desautels fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

216.   Plaintiff Kathleen Desautels has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Kathleen Desautels's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Kathleen Desautels's Private Information that was entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Kathleen Desautels, including the difference in value between what Plaintiff Kathleen Desautels should have received from Defendants and Defendants' defective and deficient

performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Kathleen Desautels's Private Information; and (e) continued risk to Plaintiff Kathleen Desautels's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

### *Plaintiff Lesley Wynne Mojaddedi*

217.    At all relevant times, Plaintiff Mojadeddi was a member of WellCare.

218.    Plaintiff Mojaddedi received a Notice Letter from Episource informing her that her Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

219.    Plaintiff Mojaddedi is very careful about sharing her sensitive information. Plaintiff Mojaddedi would not have allowed Defendants to collect her Private Information had she known the true state of affairs regarding Defendants' data security practices.

220.    Plaintiff Mojaddedi stores any documents containing her Private Information in a safe and secure location.

221.    Because of the Data Breach, Plaintiff Mojaddedi's Private Information is now in the hands of cybercriminals.

222.    Plaintiff Mojaddedi has suffered actual injury from the exposure and theft of her Private Information—including violation of her right to privacy.

223.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Mojaddedi is now at a present and continuing risk of identity theft and fraud.

224.    As a result of the Data Breach, Plaintiff Mojaddedi has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Mojaddedi has already expended time and suffered loss of productivity from taking

time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Mojaddedi away from other activities and money-making opportunities.

225.   The Notice Letter Plaintiff Mojaddedi received from Episource directed her to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

226.   Plaintiff Mojaddedi fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

227.   Plaintiff Mojaddedi has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Mojaddedi's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Mojaddedi's Private Information that was entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Mojaddedi, including the difference in value between what Plaintiff Mojaddedi should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Mojaddedi's Private Information; and (e) continued risk to Plaintiff Mojaddedi's

Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

***Plaintiff Maurice Desautels***

228.    At all relevant times, Plaintiff Maurice Desautels was a member of Blue Cross.

229.    Plaintiff Maurice Desautels received a Notice Letter from Episource dated June 6, 2025, informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

230.    Plaintiff Maurice Desautels is very careful about sharing his sensitive information. Plaintiff Maurice Desautels would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

231.    Plaintiff Maurice Desautels stores any documents containing his Private Information in a safe and secure location.

232.    Because of the Data Breach, Plaintiff Maurice Desautels's Private Information is now in the hands of cybercriminals.

233.    Plaintiff Maurice Desautels has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

234.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Desautels is now at a present and continuing risk of identity theft and fraud.

235.    Shortly after the Data Breach, Plaintiff Maurice Desautels started to receive an increased number of spam calls and test messages. These emails and text claim to be from healthcare companies and mimic the text messages that he had previously received from his healthcare companies, but do not appear to be legitimate. Rather, the emails and text appear to be phishing scams, attempting to get Plaintiff

Maurice Desautels to click on an external link or provide additional personal information.

236.   As a result of the Data Breach, Plaintiff Maurice Desautels has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Maurice Desautels has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This time that was lost and unproductive, and took Plaintiff Maurice Desautels away from other activities and money-making opportunities.

237.   The Notice Letter Plaintiff Maurice Desautels received from Episource directed him to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

238.   Plaintiff Maurice Desautels fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

239.   Plaintiff Maurice Desautels has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Maurice Desautels's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of

Plaintiff Maurice Desautels's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Maurice Desautels, including the difference in value between what Plaintiff Maurice Desautels should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Maurice Desautels's Private Information; and (e) continued risk to Plaintiff Maurice Desautels's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

### ***Plaintiff Melissa Griffith***

240.    At all relevant times, Plaintiff Griffith was a member of HPWV.

241.    Plaintiff Griffith received a Notice Letter from Episource dated June 6, 2025, informing her that her Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

242.    Plaintiff Griffith is very careful about sharing her sensitive information. Plaintiff Griffith would not have allowed Defendants to collect her Private Information had she known the true state of affairs regarding Defendants' data security practices.

243.    Plaintiff Griffith stores any documents containing her Private Information in a safe and secure location.

244.    Because of the Data Breach, Plaintiff Griffith's Private Information is now in the hands of cybercriminals.

245.    Plaintiff Griffith has suffered actual injury from the exposure and theft of her Private Information—including violation of her right to privacy.

246.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Griffith is now at a present and continuing risk of identity theft and fraud.

247.   As a result of the Data Breach, Plaintiff Griffith has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Griffith has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Griffith away from other activities and money-making opportunities.

248.   The Netter Letter Plaintiff Griffith received from Episource specifically directed her to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

249.   Plaintiff Griffith fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

250.   Plaintiff Griffith has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Griffith's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Griffith's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Griffith's Private Information that was entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff, including the difference in value between what

69

Plaintiff should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Griffith's Private Information; and (e) continued risk to Plaintiff Griffith's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

### ***Plaintiff Michael Alcorn***

251.    At all relevant times, Plaintiff Alcorn was a member of Molina.

252.    Plaintiff Alcorn received a Notice Letter from Episource dated June 6, 2025, informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

253.    Plaintiff Alcorn is very careful about sharing his sensitive information. Plaintiff Alcorn would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

254.    Plaintiff Alcorn stores any documents containing his Private Information in a safe and secure location.

255.    Because of the Data Breach, Plaintiff Alcorn's Private Information is now in the hands of cybercriminals.

256.    Plaintiff Alcorn has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

257.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Alcorn is now at a present and continuing risk of identity theft and fraud.

258.    As a result of the Data Breach, Plaintiff Alcorn has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Alcorn has already expended time and suffered loss of productivity from taking time

1    to address and attempt to ameliorate, mitigate, and address the future consequences of
2    the Data Breach, including researching facts about the Data Breach, thoroughly
3    reviewing account statements and credit reports, contacting his bank regarding
4    fraudulent activity, changing password and autopayment information, sifting through
5    his e-mail inbox to verify which messages are legitimate and which are malicious
6    spam, and taking other protective and ameliorative steps in response to the Data
7    Breach. This is time that was lost and unproductive, taking Plaintiff Alcorn away from
8    other activities. This has also exacerbated Plaintiff Alcorn's anxiety and emotional
9    distress symptoms arising from a traumatic brain injury sustained in 2014.

10   259.   The Notice Letter Plaintiff Alcorn received from Episource directed him
11   to take the actions described above. Indeed, the Notice Letter Episource sent to Plaintiff
12   Alcorn and all Class Members advised individuals affected by the breach to "remain
13   vigilant against incidents of identity theft and fraud, to review your account statements,
14   and monitor free credit reports for suspicious activity and to detect errors." In addition,
15   the breach notice advised victims of the Data Breach how they could place a credit
16   freeze on their file through a credit reporting agency.

17   260.   Plaintiff Alcorn fears that criminals will use his information to commit
18   identity theft and anticipates spending considerable time and money on an ongoing
19   basis to remedy the harms caused by the Data Breach.

20   261.   Plaintiff Alcorn has also suffered injury directly and proximately caused
21   by the Data Breach, including: (a) theft of Plaintiff Alcorn's valuable Private
22   Information; (b) the imminent and certainly impending injury flowing from fraud and
23   identity theft posed by Plaintiff Alcorn's Private Information being placed in the hands
24   of cybercriminals; (c) damages to and diminution in value of Plaintiff Alcorn's Private
25   Information entrusted to Defendants; (d) damages unjustly retained by Defendants and
26   at the cost to Plaintiff Alcorn, including the difference in value between what Plaintiff
27   Alcorn should have received from Defendants and Defendants' defective and deficient
28   performance of that obligation by failing to provide reasonable and adequate data

CONSOLIDATED CLASS ACTION COMPLAINT

security to protect Plaintiff Alcorn's Private Information; and (e) continued risk to Plaintiff Alcorn's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information entrusted to them.

### *Plaintiff Nesrin Haddad*

262.    At all relevant times, Plaintiff Haddad was a member of Blue Shield.

263.    Plaintiff Haddad received a Notice Letter from Episoure dated June 6, 2025, informing her that her Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

264.    Plaintiff Haddad is very careful about sharing her sensitive information. Plaintiff Haddad would not have allowed Defendants to collect her Private Information had she known the true state of affairs regarding Defendants' data security practices.

265.    Plaintiff Haddad stores any documents containing her Private Information in a safe and secure location. Plaintiff Haddad has never knowingly transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured source.

266.    Because of the Data Breach, Plaintiff Haddad's Private Information is now in the hands of cybercriminals.

267.    Plaintiff Haddad has suffered actual injury from the exposure and theft of her Private Information—including violation of her right to privacy.

268.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Haddad is now at a present and continuing risk of identity theft and fraud.

269.    As a result of the Data Breach, Plaintiff Haddad has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Haddad has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly

reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Haddad away from other activities and money-making opportunities.

270.  The Notice Letter Plaintiff Haddad received from Episource directed her to take the actions described above. Indeed, the Notice Letter Episource sent to Plaintiff Haddad and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

271.  Plaintiff Haddad fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

272.  Plaintiff Haddad has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Haddad's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Haddad's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Haddad's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Haddad, including the difference in value between what Plaintiff Haddad should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Haddad's Private Information; and (e) continued risk to Plaintiff Haddad's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information entrusted to them.

***Plaintiff Patricia Giles***

273.    At all relevant times, Plaintiff Giles was a member of VNS.

274.    Plaintiff Giles received a Notice Letter from Episoure, informing her that her Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

275.    Plaintiff Giles is very careful about sharing her sensitive information. Plaintiff Giles would not have allowed Defendants to collect her Private Information had she known the true state of affairs regarding Defendants' data security practices.

276.    Plaintiff Giles stores any documents containing her Private Information in a safe and secure location.

277.    Because of the Data Breach, Plaintiff Giles's Private Information is now in the hands of cybercriminals.

278.    Plaintiff Giles has suffered actual injury from the exposure and theft of her Private Information—including violation of her right to privacy.

279.    As a result of the Data Breach, which exposed highly valuable, Plaintiff Giles is now at present and continuing risk of identity theft and fraud.

280.    As a result of the Data Breach, Plaintiff Giles has experienced data misuse and identity theft. For example, since the Data Breach, Plaintiff Giles has had numerous fraudulent charges on her bank accounts. Plaintiff Giles has also experienced a notable increase in the number of spam calls she receives since the Data Breach. She believes they are attempts to acquire additional data from her for fraud and identity theft. Plaintiff Giles attributes the foregoing suspicious and unauthorized activities to the Data Breach given the time proximity, the fact that she is very careful with his Private Information, and the fact that she has never experienced anything like this prior to now.

281.    As a result of the Data Breach, Plaintiff Giles has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff

1  Giles has already expended time and suffered loss of productivity from taking time to

2  address and attempt to ameliorate, mitigate, and address the future consequences of the

3  Data Breach, including researching facts about the Data Breach, thoroughly reviewing

4  account statements and credit reports, contacting her bank regarding fraudulent

5  activity, changing password and autopayment information, and taking other protective

6  and ameliorative steps in response to the Data Breach. This is time that was lost and

7  unproductive, and took Plaintiff Giles away from other activities and money-making

8  opportunities.

9      282.   The Notice Letter Plaintiff Giles received from Episource directed her to

10 take the actions described above. Indeed, the Notice Letter Episource sent to Plaintiff

11 and all Class Members advised individuals affected by the breach to "remain vigilant

12 against incidents of identity theft and fraud, to review your account statements, and

13 monitor free credit reports for suspicious activity and to detect errors." In addition, the

14 breach notice advised victims of the Data Breach how they could place a credit freeze

15 on their file through a credit reporting agency.

16     283.   Plaintiff Giles fears that criminals will use her information to commit

17 identity theft and anticipates spending considerable time and money on an ongoing

18 basis to remedy the harms caused by the Data Breach.

19     284.   Plaintiff Giles has also suffered injury directly and proximately caused by

20 the Data Breach, including: (a) theft of Plaintiff Giles's valuable Private Information;

21 (b) the imminent and certainly impending injury flowing from fraud and identity theft

22 posed by Plaintiff Giles's Private Information being placed in the hands of

23 cybercriminals; (c) damages to and diminution in value of Plaintiff Giles's Private

24 Information entrusted to Defendants; (d) damages unjustly retained by Defendants and

25 at the cost to Plaintiff, including the difference in value between what Plaintiff Giles

26 should have received from Defendants and Defendants' defective and deficient

27 performance of that obligation by failing to provide reasonable and adequate data

28 security to protect Plaintiff Giles's Private Information; and (e) continued risk to

1    Plaintiff Giles's Private Information, which remains in the possession of Defendants

2    and which is subject to further breaches so long as they fail to undertake appropriate

3    and adequate measures to protect the Private Information that was entrusted to them.

4    ***Plaintiff Paul Lewow***

5         285.    At all relevant times, Plaintiff Lewow was a member of Blue Shield.

6         286.    Plaintiff Lewow received a Notice Letter from Episource dated June 6,

7    2025, informing him that his Private Information was specifically identified as having

8    been exposed to cybercriminals in the Data Breach.

9         287.   Plaintiff Lewow is very careful about sharing his sensitive information.

10   Plaintiff Lewow would not have allowed Defendants to collect his Private Information

11   had he known the true state of affairs regarding Defendants' data security practices.

12        288.    Plaintiff Lewow stores any documents containing his Private Information

13   in a safe and secure location.

14        289.   Because of the Data Breach, Plaintiff Lewow's Private Information is now

15   in the hands of cybercriminals.

16        290.   Plaintiff Lewow has suffered actual injury from the exposure and theft of

17   his Private Information—including violation of his right to privacy.

18        291.   As a result of the Data Breach, which exposed highly valuable

19   information, Plaintiff Lewow is now at a present and continuing risk of identity theft

20   and fraud.

21        292.   As a result of the Data Breach, Plaintiff Lewow has had no choice but to

22   spend numerous hours attempting to mitigate the harms caused by the Data Breach and

23   addressing the future consequences of the Data Breach. Among other things, Plaintiff

24   Lewow has already expended time and suffered loss of productivity from taking time

25   to address and attempt to ameliorate, mitigate, and address the future consequences of

26   the Data Breach, including researching facts about the Data Breach, thoroughly

27   reviewing account statements and credit reports, contacting his bank regarding

28   fraudulent activity, changing password and autopayment information, and taking other

protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, taking Plaintiff Lewow away from other activities and money-making opportunities.

293.    The Notice Letter Plaintiff Lewow received from Episource directed him to take the actions described above. Indeed, the Notice Letter Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

294.    Plaintiff Lewow fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

295.    Plaintiff Lewow has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Lewow's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Lewow's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Lewow's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Lewow, including the difference in value between what Plaintiff Lewow should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Lewow's Private Information; and (e) continued risk to Plaintiff Lewow's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information entrusted to them.

### ***Plaintiff Phoebe Black***

296.    At all relevant times, Plaintiff Black was a member of Aetna.

297.    Plaintiff Black received a Notice Letter from Episource dated June 6, 2025, informing her that her Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

298.    Plaintiff Black is very careful about sharing her sensitive information. Plaintiff Black would not have allowed Defendants to collect her Private Information had she known the true state of affairs regarding Defendants' data security practices.

299.    Plaintiff Black stores any documents containing her Private Information in a safe and secure location.

300.    Because of the Data Breach, Plaintiff Black's Private Information is now in the hands of cybercriminals.

301.    Plaintiff Black has suffered actual injury from the exposure and theft of her Private Information—including violation of her right to privacy.

302.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Black is now at a present and continuing risk of identity theft and fraud.

303.    As a result of the Data Breach, Plaintiff Black has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Black has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Black away from other activities and money-making opportunities.

304.    The Notice Letter Plaintiff Black received from Episource directed her to take the actions described above. Indeed, the Notice Letter that Episource sent to

Plaintiff Black and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

305. Plaintiff Black fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

306. Plaintiff Black has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Black's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Black's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Black's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Black, including the difference in value between what Plaintiff Black should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Black's Private Information; and (e) continued risk to Plaintiff Black's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information entrusted to them.

### ***Plaintiff Ramon Cotto Rosa***

307. At all relevant times, Plaintiff Cotto Rosa was a member of Triple-S.

308. Plaintiff Cotto Rosa received a Notice Letter from Episource dated June 6, 2025, informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

309. Plaintiff Cotto Rosa is very careful about sharing his sensitive information. Plaintiff Rosa would not have allowed Defendants to collect his Private

Information had he known the true state of affairs regarding Defendants' data security practices.

310. Plaintiff Cotto Rosa stores any documents containing his Private Information in a safe and secure location.

311. Because of the Data Breach, Plaintiff Cotto Rosa's Private Information is now in the hands of cybercriminals.

312. Plaintiff Cotto Rosa has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

313. As a result of the Data Breach, which exposed highly valuable information, Plaintiff Cotto Rosa is now at present and continuing risk of identity theft and fraud.

314. As a result of the Data Breach, Plaintiff Cotto Rosa has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Cotto Rosa has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Rosa away from other activities and money-making opportunities.

315. The Notice Letter Plaintiff Cotto Rosa received from Episource specifically directed him to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to

detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

316.   Plaintiff Cotto Rosa fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

317.   Plaintiff Cotto Rosa has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Cotto Rosa's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Cotto Rosa's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Cotto Rosa's Private Information that was entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Cotto Rosa's Private Information; and (e) continued risk to Plaintiff Cotto Rosa's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

### ***Plaintiff Steve Altes***

318.   At all relevant times, Plaintiff Altes was a member of Blue Shield.

319.   Plaintiff Altes received a Notice Letter from Episource dated June 6, 2025 informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

320.   Plaintiff Altes is very careful about sharing his sensitive information. Plaintiff Altes would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

321.   Plaintiff Altes stores any documents containing his Private Information in a safe and secure location.

322.   Because of the Data Breach, Plaintiff Altes's Private Information is now in the hands of cybercriminals.

323.   Plaintiff Altes has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

324.   As a result of the Data Breach, which exposed highly valuable information, Plaintiff Altes is now at a present and continuing risk of identity theft and fraud.

325.   As a result of the Data Breach, Plaintiff Altes has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Altes has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Altes away from other activities and money-making opportunities.

326.   The Notice Letter Plaintiff Altes received from Episource specifically directed him to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

CONSOLIDATED CLASS ACTION COMPLAINT

327.   Plaintiff Altes fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

328.   Plaintiff Altes has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Altes's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Altes's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Altes's Private Information that was entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Altes's Private Information; and (e) continued risk to Plaintiff Altes's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

### ***Plaintiff Larry Thomas***

329.   During all times relevant, Plaintiff Thomas was a member of Banner Health.

330.   Plaintiff Thomas received a Notice Letter from Episource informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

331.   Plaintiff Thomas is very careful about sharing his sensitive information. Plaintiff Thomas would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

332.   Plaintiff Thomas stores any documents containing his Private Information in a safe and secure location.

333.   Because of the Data Breach, Plaintiff Thomas's Private Information is now in the hands of cybercriminals.

334.   Plaintiff Thomas has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

335.   As a result of the Data Breach, which exposed highly valuable information, Plaintiff Thomas is now at a present and continuing risk of identity theft and fraud.

336.   As a result of the Data Breach, Plaintiff Thomas has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Thomas has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements, placing a credit freeze on file with the credit bureaus, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Thomas away from other activities and money-making opportunities.

337.   The Notice Letter Plaintiff Thomas received from Episource directed him to take the actions described above. Indeed, the Notice Letter Episource sent to Plaintiff Thomas and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

338.   Plaintiff Thomas fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

339.    Plaintiff Thomas has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Thomas's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Thomas's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Thomas's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Thomas, including the difference in value between what Plaintiff Thomas should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Thomas's Private Information; and (e) continued risk to Plaintiff Thomas's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information entrusted to them.

### *Plaintiff Tyrone Holifield*

340.    During all times relevant, Plaintiff Holifield was a member of Anthem Blue Cross. Elevance Health and its affiliates provided Plaintiff Holifield with his Anthem Blue Cross plan.

341.    Plaintiff Holifield received a Notice Letter from Episource dated June 6, 2025, informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

342.    Plaintiff Holifield is very careful about sharing his sensitive information. Plaintiff Holifield would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

343.    Plaintiff Holifield stores any documents containing his Private Information in a safe and secure location.

344. Because of the Data Breach, Plaintiff Holifield's Private Information is now in the hands of cybercriminals.

345. Plaintiff Holifield has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

346. As a result of the Data Breach, which exposed highly valuable information, Plaintiff Holifield is now at a present and continuing risk of identity theft and fraud.

347. As a result of the Data Breach, Plaintiff Holifield has experienced data misuse and identity theft. For example, since the Data Breach, Plaintiff Holifield has had two loan applications opened in his name. Shortly after the Data Breach, Plaintiff Holifield received a text message from GoChecks informing him they received his loan application for $7,490.00. Plaintiff Holifield did not approve this loan application or apply for this loan. Armed with the Private Information leaked in the Data Breach, cybercriminals were able to pose as Plaintiff Holifield and request this unauthorized loan under his line of credit. Plaintiff Holifield later received an email from another company informing him that his loan application was pending. As before, Plaintiff Holifield did not apply for or otherwise authorize this loan.

348. Plaintiff Holifield has also experienced a notable increase in the number of spam calls he receives since the Data Breach. He believes they are attempts to acquire additional data from him for fraud and identity theft. Plaintiff Holifield attributes the foregoing suspicious and unauthorized activities to the Data Breach given the time proximity, the fact that he is very careful with his Private Information, and the fact that he has never experienced anything like this prior to now.

349. As a result of the Data Breach, Plaintiff Holifield has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Holifield has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of

the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Holifield away from other activities and money-making opportunities.

350.    The Notice Letter Plaintiff Holifield received from Episource directed him to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

351.    Plaintiff Holifield fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

352.    Plaintiff Holifield has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Holifield's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Holifield's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Holifield's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Holifield, including the difference in value between what Plaintiff Holifield should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Holifield's Private Information; and (e) continued risk to Plaintiff Holifield's Private Information, which remains in the possession of Defendants and which is subject to further breaches so

1  long as they fail to undertake appropriate and adequate measures to protect the Private

2  Information that was entrusted to them. Plaintiff Holifield has also suffered injury

3  directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's

4  valuable Private Information; (b) the imminent and certainly impending injury flowing

5  from fraud and identity theft posed by Plaintiff Holifield's Private Information being

6  placed in the hands of cybercriminals; (c) damages to and diminution in value of

7  Plaintiff Holifield's Private Information that was entrusted to Defendants; (d) damages

8  unjustly retained by Defendants and at the cost to Plaintiff, including the difference in

9  value between what Plaintiff should have received from Defendants and Defendants'

10  defective and deficient performance of that obligation by failing to provide reasonable

11  and adequate data security to protect Plaintiff Holifield's Private Information; and (e)

12  continued risk to Plaintiff Holifield's Private Information, which remains in the

13  possession of Defendants and which is subject to further breaches so long as they fail

14  to undertake appropriate and adequate measures to protect the Private Information that

15  was entrusted to them.

16  ***Plaintiff Wanda Hernandez***

17  353.   During all times relevant, Plaintiff Hernandez was a member of

18  InnovaCare.

19  354.   Plaintiff Hernandez received a Notice Letter from Episource dated June

20  6, 2025, informing her that her Private Information was specifically identified as

21  having been exposed to cybercriminals in the Data Breach.

22  355. Plaintiff Hernandez is very careful about sharing her sensitive

23  information. Plaintiff Hernandez would not have allowed Defendants to collect her

24  Private Information had she known the true state of affairs regarding Defendants' data

25  security practices.

26  356.   Plaintiff Hernandez stores any documents containing her Private

27  Information in a safe and secure location. Plaintiff Hernandez has never knowingly

28  transmitted unencrypted sensitive PII over the internet or any other unsecured source.

357.   Because of the Data Breach, Plaintiff Hernandez's Private Information is now in the hands of cybercriminals.

358.   Plaintiff Hernandez has suffered actual injury from the exposure and theft of her Private Information—including violation of her right to privacy.

359.   As a result of the Data Breach, which exposed highly valuable information such as her name, address, phone number, date of birth, health insurance data (such as health plan and policies, insurance companies, member and group ID numbers, and Medicaid-Medicare-government payor ID numbers) and health data (such as medical record numbers, doctors, diagnoses, medicines, test results, care, images, and treatment), Plaintiff Hernandez is now at a present and continuing risk of identity theft and fraud.

360.   On or around May 12, 2025, Plaintiff Hernandez received an email from Medicare Comparison Shop informing her that an unknown man going by the name of Geronimo Hernandez requested information about Medicare plans and coverage, attempting to obtain coverage under Plaintiff Hernandez's identity. Plaintiff Hernandez also started receiving emails from healthcare companies claiming that she has won free healthcare supplies and directing her to click on an external link.

361.   As a result of the Data Breach, Plaintiff Hernandez has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Hernandez has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Hernandez away from other activities and money-making opportunities.

362. The Notice Letter Plaintiff Hernandez received from Episource directed her to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff Hernandez and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

363. Plaintiff Hernandez fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

364. Plaintiff Hernandez has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Hernandez's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Hernandez's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Hernandez's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Hernandez, including the difference in value between what Plaintiff Hernandez should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Hernandez's Private Information; and (e) continued risk to Plaintiff Hernandez's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information entrusted to them.

***Plaintiff William Glenn Johnson***

365. At all relevant times, Plaintiff Johnson was a member of Blue Shield.

366.    Plaintiff Johnson received a Notice Letter from Episource dated June 6, 2025 informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

367.    Plaintiff Johnson is very careful about sharing his sensitive information. Plaintiff Johnson would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

368.    Plaintiff Johnson stores any documents containing his Private Information in a safe and secure location.

369.    Because of the Data Breach, Plaintiff Johnson's Private Information is now in the hands of cybercriminals.

370.    Plaintiff Johnson has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

371.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Johnson is now at a present and continuing risk of identity theft and fraud.

372.    As a result of the Data Breach, Plaintiff Johnson has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Johnson has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, taking Plaintiff Johnson away from other activities and money-making opportunities.

373.    The Notice Letter Plaintiff Johnson received from Episource directed him to take the actions described above. Indeed, the Notice Letter Episource sent to Plaintiff

and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

374.   Plaintiff Johnson fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

375.   Plaintiff Johnson has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Johnson's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Johnson's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Johnson, including the difference in value between what Plaintiff Johnson should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Johnson's Private Information; and (e) continued risk to Plaintiff Johnson's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information entrusted to them.

### ***Plaintiff Stephen Dollar***

376.   At all relevant times, Plaintiff Dollar was a member of Molina.

377.   Plaintiff Dollar received a Notice Letter from Episource dated June 6, 2025, informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

378.    Plaintiff Dollar is very careful about sharing his sensitive information. Plaintiff Dollar would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

379.    Plaintiff Dollar stores any documents containing his Private Information in a safe and secure location.

380.    Because of the Data Breach, Plaintiff Dollar's Private Information is now in the hands of cybercriminals.

381.    Plaintiff Dollar has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

382.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Dollar is now at a present and continuing risk of identity theft and fraud.

383.    As a result of the Data Breach, Plaintiff Dollar has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Dollar has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Dollar away from other activities and money-making opportunities.

384.    The Notice Letter Plaintiff Dollar received from Episource directed him to take the actions described above. Indeed, the Notice Letter Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the

93

breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

385.   Plaintiff Dollar fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach. Plaintiff Dollar has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Dollar's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Dollar's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Dollar, including the difference in value between what Plaintiff Dollar should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Dollar's Private Information; and (e) continued risk to Plaintiff Dollar's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

### ***Plaintiff Stephen Wharton***

386.    On information and belief, at all relevant times, Plaintiff Wharton was a member of Blue Cross.

387.    Plaintiff Wharton received a Notice Letter from Episource dated June 6, 2025, informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

388.   Plaintiff Wharton is very careful about sharing his sensitive information. Plaintiff Wharton would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

389. Plaintiff Wharton stores any documents containing his Private Information in a safe and secure location.

390. Because of the Data Breach, Plaintiff Wharton's Private Information is now in the hands of cybercriminals.

391. Plaintiff Wharton has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

392. As a result of the Data Breach, which exposed highly valuable information, Plaintiff Wharton is now at a present and continuing risk of identity theft and fraud.

393. As a result of the Data Breach, Plaintiff Wharton has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Wharton has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Wharton away from other activities and money-making opportunities.

394. The Notice Letter Plaintiff Wharton received from Episource directed him to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

395.   Plaintiff Wharton fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

396.   Plaintiff Wharton has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Wharton's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Wharton's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Wharton's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Wharton, including the difference in value between what Plaintiff Wharton should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Wharton's Private Information; and (e) continued risk to Plaintiff Wharton's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information entrusted to them.

## CLASS ACTION ALLEGATIONS

397.   Plaintiffs bring this action on behalf of themselves, and all other persons similarly situated pursuant to Fed. R. Civ. P. 23(a) and (b):

> All persons residing in the United States whose Private Information was accessed in the Data Breach, including all who were sent a notice of the Data Breach ("Nationwide Class").

398.   Plaintiffs Kathleen Desautles, Maurice Desautles, Larry Thomas, and Stephen Wharton (together, "Arizona Plaintiffs") separately seek to represent an Arizona Subclass defined as:

> All persons residing in the State of Arizona whose Private Information was accessed in the Data Breach, including all

who were sent a notice of the Data Breach ("Arizona Subclass").

399.    Plaintiffs Jose Contreras, Nesrin Haddad, Paul Lewow, Steve Altes, Tyrone Holifield, and William Glenn Johnson (together, "California Plaintiffs") separately seek to represent as California Subclass defined as:

> All persons residing in the State of California whose Private Information was accessed in the Data Breach, including all who were sent a notice of the Data Breach ("California Subclass").

400.    Plaintiffs Michael Alcorn and Stephen Dollar (together, "Illinois Plaintiffs") separately seek to represent an Illinois Subclass defined as:

> All persons residing in the State of Illinois whose Private Information was accessed in the Data Breach, including all who were sent a notice of the Data Breach ("Illinois Subclass").

401.    Plaintiff Patricia Giles separately seeks to represent a New York Subclass defined as:

> All persons residing in the State of New York whose Private Information was accessed in the Data Breach, including all who were sent a notice of the Data Breach ("New York Subclass").

402.    Excluded from the Class and subclasses are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, any entities in which Defendants have a controlling interest, as well as any Judge presiding over this matter and the clerks, judicial staff, and immediate family members of said Judge.

403.    Plaintiffs reserve the right to modify or amend the foregoing Class definitions before the Court determines whether certification is appropriate.

404.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

405.    <u>Numerosity:</u> The members in the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. Upon information and

belief, the Nationwide Class consists of 5,418,666 Class Members, whose data was compromised in the Data Breach, and the Arizona Subclass, California Subclass, Illinois Subclass, and New York Subclass each consist of at least thousands of members. The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

406. <u>Commonality and Predominance:</u> Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. These common questions of law or fact include, *inter alia*:

a. Whether Defendants engaged in the conduct alleged herein;

b. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class Members' Private Information from unauthorized access and disclosure;

c. Whether Defendants' computer systems and data security practices used to protect Plaintiffs' and Class Members' Private Information violated the FTC Act, HIPAA, CMIA, and/or state laws, and/or Defendants' other duties discussed herein;

d. Whether Defendants failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and Class Members;

e. Whether Defendants unlawfully shared, lost, or disclosed Plaintiffs' and Class Members' Private Information;

f. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

h. Whether Plaintiffs and Class Members suffered injury as a proximate result of Defendants' negligent actions or failures to act;

i. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class Members' Private Information;

j. Whether Defendants breached duties to protect Plaintiffs' and Class Members' Private Information;

k. Whether Defendants' actions and inactions alleged herein were negligent;

l. Whether Defendants were unjustly enriched by their conduct as alleged herein;

m. Whether Plaintiffs and Class Members were intended third party beneficiaries of contracts between Episource and Client Defendants, under which Defendants were required to protect Plaintiffs' and Class Members' Private Information and privacy, and whether that contract was breached;

n. Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

o. Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

p. Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

407. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs on behalf of themselves and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and

1   quality, to the numerous common questions that dominate this action.

2   408.   Typicality: Plaintiffs' claims are typical of the claims of the Class.

3   Plaintiffs, like all proposed members of the Class, had their Private Information

4   compromised in the Data Breach. Plaintiffs and Class Members were injured by the

5   same wrongful acts, practices, and omissions committed by Defendants, as described

6   herein. Plaintiffs' claims therefore arise from the same practices or course of conduct

7   that give rise to the claims of all Class Members.

8   409.   Adequacy: Plaintiffs will fairly and adequately protect the interests of the

9   Class Members. Plaintiffs are adequate representatives of the Class and have no

10   interests adverse to, or conflict with, the Class they seek to represent. Plaintiffs have

11   retained counsel with substantial experience and success in the prosecution of complex

12   consumer protection class actions of this nature.

13   410.   Predominance: Defendants have engaged in a common course of conduct

14   toward Plaintiffs and Class Members in that all of Plaintiffs and Class Members' data

15   was stored on the same computer systems and unlawfully accessed and exfiltrated in

16   the same way. The common issues arising from Defendants' conduct affecting Class

17   Members set out above predominate over any individualized issues. Adjudication of

18   these common issues in a single action has important and desirable advantages of

19   judicial economy.

20   411.   Superiority: A class action is superior to any other available means for the

21   fair and efficient adjudication of this controversy, and no unusual difficulties are likely

22   to be encountered in the management of this class action. The damages and other

23   financial detriment suffered by Plaintiffs and all other Class Members are relatively

24   small compared to the burden and expense that would be required to individually

25   litigate their claims against Defendants, so it would be impracticable for Class

26   Members to individually seek redress from Defendants' wrongful conduct. Even if

27   Class Members could afford individual litigation, the court system could not.

28   Individualized litigation creates a potential for inconsistent or contradictory judgments

and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

412.   Injunctive and Declaratory Relief: Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

413.   Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names in combination with addresses and/or e-mail addresses of Class Members affected by the Data Breach. Indeed, impacted Class Members already have been preliminarily identified and sent a Notice Letter.

## CAUSES OF ACTION

## COUNT I
## NEGLIGENCE
**(Against Episource On Behalf of Plaintiffs and the National Class)**

414.   Plaintiffs restate and reallege the preceding paragraphs as if fully set forth herein.

415.   Episource requires its client's customers to submit non-public Private Information as a condition of risk adjustment services, software, and solutions. Episource gathered and stored the Private Information of Plaintiffs and Class Members as part of its business, which affects commerce.

416.   Plaintiffs and Class Members entrusted Episource with their Private Information with the understanding that the information would be safeguarded against the foreseeable threat of a cyberattack designed to acquire that information.

417.   Episource knew and understood that cyberattacks are a foreseeable risk against which it was required to protect. Episource had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members

could and would suffer if their Private Information were wrongfully disclosed.

418.    By assuming the responsibility to collect and store this data, Episource had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

419.    Episource owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

420.    Episource also had a duty to exercise appropriate clearinghouse practices to remove its former clients' customers' Private Information they were no longer required to retain pursuant to regulations.

421.    Moreover, Episource had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach, but failed to do so.

422.    Episource's duty to use reasonable security measures arose as a result of the special relationship that existed between Episource, on the one hand, and Plaintiffs and Class Members, on the other hand. That special relationship arose because Episource was entrusted with their confidential Private Information as a condition of receiving risk adjustment services, software, and solutions with Defendants.

423.    California Courts analyze six factors to determine the existence of a special relationship with no single factor being required or dispositive: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm.

424.    Here, each factor is satisfied as (1) the transactions in which Plaintiffs provided their Private Information to Defendants were for the purpose of receiving healthcare services; (2) data breaches targeting Private Information are readily

foreseeable and the subject of frequent warnings by data security experts and state and federal governments; (3) the injuries associated with the theft and misuse of Plaintiffs' Private Information, including the expenditure of time and money mitigating the consequences of a data breach are alleged by Plaintiffs; (4) the theft of Private Information and Plaintiffs' allegations that Episource failed to implement reasonable data security measures is logically connected to and proximately caused by the Data Breach; (5) the moral blame associated with Episource's collection and use of Plaintiffs' Private Information for its own profit while failing to fund data security measures intended to protect Plaintiffs' Private Information from the foreseeable consequences of a data breach is high; and (6) imposing liability on Episource for failing to safeguard Private Information will further California state policy of ensuring that personal information is protected and preventing the theft and misuse of Private Information by criminals.

425.    Episource had duties arising under the FTC Act, HIPAA, and the CMIA to protect Plaintiffs' and Class Members' Private Information.

426.    Episource's violations of Section 5 of the FTC Act, HIPAA, the CMIA, and other state data security and consumer protection statutes constitute negligence *per se*.

427.    Plaintiffs and Class Members are consumers within the class of persons that these statutes were intended to protect and the harm that has occurred is the type of harm these statutes were intended to guard against.

428.    In addition, under state data security and consumer protection statutes such as those outlined herein, Episource had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and Class Members' Private Information.

429.    Plaintiffs and Class Members were foreseeable victims of Episource's violations of the FTC Act, HIPAA, the CMIA and state data security and consumer protection statutes. Episource knew or should have known that its failure to implement

reasonable data security measures to protect and safeguard Plaintiffs' and Class Members' Private Information would cause damage to Plaintiffs and the Class.

430. Episource's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described herein, but also because Episource is bound by industry standards to protect confidential Private Information. Episource also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain under regulations.

431. Episource's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

432. Episource had and continues to have duties to adequately disclose that Plaintiffs' and Class Members' Private Information within Episource's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

433. Episource breached its duties and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information. The specific negligent acts and omissions committed by Episource include, but are not limited to, the following:

> a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;
>
> b.  Failing to adequately monitor the security of their networks and systems for unauthorized access or the transfer of large volumes of

data;

c.   Failing to encrypt or limit access to Class Members' Private Information;

d.   Failing to detect in a timely manner that Class Members' Private Information had been compromised;

e.   Failing to remove former clients' customers' Private Information they were no longer required to retain under regulations; and

f.   Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take steps to mitigate the potential for identity theft and other damages.

434.   Episource breached its duties to Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

435.   Episource knew or should have known that its failure to implement reasonable data security measures to protect and safeguard Plaintiffs' and Class Members' Private Information would cause damage to Plaintiffs and the Class.

436.   A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Episource's inadequate security practices.

437.   Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Episource knew or should have known of the inherent risks in collecting and storing Private Information, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on its systems.

438.   Plaintiffs and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendants' possession.

439.   Episource was in an exclusive position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

440.    Episource's duties extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

441.    Episource has admitted that the Private Information of Plaintiffs and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

442.    But for Episource's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, Plaintiffs' and Class Members' Private Information would not have been compromised.

443.    There is a close causal connection between Episource's failure to implement security measures to protect Plaintiffs' and Class Members' Private Information, and the harm, or risk of imminent harm suffered by Plaintiffs and Class Members. Private Information was lost and accessed as the proximate result of Episource's failure to exercise reasonable care by adopting, implementing, and maintaining appropriate security measures.

444.    As a direct and proximate result of Episource's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised Private Information; (ii) invasion of privacy; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Episource's possession and is subject to further

unauthorized disclosures so long as Episource fails to undertake appropriate and adequate measures to protect the Private Information; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the value of the unauthorized access to their Private Information permitted by Defendants; and (xi) any nominal damages that may be awarded.

445.   As a direct and proximate result of Episource's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses including nominal damages.

446.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

447.   Episource's negligent conduct is ongoing, in that it still possesses Plaintiffs' and Class Members' Private Information in an unsafe and insecure manner.

448.   Plaintiffs and Class Members are entitled to injunctive relief requiring Episource to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### NEGLIGENCE
### (Against The Client Defendants On Behalf Of Plaintiffs And The Nationwide Class)

449.   Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, and bring this claim against the Client Defendants.

450.   Client Defendants engaged Episource for medical coding and risk adjustment services and shared their customers' and patients'—i.e., Plaintiffs' and Class Members'—non-public Private Information with Episource.

451.   Client Defendants had full knowledge of the sensitivity of the Private Information at issue, and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was ever wrongfully disclosed.

452.   By assuming the responsibility to collect and store this data, Client Defendants had duties of care to Plaintiffs and Class Members to use reasonable means to secure and to prevent disclosure of the Private Information entrusted to it, and to safeguard it from theft.

453.   Client Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

454.   Client Defendants also had a duty under HIPAA, 42 U.S.C. § 1302(d), *et seq*., to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

455.   Specifically, under HIPAA, Client Defendants had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." See definition of "encryption" at 45 C.F.R. § 164.304.

456.   Client Defendants breached their duties to Plaintiffs and Class Members under the FTCA and HIPAA by not complying with industry standards and other requirements discussed herein, and by failing to provide fair, reasonable, or adequate computer systems and data security monitoring practices that were adequate to safeguard Plaintiffs' and Class Members' Private Information.

457.   Client Defendants owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements

discussed herein, and to ensure that their systems and networks, and those belonging to their vendors, adequately protected the Private Information.

458.    Client Defendants' duty to use reasonable security measures arose as a result of the special relationship that existed between them, on the one hand, and Plaintiffs and Class Members, on the other hand. That special relationship arose because Plaintiffs and the Class entrusted Client Defendants with their confidential Private Information, a necessary part of receiving services from Client Defendants.

459.    Client Defendants also had a duty to exercise appropriate clearinghouse practices to remove former customers and patients' Private Information they were no longer required to retain under regulations.

460.    Moreover, Client Defendants had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach, which they failed to do.

461.    Client Defendants had, and continue to have, duties to adequately disclose that Plaintiffs' and Class Members' Private Information within Episource's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

462.    Client Defendants breached their duties, under the FTCA, HIPAA, and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information with which they were entrusted. The specific negligent acts and omissions committed by Client Defendants include, but are not limited to, the following:

    a.    Failing to adequately vet, audit, monitor, or ensure the integrity of vendor data security practices;

    b.    Allowing unauthorized access to Class Members' Private Information;

CONSOLIDATED CLASS ACTION COMPLAINT

    c.    Failing to keep Class Members' Private Information in encrypted format;

    d.    Failing to remove former customers' Private Information that was no longer required to be retained under regulations; and

    e.    Failing to timely and adequately notify Class Members about the Data Breach and its scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

463.   Client Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class if such information was not protected.

464.   Plaintiffs and Class Members were within the class of persons the provisions of the FTCA and HIPAA were intended to protect, and the type of harm that resulted from the Data Breach was the type of harm they were intended to guard against.

465.   A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Episource's inadequate security practices.

466.   It was foreseeable that Client Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large corporations.

467.   Client Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if the Private Information was wrongfully disclosed.

468.   Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Client Defendants knew or should have known of the inherent risks in collecting and storing the Private Information and

providing sensitive data to vendors who do not adequately protect the data, the critical importance of providing adequate security of that data, and the necessity for encrypting the data stored on their systems.

469.   It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information, instead placing it in the hands of a vendor that does not adequately safeguard sensitive data, would result in one or more types of injuries to Class Members.

470.   Plaintiffs and the Class had no ability to protect their Private Information that was in, and possibly remains in, Episource's possession, and which Client Defendants handed over to Episource.

471.   Defendants were in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach, including through properly vetting their vendors to ensure such vendors adequately protect Private Information.

472.   But for Client Defendants' wrongful and negligent breaches of duties owed to Plaintiffs and the Class, the Private Information of Plaintiffs and the Class would not have been compromised.

473.   There is a close causal connection between Client Defendants' failure to ensure the protection of Plaintiffs' and Class Members' Private Information, and the harm or risk of imminent harm suffered by Plaintiffs and the Class. Plaintiffs' and Class Members' Private Information was lost and accessed as the proximate result of Client Defendants' failure to exercise reasonable care in ensuring that Private Information is adequately safeguarded.

474.   As a direct and proximate result of Client Defendants' negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised Private Information; (ii) invasion of privacy; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts,

and/or emails; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Client Defendants' (including Episource's) possession and is subject to further unauthorized disclosures so long as Client Defendants and Episource fail to undertake appropriate and adequate measures to protect the Private Information.

475.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

476.   Plaintiffs and class members are also entitled to injunctive relief requiring Client Defendants to: (i) strengthen their data security systems and monitoring procedures; (ii) evaluate, audit, and improve their processes for vetting third-party vendors and the selection processes for vendors to which they provide sensitive data; (iii) submit to future annual audits of those systems and monitoring procedures; and (iv) continue to provide adequate credit monitoring to all Class Members.

## COUNT III
### BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
### (Against Episource On Behalf of Plaintiffs and the National Class)

477.   Plaintiffs restate and reallege the preceding paragraphs as if fully set forth herein.

478.   As a HIPAA covered business associate, Episource is required to enter into contracts with healthcare organizations in which it agrees to implement reasonable safeguards to protect the information of healthcare patients from unauthorized access.

479.   Plaintiffs and the proposed Class Members are third-party beneficiaries of contracts between Episource and its clients, under which Episource received Plaintiffs' and the Class's Private Information; stored that information in its computer network systems; and provided services to its clients.

480.   Episource knew that Plaintiffs and the Class Members, as customers of Episource's clients, were the intended beneficiaries of these contracts, in that the contracts all related to the provision of healthcare services to Plaintiffs and the Class.

481.    Episource breached the foregoing contracts by failing to adequately protect Plaintiffs' and the Class Members' Private Information, resulting in the Data Breach, and injury-in-fact and damages as alleged herein.

482.    Episource materially breached the contract(s) each had entered into by failing to safeguard the Private Information entrusted to it, safeguard Plaintiffs' and the Class's Private Information, and breaching the covenant of good faith and fair dealing.

483.    As a direct and proximate result, Plaintiffs and Class Members are entitled to actual, compensatory, and consequential damages.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (Against the Client Defendants On Behalf of Plaintiffs and the National Class)

484.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, and bring this claim against the Client Defendants.

485.    Plaintiffs and Class Members were required to deliver their Private Information to Client Defendants as part of the process of obtaining insurance products or services provided by Client Defendants. Plaintiffs and Class Members paid money to Client Defendants in exchange for products or services and would not have paid for Client Defendants' products or services, or would have paid less for them, had they known that Client Defendants' data security practices were substandard.

486.    Client Defendants solicited, offered, and invited Class Members to provide their Private Information as part of Client Defendants' regular business practices. Plaintiffs and Class Members accepted Client Defendants' offers and provided their Private Information to Client Defendants as part of their express contracts for insurance services.

487.    Plaintiffs and the Class entrusted their Private Information to Client Defendants. In so doing, Plaintiffs and the Class entered into implied contracts with Client Defendants by which Client Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and

113

compromised or stolen.

488.   In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Client Defendants' data security practices complied with relevant laws and regulations (including FTCA and HIPAA) and were consistent with industry standards.

489.   Implicit in the agreement between Plaintiffs and Class Members and Client Defendants to provide Private Information was Defendants' obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

490.   The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Client Defendants, on the other, is shown by their conduct and course of dealing.

491.   On information and belief, at all relevant times Client Defendants promulgated, adopted, and implemented written privacy policies whereby they promised Plaintiffs and Class Members that they would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

492.   On information and belief, Client Defendants further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' Private Information would remain protected.

493.   Plaintiffs and Class Members paid money to Client Defendants and entrusted their inherently valuable Private Information to them with the reasonable belief and expectation that Client Defendants would use part of the profits resulting therefrom to obtain and implement adequate data security, including costs required to

adequately monitor their vendors. Client Defendants failed to do so.

494.    Plaintiffs and Class Members would not have entrusted their Private Information to Client Defendants in the absence of the implied contract between them and Client Defendants to keep their Private Information reasonably secure.

495.    Plaintiffs and Class Members would not have entrusted their Private Information to Client Defendants in the absence of their implied promise to monitor their computer systems and networks and vendors, including Episource, to ensure that reasonable data security measures were in place to protect the Private Information from compromise.

496.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Client Defendants.

497.    Client Defendants breached the implied contracts they made with Plaintiffs and the Class by failing to safeguard and protect their Private Information, by failing to delete (or require deletion of) Plaintiffs and Class Members' Private Information once the relationship ended, and by failing to provide accurate notice to them that their Private Information was compromised as a result of the Data Breach.

498.    Every contract has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

499.    Client Defendants breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices, including vendor-monitoring practices, necessary to safeguard the Private Information, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members, and continued acceptance of Private Information and storage of other personal information after Client Defendants knew, or should have known, of the security vulnerabilities of the data security practices, procedures, and protocols that were exploited in the Data Breach.

500.    As a direct and proximate result of Client Defendants' breach of the

implied contracts, Plaintiffs and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) dissemination of the compromised Private Information on the dark web; (viii) experiencing an increase in spam calls, texts, and/or emails; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Client Defendants' possession and is subject to further unauthorized disclosures so long as Client Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

501. Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

502. Plaintiffs and Class Members are also entitled to injunctive relief requiring Client Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT V
## UNJUST ENRICHMENT
### (Against Episoure On Behalf of Plaintiffs and the National Class)

503. Plaintiffs restate and reallege the preceding paragraphs as if fully set forth herein.

504. This count is brought in the alternative to Plaintiffs' breach of third-party beneficiary contract count.

505. Plaintiffs and Class Members conferred a monetary benefit on Episoure through payments made to Episoure on their behalf. In addition, they provided

Episource with their Private Information. In exchange, Episource should have provided adequate data security for Plaintiffs' and Class Members' Private Information.

506.    Episource knew that Plaintiffs and Class Members conferred a benefit on it in the form of payments made on their behalf by their healthcare organizations and through the receipt of their Private Information as a necessary part of providing its services. Episource appreciated and accepted that benefit. Episource profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

507.    Upon information and belief, Episource funds its data security measures entirely from its general revenue, including payments on behalf of or for the benefit of Plaintiffs and Class Members.

508.    As such, a portion of the payments made for the benefit of or on behalf of Plaintiffs and Class Members is to be used to provide a reasonable level of data security. The amount of the portion of each payment made that is allocated to data security is known to Episource.

509.    Episource, however, failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not provide adequate data security in return for the benefit Plaintiffs and Class Members provided.

510.    Episource would not be able to carry out an essential function of its regular business without the Private Information of Plaintiffs and Class Members and derived revenue by using it for business purposes. Plaintiffs and Class Members expected that Episource or anyone in Episource's position would use a portion of that revenue to fund adequate data security practices.

511.    Episource acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

512.    If Plaintiffs and Class Members knew that Episource had not reasonably secured their Private Information, they would not have allowed their Private Information to be provided to Episource.

513.   Episource enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Episource instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Episource's decision to prioritize their own profits over the requisite security and the safety of their Private Information.

514.   Under the principles of equity and good conscience, Episource should not be permitted to retain the money wrongfully obtained from Plaintiffs and Class Members, because Episource failed to implement appropriate data management and security measures mandated by industry standards.

515.   Plaintiffs and Class Members have no adequate remedy at law.

516.   As a direct and proximate result of Episource's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

517.   Episource should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Episource should be compelled to refund the amounts that Plaintiffs and Class Members were underpaid by Episource.

## COUNT VI
## DECLARATORY JUDGMENT
### (Against All Defendants On Behalf of the National Class)

518.   Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

519.   Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties

and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described in this Complaint.

520.    Defendants owe a duty of care to Plaintiffs and Class Members, which required them to adequately secure Plaintiffs and Class Members' Private Information.

521.    Defendants still possess Private Information regarding Plaintiffs and Class Members.

522.    Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information, and the risk remains that further compromises of their Private Information will occur in the future.

523.    Under its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a.    Defendants owe a legal duty to secure individuals' Private Information and to timely notify them of a data breach under the common law, HIPAA, and the FTCA;

    b.    Defendants' existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to protect individuals' Private Information; and

    c.    Defendants continue to breach this legal duty by failing to employ reasonable measures to secure individuals' Private Information.

524.    This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect patient and customer Private Information in their possession, including the following:

    a.    Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b.    Order that, to comply with Defendants' explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

    i.    engaging (or, in the case of the Client Defendants, requiring that their vendors engage) third-party security auditors and penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on the systems storing patient and/or policyholder PII and PHI on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

    ii.    engaging (or, in the case of the Client Defendants, requiring that their vendors engage) third-party security auditors and internal personnel to run automated security monitoring;

    iii.    auditing, testing, and training security personnel regarding any new or modified procedures;

    iv.    segmenting their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

    v.    storing Private Information in an encrypted format;

    vi.    conducting regular database scanning and security checks; and

    vii.    routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

525.   If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach by Defendants. The risk of another such breach is real, immediate, and substantial. If another breach impacts Defendants, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

526.   The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiffs will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

527.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Episource, thus preventing future injury to Plaintiffs, Class Members, and others whose Private Information would be further compromised.

<u>**COUNT VII**</u>
**CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, Cal. Civ. Code § 56, *et seq.***
**(Against California Defendants On Behalf of California Plaintiffs and the California Subclass)**

528.   California Plaintiffs (for purposes of this Count, "Plaintiffs") restate and reallege the preceding paragraphs as if fully set forth herein.

529.   Plaintiffs bring this claim on behalf of themselves and the California Subclass against Defendant Episource and Client Defendants Molina and Blue Shield (collectively, "California Defendants").

530.   Plaintiffs are "patients" as defined in Cal. Civ. Code § 56.05(m), and California Defendants are each "a provider of health care," as defined in Cal. Civ. Code § 56.06; thus, California Defendants are subject to the requirements of the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56.10(a), (d)

1   and (e), 56.36(b), 56.101(a) and (b).

2       531.  At all relevant times, California Defendants were each a health care

3   provider because they had the "purpose of maintaining medical information to make

4   the information available to the individual or to a provider of health care at the request

5   of the individual or a provider of health care, for purposes of allowing the individual

6   to manager her or her information, or for the diagnosis or treatment of the individual."

7       532.  As a provider of health care or a contractor, California Defendants were

8   required by the CMIA to ensure that medical information regarding patients is not

9   disclosed or disseminated or released without patient's authorization, and to protect

10  and preserve the confidentiality of the medical information regarding a patient, under

11  Civil Code §§ 56.06, 56.10, 56.13, 56.20, 56.245, 56.26, 56.35, 56.36, and 56.101.

12      533.  Each Defendant is a "health care service plan" to the extent they are an

13  "entity regulated pursuant to the Knox-Keene Health Care Service Plan Act of 1975

14  (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety

15  Code)." Cal. Civ. Code § 56.05(f).

16      534.  Each Defendant is "contractor" to the extent it is a "person or entity that

17  is a medical group, independent practice association, pharmaceutical benefits manager,

18  or a medical service organization and is not a health care service plan or provider of

19  health care. 'Contractor' does not include insurance institutions as defined in

20  subdivision (k) of Section 791.02 of the Insurance Code or pharmaceutical benefits

21  managers licensed under the Knox-Keene Health Care Service Plan Act of 1975

22  (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety

23  Code).'" Cal. Civ. Code § 56.05(d).

24      535.  California Defendants are each a person licensed under California under

25  California's Business and Professions Code, Division 2. *See* Cal. Bus. Prof. Code §

26  4000, *et seq*.

27      536.  Plaintiffs and California Subclass Members are "patients" as defined in

28  Cal. Civ. Code § 56.05(m) ("'Patient' means a natural person, whether or not still

living, who received health care services from a provider of health care and to whom medical information pertains.").

537.    Plaintiffs and Class Members are "Enrollees" under Civil Code § 56.05(e) to the extent they are a "person who is enrolled in a plan and who is a recipient of services from the plan." *See* Cal. Health & Safety Code § 1345(c).

538.    Plaintiffs and Class Members are "Subscribers" under Civil Code § 56.05(q) to the extent they are a "person who is enrolled in a plan and who is a recipient of services from the plan." *See* Cal. Health & Safety Code § 1345(p).

539.    Furthermore, Plaintiffs and California Subclass Members, as patients and customers of California Defendants, had their individually identifiable "medical information," within the meaning of Cal. Civ. Code § 56.05(j), created, maintained, preserved, and stored on California Defendants' computer network, and were patients on or before the date of the Data Breach.

540.    California Defendants disclosed "medical information," as defined in CMIA, Cal. Civ. Code 196. § 56.05(j), to unauthorized persons without first obtaining consent, in violation of Cal. Civ. Code § 56.10(a). The disclosure of information to unauthorized individuals in the Data Breach resulted from the affirmative actions of California Defendants' employees, which allowed the hacker to see and obtain Plaintiff and California Subclass Members' medical information.

541.    California Defendants negligently created, maintained, preserved, stored, and then exposed Plaintiffs and California Subclass Members' individually identifiable "medical information," within the meaning of Cal. Civ. Code § 56.05(j), including Plaintiffs and California Subclass Members' names, cities, states, zip codes, emails, telephone numbers, dates of birth, gender, patient service dates, patient service locations, and next appointment dates, that alone or in combination with other publicly available information, reveals their identities. Specifically, California Defendants knowingly allowed and affirmatively acted in a manner that allowed unauthorized parties to access and actually view Plaintiffs and California Subclass Members'

1   confidential Private Information.

2     542.  California Defendants' negligence resulted in the release of individually

3 identifiable medical information pertaining to Plaintiffs and California Subclass

4 Members to unauthorized persons and the breach of the confidentiality of that

5 information. California Defendants' negligent failure to maintain, preserve, store,

6 abandon, destroy, and/or dispose of Plaintiffs and California Subclass Members'

7 medical information in a manner that preserved the confidentiality of the information

8 contained therein, in violation of Cal. Civ. Code §§ 56.06 and 56.101(a).

9     543.  California Defendants also violated Sections 56.06 and 56.101 of the

10 CMIA, which prohibit the negligent creation, maintenance, preservation, storage,

11 abandonment, destruction or disposal of confidential personal medical information.

12     544.  Section 56.10(a) of the CMIA provides that "[a] provider of health care,

13 health care service plan, or contractor shall not disclose medical information regarding

14 a patient of the provider of health care or an enrollee or subscriber of a health care

15 service plan without first obtaining an authorization."

16     545.  Section 56.101(a) of the CMIA provides that "[e]very provider of health

17 care, health care service plan, pharmaceutical company, or contractor who creates,

18 maintains, preserves, stores, abandons, destroys, or disposes of medical information

19 shall do so in a manner that preserves the confidentiality of the information contained

20 therein. Any provider of health care, health care service plan, pharmaceutical company,

21 or contractor who negligently creates, maintains, preserves, stores, abandons, destroys,

22 or disposes of medical information shall be subject to the remedies and penalties

23 provided under subdivisions (b) and (c) of Section 56.36." Section 56.101(b)(1)(A)

24 further provides that "[a]n electronic health record system or electronic medical record

25 system . . . [p]rotect and preserve the integrity of electronic medical information."

26     546.  Section 56.35 of the CMIA provides that "[i]n addition to any other

27 remedies available at law, a patient whose medical information has been used or

28 disclosed in violation of Section 56.10, 56.104, 56.107, or 56.20 or subdivision (a) of

Section 56.26 and who has sustained economic loss or personal injury therefrom may recover compensatory damages, punitive damages not to exceed three thousand dollars ($3,000), attorney's fees not to exceed one thousand dollars ($1,000), and the costs of litigation."

547.    Section 56.36(b) of the CMIA provides the following:

> In addition to any other remedies available at law, an individual may bring an action against a person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following:
>
> (1) Except as provided in subdivision (e), nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it is not necessary that the plaintiff suffered or was threatened with actual damages.
>
> (2) The amount of actual damages, if any, sustained by the patient.

548.    California Defendants have misused, disclosed, and/or otherwise allowed third parties to access and view Plaintiffs' and Class Members' personal medical information without their written authorization in violation of Civil Code §§ 56.10, 56.11, 56.13, 56.26, and 56.101.

549.    Plaintiffs and California Subclass Members' medical information was accessed, removed, and actually viewed by hackers and other unauthorized parties during and following the Data Breach.

550.    Plaintiffs and California Subclass Members' medical information that was the subject of the Data Breach included "electronic medical records" or "electronic health records" as referenced by Civil Code § 56.101(c) and defined by 42 U.S.C. § 17921(5).

551.    California Defendants' computer systems did not protect and preserve the integrity of electronic medical information in violation of Cal. Civ. Code § 56.101(b)(1)(A). As a direct and proximate result of California Defendants' above-noted wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, and violation of the CMIA, Plaintiffs and the

125

California Subclass Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia, (a) present, imminent, immediate and continuing increased risk of identity theft, identity fraud and medical fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (b) invasion of privacy, (c) breach of the confidentiality of the PHI, (d) statutory damages under the CMIA, (e) deprivation of the value of their PHI, for which there is well-established national and international markets, and/or (f) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

552.    California Defendants violated the CMIA by (1) failing to implement reasonable administrative, physical and technical safeguards to protect, secure and prevent the unauthorized access to, and acquisition of, Plaintiffs' and Class Members' personal medical information; (2) failing to implement reasonable data security measures, such as intrusion detection processes that detect data breaches in a timely manner, to protect and secure Plaintiffs' and Class Members' personal medical information; (3) failing to use reasonable authentication procedures to track Plaintiffs' and Class Members' personal medical information in case of a security breach; and (4) allowing undetected and unauthorized access to servers, networks and systems where Plaintiffs' and Class Members' personal medical information was kept, all in violation of the CMIA.

553.    Defendant further violated the CMIA by affirmatively sharing and disclosing, and providing third parties with access to, Plaintiffs' and Class Members' medical information.

554.    As a direct and proximate result of California Defendants' wrongful actions, inaction, omission, and want of ordinary care that directly and proximately caused the release of Plaintiffs and California Subclass Members' Private Information, Plaintiff and California Subclass Members' personal medical information was viewed by, released to, and disclosed to third parties without Plaintiffs and California Subclass

Members' written authorization.

555.   As a result of the Data Breach, unauthorized parties obtained personal medical information, viewed it, and now have it available to them to sell to other bad actors, including on the dark web, post the information on the dark web or otherwise misuse.

556.   As a further result of the Data Breach, the confidential nature of Plaintiffs' and Class members' medical information was breached as a result of California Defendants' negligence. Specifically, California Defendants knowingly allowed and affirmatively acted in a manner that actually allowed unauthorized parties to access and view Plaintiffs' and Class Members' Private Information, which was viewed and used when the unauthorized parties engaged in the above-described fraudulent activity.

557.   California Defendants' negligent failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiffs and California Subclass Members' medical information in a manner that preserved the confidentiality of the information contained therein violated the CMIA.

558.   California Defendants' failure to implement adequate data security measures to protect the PHI of Plaintiffs and Class Members was a substantial factor in allowing unauthorized parties to access California Defendants' computer systems and acquire the PHI of Plaintiffs and California Subclass Members.

559.   As a direct and proximate result of California Defendants' violation of the CMIA, California Defendants allowed the PHI of Plaintiffs and Class Members to (a) escape and spread from its normal place of storage through unauthorized disclosure or release; and (b) be accessed and acquired by unauthorized parties in order to, view, mine, exploit, use, and/or profit from their personal medical information, thereby breaching the confidentiality of their personal medical information. Plaintiffs and Class Members have accordingly sustained and will continue to sustain actual damages as set forth above.

//

560.   As a direct and proximate result of California Defendants' wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs' and Class Members' personal medical information was viewed by, released to, and disclosed to third parties without Plaintiffs' and Class Members' written authorization.

561.   Plaintiffs and the California Subclass Members were injured and have suffered damages, as described above, from California Defendants' illegal and unauthorized disclosure and negligent release of their medical information in violation of Cal. Civ. Code §§ 56.10 and 56.101, and Plaintiffs and Class Members are entitled to (i) actual damages, (ii) nominal damages of $1,000 per Plaintiff and Class Member, (iii) punitive damages of up to $3,000 per Plaintiff and Class Member, and (iv) attorneys' fees, litigation expenses, and court costs under California Civil Code § 56.35 and 56.36.

### COUNT VIII
### VIOLATION OF CALIFORNIA CONSUMER PRIVACY ACT
### Cal. Civ. Code § 1798.150, *et seq*.
### (Against California Defendants On Behalf of California Plaintiffs and the California Subclass)

562.   California Plaintiffs (for purposes of this Count, "Plaintiffs") restate and reallege the preceding paragraphs as if fully set forth herein.

563.   Plaintiffs bring this claim on behalf of themselves and the California Subclass against Defendant Episource and Client Defendants Molina and Blue Shield (collectively, "California Defendants").

564.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

565.   Cal. Civ. Code § 1798.150(a) of the California Consumer Privacy Act ("CCPA") provides that "[a]ny consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5 . . . is subject to an unauthorized access and exfiltration, theft,

128

or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action" for statutory damages, actual damages, injunctive relief, declaratory relief and any other relief the court deems proper.

566.    On or about September 26, 2025, Plaintiffs sent California Defendants notice pursuant to the CCPA.

567.    Plaintiffs and California Subclass Members are "consumers" as defined by Cal. Civ. Code § 1798.140(g) because they are natural persons who reside in California.

568.    California Defendants are "business[es]" as defined by Cal. Civ. Code § 1798.140(c) because California Defendants are corporations organized for the profit or financial benefit of their shareholders or owners and have gross annual revenues in excess of twenty-five million dollars.

569.    Plaintiffs and California Subclass Members provided California Defendants with their nonencrypted and nonredacted personal information as defined in § 1798.81.5 in the form of their PII/PHI. The information Plaintiffs and California Subclass Members provided to California Defendants included medical information under the CMIA and protected health information under HIPAA, as well as non-medical patient information (such as social security numbers, addresses, dates of birth, telephone numbers, among other information).

570.    Plaintiffs allege that California Defendants did not store all non-medical patient information in the same manner as they maintained medical information under the CMIA and protected health information under HIPAA. For instance, California Defendants non-medical patient information, such as billing details, contact information, and insurance data, was maintained with different security measures and/or made more accessible to a broader range of individuals than its systems that stored medical information under the CMIA and protected health information under

HIPAA. Plaintiffs also allege that California Defendants conducted different audits and monitoring for medical information consistent with its obligations under the CMIA and HIPAA (although such monitoring fell short) than it did with the non-medical patient information involved in the Data Breach. Plaintiffs further allege that California Defendants had different incident response protocols for medical information than the non-medical patient information involved in the Data Breach. For the non-medical patient information that California Defendants stored in a different manner than medical information under the CMIA and protected health information under HIPAA, Plaintiffs brings a CCPA claim.

571. Defendants failed to take sufficient and reasonable measures to safeguard their data security systems and protect Plaintiffs' and California Subclass Members' highly sensitive personal information and medical data from unauthorized access. California Defendants' failure to maintain adequate data protections subjected Plaintiff's and the California Subclass Members' nonencrypted and nonredacted sensitive personal information to exfiltration and disclosure by malevolent actors.

572. The unauthorized access, exfiltration, theft, and disclosure of Plaintiffs' and the California Subclass Members' Private Information was a result of California Defendants' violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information.

573. Under California Defendants' duty to protect customers' Private Information, it was required to implement reasonable security measures to prevent and deter hacks from accessing the Private Information of its customers. That these vulnerabilities existed and enabled unauthorized third parties to access and harvest customers' Private Information evidence that California Defendants have breached that duty.

574. Plaintiffs and California Subclass Members have suffered actual injury and are entitled to damages in an amount to be proven at trial but in excess of the

1    minimum jurisdictional requirement of this Court.

2    575.   California Defendants' violations of Cal. Civ. Code § 1798.150(a) are a

3    direct and proximate result of the Data Breach.

4    576.   Plaintiffs and California Subclass Members seek all monetary and non-

5    monetary relief allowed by law, including actual or nominal damages; statutory

6    damages pursuant to Cal. Civ. Code § 1798.150(a)(1)(A) in an amount not less than

7    one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per

8    consumer per incident or actual damages, whichever is greater; declaratory and

9    injunctive relief, including an injunction barring California Defendants from disclosing

10   their PHI and PII without their consent; reasonable attorney's fees and costs; and any

11   other relief that is just and proper.

## COUNT IX
## CALIFORNIA CONSUMER RECORDS ACT
### Cal. Civ. Code §§ 1798.80, *et seq.*
### (Against California Defendants On Behalf of California Plaintiffs and the California Subclass)

577.   California Plaintiffs (for purposes of this Count, "Plaintiffs") restate and reallege the preceding paragraphs as if fully set forth herein.

578.   Plaintiffs bring this claim on behalf of themselves and the California Subclass against Defendant Episource and Client Defendants Molina and Blue Shield (collectively, "California Defendants").

579.   "[T]o ensure that personal information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information [PII] from unauthorized access, destruction, use, modification, or disclosure."

580.   California Defendants are businesses that own, maintain, and license

personal information (or "PII"), within the meaning of Cal. Civ. Code §§ 1798.80(a) and 1798.81.5(b), about Plaintiffs and Class Members.

581.   Businesses that own or license computerized data that includes PII are required to notify California residents when their PII has been acquired (or is reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Among other requirements, the security breach notification must include "the types of personal information [PII] that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

582.   California Defendants are businesses that own or license computerized data that includes "personal information" [PII] as defined by Cal. Civ. Code § 1798.80.

583.   Plaintiffs and Class Members' PII includes "personal information" as covered by Cal. Civ. Code § 1798.82.

584.   Because California Defendants reasonably believed that Plaintiffs and Class Members' PII was acquired by unauthorized persons during the Data Breach, California Defendants had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Cal. Civ. Code § 1798.82.

585.   California Defendants failed to fully disclose material information about the Data Breach in a timely manner.

586.   By failing to disclose the Data Breach in a timely manner, California Defendants violated Cal. Civ. Code § 1798.82.

587.   As a direct and proximate result of California Defendants' violations of the Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiffs and Class Members suffered damages, as described above.

588.   Plaintiffs and the Class Members seek relief under Cal. Civ. Code § 1798.84, including actual damages and injunctive relief.

589.   Plaintiffs and the Class Members were injured and have suffered damages, as described above, from California Defendants' illegal and unauthorized

disclosure and negligent release of their Private Information in violation of Cal. Civ. Code §§56.10 and 56.101, and therefore seek relief under Civ. Code §§ 56.35 and 56.36, which allows for actual damages, nominal statutory damages of $1,000, punitive damages of $3,000, injunctive relief, and attorney's fees, expenses and costs.

<u>COUNT X</u>
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(Against California Defendants On Behalf of California Plaintiffs and the California Subclass)**

590.    California Plaintiffs (for purposes of this Count, "Plaintiffs") restate and reallege the preceding paragraphs as if fully set forth herein.

591.    Plaintiffs bring this claim on behalf of themselves and the California Subclass against Defendant Episoure and Client Defendants Molina and Blue Shield (collectively, "California Defendants").

592.    The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. ("UCL"), prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

593.    By reason of California Defendants' above-described wrongful actions, inactions, and omissions, the resulting Data Breach, and the unauthorized disclosure of Plaintiffs' and Class Members' Private Information, California Defendants engaged in unfair, unlawful, and fraudulent business practices in violation of the UCL.

594.    The acts, omissions, and conduct complained of herein in violation of the UCL were designed and emanated from California Defendants' corporate offices.

595.    Plaintiffs suffered injury, in fact, and lost money or property as a result of California Defendants' alleged violations of the UCL.

596.    The acts, omissions, and conduct of California Defendants as alleged herein constitute a "business practice" within the meaning of the UCL.

//

**Unlawful Prong**

597.    California Defendants violated the unlawful prong of the UCL by violating, inter alia, violation of California's data breach statutes, Section 5 of the FTC Act, FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1302d, *et seq.*, CMIA, Cal. Civ. Code § 56, *et seq.*, California Customer Records Act, California Civil Code § 1798.81.5, and HITECH, 42 U.S.C. § 17921, 45 C.F.R. § 160.103 as alleged herein.

598.    California Defendants violated the unlawful prong of the UCL by failing to honor the terms of its implied contracts with Plaintiffs and Class Members, as alleged herein.

599.    California Defendants' conduct also undermines California public policy—as reflected in statutes like the California Information Practices Act, Cal. Civ. Code §§ 1798, *et seq.*, the CCPA concerning consumer privacy, and the CCRA concerning customer records, and the CMIA concerning medical information—which seek to protect customer and consumer data and ensure that entities who solicit or are entrusted with personal data utilize reasonable security measures.

**Unfair Prong**

600.    Defendants' "unfair" acts and practices include: utilizing cheaper, ineffective security measures and diverting funds to their own profit, instead of providing a reasonable level of security that would have prevented the hacking incident; failing to follow industry standard and the applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data; failing to timely and adequately notify California Subclass Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and California Subclass Members' personal information.

601.    California Defendants' acts, omissions, and conduct also violate the unfair prong of the UCL because California Defendants' acts, omissions, and conduct, as

1    alleged herein, offended public policy and constitute immoral, unethical, oppressive,

2    and unscrupulous activities that caused substantial injury, including to Plaintiffs and

3    other California Class Members. The gravity of California Defendants' conduct

4    outweighs any potential benefits attributable to such conduct and there were reasonably

5    available alternatives to further California Defendants' legitimate business interests,

6    other than Defendants' conduct described herein.

7        602.   California Defendants' failure to utilize, and to disclose that they do not

8    utilize industry standard security practices, constitutes an unfair business practice

9    under the UCL. California Defendants' conduct is unethical, unscrupulous, and

10   substantially injurious to the Class. While California Defendants' competitors have

11   spent the time and money necessary to appropriately safeguard their products, service,

12   and customer information, California Defendants have not—to the detriment of their

13   customers and to competition.

14       603.   California Defendants' conduct was immoral, unethical, oppressive,

15   unscrupulous, and substantially injurious to Plaintiffs and California Subclass

16   Members. Further, California Defendants' conduct narrowly benefited their own

17   business interests at the expense of Plaintiffs' and California Subclass Members'

18   fundamental property and privacy interests protected by the California Constitution

19   and the common law.

20       **Fraudulent Prong**

21       604.   By failing to disclose that they do not enlist industry-standard security

22   practices, all of which rendered Class Members particularly vulnerable to data

23   breaches, California Defendants engaged in UCL-violative practices.

24       605.   A reasonable consumer would not have transacted with California

25   Defendants if they knew the truth about their security procedures. By withholding

26   material information about their security practices, California Defendants were able to

27   obtain customers who provided and entrusted their Private Information in connection

28   with transacting business with California Defendants. Had Plaintiffs known the truth

1    about California Defendants' security procedures, Plaintiffs would not have done

2    business with California Defendants.

3        606.   As a result of California Defendants' violations of the UCL, Plaintiffs and

4    Class Members are entitled to injunctive relief including, but not limited to: (1)

5    ordering that California Defendants use strong industry standard data security

6    measures for the collection, storage, and retention of customer data; (2) ordering that

7    California Defendants, consistent with industry standard practices, engage third party

8    security auditors and penetration testers as well as internal security personnel to

9    conduct testing, including simulated attacks, penetration tests, and audits on California

10   Defendants' systems on a periodic basis; (3) ordering that California Defendants

11   engage third-party security auditors and internal personnel, consistent with industry

12   standard practices, to run automated security monitoring; (4) ordering that California

13   Defendants audit, test, and train their security personnel regarding any new or modified

14   procedures; (5) ordering that California Defendants, consistent with industry standard

15   practices, segment consumer data by, among other things, creating firewalls and access

16   controls so that if one area of California Defendants' systems are compromised,

17   hackers cannot gain access to other portions of those systems; (6) ordering that

18   California Defendants purge, delete, and destroy in a reasonably secure manner Class

19   Member's data not necessary for their provisions of services; (7) ordering that

20   California Defendants, consistent with industry standard practices, conduct regular

21   database scanning and security checks; (8) ordering that California Defendants,

22   consistent with industry standard practices, evaluate all software, systems, or programs

23   utilized for collection and storage of sensitive Private Information for vulnerabilities

24   to prevent threats to customers; (9) ordering that California Defendants, consistent with

25   industry standard practices, periodically conduct internal training and education to

26   inform internal security personnel how to identify and contain a breach when it occurs

27   and what to do in response to a breach; and (10) ordering California Defendants to

28   meaningfully educate their customers about the threats they face as a result of the loss

of their Private Information.

607.   As a result of California Defendants' violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property, as detailed herein.

608.   They agreed to transact with California Defendants or made purchases or spent money that they otherwise would not have made or spent, had they known the true state of affairs regarding California Defendants' data security policies. Class Members lost control over their Private Information and suffered a corresponding diminution in value of that Private Information, which is a property right. Class Members lost money as a result of dealing with the fallout of and attempting to mitigate harm arising from the Data Breach.

609.   Plaintiffs request that the Court issue sufficient equitable relief to restore Class Members to the position they would have been in had California Defendants not engaged in violations of the UCL, including by ordering restitution of all funds that California Defendants may have acquired from Plaintiffs and Class Members as a result of those violations.

610.   Plaintiffs seek prospective injunctive relief, including improvements to California Defendants' data security systems and practices, in order to ensure that such security is reasonably sufficient to safeguard customers' Private Information that remains in California Defendants' custody, including but not limited to the following:

   a.   Ordering that California Defendants engage third-party security auditors and penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on California Defendants' systems on a periodic basis, and ordering California Defendants to promptly correct any problems or issues detected by such third-party security auditors;

   b.   Ordering that California Defendants engage third-party security auditors and internal personnel to run automated security

monitoring;

    c.    Ordering that California Defendants audit, test, and train their security personnel regarding any new or modified procedures;

    d.    Ordering that California Defendants segment customers' Private Information by, among other things, creating firewalls and access controls so that if one area of California Defendants' systems is compromised, hackers cannot gain access to other portions of California Defendants' systems;

    e.    Ordering that California Defendants purge, delete, and destroy in a reasonably secure manner customers' Private Information not necessary for provisions of California Defendants' services;

    f.    Ordering that California Defendants conduct regular computer system scanning and security checks;

    g.    Ordering that California Defendants routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

    h.    Ordering California Defendants to meaningfully educate their current, former, and prospective customers about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves;

    i.    Ordering California Defendants to implement systems to ensure that Private Information is stored in an encrypted format; and

    j.    Ordering that California Defendants ensure that the third parties to whom they provide access to their customers' Private Information have similar data security measures in place to adequately protect that information.

//

611.   Unless such Class-wide injunctive relief is issued, Plaintiffs and Class Members remain at risk, and there is no other adequate remedy at law that would ensure that Plaintiffs (and other consumers) can rely on California Defendants' representations regarding their data security in the future.

612.   California Defendants acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiffs' and Class Members' rights.

613.   California Defendants' actions caused damage to and loss of Plaintiffs' and California Subclass Members' property right to control the dissemination and use of their personal information and communications. California Defendants were in an exclusive position to protect the Private Information. Plaintiffs and California Subclass Members had no way of reasonably avoiding the injury.

614.   As a direct and proximate result of California Defendants' violation of the UCL, Plaintiffs and California Subclass Members lost money or property, including, but not limited to benefit of the bargain losses in the form of monies paid to California Defendants on their behalf and intended to be devoted to data security, lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, and actual misuse of the compromised data.

615.   California Defendants knew or should have known that California Defendants' computer systems and data security practices were inadequate to safeguard Plaintiffs' and California Subclass Members' Private Information and that the risk of a data breach or theft was highly likely. California Defendants' actions in engaging in the above-named unlawful and unfair practices and acts were knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and California Subclass Members.

616.   Under Business and Professions Code Sections 17203, Plaintiffs and the California Subclass seek an order from this Court enjoining California Defendants from continuing to engage, use, or employ its unfair business practices.

617.    Plaintiffs and the California Subclass Members have suffered injury-in-fact and would not have done business with California Defendants if they had known that their association would put their Private Information at risk. Plaintiffs and the California Subclass would not have given California Defendants their Private Information had they known that their Private Information was vulnerable to a data breach. Likewise, Plaintiffs and California Subclass Members seek an order mandating that California Defendants implement adequate security practices to protect California Subclass Members' Private Information. Additionally, Plaintiffs and the California Subclass Members seek and request an order awarding Plaintiffs and the Subclass restitution of the money wrongfully acquired by California Defendants by means of California Defendants' unfair and unlawful practices.

618.    Plaintiffs and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution to Plaintiffs and Class Members of money or property that California Defendants may have acquired by means of California Defendants' unlawful, and unfair business practices; disgorgement of all profits accruing to California Defendants because of California Defendants' unlawful and unfair business practices; declaratory relief; reasonable attorney's fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief, including public injunctive relief.

## COUNT XI
### VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT
#### Cal. Civ. Code § 1750, *et seq.*
**(Against California Defendants On Behalf of California Plaintiffs and the California Subclass)**

619.    California Plaintiffs (for purposes of this Count, "Plaintiffs") restate and reallege the preceding paragraphs as if fully set forth herein.

620.    Plaintiffs bring this claim on behalf of themselves and the California Subclass against Defendant Episoure and Client Defendants Molina and Blue Shield

CONSOLIDATED CLASS ACTION COMPLAINT

(collectively, "California Defendants").

621.   This cause of action is brought under the California Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq*.

622.   On or about September 26, 2025, Plaintiffs sent California Defendants notice under the CLRA.

623.   California Defendants are the parties with the most knowledge of the underlying facts giving rise to Plaintiffs' allegations, so that any pre-suit notice would not put California Defendants in a better position to evaluate those claims. To the extent additional notice is required, Plaintiffs will issue separate demands under Cal. Civ. Code § 1782(a). Plaintiffs in the alternative seek only injunctive relief pursuant to Cal. Civ. Code § 1782, subdivision (d), which provides that "[a]n action for injunctive relief brought under the specific provisions of Section 1770 may be commenced without compliance with subdivision (a)."

624.   Plaintiffs and Class Members are "consumers," as the term is defined by California Civil Code § 1761(d).

625.   Plaintiffs, Class Members, and California Defendants have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

626.   The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by California Defendants were likely to deceive consumers.

627.   Cal. Civ. Code § 1770(a)(5) prohibits one who is involved in a transaction from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

628.   California Defendants violated this provision by representing that it took appropriate measures to protect Plaintiffs and the Class Members' Private Information. California Defendants improperly handled, stored, or protected either unencrypted or partially encrypted data.

629.   Plaintiffs and Class Members relied upon California Defendants' representations and were induced to sign up for California Defendants' services, and provide their Private Information which contains value in order to obtain services from California Defendants.

630.   As a result, Plaintiffs and Class Members were induced to enter into a relationship with California Defendants and provide their Private Information.

631.   As a result of engaging in such conduct, California Defendants violated Civil Code § 1770.

632.   Under Civil Code § 1780(a)(2) and (a)(5), Plaintiffs seek an order of this Court that includes, but is not limited to, an order enjoining California Defendants from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

633.   Plaintiffs and Class Members suffered injuries caused by California Defendants' misrepresentations, because they provided their Private Information believing that California Defendants would adequately protect this information.

634.   Plaintiffs and Class Members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

635.   The unfair and deceptive acts and practices of California Defendants, as described above, present a serious threat to Plaintiffs and Class Members.

636.   Plaintiffs seeks prospective injunctive relief, including improvements to California Defendants' data security systems and practices, in order to ensure that such security is reasonably sufficient to safeguard patients' Private Information that remains in California Defendants' custody, including but not limited to the following:

a.   Ordering that California Defendants engage third-party security auditors and penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on California Defendants' systems on a periodic basis,

CONSOLIDATED CLASS ACTION COMPLAINT

1      and ordering California Defendants to promptly correct any

2      problems or issues detected by such third-party security auditors;

3    b.    Ordering that California Defendants engage third-party security

4      auditors and internal personnel to run automated security

5      monitoring;

6    c.    Ordering that California Defendants audit, test, and train their

7      security personnel regarding any new or modified procedures;

8    d.    Ordering that California Defendants segment patient data by, among

9      other things, creating firewalls and access controls so that if one area

10     of California Defendants' systems is compromised, hackers cannot

11     gain access to other portions of California Defendants' systems;

12    e.    Ordering that California Defendants not transmit Private

13     Information via unencrypted email;

14    f.    Ordering that California Defendants not store Private Information in

15     email accounts;

16    g.    Ordering that California Defendants purge, delete, and destroy in a

17     reasonably secure manner patient data not necessary for provisions

18     of California Defendants' services;

19    h.    Ordering that California Defendants conduct regular computer

20     system scanning and security checks;

21    i.    Ordering that California Defendants routinely and continually

22     conduct internal training and education to inform internal security

23     personnel how to identify and contain a breach when it occurs and

24     what to do in response to a breach;

25    j.    Ordering California Defendants to implement systems to ensure that

26     Private Information is stored in an encrypted format;

27    k.    Ordering California Defendants to meaningfully educate their

28     current, former, and prospective patients about the threats they face

as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves; and

l.    Ordering that California Defendants ensure that any third parties they provide Plaintiffs and Class Members Private Information to have similar and adequate systems identified above in place to ensure Plaintiffs' and Class Members' Private Information remains protected.

637.    Unless such Class-wide injunctive relief is issued, Plaintiffs and Class Members remain at risk, and there is no other adequate remedy at law that would ensure that Plaintiff Adams (and other consumers) can rely on California Defendants' representations regarding their data security in the future.

638.    Furthermore, in the alternative to all legal remedies sought herein, Plaintiffs, on behalf of the Class, seek monetary relief including but not limited to restitution to Plaintiffs and Class Members of money or property that California Defendants may have acquired by means of California Defendants' unlawful, and unfair business practices; restitutionary disgorgement of all profits accruing to California Defendants because of California Defendants' unlawful and unfair business practices; declaratory relief; and attorney's fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

## COUNT XII
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT ("ICFA"),
### 815 Ill. Comp. Stat. §§ 505, *et seq.*
### (Against Illinois Defendants On Behalf of Illinois Plaintiffs and the Illinois Subclass)

639.    Illinois Plaintiffs (for purposes of this Count, "Plaintiffs") restate and reallege the preceding paragraphs as if fully set forth herein.

640.    Plaintiffs bring this claim on behalf of themselves and the Illinois Subclass against Defendant Episource and Client Defendant Molina (collectively,

144

"Illinois Defendants").

641.   Plaintiffs and Illinois Subclass Members are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e).

642.   Plaintiffs, the Illinois Subclass, and Illinois Defendants are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

643.   Illinois Defendants engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f).

644.   Illinois Defendants engage in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. §§ 505/1(b) and (d).

645.   Illinois Defendants engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and omission of material facts in connection with the sale and advertisement of their services in violation of the ICFA, including: (i) failing to maintain adequate data security to keep Plaintiffs' and Illinois Subclass Members' sensitive Private Information from being stolen by cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act; (ii) failing to disclose or omitting materials facts to Plaintiffs and the Illinois Subclass regarding its lack of adequate data security and inability or unwillingness to properly secure and protect the Private Information of Plaintiffs and the Illinois Subclass; (iii) failing to disclose or omitting materials facts to Plaintiffs and the Illinois Subclass about Illinois Defendants' failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the Private Information of Plaintiffs and the Illinois Subclass; and (iv) failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiffs' and the Illinois Subclass's Private Information from further unauthorized disclosure, release, data breaches, and theft.

646.   These actions also constitute deceptive and unfair acts or practices because Illinois Defendants knew the facts about their inadequate data security and failure to comply with applicable state and federal laws and industry standards would

1    be unknown to and not easily discoverable by Plaintiffs and the Illinois Subclass and

2    defeat their reasonable expectations about the security of their Private Information.

3      647.  Illinois Defendants intended that Plaintiffs and the Illinois Subclass rely

4    on its deceptive and unfair acts and practices and the concealment and omission of

5    material facts in connection with Defendants' offering of goods and services and

6    employment positions.

7      648.  Illinois Defendants' wrongful practices were and are injurious to the

8    public because those practices were part of Defendants' generalized course of conduct

9    that applied to the Illinois Subclass. Plaintiffs and the Illinois Subclass have been

10    adversely affected by Illinois Defendants' conduct and the public was and is at risk as

11    a result thereof.

12      649.  Illinois Defendants also violated Personal Information Protection Act

13    ("PIPA"), 815 Ill. Comp. Stat. § 530/1, *et seq*. PIPA obligates "data collectors" that

14    own, license, maintain or store records that contain personal information of Illinois

15    residents to "implement and maintain reasonable security measures to protect those

16    records from unauthorized access, acquisition, destruction, use, modification, or

17    disclosure." 815 Ill. Comp. Stat. § 530/45. Illinois Defendants violated this duty by

18    failing to implement reasonably secure data security policies. Violation of PIPA

19    constitutes an unlawful practice under the ICFA. 815 Ill. Comp. Stat. § 530/20.

20      650.  Illinois Defendants further violated the ICFA by failing to notify plaintiffs

21    of the data breach in a timely manner. PIPA requires entities that experience a data

22    breach to notify Illinois residents "in the most expedient time possible and without

23    unreasonable delay." 815 Ill. Comp. Stat. § 530/10.

24      651.  As a result of Illinois Defendants' wrongful conduct, Plaintiffs and the

25    Illinois Subclass were injured in that they never would have provided their Private

26    Information to Illinois Defendants had they known or been told that Illinois Defendants

27    failed to maintain sufficient security to keep their Private Information from being

28    hacked and taken and misused by others.

652.    As a direct and proximate result of Illinois Defendants' violations of the ICFA, Plaintiffs and the Illinois Subclass have suffered harm, as alleged herein.

653.    Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiffs and the Illinois Subclass seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Illinois Defendants' violations of the ICFA.

**COUNT XIII**
**VIOLATION OF ARIZONA CONSUMER FRAUD ACT**
**A.R.S. § 44-1521, *et seq.***
**(Against Arizona Defendants On Behalf of the Arizona Plaintiffs and the Arizona Subclass)**

654.    Arizona Plaintiffs and the Arizona Subclass (for purposes of this Count, "Plaintiffs") restate and reallege the preceding paragraphs as if fully set forth herein.

655.    Plaintiffs bring this claim on behalf of themselves and the Arizona Subclass against Defendant Episource and Client Defendant Blue Cross (collectively, "Arizona Defendants").

656.    Arizona Defendants sold Arizona Plaintiffs and other Arizona Subclass members "merchandise" as that term as defined by A.R.S. § 44-1521, in the form of services, including health and insurance services.

657.    Section 44-1522 of the Arizona Consumer Fraud Act provides:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby.

*See* A.R.S. § 44-1522(A).

658.    Arizona Defendants violated the Arizona Consumer Fraud Act by employing unfair acts and practices in connection with the sale or advertisement of that merchandise in violation of A.R.S. § 44-1522(A).

147
CONSOLIDATED CLASS ACTION COMPLAINT

659.    Specifically, Arizona Defendants collected and stored Plaintiffs' and the Arizona Subclass's Private Information. Arizona Defendants stored the Private Information in a knowingly unsafe and unsecured manner by, among other things, maintaining the data on an unsecured database in an unencrypted format, failing to adequately monitor activity on the servers containing Arizona Plaintiffs' and the Arizona Subclass's information, and failing to adequately segment the sensitive data from other parts of Episource's servers and networks.

660.    Arizona Defendants deployed knowingly unreasonable data security measures that defied industry standards and statutory requirements for reasonable data security.

661.    Arizona Defendants' failure to comply with basic data security necessary to protect any stored data, much less the significant and highly private and personal information Episource stored constitutes immoral, unethical, oppressive, and unscrupulous conduct that caused substantial harm to tens of thousands of Arizona residents.

662.    Although Arizona Defendants collectively acted in violation of the Arizona Consumer Fraud Act, each Defendant also separately violated the statute by acting unfairly, unlawfully, and unscrupulously.

663.    As a result of those unlawful and unfair business practices, Arizona Plaintiffs and the Arizona Subclass's highly sensitive and private health and medical information were put at foreseeable risk of unauthorized access, theft, and acquisition. That risk materialized with the Data Breach, where hackers obtained and successfully exfiltrated the Private Information of over five million patients. Subsequently, the stolen information was posted on the dark web, exposing their private and personal information and putting patients at a substantial risk of misuse of their data.

664.    Due to Arizona Defendants' inadequate security and the resulting Data Breach, Plaintiffs suffered and will continue to suffer significant injuries, including, but not limited to: (1) loss of privacy; (2) misappropriation of their identity and name

and likeness; (3) fraud and identity theft from the misuse of their stolen Private Information; (4) diminution in the value of their personal data due to the loss of security, confidentiality, and privacy; (5) emotional and mental distress and anguish resulting from the access, theft, and posting of their personal and private medical information; (6) disruption of their medical care and treatment; (7) inability to obtain pharmaceutical prescriptions necessary for their health and well-being; (8) lost time, effort, and expense responding to and preventing the threats and harm posed by the Data Breach; and (9) a continued substantial and imminent risk of the misuse of their data.

665.   Plaintiffs also remain at heightened risk of future injury because their information resides with Arizona Defendants and, further, because Arizona Defendants continue to gather new medical information on Plaintiffs and the Class.  Without the use of adequate data security, Plaintiffs remain at a heightened and substantial risk that their Private Information will be subject to another data breach.

666.   Arizona Plaintiffs and the Arizona Subclass seek all monetary and non-monetary relief allowed by law, including any: economic damages; damages for emotional and mental anguish; nominal damages; enhanced or treble damages available under the law; court costs; reasonable necessary attorneys' fees; injunctive relief; and any other relief available by law and to which the court deems proper.

## COUNT XIV
## VIOLATION OF NY GEN. BUS. LAW § 349
### (Against New York Defendants On Behalf of Plaintiff Giles and the New York Subclass)

667.   Plaintiff Giles and the New York Subclass (for purposes of this Count, "Plaintiffs") restate and reallege the preceding paragraphs as if fully set forth herein.

668.   Plaintiffs bring this claim on behalf of themselves and the New York Subclass against Defendant Episource and Client Defendant VNS (collectively, "New York Defendants").

669.   New York General Business Law §349(a) states, "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." New York courts specifically interpret § 349 "by looking to the definition of deceptive acts and practices under [S]ection 5 of the Federal Trade Commission Act." *New York v. Feldman*, 210 F. Supp. 2d 294, 302 (S.D.N.Y. 2002).

670.   The New York Defendants are each a "person, firm, corporation or association or agent or employee thereof" within the meaning of N.Y. Gen. Bus. Law § 349(b).

671.   At all relevant times, the New York Defendants were engaged in "business," "trade," or "commerce" within the meaning of N.Y. Gen. Bus. Law § 349(a).

672.   Plaintiff Giles and New York Subclass members are each a "person" within the meaning of N.Y. Gen. Bus. Law § 349(h).

673.   At all relevant times, New York Defendants engaged in transactions affecting trade or commerce and furnishing services in New York including, but not limited to, the responsibility for overseeing or contributing to the protocols for properly safeguarding Plaintiff Giles' and New York Subclass members' Private Information.

674.   Specifically, New York Defendants collected and stored Plaintiff Giles' and the New York Subclass's Private Information. New York Defendants stored the Private Information in a knowingly unsafe and unsecured manner by, among other things, failing to dispose of data no longer needed for any legitimate business purpose, maintaining the data on an unsecured database in an unencrypted format, failing to adequately monitor activity on the servers containing Plaintiff Giles' and New York Subclass's information, and failing to adequately segment the sensitive data from other parts of Episource's servers and networks.

675.   Similarly, New York Defendants deployed knowingly unreasonable data security measures that defied industry standards and statutory requirements for

reasonable data security.  New York Defendants engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, including:

a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Giles' and New York Subclass members' Private Information, which was a direct and proximate cause of the Data Breach;

b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Giles' and New York Subclass members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach.

676.   Plaintiff Giles and members of the New York Subclass were deceived in New York. They also transacted with New York Defendants in New York by providing their Private Information for medical care and treatment in New York.

677.   New York Defendants' deceptive conduct was material because it was likely to deceive reasonable consumers about the adequacy of the New York Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

678.   New York Defendants' failure to comply with basic data security necessary to protect any stored data, much less the significant and highly private and personal information Episource stored constitutes immoral, unethical, oppressive, and unscrupulous conduct that caused substantial harm to over five million individuals.

New York Defendants failed to take the necessary measures to protect the Private Information of Plaintiff Giles and the New York Subclass, leaving them at significant and foreseeable risk of harm.

679.   Consequently, New York Defendants collectively and each independently took actions in violation of the N.Y. Gen. Bus. Law § 349 by failing to safeguard Plaintiff Giles and the New York Subclass Members' Private Information.

680.   New York Defendants' deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the nearly thirty thousand New Yorkers affected by the Data Breach.

681.   As a result of those unlawful and unfair business practices, Plaintiff Giles' and the New York Subclass's highly sensitive and private health and medical information were put at foreseeable risk of unauthorized access, theft, and acquisition. That risk materialized with the Data Breach, where hackers obtained and successfully exfiltrated the Private Information over five million patients.

682.   As a direct and proximate result of New York Defendants' inadequate security and the resulting Data Breach, the above deceptive and unlawful practices and acts by the Defendants caused and will continue to cause substantial injuries to Plaintiff Giles and New York Subclass members that they could not reasonably avoid, including, but not limited to: (1) loss of privacy; (2) misappropriation of their identity and name and likeness; (3) fraud and identity theft from the misuse of their stolen Private Information; (4) diminution in the value of their personal data due to the loss of security, confidentiality, and privacy; (5) emotional and mental distress and anguish resulting from the access, theft, and posting of their personal and private medical information; (6) disruption of their medical care and treatment; (7) inability to obtain pharmaceutical prescriptions necessary for their health and well-being; (8) lost time, effort, and expense responding to and preventing the threats and harm posed by the Data Breach; and (9) a continued substantial and imminent risk of the misuse of their data.

683.   Plaintiff Giles and the New York Subclass seek all monetary and non-monetary relief allowed by law, including any: economic damages; damages for emotional and mental anguish; nominal damages; enhanced or treble damages available under the law; court costs; reasonable necessary attorneys' fees; injunctive relief; and any other relief available by law and to which the court deems proper.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all other members of the Class, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants as follows:

A.    An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Classes requested herein, appointing the undersigned as Class Counsel, and finding that Plaintiffs are proper representatives of the Classes requested herein;

B.    Injunctive relief requiring Defendants to (1) strengthen their data security systems that maintain personally identifying information to comply with the applicable state laws alleged herein (including, but not limited to, the California Customer Records Act) and best practices under industry standards; (2) engage third-party auditors and internal personnel to conduct security testing and audits on Defendants' systems on a periodic basis; (3) promptly correct any problems or issues detected by such audits and testing; (4) implement systems to ensure that Private Information is stored in an encrypted format;  and (5) routinely and continually conduct training to inform internal security personnel how to prevent, identify and contain a breach, and how to appropriately respond;

C.    An order requiring Defendants to pay all costs associated with class notice and administration of class-wide relief;

D. An award to Plaintiffs and all members of the Classes of compensatory, consequential, incidental, nominal, and statutory damages, restitution, and

1   disgorgement, in an amount to be determined at trial;

2   E.    That the Court award statutory damages, trebled, and/or punitive or

3        exemplary damages, to the extent permitted by law, including but not

4        limited to the following:

5        1.    Compensatory damages, punitive damages not to exceed three

6              thousand dollars ($3,000), attorneys' fees not to exceed one

7              thousand dollars ($1,000), and the costs of litigation under Civil

8              Code § 56.35;

9        2.    Nominal damages of one thousand dollars ($1,000) for each

10             violation under Civil Code § 56.36(b)(1);

11       3.    Actual damages suffered, according to proof, for each violation

12             under Civil Code § 56.36(b)(2);

13       4.    Damages pursuant to Civil Code §§ 1798.84(b) and 1798.150,

14             including, but not limited to, not less than $100 and not greater than

15             $750 per California Subclass Member per incident or actual

16             damages, whichever is greater, pursuant to Cal. Civ. Code §

17             1798.150(a)(1)(A);

18       5.    Statutory damages pursuant to N.Y. Gen. Bus. Law § 349(h),

19             including, but not limited to, $50.00 per violation, or actual

20             damages, whichever is greater; up to $1,000 per violation for

21             willful or knowing violations;  and reasonable attorneys' fees and

22             costs, as authorized by statute;

23       6.    Injunctive relief pursuant to Civil Code § 1798.84(e); and

24       7.    All other damages, injunctive relief, attorneys' fees, expenses and

25             costs permitted by law or statute.

26  F.    An award of credit monitoring and identity theft protection services to

27        Plaintiffs and all members of the Classes;

28  G.    An award of attorneys' fees, costs, and expenses, as provided by law or

154

1    equity;

2    H.    An award for equitable relief requiring restitution and disgorgement of the

3    revenues wrongfully retained as a result of Defendants' wrongful conduct;

4    I.    An order requiring Defendants to pay pre-judgment and post-judgment

5    interest, as provided by law or equity; and

6    J.    Any such other and further relief as this Court may deem just and proper.

7    Certifying the Class as requested herein, designating Plaintiffs as Class

8    Representatives, and appointing Plaintiffs' counsel as Class Counsel;

9    K.    Awarding Plaintiffs and the Class appropriate monetary relief, including

10    actual damages, statutory damages, punitive damages, restitution,

11    nominal damages and disgorgement;

12    L.    Awarding Plaintiffs and the Class equitable, injunctive, and declaratory

13    relief, as may be appropriate. Plaintiffs, on behalf of themselves and the

14    Class, seek appropriate injunctive relief designed to prevent Defendant

15    from experiencing another data breach by adopting and implementing best

16    data security practices to safeguard Private Information and to provide or

17    extend credit monitoring services and similar services to protect against

18    all types of identity theft;

19    M.    Awarding Plaintiffs and the Class pre-judgment and post-judgment

20    interest to the maximum extent allowable;

21    N.    Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and

22    expenses, as allowable; and

23    O.    Awarding Plaintiffs and the Class such other favorable relief as allowable

24    under law.

25    Dated: September 26, 2025.                    Respectfully submitted,

26                                            */s/ Stephen G. Larson*
                                            Stephen G. Larson
27                                            **LARSON, LLP**

28

Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel: (310) 474-9111

Daniel S. Robinson (SBN 244245)
*drobinson@robinsonfirm.com*
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
Tel: (949) 720-1288;

*Plaintiffs' Interim Co-Lead Counsel*

Daniel L. Warshaw (SBN 185365)
*dwarshaw@pwfirm.com*
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Tel: (818) 788-8300

*Plaintiffs' Liaison Counsel*

CONSOLIDATED CLASS ACTION COMPLAINT

1

## **JURY TRIAL DEMAND**

2

Plaintiffs demand a trial by jury of all claims herein so triable.

3

Dated: September 26, 2025.                          Respectfully submitted,

4

*/s/ Stephen G. Larson*

5

Stephen G. Larson
*slarson@larsonllp.com*

6

**LARSON, LLP**
555 S. Flower Street, 30th Floor

7

Los Angeles, CA 90071
Tel: (213) 436-4864

8

Tina Wolfson

9

*twolfson@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**

10

2600 West Olive Avenue, Suite 500
Burbank, CA 91505

11

Tel: (310) 474-9111

12

Daniel S. Robinson
*drobinson@robinsonfirm.com*

13

**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive

14

Newport Beach, CA 92660
Tel: (949) 720-1288

15

*Plaintiffs' Interim Co-Lead Counsel*

16

Daniel L. Warshaw
*dwarshaw@pwfirm.com*

17

**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400

18

Sherman Oaks, California 91403
Tel: (818) 788-8300

19

20

*Plaintiffs' Liaison Counsel*

21

22

23

24

25

26

27

28

157

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28