Stephen G. Larson (SBN 145225)
**LARSON LLP**
555 S. Flower Street, 30th Floor
Los Angeles, CA 90071
Tel: (213) 436-4864
*slarson@larsonllp.com*

Daniel S. Robinson (SBN 244245)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
Tel: (949) 720-1288;
Fax: (949) 720-1292
*drobinson@robinsonfirm.com*

Tina Wolfson (SBN 174806)
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
*twolfson@ahdootwolfson.com*

Daniel L. Warshaw (SBN 185365)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Tel: (818) 788-8300
*dwarshaw@pwfirm.com*

*Interim Co-Lead Counsel and Liaison Counsel for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Episource LLC Data Breach Litigation*<br><br>This Document Relates To: All Actions | Case No.: 2:25-cv-05330-SB-MBK<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs David Bartelt, Angela Jo Carter, Farreece Grimmett, Frederick Lower, Jose Contreras, Michael Alcorn, Nesrin Haddad, Patricia Giles, Paul Lewow, Steve Altes, Tyrone Holifield, Wanda Hernandez, William Glenn Johnson, and Stephen Dollar (collectively, "Plaintiffs"), individually and on behalf of the Class defined below of similarly situated persons, allege the following against Defendant Episource, LLC ("Episource") and Client Defendants Molina Healthcare, Inc. ("Molina"), InnovaCare, Inc. ("InnovaCare"), California Physicians' Service d/b/a Blue Shield of California ("Blue Shield CA"), and Elevance Health, Inc. ("Elevance") (collectively, "Client Defendants") (Episource and Client Defendants are collectively referred to as "Defendants"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by counsel as to all other matters:

## SUMMARY OF THE CASE

1. This class action arises from Defendants' failure to secure the personally identifiable information ("PII") [1] and protected health information ("PHI") [2] (collectively, "Private Information") of Plaintiffs and putative Class Members, where

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d, *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information.* "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited Jan. 30, 2026).

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs provided their Private Information indirectly to Episource as a condition of receiving care from their health care providers and/or insurance coverage.

2.    Episource is a for-profit business that is organized, in substantial part, to maintain, receive, analyze, and process confidential medical information on behalf of health care service plans and insurers. Episource describes itself as "a leading provider of risk adjustment services, software, and solutions for health plans and provider groups. As an integrated platform, Episource empowers Commercial, Medicare, and Medicaid payers and providers with end-to-end risk adjustment solutions, including risk adjustment analytics, medical record retrieval, medical chart coding, and encounter submissions."[3] In performing these services, Episource maintains and uses patients' diagnoses, treatment information, and clinical records to evaluate health conditions and translate medical care into payment and reimbursement determinations.

3.    In the regular course of its business, Episource receives and stores Private Information, including confidential medical information, obtained from healthcare providers and healthcare service plans, including information concerning individuals' diagnoses, treatment, and medical histories. Episource is fully aware of the sensitivity of the Private Information it receives and collects and its obligation to maintain that information as confidential and safe from unauthorized access.

4.    Client Defendants are health care service plans, insurers, and related health care entities who contracted with Episource for risk adjustment, coding, auditing, or other related services that required Episource to access, receive, and maintain the Private Information, including confidential medical information, of Client Defendants' members such as Plaintiffs and other Class Members. Through these contractual relationships, Episource obtained medical information for purposes

---

[3] Remember the Member: Unveiling Hidden Health Influencers Through Advanced Analytics, Episource https://rise.episource.com/webinar-unveiling-hidden-health-influencers-through-advanced-analytics (last visited Jan. 30, 2026).

directly related to health care payment, evaluation, and administration, and did so subject to statutory and contractual obligations to preserve the confidentiality and security of that information.

5.     Episource occupies a lucrative intermediary role in the health care system by translating the medical diagnoses, treatments, and clinical documentation created by health care providers into coded data used by health plans and government programs to determine coverage, reimbursement, and payment for patient care. Episource's business model depends on the ongoing possession, analysis, and storage of confidential medical information.

6.     On or about February 6, 2025, Episource found suspicious activity on its computer network and determined that between January 27 and February 6, 2025, an unauthorized actor accessed, viewed, copied, downloaded, and exfiltrated data from its systems containing Plaintiffs and Class Members' Private Information ("Data Breach"), which Episource obtained from the Client Defendants and other health care service plans, insurers, and related health care entities.[4]

7.     The Private Information the unauthorized actor targeted, accessed, viewed, and exfiltrated from Defendants' systems included Plaintiffs' and Class Members' names, addresses, phone numbers, dates of birth, emails, Social Security numbers, health insurance data (such as health plans/policies, insurance companies, member/group ID numbers, and Medicaid-Medicare-government payor ID numbers), and health data (such as medical record numbers, doctors, diagnoses, medicines, tests results, images, care, and treatment).

8.     Beginning on or about June 6, 2025, Defendants began sending letters entitled "Notice of Data Breach" ("Notice Letters") to Plaintiffs and Class Members.

9.     Although Episource provided insufficient information concerning the Data Breach in the Notice Letters, Episource has since confirmed the Data Breach is

---

[4] *See Notice of Data Breach*, https://response.idx.us/episource/ (last visited Jan. 30, 2026).

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

a ransomware incident. Ransomware is a type of malicious software, or malware, which prevents a user from accessing their computer files, systems or networks, and demands a ransom for their return.[5]

10.    Episource's forensic investigators affirmatively found that the earliest unauthorized activity began on January 27, 2025, via access to an Episource firewall device. Thereafter, between January 27, 2025 and February 6, 2025, the cyber criminals took actions allowing them to find, copy and take Private Information off Episource systems. Following this breach, ransomware software was deployed.

11.    Based on Episource's report to United States Department of Health and Human Services, Office for Civil Rights, 5,418,866 individuals have been affected by the Data Breach.[6]

12.    Defendants could have prevented this Data Breach by implementing reasonable, expected, and industry standard data security measures. Instead, they disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to implement these measures to safeguard its current and former health insurer clients' (including, but not limited to, its Client Defendants') members' and insureds' Private Information and by failing to take necessary steps to prevent unauthorized disclosure of that information. Defendants' woefully inadequate data security measures made the Data Breach a foreseeable, and even likely, consequence of their negligence.

13.    As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have suffered actual and present injuries, including but not limited to: (a) present, certainly impending, and continuing threats of identity theft crimes, fraud, scams, and other misuses of their Private Information; (b) diminution of value of their

---

[5] In support of this conclusion, Sharp Healthcare characterized the Data Breach as a ransomware data breach in its notice to customers. *Episource Data Breach: A Notice to Our Patients*, https://www.sharp.com/episource-data-breach (last visited Jan. 30, 2026).

[6] OCR Breach Portal, HHS, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Jan. 30, 2025).

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Private Information; (c) loss of benefit of the bargain (price premium damages); (d) loss of value of privacy and confidentiality of the stolen Private Information; (e) mitigation expenses and time spent responding to and remedying the effects of the Data Breach; (f) "out of pocket" costs incurred due to actual identity theft; (g) decreased credit scores; (h) anxiety, annoyance, and nuisance; and (i) continued risk to their Private Information, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

14.    Plaintiffs and Class Members would not have provided their valuable Private Information to their health insurers (including, but not limited to, Client Defendants), who in turn provided it to Episource, had they known that Defendants would, *inter alia*, make their Private Information Internet-accessible, not encrypt personal and sensitive data elements, and not delete the Private Information they no longer had reason to maintain.

15.    Client Defendants and Episource's other health insurer clients who contracted for Episource's services had a duty to ensure their agent, Episource, protected the Private Information, but they failed to do so.

16.    Through this lawsuit, Plaintiffs seek to hold Defendants responsible for the injuries they inflicted on Plaintiffs and Class Members due to their impermissibly inadequate data security measures, and seek injunctive relief to ensure the implementation of proper security measures to protect the Private Information that remains in Defendants' possession.

## JURISDICTION AND VENUE

17.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, millions of individuals had their Private Information compromised in the Data Breach, many of

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

whom, including several Plaintiffs, have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

18.    This Court has personal jurisdiction over Defendant Episource because it is incorporated in, maintains its principal place of business in, and/or regularly conducts business in this District. The Court likewise has personal jurisdiction over the Client Defendants because, by contracting with Episource, receiving services from Episource, and directing Episource to process and store sensitive data within this District, they purposefully availed themselves of the privilege of conducting activities here and established sufficient minimum contacts with this District.

19.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Episource is domiciled in this District, maintains Plaintiffs' and Class Members' Private Information in this District, and has caused harm to Plaintiffs and Class Members in this District.

## PARTIES

### A.    Plaintiffs

20.    Plaintiff David Bartelt is, and at all relevant times has been, a resident and citizen of the State of Wisconsin where he intends to remain. Plaintiff Bartelt is a member of Molina and received medical insurance services from Molina. In exchange for these services, Plaintiff Bartelt provided his Private Information to Molina and his medical providers who Plaintiff Bartelt understands, in turn, provided that information to Episource. Indeed, prior to and at the time of receiving services from Molina, Plaintiff Bartelt reviewed and expressly relied on Privacy Policies and other documents containing statements that Molina would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Bartelt believed, at the time of receiving services from Molina, that they would maintain the privacy and security of his Private Information. Plaintiff Bartelt further believes he paid a premium to Defendants for

their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Bartelt a Notice Letter, notifying that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Bartelt's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Bartelt has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

21.     Plaintiff Angela Jo Carter is, and at all relevant times has been, a resident and citizen of the State of Texas where she intends to remain. Plaintiff Carter is a member of Humana and received medical insurance services from Humana. In exchange for these services, Plaintiff Carter provided her Private Information to her Humana and her medical providers, who Plaintiff Carter understands, in turn, provided that information to Episource. Plaintiff Carter believed, at the time of receiving services from Humana, that they would maintain the privacy and security of her Private Information. Indeed, prior to and at the time of receiving services from Humana, Plaintiff Carter reviewed and expressly relied on Privacy Policies and other documents containing statements that Humana would protect the confidentiality of her Private Information, which includes any third parties like Episource who would receive her Private Information. Plaintiff Carter further believes she paid a premium to Defendants for their data security, and she would not have used Defendants' services or provided her Private Information to Defendants had she known that they would expose, or allow to be exposed, her Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Carter a Notice Letter, which indicated that her Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Carter's Private Information. As a result of the Data Breach and Defendants'

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    actions, Plaintiff Carter has been injured, has suffered financial losses, and is subject

2    to a substantial risk for further identity theft due to Defendants' Data Breach.

3        22.    Plaintiff Farreece Grimmett is, and at all relevant times has been, a

4    resident and citizen of the State of Michigan where he intends to remain. Plaintiff

5    Grimmett is a member of Molina and otherwise received medical insurance services

6    from Molina. In exchange for these services, Plaintiff Grimmett provided his Private

7    Information to Molina and/or his medical providers, who Plaintiff Grimmett

8    understands, in turn, provided that information to Episource. Plaintiff Grimmett

9    believed, at the time of receiving services from Molina, that they would maintain the

10   privacy and security of his Private Information. Indeed, prior to and at the time of

11   receiving services from Molina, Plaintiff Grimmett reviewed and expressly relied on

12   Privacy Policies and other documents containing statements that Molina would protect

13   the confidentiality of his Private Information, which includes any third parties like

14   Episource who would receive his Private Information. Plaintiff Grimmett further

15   believes he paid a premium to Defendants for their data security, and he would not

16   have used Defendants' services or provided his Private Information to Defendants had

17   he known that they would expose, or allow to be exposed, his Private Information,

18   making it available to unauthorized parties. Defendants subsequently sent Plaintiff

19   Grimmett a Notice Letter, which indicated that his Private Information had been

20   acquired by unauthorized parties during the Data Breach. These unauthorized parties

21   accessed and viewed Plaintiff Grimmett's Private Information. As a result of the Data

22   Breach and Defendants' actions, Plaintiff Grimmett has been injured, has suffered

23   financial losses, and is subject to a substantial risk for further identity theft due to

24   Defendants' Data Breach.

25       23.    Plaintiff Frederick Lower is, and at all relevant times has been, a resident

26   and citizen of the State of Alabama where he intends to remain. Plaintiff Lower is a

27   member of Molina and otherwise received medical insurance services from Molina.

28   In exchange for these services, Plaintiff Lower provided his Private Information to

Molina and/or his medical providers, who Plaintiff Lower understands, in turn, provided that information to Episource. Plaintiff Lower believed, at the time of receiving services from Molina that they would maintain the privacy and security of his Private Information. Indeed, prior to and at the time of receiving services from Molina, Plaintiff Lower reviewed and expressly relied on Privacy Policies and other documents containing statements that Molina would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Lower further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Lower a Notice Letter, which indicated that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Lower's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Lower has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

24.    Plaintiff Jose Contreras is, and at all relevant times has been, a resident and citizen of the State of California where he intends to remain. Plaintiff Contreras is a member of Blue Shield and received medical insurance services from Blue Shield. In exchange for these services, Plaintiff Contreras provided his Private Information to Blue Shield and his medical providers, who Plaintiff Contreras understands, in turn, provided that information to Episource. Plaintiff Contreras believed, at the time of receiving services from Blue Shield, that they would maintain the privacy and security of his Private Information. Indeed, prior to and at the time of receiving services from Blue Shield, Plaintiff Contreras reviewed and expressly relied on Privacy Policies and other documents containing statements that Blue Shield would protect the confidentiality of his Private Information, which includes any third parties like

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Episource who would receive his Private Information. Plaintiff Contreras further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Contreras a Notice Letter, which indicated that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Contreras's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Contreras has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

25.     Plaintiff Michael Alcorn is, and at all relevant times has been, a resident and citizen of the State of Illinois where he intends to remain. Plaintiff Alcorn is a member of Molina and otherwise received medical insurance services from Molina. In exchange for these services, Plaintiff Alcorn provided his Private Information to Molina and his medical providers who Plaintiff Alcorn understands, in turn, provided that information to Episource. Indeed, prior to and at the time of receiving services from Molina, Plaintiff Alcorn reviewed and expressly relied on Privacy Policies and other documents containing statements that Molina would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Alcorn believed, at the time of receiving services from Molina, that they would maintain the privacy and security of his Private Information. Plaintiff Alcorn further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Alcorn a Notice Letter, notifying that his Private Information had been acquired by unauthorized parties during the Data

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    Breach. These unauthorized parties accessed and viewed Plaintiff Alcorn's Private

2    Information. As a result of the Data Breach and Defendants' actions, Plaintiff Alcorn

3    has been injured, and is subject to a substantial risk for further identity theft due to

4    Defendants' Data Breach.

5        26.    Plaintiff Nesrin Haddad is, and at all relevant times has been, a resident

6    and citizen of the State of California where she intends to remain. Plaintiff Haddad is

7    a member of Blue Shield and received medical insurance services from Blue Shield.

8    In exchange for these services, Plaintiff Haddad provided her Private Information to

9    Blue Sheild and her medical providers who Plaintiff Haddad understands, in turn,

10   provided that information to Episource. Plaintiff Haddad believed, at the time of

11   receiving services from Blue Shield, that they would maintain the privacy and security

12   of her Private Information. Indeed, prior to and at the time of receiving services from

13   Blue Shield, Plaintiff Haddad reviewed and expressly relied on Privacy Policies and

14   other documents containing statements that Blue Shield would protect the

15   confidentiality of her Private Information, which includes any third parties like

16   Episource who would receive her Private Information. Plaintiff Haddad further

17   believes she paid a premium to Defendants for their data security, and she would not

18   have used Defendants' services or provided her Private Information to Defendants had

19   she known that they would expose, or allow to be exposed, her Private Information,

20   making it available to unauthorized parties. Defendants subsequently sent Plaintiff

21   Haddad a Notice Letter, notifying that her Private Information had been acquired by

22   unauthorized parties during the Data Breach. These unauthorized parties accessed and

23   viewed Plaintiff Haddad's Private Information. As a result of the Data Breach and

24   Defendants' actions, Plaintiff Haddad has been injured, has suffered financial losses,

25   and is subject to a substantial risk for further identity theft due to Defendants' Data

26   Breach.

27       27.    Plaintiff Paul Lewow is, and at all relevant times has been, a resident and

28   citizen of the State of California where he intends to remain. Plaintiff Lewow is a

member of Blue Shield and otherwise received medical insurance services from Blue Shield. In exchange for these services, Plaintiff Lewow provided his Private Information to Blue Shield and/or his medical providers who Plaintiff Lewow understands, in turn, provided that information to Episource. Plaintiff Lewow believed, at the time of receiving services from Blue Shield, that they would maintain the privacy and security of his Private Information. Indeed, prior to and at the time of receiving services from Blue Shield, Plaintiff Lewow reviewed and expressly relied on Privacy Policies and other documents containing statements that Blue Shield would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Lewow further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Lewow a Notice Letter, notifying that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Lewow's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Lewow has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

28.     Plaintiff Steve Altes is, and at all relevant times has been, a resident and citizen of the State of California where he intends to remain. Based on information and belief, Plaintiff Altes is a member of Blue Shield and otherwise received medical insurance services from Blue Shield. In exchange for these services, Plaintiff Altes provided his Private Information to Blue Shield and/or his medical providers who Plaintiff Altes understands, in turn, provided that information to Episource. Plaintiff Altes believed, at the time of receiving services from Blue Shield, that they would maintain the privacy and security of his Private Information. Indeed, prior to and at

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

the time of receiving services from Blue Shield, Plaintiff Altes reviewed and expressly relied on Privacy Policies and other documents containing statements that Blue Shield would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Altes further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Altes a Notice Letter, which indicated that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Altes's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Altes has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

29.     Plaintiff Tyrone Holifield is, and at all relevant times has been, a resident and citizen of the State of California where he intends to remain. Plaintiff Holifield is a member of Blue Cross and otherwise received medical insurance services from Blue Cross. On information and belief, Blue Cross and/or Elevance provided Plaintiff Holifield's Private Information to Episource. Plaintiff Holifield believed, at the time of receiving services from Blue Cross, that they would maintain the privacy and security of his Private Information. Indeed, prior to and at the time of receiving services from Blue Cross, Plaintiff Holifield reviewed and expressly relied on Privacy Policies and other documents containing statements that Blue Cross would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Holifield further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants sent Plaintiff Holifield a

13

1  Notice Letter, notifying him that his Private Information had been acquired by
2  unauthorized parties during the Data Breach. These unauthorized parties accessed and
3  viewed Plaintiff Holifield's Private Information. As a result of the Data Breach and
4  Defendants' actions, Plaintiff Holifield has been injured, has suffered financial losses,
5  and is subject to a substantial risk for further identity theft due to Defendants' Data
6  Breach.

7       30.    Plaintiff Wanda Hernandez is, and at all relevant times has been, a
8  resident and citizen of the State of Florida where she intends to remain. Plaintiff
9  Hernandez is a member of InnovaCare and received medical and insurance services
10 from InnovaCare. In exchange for these services, Plaintiff Hernandez provided her
11 Private Information to InnovaCare and her medical providers who Plaintiff Hernandez
12 understands, in turn, provided that information to Episource. Plaintiff Hernandez
13 believed, at the time of receiving services from InnovaCare, that they would maintain
14 the privacy and security of her Private Information. Indeed, prior to and at the time of
15 receiving services from InnovaCare, Plaintiff Hernandez reviewed and expressly
16 relied on Privacy Policies and other documents containing statements that InnovaCare
17 would protect the confidentiality of her Private Information, which includes any third
18 parties like Episource who would receive her Private Information. Plaintiff Hernandez
19 further believes she paid a premium to Defendants for their data security, and she
20 would not have used Defendants' services or provided her Private Information to
21 Defendants had she known that they would expose, or allow to be exposed, her Private
22 Information, making it available to unauthorized parties. Defendants subsequently
23 sent Plaintiff Hernandez a Notice Letter, notifying her that her Private Information
24 had been acquired by unauthorized parties during the Data Breach. These
25 unauthorized parties accessed and viewed Plaintiff Hernandez's Private Information.
26 As a result of the Data Breach and Defendants' actions, Plaintiff Hernandez has been
27 injured, has suffered financial losses, and is subject to a substantial risk for further
28 identity theft due to Defendants' Data Breach.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

31.    Plaintiff William Glenn Johnson is, and at all relevant times has been, a resident and citizen of the State of California where he intends to remain. Plaintiff Johnson is a member of Blue Shield and otherwise received medical insurance services from Blue Shield. In exchange for these services, Plaintiff Johnson provided his Private Information to Blue Sheild and his medical providers who Plaintiff Johnson understands, in turn, provided that information to Episource. Plaintiff Johnson believed, at the time of receiving services from Blue Shield, that they would maintain the privacy and security of his Private Information. Indeed, prior to and at the time of receiving services from Blue Shield, Plaintiff Johnson reviewed and expressly relied on Privacy Policies and other documents containing statements that Blue Shield would protect the confidentiality of his Private Information, which includes any third parties like Episource who would receive his Private Information. Plaintiff Johnson further believes he paid a premium to Defendants for their data security, and he would not have used Defendants' services or provided his Private Information to Defendants had he known that they would expose, or allow to be exposed, his Private Information, making it available to unauthorized parties. Defendants subsequently sent Plaintiff Johnson a Notice Letter, notifying him that his Private Information had been acquired by unauthorized parties during the Data Breach. These unauthorized parties accessed and viewed Plaintiff Johnson's Private Information. As a result of the Data Breach and Defendants' actions, Plaintiff Johnson has been injured, has suffered financial losses, and is subject to a substantial risk for further identity theft due to Defendants' Data Breach.

32.    Plaintiff Stephen Dollar is, and all relevant times has been, a resident and citizen of the State of Illinois where he intends to remain. Based on information and belief, Plaintiff Dollar is a member of Molina and otherwise received medical insurance services from Molina. In exchange for these services, Plaintiff Dollar provided his Private Information to Molina and his medical providers who Plaintiff Dollar understands, in turn, provided that information to Episource. Plaintiff Dollar

1  believed, at the time of receiving services from Molina, that they would maintain the
2  privacy and security of his Private Information. Indeed, prior to and at the time of
3  receiving services from Molina, Plaintiff Dollar reviewed and expressly relied on
4  Privacy Policies and other documents containing statements that Molina would protect
5  the confidentiality of his Private Information, which includes any third parties like
6  Episource who would receive his Private Information. Plaintiff Dollar further believes
7  he paid a premium to Defendants for their data security, and he would not have used
8  Defendants' services or provided his Private Information to Defendants had he known
9  that they would expose, or allow to be exposed, his Private Information, making it
10  available to unauthorized parties. Defendants subsequently sent Plaintiff Dollar a
11  Notice Letter, notifying him that his Private Information had been acquired by
12  unauthorized parties during the Data Breach. These unauthorized parties accessed and
13  viewed Plaintiff Dollar's Private Information. As a result of the Data Breach and
14  Defendants' actions, Plaintiff Dollar has been injured, has suffered financial losses,
15  and is subject to a substantial risk for further identity theft due to Defendants' Data
16  Breach.

17  **B.    Defendants[7]**

18      33.    Episource is a California limited liability company with its headquarters
19  and principal place of business located at 500 West 190th Street, 4th Floor, Gardena,
20  California 90248.

21      34.    Molina is a managed care company that provides government-sponsored
22  healthcare services, primarily through Medicaid and Medicare programs. Molina is a
23  Delaware corporation with its principal place of business located at 200 Oceangate,
24  Suite 100, Long Beach, California 90802. Based on information and belief, Molina

---

[7] Although Episource identified Client Defendants connected to individuals identified as potential plaintiffs, it refused to identify all Client Defendants. As such, Plaintiffs may seek leave to amend the complaint to include additional Client Defendants in the future.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    Healthcare entered into and managed the Episource relationship as the centralized
2    contracting entity for the Molina enterprise, including for the benefit of and on behalf
3    of its health plan subsidiaries and affiliated entities, and exercised authority and
4    control over the engagement, scope of services, and transmission of member data to
5    Episource.

6    35.    InnovaCare, Inc. is a provider of managed healthcare services in North
7    America that offers Medicare Advantage plans, Physician Practice Services,
8    Medicaid, Clinical Services, and Population Health Management. InnovaCare is a
9    corporation maintaining its principal place of business at 173 Bridge Plaza North, Fort
10   Lee, New Jersey 07024.

11   36.    Blue Shield CA is a provider of both employer and individual & family
12   HMO and PPO health insurance plans, based in California. Blue Shield CA is a
13   corporation organized under the laws of California, with its principal place of business
14   located at 601 12th Street, 20th Floor, Oakland, California 94607.

15   37.    Elevance Health, Inc. is parent company to various health plans and
16   subsidiaries, including those operating under the Blue Cross and Blue Shield names
17   in multiple states. The company provides health insurance coverage and health-related
18   services to individuals, employers, and participants in government-sponsored
19   programs such as Medicare and Medicaid. Elevance is incorporated in Indiana and has
20   a principal place of business of 220 Virginia Avenue, Indianapolis, Indiana 46204.

21   **FACTUAL ALLEGATIONS**

22   **A.    The Data Breach**

23   38.    Plaintiffs and Class Members were required to (directly or indirectly)
24   provide Defendants with their sensitive and confidential Private Information,
25   including their names, addresses, phone numbers, dates of birth, emails, Social
26   Security numbers, health insurance data (such as health plans/policies, insurance
27   companies, member/group ID numbers, and Medicaid-Medicare-government payor
28   ID numbers), health data (such as medical record numbers, doctors, diagnoses,

17

1 medicines, tests results, images, care, and treatment), and other sensitive information,

2 that at the time of the Data Breach were held by Defendants in its systems.

3   39. The Notice Letter sent by Episource, the Client Defendants, and other

4 Episource other health insurer clients to Plaintiffs and Class Members states:

> We are sorry to tell you about a data security event. This letter is from Episource LLC ("Episource" or "We"). We work with doctors, health plans, and other health companies. This event may have involved your data.
>
> **What Happened**
>
> On February 6, 2025, we found unusual activity in our computer systems [and after conducting an investigation] [w]e learned that a criminal was able to see and take copies of some data in our computer systems. This happened between January 27, 2025 and February 6, 2025…
>
> **What Information Was Involved**
>
> On April 23, 2025, we began informing the customers about what specific data may have been involved. The data that may have been seen and taken was not the same for everyone and includes contact information (such as name, address, phone number and email), plus one or more of the following:
>
> • Health insurance data (such as health plans/policies, Insurance companies, member/group ID numbers, and Medicaid-Medicare-government payor ID numbers)
> • Health data (such as medical record numbers, doctors, diagnoses, medicines, test results, images, care, and treatment)
> • Other personal data such as date of birth
> • Social Security number (in limited instances)

  40. In the Notice Letter, Episource and the Client Defendants offer Plaintiffs and Class Members two years of credit monitoring and provides suggested steps they can take to protect themselves from identity theft (e.g., placing a fraud alert on their credit files and requesting a credit freeze).

  41. In the context of notice of data breach letters of this type, Episource's and the Client Defendants' use of the phrase "may have involved your data" is misleading legalese. Companies only send notice letters because data breach notification laws require them to do so. And such letters are only sent to those persons

18

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

who Episource itself has a reasonable belief that such personal information was accessed or acquired by an unauthorized individual or entity. Episource cannot hide behind legalese. By sending a Notice Letter to Plaintiffs and Class Members, Episource, Client Defendants, and other Episource health insurer clients admit that Episource itself has a reasonable belief that Plaintiffs' and Class Members' Private Information was accessed or acquired by cybercriminals.

42. Indeed, the Identity Theft Research Center's 2024 Annual Data Breach Report notes that, "approximately 70 percent of cyberattack-related breach notices did not include attack information, compared to 58 percent in 2023. In 2019 and previous years, ~100 percent of breach notices included attack vector information." Eva Velasquez, CEO of the Identity Theft Resource Center, remarked that "[w]ith a near-record number of compromises and over 1.3 billion victim notices, often tied to inadequate cyber practices, we are also seeing an increase in notices that provide limited actionable information for victims."[8]

43. Despite Episource's, Client Defendants', and other Episource health insurer clients' attempt to obfuscate the details of the Data Breach, it is clear that Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiffs and Class Members, such as encrypting the information or purging it when it is no longer needed, causing the exposure of Private Information.

44. As evidenced by the Data Breach, the Private Information contained in Defendants' network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

45. Moreover, Defendants could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only

---

[8] Identity Theft Resource Center, *2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices*, ITRC (Jan. 28, 2025), https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/ (last visited Jan. 30, 2026).

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring their systems for signs of unusual activity or the transfer of large volumes of data, and regularly rotating passwords.

46. Defendants' failure to implement these standard and reasonable data security practices resulted in the exfiltration of over five million individuals' sensitive personal and health information.

**B.** **Episource's Representations About Private Information**

47. Episource's privacy policy asserts a commitment to protecting confidentiality, stating, "[w]e afford the same degree of confidentiality to medical and proprietary information stored on Episource systems as is given to medical information stored by Episource systems in any other medium."[9]

48. Episource's privacy statement on its website outlines a series of technical and procedural safeguards that it claims to have in place to secure information including Private Information.[10] Specifically, Episource claims to take measures include limiting employee access to data based on their specific role within the organization. The company also states that it uses a combination of firewalls, passwords, encryption, and audit trails to protect all stored information. Furthermore, Episource notes that it identifies and logs the time and date of each instance of employee access to its systems. Episource concludes these statements with a general assertion that it has "taken steps to make all information received from and to employees are as secure as possible against unauthorized access and use."[11]

---

[9] *Privacy Statement*, Episource Provider Portal, https://uploads.episource.com/s/privacy (last accessed Jan. 30, 2026).

[10] *Id.*

[11] *Id.*

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

49.    Episource publicly represents itself as having a "cutting edge cybersecurity program" backed by prestigious third-party certifications.[12]

50.    In a press release from February 2019, Episource announced that it had achieved Certified status from the Health Information Trust Alliance ("HITRUST").[13] Episource's Chief Operating Officer at the time described the certification as a result of "innovative tech thoughtfully built into our systems."[14] Episource noted that the HITRUST certification was a step "beyond HIPAA guidelines" and built upon its existing National Institute of Standards and Technology ("NIST") certification.[15] The HITRUST Common Security Framework ("CSF") is described as the information protection framework for the healthcare industry and requires organizations to meet 740 individual controls to achieve certification.[16]

51.    While Episource achieved this certification in early 2019, the cyberattack occurred nearly six years later, in early 2025.

52.    Each of the Client Defendants and other Episource other health insurer clients also have privacy policies and/or HIPPA notices that they provide to their members and other insureds, which represent that the Private Information provided to them will be kept confidential and secure.[17]

---

[12] *Episource Achieves HITRUST and NIST Certifiation*, BIOSPACE, (Feb. 12, 2019), https://www.biospace.com/episource-achieves-hitrust-and-nist-certification.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *See, e.g.*, *Notice of Privacy Practices – Molina Healthcare of California*, https://www.molinahealthcare.com/members/ca/mem/hipaa/privacy_full.aspx (last accessed Jan. 30, 2026); *Notice of Patient Policy*, Innovacare Health, https://innovacarehealth.com/notice-of-patient-policy/ (last accessed Jan. 30, 2026); *Insurance ACE Notice of Privacy Practices*, https://assets.humana.com/is/content/humana/GN14474HHpdf (last accessed Jan. 30, 2026); *HIPAA Notice of Privacy Practices,*

21

1

### C.     Data Breaches Are Foreseeable and Preventable

2      53.     Data breaches are preventable.[18] As Lucy Thompson wrote in the Data

3   Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that

4   occurred could have been prevented by proper planning and the correct design and

5   implementation of appropriate security solutions."[19] She added that "[o]rganizations

6   that collect, use, store, and share sensitive personal data must accept responsibility for

7   protecting the information and ensuring that it is not compromised . . . ."[20]

8      54.     The prevalence of data breaches and identity theft has increased

9   dramatically in recent years, accompanied by a parallel and growing economic drain

10  on individuals, businesses, and government entities in the U.S. Data breaches have

11  been on the rise for several years. In 2023, an all-time high for data compromises

12  occurred, with 3,205 compromises affecting 353,027,892 total victims. The estimated

13  number of organizations impacted by data compromises has increased by +2,600

14  percentage points since 2018, and the estimated number of victims has increased by

15  +1,400 percentage points. The 2023 compromises represent a 78-percentage point

16  increase over the previous year and a 72-percentage point hike from the previous all-

17  time high number of compromises (1,860) set in 2021.

18      55.     In light of recent high profile data breaches at other industry leading

19  companies, including T-Mobile, USA (37 million records, February-March 2023),

20  ─────────────────
21  https://www.blueshieldca.com/content/dam/bsca/en/member/docs/A52389XLB-
    0125-REF2361452-Notice-of-Privacy-Practices.pdf (last accessed Jan. 30, 2026);
22  *Privacy        Notice        for        California        Consumers*,
    https://www.elevancehealth.com/content/dam/elevance-
23  health/documents/508C_FINAL_%203_27_2024_Privacy_Notice_CCPA.pdf    (last
24  accessed Jan. 30, 2026).

25  [18] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*,
    DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012),
26  https://lawcat.berkeley.edu/record/394088.

27  [19]*Id.* at 17.

28  [20]*Id.* at 28.

23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendants knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

56.    Additionally, as companies, including Defendants, became more dependent on computer systems to run their business,[21] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[22]

57.    At all relevant times, Defendants knew, or reasonably should have known, the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

58.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' server(s), amounting to millions of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

**D.    Defendants Failed to Comply with Regulatory Requirements and Standards**

59.    Federal and state regulators have established security standards and issued recommendations to prevent data breaches and the resulting harm to

---

[21] *Implications of Cyber Risk for Financial Stability*, Board of Gov's of the Fed. Rsrv. Sys., (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[22] Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022, PicusLabs, (Mar. 24, 2022) https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  consumers. There are a number of state and federal laws, requirements, and industry

2  standards governing the protection of Private Information.

3      60.    The Federal Trade Commission ("FTC") has issued several guides for

4  businesses, highlighting the importance of reasonable data security practices.

5  According to the FTC, the need for data security should be considered for all business

6  decision-making.[23]

7      61.    Under the FTC's 2016 *Protecting Personal Information: Guide for*

8  *Business* publication, the FTC notes that businesses should safeguard the personal

9  customer information they retain; properly dispose of unnecessary personal

10  information; encrypt information stored on computer networks; understand their

11  network's vulnerabilities; and implement policies to rectify security issues.[24]

12     62.    The guidelines also suggest that businesses use an intrusion detection

13  system to expose a breach as soon as it happens, monitor all incoming traffic for

14  activity indicating someone is trying to hack the system, watch for large amounts of

15  data being siphoned from the system, and have a response plan in the event of a breach.

16     63.    The FTC advises companies to not keep information for periods of time

17  longer than needed to authorize a transaction, restrict access to private information,

18  mandate complex passwords to be used on networks, utilize industry-standard

19  methods for security, monitor for suspicious activity on the network, and verify that

20  third-party service providers have implemented reasonable security measures.[25]

21     64.    The FTC has brought enforcement actions against companies for failing

22  to adequately and reasonably protect consumer data, treating the failure to do so as an

23

---

24  [23] *Start With Security: A Guide for Business*, FTC, https://www.ftc.gov/business-
25  guidance/resources/start-security-guide-business (last visited Jan. 30, 2026).

26  [24] *Protecting    Personal    Information:    A    Guide    for    Business*, FTC,
27  https://www.ftc.gov/business-guidance/resources/protecting-personal-information-
    guide-business (last visited Jan. 30, 2026).

28  [25] *Id.*

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

unfair act or practice barred by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders originating from these actions further elucidate the measures businesses must take to satisfy their data security obligations.

65.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

66.     Defendants' failure to verify that it had implemented reasonable security measures constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

67.     Furthermore, Defendants are required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C. The Privacy Rule and the Security Rule set nationwide standards for protecting health information, including health information stored electronically.

68.     The Security Rule requires Defendants to do the following:

    a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

    b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

    c.    Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

    d.    Ensure compliance by its workforce.[26]

---

[26] *Summary of the HIPAA Security Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html (last accessed Jan. 30, 2026).

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

69.    Under HIPAA's mandate Defendants follow "applicable standards, implementation specifications, and requirements . . . with respect to electronic protected health information," 45 C.F.R. § 164.302, Defendants were required to, at minimum, "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(e), and "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

70.    Defendants are also required to follow the regulations for safeguarding electronic medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

71.    Both HIPAA and HITECH obligate Defendants to follow reasonable security standards, respond to, contain, and mitigate security violations, and to protect against disclosure of sensitive patient Private Information. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); 45 C.F.R. § 164.530(f); 42 U.S.C. § 17902.

72.    Defendants have failed to comply with HIPAA and HITECH. They have failed to maintain adequate security practices, systems, and protocols to prevent data loss, failed to mitigate the risks of a data breach and loss of data, and failed to ensure the confidentiality and protection of PHI.

### E.    Defendants Failed to Comply with Industry Practices

73.    Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential cyber-attacks that affect businesses every day and proposes solutions to defend against those

1  cyber-attacks.[27] All organizations collecting and handling Private Information, such

2  as Defendants, are strongly encouraged to follow these controls.

3      74.    Additionally, cybersecurity firms have promulgated a series of best

4  practices that at a minimum should be implemented by sector participants including,

5  but not limited to: installing appropriate malware detection software; monitoring and

6  limiting network ports; protecting web browsers and email management systems;

7  setting up network systems such as firewalls, switches, and routers; monitoring and

8  protecting of physical security systems; protecting against any possible

9  communication system; and training staff regarding critical points.

10     75.    Other best practices include but are not limited to securely configuring

11  business software, managing access controls and vulnerabilities to networks, systems,

12  and software, maintaining network infrastructure, defending networks, adopting data

13  encryption while data is both in transit and at rest, limiting access to sensitive

14  information to only necessary employees, and securing application software.[28]

15     76.    The following frameworks incorporate these data security measures and

16  others and are regularly employed as industry standard practices: the NIST

17  Cybersecurity Framework 2.0 (including without limitation PR.AA-01, PR.AA.-02,

18  PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10,

19  PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06,

20  DE.CM-09, and RS.CO-04), NIST Special Publications 800-53, 53A, or 800-171; the

21  Federal Risk and Authorization Management Program (FEDRAMP); or the Center for

22  Internet Security's Critical Security Controls (CIS CSC), which are well respected

23  authorities in reasonable cybersecurity readiness.

24     77.    Defendants failed to follow these and other industry standards to

25  adequately protect the Private Information of Plaintiffs and Class Members.

26

27  [27] *CIS Critical Security Controls*, Center for Internet Security at 1 (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Jan. 30, 2026).

28  [28] *See id.*

**F.**    **The Data Breach Caused Injury to Class Members and Will Result in Additional Harm Such as Fraud**

78.    The ramifications of Defendants' failure to secure Plaintiffs' and Class Members' data are severe. Victims of data breaches are much more likely to become victims of identity theft and other types of fraudulent schemes. Moreover, as a result of Episource's delay between detecting the Data Breach in February of 2025, and the Notice Letters sent to affected persons in June of 2025, the risk of fraud for Plaintiffs and Class Members increased exponentially.

79.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[29] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[30]

80.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[31] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[32] As Microsoft

---

[29] 17 C.F.R. § 248.201 (2013).

[30] *Id.*

[31] *What is the Dark Web?* Microsoft 365, (Aug. 27, 2024) https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[32] *Id.*; Louis De Nicola, *What Is the Dark Web?*, Experian (May, 21, 2021) https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[33]

81.    When the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [Private Information] belonging to victims from countries all over the world. One of the key challenges of protecting Private Information online is its pervasiveness. As data breaches in the news continue to show, Private Information about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[34]

82.    Identity thieves can and will use the Private Information taken in the Data Breach to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud, such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

83.    Theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is

---

[33] *What is the Dark Web? –* Microsoft 365, *supra.*

[34] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor (Apr. 3, 2018) https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  mixed with yours, your treatment, insurance and payment records, and credit report
2  may be affected."[35]

3        84.   According to the FTC, bad actors can use the type of Private Information
4  involved in the Data Breach, such as name and health insurance account number or
5  Medicare number "to get medical care, see a doctor, get prescription drugs, buy
6  medical devices, or submit claims with your insurance provider."[36]

7        85.   As indicated by Jim Trainor, second in command at the FBI's cyber
8  security division: "Medical records are a gold mine for criminals—they can access a
9  name, DOB, Social Security and insurance numbers, and even financial information
10 all in one place. Credit cards can be, say, five dollars or more where PHI records can
11 go from $20 say up to—we've even seen $60 or $70."[37] A complete identity theft kit
12 that includes health insurance credentials may be worth up to $1,000 on the black
13 market, whereas stolen payment card information sells for about $1.[38]

14       86.   According to Experian:

15           When a healthcare data breach exposes someone's PHI
16           and/or PII, the risk of identity theft and medical identity theft rises.

17        &bull;   On average, medical identity theft can add up to $20,000 in
18            out-of-pocket expenses for a single victim

19

---

20 [35] *See What to Know About Medical Identity Theft*, Federal Trade Commission, (Sept.
21 2024)     http://www.consumer.ftc.gov/articles/0171-medical-identity-theft     (last
   accessed Jan. 30, 2026).

22 [36] *Id*.

23 [37] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New*
24 *Ponemon     Study     Shows*,     IDExperts,     (May     14,     2015),
   https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-
25 criminals-are-targeting-your-private-healthcare-dat.

26 [38] *Managing cyber risks in an interconnected world, Key findings from The Global*
27 *State of Information Security® Survey 2015*, PriceWaterhouseCoopers (Sept. 30, 2014)   https://www.pwc.com/ee/et/publications/pub/the-global-state-of-information-
28 security-survey-2015.pdf.

- Consequences of medical identity theft include becoming uninsured for both life and health insurance
- Victims of medical identity theft may receive the wrong type of care due to tampered medical files
- Unpaid medical bills sent to collection agencies can damage credit histories and financial stability[39]

87.     The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can sell for up to $1,000 online."[40]

88.     Social Security numbers were taken in the Data Breach and are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment–even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[41] (emphasis added).

89.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal

---

[39] *Healthcare Data Breaches and Medical Identity Theft Managing the Rising Risks of a Healthcare Data Bre*ach, Experian, https://www.experian.com/data-breach/healthcare-data-breach (last accessed Jan. 30, 2026).

[40] Andrew Steger, *What Happens to Stolen Healthcare Data?* HEALTHTECH, (Oct. 30, 2019) https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[41] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[42]

90.    The Social Security Administration further stresses that:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[43]

91.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[44]

92.    Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts known as

---

[42] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Jan. 30, 2026).

[43] *Id.*

[44] *Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, U.S. Gov't Accountability Off., Report to Congressional Requesters, Personal Information (June 2007) https://www.gao.gov/assets/gao-07-737.pdf (last accessed Jan. 30, 2026).

social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to target them with spam emails or solicitations to deceive the victim into providing the criminal with additional personal information.

93.    Phishing scammers use emails and text messages to trick people into giving them their personal information, including but not limited to passwords, account numbers, and Social Security numbers. Phishing scams are frequently successful, and the FBI reported that people lost approximately $18.7 million to such scams in 2023 alone.[45]

94.    Accordingly, providing credit monitoring or reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. Javelin Research reported that "[f]raud-related resolution hours skyrocketed in 2023. The average amount of time consumers spent in 2022 resolving issues stemming from identity fraud clocked in at six hours, but in 2023, fraud resolution hours rose steeply, jumping to a nearly 10-hour average, a major disruption for consumers and financial institutions alike."[46]

95.    Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting credit bureaus to place a fraud alert, reviewing their credit

---

[45] *Internal Crime Report*, FEDERAL BUREAU OF INVESTIGATION, (2023), https://www.ic3.gov/annualreport/reports/2023_ic3report.pdf (last visited Jan. 30, 2026).

[46] Suzanne Sando, *2024 Identity Fraud Study: Resolving the Shattered Identity Crisis*, Javelin Strategy & Research, (Apr. 10, 2024), https://javelinstrategy.com/research/2024-identity-fraud-study-resolving-shattered-identity-crisis.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

reports, placing a credit freeze on their credit, and correcting their credit reports.[47] The result is that Plaintiffs and Class Members are forced to spend their own personal time, or take time from work, to respond to the Data Breach. Defendants have not offered to compensate them for this loss of time.

96.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm–yet the resource and asset of time has been lost.

97.    Because the information stolen in the Data Breach is immutable and cannot be changed, it can be used to perpetrate fraud and identity theft for the remainder of their lives. Plaintiffs and Class Members now face years of constant surveillance of their financial and medical records, monitoring, and loss of rights.

### G.    Plaintiffs and Class Members Suffered Damages.

98.    Defendants' wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiffs' and Class Members' Private Information, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation.

99.    As a direct and proximate result of Defendants' failure to protect the Private Information, Plaintiffs and the Class have been injured by facing ongoing, imminent, impending threats of identity theft crimes, fraud, scams, and other misuse of this Private Information, resulting in ongoing monetary loss and economic harm, loss of value of Private Information, loss of privacy and confidentiality of the stolen

---

[47] *See* Federal Trade Commission, https://www.identitytheft.gov/Steps (last accessed Jan. 30, 2026).

Private Information, illegal sales of the compromised Private Information on the black market, mitigation expenses and time spent on credit monitoring, identity theft insurance, credit freezes/unfreezes, expenses and time spent in initiating fraud alerts, contacting third parties; decreased credit scores, lost work time, and other injuries.

100.    Information regarding an individual's health and medical choices, such as here, are some of the most personal and private types of information that exist. An individual's right to privacy regarding their body, their medical care, and their reproductive choices are some of the most sacrosanct and inviolable rights an individual can possess. Damages relating to an individual's loss of privacy and dignitary harm has also long been recognized as recoverable by courts and in the common law.

101.    Because personal data is valuable personal property, market exchanges now exist where internet users like Plaintiffs and Class Members can sell or monetize their own personal data. In 2019, the data brokering industry was worth roughly $200 billion.[48] In fact, the data marketplace is so sophisticated that patients can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[49,50] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[51]

102.    Moreover, the value of Private Information is, in part derived from its confidentiality. Consumers realize the value of Private Information by using it to verify their identities, apply for employment, and secure financial products at

---

[48] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, Los Angeles Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[49] *Id.*

[50] *Data Coupe Home Page*, https://datacoup.com/ (last accessed Jan. 30, 2026).

[51] *Digi.Me Home Page*, https://digi.me/what-is-digime/ (last accessed Jan. 30, 2026).

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

favorable rates. When the integrity of this data is compromised, its utility is diminished and its value is lost.

103.   As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. This transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

104.   The unencrypted Private Information of Plaintiffs and Class Members will eventually end up (if it has not already ended up) for sale on the dark web, as that is the *modus operandi* of cybercriminals who obtain sensitive information.

105.   At all relevant times, Defendants knew, or reasonably should have known, the importance of safeguarding the Private Information of Plaintiffs and Class Members, and the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach, including:

        a.    theft and misuse of their personal and financial information;

        b.    the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals and misused via the sale of Plaintiffs' and Class Members' information on the Internet's black market;

        c.    the untimely and inadequate notification of the Data Breach;

        d.    the improper disclosure of their Private Information;

        e.    loss of privacy;

        f.    ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the

1    effects of the Data Breach;

2    g.    ascertainable losses in the form of diminution of the value of their

3    Private Information, for which there is a well-established national

4    and international market;

5    h.    the loss of productivity and value of their time spent to address,

6    attempt to ameliorate, mitigate, and deal with the actual and future

7    consequences of the Data Breach, including finding fraudulent

8    charges, cancelling and reissuing cards, purchasing credit

9    monitoring and identity theft protection services, imposition of

10    withdrawal and purchase limits on compromised accounts, and the

11    inconvenience, nuisance and annoyance of dealing with all such

12    issues resulting from the Data Breach; and

13    i.    nominal damages.

14    106.    While Plaintiffs' and Class Members' Private Information has been

15    stolen, Defendants continue to hold Plaintiffs' and Class Members' existing Private

16    Information and will obtain other Private Information in the future. Particularly

17    because Defendants have shown an inability to prevent a breach or stop it from

18    continuing even after being detected, Plaintiffs and Class Members have an

19    undeniable interest in ensuring that their Private Information is secure, remains secure,

20    is properly and promptly destroyed, and is not subject to further theft.

21    **H.    Plaintiffs' Experiences**

22    ***Plaintiff David Bartelt***

23    107.    During all times relevant, Plaintiff Bartelt was a member of Molina.

24    108.    Plaintiff Bartelt received a Notice Letter from Episource dated June 6,

25    2025, informing him that his Private Information was specifically identified as having

26    been exposed to cybercriminals in the Data Breach.

27

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

109.   Plaintiff Bartelt is very careful about sharing his sensitive information. Plaintiff Bartelt would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

110.   Plaintiff Bartelt stores any documents containing his Private Information in a safe and secure location.

111.   Because of the Data Breach, Plaintiff Bartelt's Private Information is now in the hands of cybercriminals. Plaintiff Bartelt has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

112.   As a result of the Data Breach, which exposed highly valuable information such as health insurance data (such as health plans/policies, insurance companies, member/group ID numbers, and Medicaid-Medicare-government payor ID numbers), health data (such as medical record numbers, doctors, diagnoses, medicines, test results, images, care, and treatment), and other personal data such as date of birth), Plaintiff Bartelt is now at a present and continuing risk of identity theft and fraud. The full scope of the compromised information will be confirmed through discovery, including expert discovery, after Plaintiffs receive and analyze all relevant data. According to the Notice of Data Breach Plaintiff Bartelt received from Molina, the information exposed included "contact information (such as name, address, phone number and email), ***plus one or more*** of the following:

- Health insurance data (such as health plans/policies, insurance companies, member/group ID numbers, and Medicaid-Medicare-government payor ID numbers)
- Health data (such as medical record numbers, doctors, diagnoses, medicines, test results, images, care, and treatment)
- Other personal data such as date of birth" (emphasis added).

113.   As a result of the Data Breach, Plaintiff Bartelt has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach

and addressing the future consequences of the Data Breach. Among other things, Plaintiff Bartelt has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, taking Plaintiff Bartelt away from other activities and money-making opportunities.

114.   The Notice Letter Plaintiff Bartelt received from Episoure directed him to take the actions described above. Indeed, the Notice Letter that Episoure sent to Plaintiff Bartelt and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

115.   Plaintiff Bartelt fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

116.   Plaintiff Bartelt has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Bartelt's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Bartelt's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Bartelt's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Bartelt, including the difference in value between what Plaintiff should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data

1  security to protect Plaintiff Bartelt's Private Information; and (e) continued risk to

2  Plaintiff Bartelt's Private Information, which remains in the possession of Defendants

3  and which is subject to further breaches so long as they fail to undertake appropriate

4  and adequate measures to protect the Private Information entrusted to them.

5  ***Plaintiff Angela Jo Carter***

6      117.  At all relevant times, Plaintiff Carter was a member of Humana.

7      118.  Plaintiff Carter received a Notice Letter from Episource dated June 6,

8  2025 informing her that her Private Information was specifically identified as having

9  been exposed to cybercriminals in the Data Breach.

10      119.  Plaintiff Carter is very careful about sharing her sensitive information.

11  Plaintiff Carter would not have allowed Defendants to collect her Private Information

12  had she known the true state of affairs regarding Defendants' data security practices.

13      120.  Plaintiff Carter stores any documents containing her Private Information

14  in a safe and secure location.

15      121.  Because of the Data Breach, Plaintiff Carter's Private Information is now

16  in the hands of cybercriminals.

17      122.  Plaintiff Carter has suffered actual injury from the exposure and theft of

18  her Private Information—including violation of her right to privacy.

19      123.  As a result of the Data Breach, which exposed highly valuable

20  information such as her name, address, phone number, date of birth, health insurance

21  data (such as health plan and policies, insurance companies, member and group ID

22  numbers, and Medicaid-Medicare-government payor ID numbers) and health data

23  (such as medical record numbers, doctors, diagnoses, medicines, test results, care,

24  images, and treatment), Plaintiff Carter is now at a present and continuing risk of

25  identity theft and fraud. More specifically, according to Episoure, at a minimum,

26  Plaintiff Carter's date of birth and physician name were exposed. The full scope of the

27  compromised information will be confirmed through discovery, including expert

28  discovery, after Plaintiffs receive and analyze all relevant data.

124.    As a result of the Data Breach, Plaintiff Carter has experienced data misuse and identity theft. For example, after the Data Breach, Plaintiff Carter had a medical claim filed on her behalf using her insurance for prefabricated of-the-shelf adjustable joint knee orthosis and sagittal control lumbar-sacral orthosis. Plaintiff Cater does not have knee issues and has never been treated by the company who filed the medical claim on her behalf. Plaintiff Carter has also experienced a notable increase in the number of spam calls she receives since the Data Breach, which she believes are attempts to acquire additional data from her to be used for fraud and identity theft. Plaintiff Carter attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, the fact that she is very careful with her Private Information, and the fact that she has never experienced anything like this prior to the Data Breach.

125.    As a result of the Data Breach, Plaintiff Carter has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Carter has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive and took away from other activities and money-making opportunities.

126.    The Notice Letter Plaintiff Carter received from Episource specifically directed her to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  errors." In addition, the Notice Letter advised victims of the Data Breach and how

2  they could place a credit freeze on their file through a credit reporting agency.

3      127.   Plaintiff Carter fears that criminals will use her information to commit

4  identity theft and anticipates spending considerable time and money on an ongoing

5  basis to remedy the harms caused by the Data Breach.

6      128.   Plaintiff Carter also has experienced increased stress as a result of the

7  Data Breach and the resulting misuse of her Private Information. Since the Data

8  Breach, Plaintiff Carter has experienced an increase in her thyroid levels, increased

9  weight gain, and increased blood pressure resulting from the increased stress. Plaintiff

10  Carter has sought counsel services to help with the heightened anxiety and stress.

11      129.   Plaintiff Carter also has suffered injury directly and proximately caused

12  by the Data Breach, including: (a) theft of her valuable Private Information; (b) the

13  imminent and certainly impending injury flowing from fraud and identity theft posed

14  by Plaintiff Carter's Private Information being placed in the hands of cybercriminals;

15  (c) damages to and diminution in value of Plaintiff Carter's Private Information that

16  was entrusted to Defendants; (d) damages unjustly retained by Defendants and at the

17  cost to Plaintiff Carter, including the difference in value between what Plaintiff should

18  have received from Defendants and Defendants' defective and deficient performance

19  of that obligation by failing to provide reasonable and adequate data security to protect

20  Plaintiff Carter's Private Information; and (e) continued risk to Plaintiff Carter's

21  Private Information, which remains in the possession of Defendants and which is

22  subject to further breaches so long as they fail to undertake appropriate and adequate

23  measures to protect the Private Information that was entrusted to them.

24  ***Plaintiff Farreece Grimmett***

25      130.   At all relevant times Plaintiff Grimmett was a member of Molina.

26      131.   Plaintiff Grimmett received a Notice Letter from Episource, informing

27  him that his Private Information was specifically identified as having been exposed to

28  cybercriminals in the Data Breach.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

132.    Plaintiff Grimmett is very careful about sharing his sensitive information. Plaintiff Grimmett would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

133.    Plaintiff Grimmett stores any documents containing his Private Information in a safe and secure location.

134.    Because of the Data Breach, Plaintiff Grimmett's Private Information is now in the hands of cybercriminals.

135.    Plaintiff Grimmett has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

136.    As a result of the Data Breach, which exposed highly valuable information such as health insurance data (such as health plans/policies, insurance companies, member/group ID numbers, and Medicaid-Medicare-government payor ID numbers), health data (such as medical record numbers, doctors, diagnoses, medicines, test results, images, care, and treatment), and other personal data such as date of birth), Plaintiff Grimmett is now at a present and continuing risk of identity theft and fraud. More specifically, according to Episource, at a minimum, Plaintiff Grimmett's health plan ID and date of birth were exposed.  The full scope of the compromised information will be confirmed through discovery, including expert discovery, after Plaintiffs receive and analyze all relevant data.

137.    As a result of the Data Breach, Plaintiff Grimmett has experienced data misuse. For example, Plaintiff Grimmett has experienced a notable increase in the number of spam calls he receives since the Data Breach which he believes is attempts to acquire additional data from him to be used for fraud and identity theft. Plaintiff Grimmett attributes the foregoing suspicious and unauthorized activity to the Data Breach given the time proximity, the fact that he is very careful with his Private Information, and the fact that he has never experienced anything like this prior to now.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

138.   As a result of the Data Breach, Plaintiff Grimmett has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Grimmett has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Grimmett away from other activities and money-making opportunities.

139.   The Notice Letter Plaintiff Grimmett received from Episoure specifically directed him to take the actions described above. Indeed, the Notice Letter that Episoure sent to Plaintiff Grimmett and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the Notice Letter advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

140.   Plaintiff Grimmett fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

141.   Plaintiff Grimmett has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Grimmett's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Grimmett's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Grimmett's Private Information that was entrusted to Defendant; (d) damages

1    unjustly retained by Defendants and at the cost to Plaintiff, including the difference in

2    value between what Plaintiff should have received from Defendants and Defendants'

3    defective and deficient performance of that obligation by failing to provide reasonable

4    and adequate data security to protect Plaintiff Grimmett's Private Information; and (e)

5    continued risk to Plaintiff Grimmett's Private Information, which remains in the

6    possession of Defendants and which is subject to further breaches so long as they fail

7    to undertake appropriate and adequate measures to protect the Private Information that

8    was entrusted to them.

9    ***Plaintiff Frederick Lower***

10    142.    At all relevant times, Plaintiff Lower was a member of Molina.

11    143.    Plaintiff Lower received a Notice Letter from Episource dated June 6,

12    2025, informing him that his Private Information was specifically identified as having

13    been exposed to cybercriminals in the Data Breach.

14    144.    Plaintiff Lower is very careful about sharing his sensitive information.

15    Plaintiff Lower would not have allowed Defendants to collect his Private Information

16    had he known the true state of affairs regarding Defendants' data security practices.

17    145.    Plaintiff Lower stores any documents containing his Private Information

18    in a safe and secure location. Plaintiff Lower has never knowingly transmitted

19    unencrypted sensitive PII or PHI over the internet or any other unsecured source.

20    146.    Because of the Data Breach, Plaintiff Lower's Private Information is now

21    in the hands of cybercriminals.

22    147.    Plaintiff Lower has suffered actual injury from the exposure and theft of

23    his Private Information—including violation of his right to privacy.

24    148.    As a result of the Data Breach, which exposed highly valuable

25    information such as health insurance data (such as health plans/policies, insurance

26    companies, member/group ID numbers, and Medicaid-Medicare-government payor

27    ID numbers), health data (such as medical record numbers, doctors, diagnoses,

28    medicines, test results, images, care, and treatment), and other personal data and

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1   medical/health information, Plaintiff Lower is now at a present and continuing risk of

2   identity theft and fraud. More specifically, according to Episource, at a minimum,

3   Plaintiff Lower's health plan ID, medical chart information, and health plan

4   information were exposed. The full scope of the compromised information will be

5   confirmed through discovery, including expert discovery, after Plaintiffs receive and

6   analyze all of relevant data.

7       149.   As a result of the Data Breach, Plaintiff Lower has had no choice but to

8   spend numerous hours attempting to mitigate the harms caused by the Data Breach

9   and addressing the future consequences of the Data Breach. Among other things,

10  Plaintiff Lower has already expended time and suffered loss of productivity from

11  taking time to address and attempt to ameliorate, mitigate, and address the future

12  consequences of the Data Breach, including researching facts about the Data Breach,

13  thoroughly reviewing account statements and credit reports, contacting his bank

14  regarding fraudulent activity, changing password and autopayment information, and

15  taking other protective and ameliorative steps in response to the Data Breach. This is

16  time that was lost and unproductive, and took Plaintiff Lower away from other

17  activities and money-making opportunities.

18      150.   The Notice Letter Plaintiff Lower received from Defendant specifically

19  directed him to take the actions described above.  Indeed, the Notice Letter that

20  Defendant sent to Plaintiff and all Class Members advised individuals affected by the

21  breach to "remain vigilant against incidents of identity theft and fraud, to review your

22  account statements, and monitor free credit reports for suspicious activity and to detect

23  errors." In addition, the Notice Letter advised victims of the Data Breach how they

24  could place a credit freeze on their file through a credit reporting agency.

25      151.   Plaintiff Lower fears that criminals will use his information to commit

26  identity theft and anticipates spending considerable time and money on an ongoing

27  basis to remedy the harms caused by the Data Breach.

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

152.    Plaintiff Lower has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Lower's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Lower's Private Information that was entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Lower's Private Information; and (e) continued risk to Plaintiff Lower's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

### ***Plaintiff Jose Contreras***

153.    During all times relevant, Plaintiff Contreras was a member of Blue Shield CA.

154.    Plaintiff Contreras received a Notice Letter from Episource dated June 6, 2025, informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

155.    Plaintiff Contreras is very careful about sharing his sensitive information. Plaintiff Contreras would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

156.    Plaintiff Contreras stores any documents containing his Private Information in a safe and secure location.

157.    Because of the Data Breach, Plaintiff Contreras's Private Information is now in the hands of cybercriminals.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

158.  Plaintiff Contreras has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

159.  As a result of the Data Breach, which exposed highly valuable information such as name, address, phone number, date of birth, health insurance data (such as health plan and policies, insurance companies, member and group ID numbers, and Medicaid-Medicare-government payor ID numbers) and health data (such as medical record numbers, doctors, diagnoses, medicines, test results, care, images, and treatment), Plaintiff Contreras is now at a present and continuing risk of identity theft and fraud. More specifically, according to Episource, at a minimum, Plaintiff Contreras' provider information, date(s) of service, date of birth, and diagnosis information were exposed. The full scope of the compromised information will be confirmed through discovery, including expert discovery, after Plaintiffs receive and analyze all relevant data.

160.  Shortly after the Data Breach, Plaintiff Contreras started receiving a sharp increase in spam calls and messages. Plaintiff Contreras began receiving 3-6 spam calls per day and multiple phishing text messages per day.

161.  As a result of the Data Breach, Plaintiff Contreras has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Contreras has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Contreras away from other activities and money-making opportunities.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

162.    The Notice Letter Plaintiff Contreras received from Episource specifically directed him to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach they could place a credit freeze on their file through a credit reporting agency.

163.    Plaintiff Contreras fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

164.    Plaintiff Contreras has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Contreras's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Contreras's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant and at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Contreras's Private Information; and (e) continued risk to Plaintiff Contreras's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

/ / /

/ / /

/ / /

/ / /

49

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    ***_Plaintiff Michael Alcorn_***

2    165.    At all relevant times, Plaintiff Alcorn was a member of Molina.

3    166.    Plaintiff Alcorn received a Notice Letter from Episource dated June 6,
4    2025, informing him that his Private Information was specifically identified as having
5    been exposed to cybercriminals in the Data Breach.

6    167.    Plaintiff Alcorn is very careful about sharing his sensitive information.
7    Plaintiff Alcorn would not have allowed Defendants to collect his Private Information
8    had he known the true state of affairs regarding Defendants' data security practices.

9    168.    Plaintiff Alcorn stores any documents containing his Private Information
10    in a safe and secure location.

11    169.    Because of the Data Breach, Plaintiff Alcorn's Private Information is
12    now in the hands of cybercriminals.

13    170.    Plaintiff Alcorn has suffered actual injury from the exposure and theft of
14    his Private Information—including violation of his right to privacy.

15    171.    As a result of the Data Breach, which exposed highly valuable
16    information such as name, address, phone number, date of birth, health insurance data
17    (such as health plan and policies, insurance companies, member and group ID
18    numbers, and Medicaid-Medicare-government payor ID numbers) and health data
19    (such as medical record numbers, doctors, diagnoses, medicines, test results, care,
20    images, and treatment), Plaintiff Alcorn is now at a present and continuing risk of
21    identity theft and fraud. More specifically, according to Episource, at a minimum,
22    Plaintiff Alcorn's health plan identification information and medical chart
23    identification information were exposed. The full scope of the compromised
24    information will be confirmed through discovery, including expert discovery, after
25    Plaintiffs receive and analyze all relevant data.

26    172.    As a result of the Data Breach, Plaintiff Alcorn has had no choice but to
27    spend numerous hours attempting to mitigate the harms caused by the Data Breach
28    and addressing the future consequences of the Data Breach. Among other things,

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  Plaintiff Alcorn has already expended time and suffered loss of productivity from
2  taking time to address and attempt to ameliorate, mitigate, and address the future
3  consequences of the Data Breach, including researching facts about the Data Breach,
4  thoroughly reviewing account statements and credit reports, contacting his bank
5  regarding fraudulent activity, changing password and autopayment information,
6  sifting through his e-mail inbox to verify which messages are legitimate and which
7  are malicious spam, and taking other protective and ameliorative steps in response to
8  the Data Breach. This is time that was lost and unproductive, taking Plaintiff Alcorn
9  away from other activities. This has also exacerbated Plaintiff Alcorn's anxiety and
10  emotional distress symptoms arising from a traumatic brain injury sustained in 2014.

11  173.  The Notice Letter Plaintiff Alcorn received from Episource directed him
12  to take the actions described above. Indeed, the Notice Letter Episource sent to
13  Plaintiff Alcorn and all Class Members advised individuals affected by the breach to
14  "remain vigilant against incidents of identity theft and fraud, to review your account
15  statements, and monitor free credit reports for suspicious activity and to detect errors."
16  In addition, the breach notice advised victims of the Data Breach how they could place
17  a credit freeze on their file through a credit reporting agency.

18  174.  Plaintiff Alcorn fears that criminals will use his information to commit
19  identity theft and anticipates spending considerable time and money on an ongoing
20  basis to remedy the harms caused by the Data Breach.

21  175.  Plaintiff Alcorn has also suffered injury directly and proximately caused
22  by the Data Breach, including: (a) theft of Plaintiff Alcorn's valuable Private
23  Information; (b) the imminent and certainly impending injury flowing from fraud and
24  identity theft posed by Plaintiff Alcorn's Private Information being placed in the hands
25  of cybercriminals; (c) damages to and diminution in value of Plaintiff Alcorn's Private
26  Information entrusted to Defendants; (d) damages unjustly retained by Defendants and
27  at the cost to Plaintiff Alcorn, including the difference in value between what Plaintiff
28  Alcorn should have received from Defendants and Defendants' defective and deficient

1    performance of that obligation by failing to provide reasonable and adequate data

2    security to protect Plaintiff Alcorn's Private Information; and (e) continued risk to

3    Plaintiff Alcorn's Private Information, which remains in the possession of Defendants

4    and which is subject to further breaches so long as they fail to undertake appropriate

5    and adequate measures to protect the Private Information entrusted to them.

6    ***Plaintiff Nesrin Haddad***

7    176.    At all relevant times, Plaintiff Haddad was a member of Blue Shield

8    CA.

9    177.    Plaintiff Haddad received a Notice Letter from Episource dated June 6,

10    2025, informing her that her Private Information was specifically identified as having

11    been exposed to cybercriminals in the Data Breach.

12    178.    Plaintiff Haddad is very careful about sharing her sensitive information.

13    Plaintiff Haddad would not have allowed Defendants to collect her Private

14    Information had she known the true state of affairs regarding Defendants' data security

15    practices.

16    179.    Plaintiff Haddad stores any documents containing her Private

17    Information in a safe and secure location. Plaintiff Haddad has never knowingly

18    transmitted unencrypted sensitive PII or PHI over the internet or any other unsecured

19    source.

20    180.    Because of the Data Breach, Plaintiff Haddad's Private Information is

21    now in the hands of cybercriminals.

22    181.    Plaintiff Haddad has suffered actual injury from the exposure and theft

23    of her Private Information—including violation of her right to privacy.

24    182.    As a result of the Data Breach, which exposed highly valuable

25    information such as name, address, phone number, date of birth, health insurance data

26    (such as health plan and policies, insurance companies, member and group ID

27    numbers, and Medicaid-Medicare-government payor ID numbers) and health data

28    (such as medical record numbers, doctors, diagnoses, medicines, test results, care,

images, and treatment), Plaintiff Haddad is now at a present and continuing risk of identity theft and fraud. More specifically, according to Episource, at a minimum, Plaintiff Haddad's health plan information, date of birth, and Episource project name were exposed. The full scope of the compromised information will be confirmed through discovery, including expert discovery, after Plaintiffs receive and analyze all relevant data.

183.    As a result of the Data Breach, Plaintiff Haddad has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Haddad has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Haddad away from other activities and money-making opportunities.

184.    The Notice Letter Plaintiff Haddad received from Episource directed her to take the actions described above. Indeed, the Notice Letter Episource sent to Plaintiff Haddad and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

185.    Plaintiff Haddad fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

186. Plaintiff Haddad has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Haddad's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Haddad's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Haddad's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Haddad, including the difference in value between what Plaintiff Haddad should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Haddad's Private Information; and (e) continued risk to Plaintiff Haddad's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information entrusted to them.

***Plaintiff Paul Lewow***

187. At all relevant times, Plaintiff Lewow was a member of Blue Shield CA.

188. Plaintiff Lewow received a Notice Letter from Episource dated June 6, 2025, informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

189. Plaintiff Lewow is very careful about sharing his sensitive information. Plaintiff Lewow would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

190. Plaintiff Lewow stores any documents containing his Private Information in a safe and secure location.

191. Because of the Data Breach, Plaintiff Lewow's Private Information is now in the hands of cybercriminals.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

192.   Plaintiff Lewow has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

193.   As a result of the Data Breach, which exposed highly valuable information such as name, address, phone number, date of birth, health insurance data (such as health plan and policies, insurance companies, member and group ID numbers, and Medicaid-Medicare-government payor ID numbers) and health data (such as medical record numbers, doctors, diagnoses, medicines, test results, care, images, and treatment), Plaintiff Lewow is now at a present and continuing risk of identity theft and fraud. More specifically, according to Episource, at a minimum, Plaintiff Lewow's health plan identification information, date of birth, provider identification information, medical chart identification information, health insurance claim number, and diagnosis code were exposed. The full scope of the compromised information will be confirmed through discovery, including expert discovery, after Plaintiffs receive and analyze all relevant data.

194.   As a result of the Data Breach, Plaintiff Lewow has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Lewow has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, taking Plaintiff Lewow away from other activities and money-making opportunities.

195.   The Notice Letter Plaintiff Lewow received from Episource directed him to take the actions described above. Indeed, the Notice Letter Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain

vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

196.    Plaintiff Lewow fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

197.    Plaintiff Lewow has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Lewow's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Lewow's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Lewow's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Lewow, including the difference in value between what Plaintiff Lewow should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Lewow's Private Information; and (e) continued risk to Plaintiff Lewow's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information entrusted to them.

### ***Plaintiff Steve Altes***

198.    At all relevant times, Plaintiff Altes was a member of Blue Shield CA.

199.    Plaintiff Altes received a Notice Letter from Episource dated June 6, 2025 informing him that his Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    200.   Plaintiff Altes is very careful about sharing his sensitive information. Plaintiff Altes would not have allowed Defendants to collect his Private Information had he known the true state of affairs regarding Defendants' data security practices.

201.   Plaintiff Altes stores any documents containing his Private Information in a safe and secure location.

202.   Because of the Data Breach, Plaintiff Altes's Private Information is now in the hands of cybercriminals.

203.   Plaintiff Altes has suffered actual injury from the exposure and theft of his Private Information—including violation of his right to privacy.

204.   As a result of the Data Breach, which exposed highly valuable information such as name, address, phone number, date of birth, health insurance data (such as health plan and policies, insurance companies, member and group ID numbers, and Medicaid-Medicare-government payor ID numbers) and health data (such as medical record numbers, doctors, diagnoses, medicines, test results, care, images, and treatment), Plaintiff Altes is now at a present and continuing risk of identity theft and fraud. More specifically, according to Episource, at a minimum, Plaintiff Altes' health plan identification information, provider identification information, medical chart identification information, and diagnosis code were exposed. The full scope of the compromised information will be confirmed through discovery, including expert discovery, after Plaintiffs receive and analyze all relevant data.

205.   As a result of the Data Breach, Plaintiff Altes has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Altes has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank

1    regarding fraudulent activity, changing password and autopayment information, and

2    taking other protective and ameliorative steps in response to the Data Breach. This is

3    time that was lost and unproductive, and took Plaintiff Altes away from other activities

4    and money-making opportunities.

5        206.   The Notice Letter Plaintiff Altes received from Episource specifically

6    directed him to take the actions described above. Indeed, the Notice Letter that

7    Episource sent to Plaintiff and all Class Members advised individuals affected by the

8    breach to "remain vigilant against incidents of identity theft and fraud, to review your

9    account statements, and monitor free credit reports for suspicious activity and to detect

10   errors." In addition, the breach notice advised victims of the Data Breach how they

11   could place a credit freeze on their file through a credit reporting agency.

12       207.   Plaintiff Altes fears that criminals will use his information to commit

13   identity theft and anticipates spending considerable time and money on an ongoing

14   basis to remedy the harms caused by the Data Breach.

15       208.   Plaintiff Altes has also suffered injury directly and proximately caused

16   by the Data Breach, including: (a) theft of Plaintiff Altes's valuable Private

17   Information; (b) the imminent and certainly impending injury flowing from fraud and

18   identity theft posed by Plaintiff Altes's Private Information being placed in the hands

19   of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Altes's

20   Private Information that was entrusted to Defendants; (d) damages unjustly retained

21   by Defendants and at the cost to Plaintiff, including the difference in value between

22   what Plaintiff should have received from Defendants and Defendants' defective and

23   deficient performance of that obligation by failing to provide reasonable and adequate

24   data security to protect Plaintiff Altes's Private Information; and (e) continued risk to

25   Plaintiff Altes's Private Information, which remains in the possession of Defendants

26   and which is subject to further breaches so long as they fail to undertake appropriate

27   and adequate measures to protect the Private Information that was entrusted to them.

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    ***Plaintiff Tyrone Holifield***

2        209.   During all times relevant, Plaintiff Holifield was a member of Anthem

3    Blue Cross. Elevance Health and its affiliates provided Plaintiff Holifield with his

4    Anthem Blue Cross plan.

5        210.   Plaintiff Holifield received a Notice Letter from Episource dated June 6,

6    2025, informing him that his Private Information was specifically identified as having

7    been exposed to cybercriminals in the Data Breach.

8        211.   Plaintiff Holifield is very careful about sharing his sensitive information.

9        212.   Plaintiff Holifield would not have allowed Defendants to collect his

10   Private Information had he known the true state of affairs regarding Defendants' data

11   security practices.

12       213.   Plaintiff Holifield stores any documents containing his Private

13   Information in a safe and secure location.

14       214.   Because of the Data Breach, Plaintiff Holifield's Private Information is

15   now in the hands of cybercriminals.

16       215.   Plaintiff Holifield has suffered actual injury from the exposure and theft

17   of his Private Information—including violation of his right to privacy.

18       216.   As a result of the Data Breach, which exposed highly valuable

19   information such as name, address, phone number, date of birth, health insurance data

20   (such as health plan and policies, insurance companies, member and group ID

21   numbers, and Medicaid-Medicare-government payor ID numbers) and health data

22   (such as medical record numbers, doctors, diagnoses, medicines, test results, care,

23   images, and treatment), Plaintiff Holifield is now at a present and continuing risk of

24   identity theft and fraud. More specifically, according to Episource, at a minimum,

25   Plaintiff Holifield's health plan identification information, date of birth, and medical

26   chart identification information were exposed. The full scope of the compromised

27   information will be confirmed through discovery, including expert discovery, after

28   Plaintiffs receive and analyze all relevant data.

217.   As a result of the Data Breach, Plaintiff Holifield has experienced data misuse. For example, Plaintiff Holifield has experienced a notable increase in the number of spam calls he receives since the Data Breach. He believes they are attempts to acquire additional data from him for fraud and identity theft. Plaintiff Holifield attributes the foregoing suspicious and unauthorized activities to the Data Breach given the time proximity, the fact that he is very careful with his Private Information, and the fact that he has never experienced anything like this prior to now.

218.   As a result of the Data Breach, Plaintiff Holifield has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Holifield has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Holifield away from other activities and money-making opportunities.

219.   The Notice Letter Plaintiff Holifield received from Episource directed him to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

220.   Plaintiff Holifield fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

221.    Plaintiff Holifield has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Holifield's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Holifield's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Holifield's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Holifield, including the difference in value between what Plaintiff Holifield should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Holifield's Private Information; and (e) continued risk to Plaintiff Holifield's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

### ***Plaintiff Wanda Hernandez***

222.    During all times relevant, Plaintiff Hernandez was a member of InnovaCare.

223.    Plaintiff Hernandez received a Notice Letter from Episource dated June 6, 2025, informing her that her Private Information was specifically identified as having been exposed to cybercriminals in the Data Breach.

224.    Plaintiff Hernandez is very careful about sharing her sensitive information. Plaintiff Hernandez would not have allowed Defendants to collect her Private Information had she known the true state of affairs regarding Defendants' data security practices.

225.    Plaintiff Hernandez stores any documents containing her Private Information in a safe and secure location. Plaintiff Hernandez has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

226.    Because of the Data Breach, Plaintiff Hernandez's Private Information is now in the hands of cybercriminals.

227.    Plaintiff Hernandez has suffered actual injury from the exposure and theft of her Private Information—including violation of her right to privacy.

228.    As a result of the Data Breach, which exposed highly valuable information such as name, address, phone number, date of birth, health insurance data (such as health plan and policies, insurance companies, member and group ID numbers, and Medicaid-Medicare-government payor ID numbers) and health data (such as medical record numbers, doctors, diagnoses, medicines, test results, care, images, and treatment), Plaintiff Hernandez is now at a present and continuing risk of identity theft and fraud. More specifically, according to Episource, at a minimum, Plaintiff Hernandez's health plan identification information, date of birth, provider national provider identifier, Medicaid ID, and medical beneficiary identifier were exposed. The full scope of the compromised information will be confirmed through discovery, including expert discovery, after Plaintiffs receive and analyze all relevant data.

229.    On or around May 12, 2025, Plaintiff Hernandez received an email from Medicare Comparison Shop informing her that an unknown man going by the name of Geronimo Hernandez requested information about Medicare plans and coverage, attempting to obtain coverage under Plaintiff Hernandez's identity. Plaintiff Hernandez also started receiving emails from healthcare companies claiming that she has won free healthcare supplies and directing her to click on an external link.

230.    As a result of the Data Breach, Plaintiff Hernandez has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Breach. Among other things, Plaintiff Hernandez has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach,

thoroughly reviewing account statements and credit reports, contacting her bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Hernandez away from other activities and money-making opportunities.

231.    The Notice Letter Plaintiff Hernandez received from Episource directed her to take the actions described above. Indeed, the Notice Letter that Episource sent to Plaintiff Hernandez and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

232.    Plaintiff Hernandez fears that criminals will use her information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

233.    Plaintiff Hernandez has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Hernandez's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Hernandez's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Hernandez's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Hernandez, including the difference in value between what Plaintiff Hernandez should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Hernandez's Private Information; and (e) continued risk to Plaintiff Hernandez's Private Information, which remains in the possession of Defendants and which is

1  subject to further breaches so long as they fail to undertake appropriate and adequate
2  measures to protect the Private Information entrusted to them.

3  ***Plaintiff William Glenn Johnson***

4  234.    At all relevant times, Plaintiff Johnson was a member of Blue Shield
5  CA.

6  235.    Plaintiff Johnson received a Notice Letter from Episource dated June 6,
7  2025 informing him that his Private Information was specifically identified as having
8  been exposed to cybercriminals in the Data Breach.

9  236.    Plaintiff Johnson is very careful about sharing his sensitive information.
10  Plaintiff Johnson would not have allowed Defendants to collect his Private
11  Information had he known the true state of affairs regarding Defendants' data security
12  practices.

13  237.    Plaintiff Johnson stores any documents containing his Private
14  Information in a safe and secure location.

15  238.    Because of the Data Breach, Plaintiff Johnson's Private Information is
16  now in the hands of cybercriminals.

17  239.    Plaintiff Johnson has suffered actual injury from the exposure and theft
18  of his Private Information—including violation of his right to privacy.

19  240.    As a result of the Data Breach, which exposed highly valuable
20  information such as name, address, phone number, date of birth, health insurance data
21  (such as health plan and policies, insurance companies, member and group ID
22  numbers, and Medicaid-Medicare-government payor ID numbers) and health data
23  (such as medical record numbers, doctors, diagnoses, medicines, test results, care,
24  images, and treatment), Plaintiff Holifield is now at a present and continuing risk of
25  identity theft and fraud. More specifically, according to Episoure, at a minimum,
26  Plaintiff Johnson's health plan identification information, provider identification
27  information, Episource project name, medical chart identification information, and
28  diagnosis code were exposed. The full scope of the compromised information will be

confirmed through discovery, including expert discovery, after Plaintiffs receive and analyze all relevant data.

241.    As a result of the Data Breach, which exposed highly valuable information, Plaintiff Johnson is now at a present and continuing risk of identity theft and fraud.

242.    As a result of the Data Breach, Plaintiff Johnson has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Johnson has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. Plaintiff Johnson further spent $250 out-of-pocket to bolster his IT network security, as a result of concerns surrounding the Data Breach. This is time that was lost and unproductive, taking Plaintiff Johnson away from other activities and money-making opportunities.

243.    The Notice Letter Plaintiff Johnson received from Episource directed him to take the actions described above. Indeed, the Notice Letter Episource sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

244.    Plaintiff Johnson fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    245.   Plaintiff Johnson has also suffered injury directly and proximately caused
2    by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b)
3    the imminent and certainly impending injury flowing from fraud and identity theft
4    posed by Plaintiff Johnson's Private Information being placed in the hands of
5    cybercriminals; (c) damages to and diminution in value of Plaintiff Johnson's Private
6    Information entrusted to Defendants; (d) damages unjustly retained by Defendants and
7    at the cost to Plaintiff Johnson, including the difference in value between what
8    Plaintiff Johnson should have received from Defendants and Defendants' defective
9    and deficient performance of that obligation by failing to provide reasonable and
10   adequate data security to protect Plaintiff Johnson's Private Information; and (e)
11   continued risk to Plaintiff Johnson's Private Information, which remains in the
12   possession of Defendants and which is subject to further breaches so long as they fail
13   to undertake appropriate and adequate measures to protect the Private Information
14   entrusted to them.

15   ***Plaintiff Stephen Dollar***

16   246.   At all relevant times, Plaintiff Dollar was a member of Molina.

17   247.   Plaintiff Dollar received a Notice Letter from Episource dated June 6,
18   2025, informing him that his Private Information was specifically identified as having
19   been exposed to cybercriminals in the Data Breach.

20   248.   Plaintiff Dollar is very careful about sharing his sensitive information.
21   Plaintiff Dollar would not have allowed Defendants to collect his Private Information
22   had he known the true state of affairs regarding Defendants' data security practices.

23   249.   Plaintiff Dollar stores any documents containing his Private Information
24   in a safe and secure location.

25   250.   Because of the Data Breach, Plaintiff Dollar's Private Information is now
26   in the hands of cybercriminals.

27   251.   Plaintiff Dollar has suffered actual injury from the exposure and theft of
28   his Private Information—including violation of his right to privacy.

252.  As a result of the Data Breach, which exposed highly valuable information such as name, address, phone number, date of birth, health insurance data (such as health plan and policies, insurance companies, member and group ID numbers, and Medicaid-Medicare-government payor ID numbers) and health data (such as medical record numbers, doctors, diagnoses, medicines, test results, care, images, and treatment), Plaintiff Holifield is now at a present and continuing risk of identity theft and fraud. More specifically, according to Episoure, at a minimum, Plaintiff Dollar's health plan identification information, date of birth, health insurance claim information, and medical file identification information were exposed. The full scope of the compromised information will be confirmed through discovery, including expert discovery, after Plaintiffs receive and analyze all relevant data.

253.  As a result of the Data Breach, which exposed highly valuable information, Plaintiff Dollar is now at a present and continuing risk of identity theft and fraud.

254.  As a result of the Data Breach, Plaintiff Dollar has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Dollar has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing account statements and credit reports, contacting his bank regarding fraudulent activity, changing password and autopayment information, and taking other protective and ameliorative steps in response to the Data Breach. This is time that was lost and unproductive, and took Plaintiff Dollar away from other activities and money-making opportunities.

255.  The Notice Letter Plaintiff Dollar received from Episoure directed him to take the actions described above. Indeed, the Notice Letter Episoure sent to Plaintiff and all Class Members advised individuals affected by the breach to "remain

vigilant against incidents of identity theft and fraud, to review your account statements, and monitor free credit reports for suspicious activity and to detect errors." In addition, the breach notice advised victims of the Data Breach how they could place a credit freeze on their file through a credit reporting agency.

256.    Plaintiff Dollar fears that criminals will use his information to commit identity theft and anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach. Plaintiff Dollar has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by Plaintiff Dollar's Private Information being placed in the hands of cybercriminals; (c) damages to and diminution in value of Plaintiff Dollar's Private Information entrusted to Defendants; (d) damages unjustly retained by Defendants and at the cost to Plaintiff Dollar, including the difference in value between what Plaintiff Dollar should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Dollar's Private Information; and (e) continued risk to Plaintiff Dollar's Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as they fail to undertake appropriate and adequate measures to protect the Private Information that was entrusted to them.

## CLASS ACTION ALLEGATIONS

257.    Plaintiffs bring this action on behalf of themselves, and all other persons similarly situated in the "National Class" pursuant to Fed. R. Civ. P. 23(a) and (b):

> All persons residing in the United States whose Private Information was accessed in the Data Breach, including all who were sent a notice of the Data Breach ("Nationwide Class").

258.    Plaintiffs Contreras, Haddad, Lewow, Altes, Holifield, and Johnson (together, "California Plaintiffs") separately seek to represent a "California Subclass" defined as:

> All persons residing in the State of California whose Private Information was accessed in the Data Breach, including all who were sent a notice of the Data Breach ("California Subclass").

259.    Plaintiffs Alcorn, Bartelt, Dollar, Grimmett, and Lower (together "Molina Plaintiffs") separately seek to represent a "Molina Subclass" defined as:

> All members of the Nationwide Class who are also members of Molina.

260.    Plaintiffs Contreras, Haddad, Lewow, Altes, Holifield, and Johnson (together "Blue Shield CA Plaintiffs") separately seek to represent a "Blue Shield CA Subclass" defined as:

> All members of the Nationwide Class who are also members of Blue Shield.

261.    Plaintiff Hernandez separately seeks to represent an "Innovacare Subclass" defined as:

> All members of the Nationwide Class who are also members of Innovacare.

262.    Plaintiff Holifield separately seeks to represent an "Elevance Subclass" defined as:

> All members of the Nationwide Class who are also members of Elevance.

263.    The National Class, California Subclass, Molina Subclass, Blue Shield Subclass, the Innovacare Subclass, and the Elevance Subclass are collectively the "Classes."

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

264.   Excluded from the Classes are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, any entities in which Defendants have a controlling interest, as well as any Judge presiding over this matter and the clerks, judicial staff, and immediate family members of said Judge.

265.   Plaintiffs reserve the right to modify or amend the foregoing class definitions before the Court determines whether certification is appropriate.

266.   The proposed Classes meet the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

267.   <u>Numerosity:</u> The members in the Classes are so numerous that joinder of all Class Members in a single proceeding would be impracticable. Upon information and belief, the Nationwide Class consists of 5,418,666 Class Members. Upon information and belief, the California Subclass, Molina Subclass, Blue Shield CA Subclass, Innovacare Subclass, and Elevance Subclass each also meet the numerosity requirements. The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

268.   <u>Commonality and Predominance:</u> Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. These common questions of law or fact include, *inter alia*:

      a.   Whether Defendants engaged in the conduct alleged herein;

      b.   Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class Members' Private Information from unauthorized access and disclosure;

      c.   Whether Defendants' computer systems and data security practices used to protect Plaintiffs' and Class Members' Private Information violated the FTC Act, HIPAA, CMIA, and/or state

1    laws, and/or Defendants' other duties discussed herein;

2    d.    Whether Defendants failed to adequately respond to the Data

3        Breach, including failing to investigate it diligently and notify

4        affected individuals in the most expedient time possible and

5        without unreasonable delay, and whether this caused damages to

6        Plaintiffs and Class Members;

7    e.    Whether Defendants unlawfully shared, lost, or disclosed

8        Plaintiffs' and Class Members' Private Information;

9    f.    Whether Defendants' data security systems prior to, during, and

10        after the Data Breach complied with applicable data security laws

11        and regulations;

12    g.    Whether Defendants' data security systems prior to, during, and

13        after the Data Breach were consistent with industry standards;

14    h.    Whether Defendants' actions and inactions alleged herein were

15        negligent;

16    i.    Whether Plaintiffs and Class Members suffered injury as a

17        proximate result of Defendants' negligent actions or failures to act;

18    j.    Whether Defendants failed to exercise reasonable care to secure

19        and safeguard Plaintiffs' and Class Members' Private Information;

20    k.    Whether Defendants breached duties to protect Plaintiffs' and

21        Class Members' Private Information;

22    l.    Whether Defendants were unjustly enriched by their conduct as

23        alleged herein;

24    m.    Whether Plaintiffs and Class Members are entitled to actual and/or

25        statutory damages or other relief, and the measure of such damages

26        and relief;

27    n.    Whether Plaintiffs and Class Members are entitled to additional

28        credit or identity monitoring and monetary relief; and

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

o.    Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

269.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs on behalf of themselves and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

270.    Typicality: Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs, like all proposed members of the Classes, had their Private Information compromised in the Data Breach. Plaintiffs and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

271.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs are adequate representatives of the Classes and have no interests adverse to, or conflict with, the Classes they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

272.    Predominance: Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

273.    Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and

other financial detriment suffered by Plaintiffs and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress from Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

274.    <u>Injunctive and Declaratory Relief:</u> Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

275.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names in combination with addresses and/or e-mail addresses of Class Members affected by the Data Breach. Indeed, impacted Class Members already have been preliminarily identified and sent a Notice Letter.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (Against Episource on Behalf of Plaintiffs and the National Class)

276.    Plaintiffs restate and reallege the paragraphs 1-275 as if fully set forth herein.

277.    Episource requires its clients to provide, and in fact receives and maintains, non-public Private Information concerning individuals insured by or receiving services through Client Defendants as a necessary component of Episource's risk adjustment services, software, and solutions. Episource collected, stored, and

exercised exclusive control over Plaintiffs' and Class Members' Private Information in the ordinary course of its business.

278.   Plaintiffs and Class Members entrusted their Private Information to Client Defendants for purposes of obtaining health-related coverage and services, with the reasonable expectation and understanding that such information would be safeguarded against foreseeable cybersecurity threats. Client Defendants, in turn, shared that information with Episource for risk adjustment and related purposes, placing Plaintiffs' and Class Members' Private Information in Episource's exclusive custody and control.

279.   Episource knew and understood that cyberattacks targeting health-related data were a well-documented and foreseeable risk against which it was required to protect. Episource had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if their Private Information were wrongfully disclosed.

280.   By assuming the responsibility to collect, store, process, and retain this data, Episource had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

281.   Episource owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

282.   Episource also had a duty to exercise appropriate clearinghouse practices to remove its former clients' customers' Private Information they were no longer required to retain pursuant to regulations.

283.   Moreover, Episource had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach, but failed to do so.

284.   The economic loss rule does not preclude Plaintiffs from recovering economic damages through their negligence claims, as there is no contractual privity

between Plaintiffs and Episource. Plaintiffs' injuries arise from Defendants' breach of duties independent of any contract, including duties to implement reasonable data-security measures and to safeguard sensitive personal and medical information entrusted to them. Even if the economic loss rule were to apply, there is an exception based on the special relationship between the parties.

285.    Episource's duty to use reasonable security measures arose, in part, as a result of the special relationship that existed between Episource, on the one hand, and Plaintiffs and Class Members, on the other hand. That special relationship arose because Episource was entrusted with their confidential Private Information as a condition of receiving risk adjustment services, software, and solutions with Client Defendants.

286.    California Courts analyze six factors to determine the existence of a special relationship with no single factor being required or dispositive: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm.

287.    Here, each factor is satisfied as (1) the transactions in which Plaintiffs provided their Private Information to Defendants were for the purpose of receiving healthcare services; (2) data breaches targeting Private Information are readily foreseeable and the subject of frequent warnings by data security experts and state and federal governments; (3) the injuries associated with the theft and misuse of Plaintiffs' Private Information, including the expenditure of time and money mitigating the consequences of a data breach are alleged by Plaintiffs; (4) the theft of Private Information and Plaintiffs' allegations that Episource failed to implement reasonable data security measures is logically connected to and proximately caused by the Data Breach; (5) the moral blame associated with Episource's collection and use of

1  Plaintiffs' Private Information for its own profit while failing to fund data security

2  measures intended to protect Plaintiffs' Private Information from the foreseeable

3  consequences of a data breach is high; and (6) imposing liability on Episource for

4  failing to safeguard Private Information will further California state policy of ensuring

5  that personal information is protected and preventing the theft and misuse of Private

6  Information by criminals.

7       288.   Episource had duties arising under the FTC Act, HIPAA, and the CMIA

8  to protect Plaintiffs' and Class Members' Private Information.

9       289.   Episource's violations of Section 5 of the FTC Act, HIPAA, the CMIA,

10  and other state data security and consumer protection statutes constitute negligence

11  *per se*.

12      290.   Plaintiffs and Class Members are consumers within the class of persons

13  that these statutes were intended to protect and the harm that has occurred is the type

14  of harm these statutes were intended to guard against.

15      291.   In addition, under state data security and consumer protection statutes

16  such as those outlined herein, Episource had a duty to implement and maintain

17  reasonable security procedures and practices to safeguard Plaintiffs' and Class

18  Members' Private Information.

19      292.   Plaintiffs and Class Members were foreseeable victims of Episource's

20  violations of the FTC Act, HIPAA, the CMIA and state data security and consumer

21  protection statutes. Episource knew or should have known that its failure to implement

22  reasonable data security measures to protect and safeguard Plaintiffs' and Class

23  Members' Private Information would cause damage to Plaintiffs and the Class.

24      293.   Episource's duty to use reasonable care in protecting confidential data

25  arose not only as a result of the statutes and regulations described herein, but also

26  because Episource is bound by industry standards to protect confidential Private

27  Information. Episource also had a duty to exercise appropriate clearinghouse practices

28  to remove Private Information it was no longer required to retain under regulations.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

294.    Episource's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

295.    Episource had and continues to have duties to adequately disclose that Plaintiffs' and Class Members' Private Information within Episource's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

296.    Episource breached its duties and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information. The specific negligent acts and omissions committed by Episource include, but are not limited to, the following:

      a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

      b.    Failing to adequately monitor the security of their networks and systems for unauthorized access or the transfer of large volumes of data;

      c.    Failing to encrypt or limit access to Class Members' Private Information;

      d.    Failing to detect in a timely manner that Class Members' Private Information had been compromised;

      e.    Failing to remove former clients' customers' Private Information they were no longer required to retain under regulations; and

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1         f.     Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take steps to mitigate the potential for identity theft and other damages.

297. Episource breached its duties to Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

298. Episource knew or should have known that its failure to implement reasonable data security measures to protect and safeguard Plaintiffs' and Class Members' Private Information would cause damage to Plaintiffs and the Class.

299. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Episource's inadequate security practices.

300. Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Episource knew or should have known of the inherent risks in collecting and storing Private Information, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on its systems.

301. Plaintiffs and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendants' possession.

302. Episource was in an exclusive position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

303. Episource's duties extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

304.  Episource has admitted that the Private Information of Plaintiffs and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

305.  But for Episource's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, Plaintiffs' and Class Members' Private Information would not have been compromised.

306.  There is a close causal connection between Episource's failure to implement security measures to protect Plaintiffs' and Class Members' Private Information, and the harm, or risk of imminent harm suffered by Plaintiffs and Class Members. Private Information was lost and accessed as the proximate result of Episource's failure to exercise reasonable care by adopting, implementing, and maintaining appropriate security measures.

307.  As a direct and proximate result of Episource's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised Private Information; (ii) invasion of privacy; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Episource's possession and is subject to further unauthorized disclosures so long as Episource fails to undertake appropriate and adequate measures to protect the Private Information; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the value of the unauthorized

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

access to their Private Information permitted by Defendants; and (xi) any nominal damages that may be awarded.

308.    As a direct and proximate result of Episource's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses including nominal damages.

309.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

310.    Episource's negligent conduct is ongoing, in that it still possesses Plaintiffs' and Class Members' Private Information in an unsafe and insecure manner.

311.    Plaintiffs and Class Members are entitled to injunctive relief requiring Episource to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### NEGLIGENCE
**(Against Molina on Behalf of Molina Plaintiffs and the Molina Subclass)**

312.    Molina Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, and bring this claim against Molina.

313.    Molina contracted with Episource to perform medical coding, risk adjustment, and related administrative services and, in doing so, provided Episource with access to Molina Plaintiffs' and Molina Subclass Members' non-public Private Information necessary to perform those services.

314.    Molina had full knowledge of the sensitivity of the Private Information at issue, and the types of harm that Molina Plaintiffs and Molina Subclass Members could and would suffer if the Private Information was ever wrongfully disclosed.

315.    By collecting, maintaining, and disclosing Molina Plaintiffs' and Molina Subclass Members' Private Information to third-party vendors, including Episource,

Molina owed a duty of reasonable care to safeguard that information and to prevent its unauthorized access, disclosure, or misuse.

316.   Molina had a duty to employ reasonable security measures, including but not limited to under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

317.   Molina also had a duty under HIPAA, 42 U.S.C. § 1302(d), *et seq*., to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

318.   Specifically, under HIPAA, Molina had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

319.   Molina breached its duties of reasonable care by failing to adequately assess, vet, and monitor Episource's data-security practices before and after providing Episource with Molina Plaintiffs' and Molina Subclass Members' Private Information, and by failing to ensure that reasonable safeguards were in place to protect that information from unauthorized access.

320.   Providing Molina Plaintiffs' and Molina Subclass Members' Private Information to Episource did not relieve Molina of its own duty to protect this Private Information. Nor did it relieve Molina of its independent duty to adequately notify its affected members that the Private Information Molina provided to Episource had been breached.

321.   Molina owed Molina Plaintiffs and Molina Subclass Members a duty to ensure that reasonable security measures were implemented both within Molina's own

systems and by third-party vendors to whom Molina entrusted sensitive Private Information.

322.    Molina's duty to use reasonable security measures (and ensure Episource did the same) arose as a result of the special relationship that existed between them, on the one hand, and Molina Plaintiffs and Molina Subclass Members, on the other hand. That special relationship arose because Molina Plaintiffs and the Molina Subclass entrusted Molina with their confidential Private Information, a necessary part of receiving services from Molina.

323.    Molina also had a duty to exercise appropriate clearinghouse practices to remove former customers and patients' Private Information they were no longer required to retain under regulations.

324.    Molina had, and continues to have, duties to adequately disclose that Molina Plaintiffs' and Molina Subclass Members' Private Information within its and/or Episource's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Molina Plaintiffs and Molina Subclass Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

325.    Molina breached its duties of reasonable care by failing to use reasonable measures to protect Molina Plaintiffs' and Molina Subclass Members' Private Information. These breaches include, but are not limited to:

        a.    Failing to adequately vet, audit, monitor, or ensure the integrity of Episource's data security practices;

        b.    Allowing unauthorized access to Molina Subclass Members' Private Information through Episource;

        c.    Failing to keep Molina Subclass Members' Private Information in encrypted format when in Episource's possession;

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

d.   Failing to ensure Episource removed former Molina insureds' Private Information that was no longer required to be retained under regulations; and

e.   Failing to timely and adequately notify Molina Subclass Members about the Data Breach and its scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

326.   Molina's conduct was particularly unreasonable given the nature and amount of Private Information it obtained, stored, and provided to vendors, including Episource, and the foreseeable consequences of the immense damages that would result to Molina Plaintiffs and the Molina Subclass if such information was not protected.

327.   Molina Plaintiffs and Molina Subclass Members were within the class of persons the provisions of the FTCA and HIPAA were intended to protect, and the type of harm that resulted from the Data Breach was the type of harm they were intended to guard against.

328.   A breach of security, unauthorized access, and resulting injury to Molina Plaintiffs and the Molina Subclass was reasonably foreseeable, particularly in light of Episource's inadequate security practices.

329.   It was foreseeable that Molina's failure to use reasonable measures to protect Molina Subclass Members' Private Information would result in injury to Molina Subclass Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large corporations.

330.   Molina had full knowledge of the sensitivity of the Private Information and the types of harm that Molina Plaintiffs and the Molina Subclass could and would suffer if the Private Information was wrongfully disclosed.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

331.    Molina Plaintiffs and the Molina Subclass were the foreseeable and probable victims of any inadequate security practices and procedures. Molina knew or should have known of the inherent risks in collecting and storing the Private Information and providing sensitive data to vendors, including Episource, who do not adequately protect the data, the critical importance of providing adequate security of that data, and the necessity for encrypting the data stored on their systems.

332.    It was therefore foreseeable that the failure to adequately safeguard Molina Subclass Members' Private Information, instead placing it in the hands of a vendor, including Episource, that does not adequately safeguard sensitive data, would result in one or more types of injuries to Molina Subclass Members.

333.    Molina Plaintiffs and the Molina Subclass had no ability to protect their Private Information that was in, and possibly remains in, Episource's possession, and which Molina handed over to Episource.

334.    Molina was in a position to protect against the harm suffered by Molina Plaintiffs and the Molina Subclass as a result of the Data Breach, including through properly vetting their vendors to ensure such vendors adequately protect Private Information.

335.    But for Molina's wrongful and negligent breaches of duties owed to Molina Plaintiffs and the Molina Subclass, the Private Information of Molina Plaintiffs and the Molina Subclass would not have been compromised.

336.    There is a close causal connection between Molina's failure to exercise reasonable care in selecting and overseeing vendors entrusted with Private Information and the unauthorized access to Molina Plaintiffs' and Molina Subclass Members' Private Information.

337.    As a direct and proximate result of Molina's negligence, Molina Plaintiffs and the Molina Subclass have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised Private Information; (ii) invasion of privacy; (iii) lost or diminished value of Private Information; (iv) lost time

and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Molina's (including Episource's) possession and is subject to further unauthorized disclosures so long as Molina and Episource fail to undertake appropriate and adequate measures to protect the Private Information.

338.    Molina Plaintiffs and Molina Subclass Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

339.    Molina Plaintiffs and Molina Subclass Members are also entitled to injunctive relief requiring Molina to: (i) strengthen its data security systems and monitoring procedures; (ii) evaluate, audit, and improve its processes for vetting third-party vendors and the selection processes for vendors to which they provide sensitive data; (iii) submit to future annual audits of those systems and monitoring procedures; and (iv) continue to provide adequate credit monitoring to all Molina Subclass Members.

## COUNT III
### NEGLIGENCE
**(Against Blue Shield CA on Behalf of Blue Shield CA Plaintiffs and the Blue Shield CA Subclass)**

340.    Blue Shield CA Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, and bring this claim against Blue Shield CA.

341.    Blue Shield CA contracted with Episource to perform medical coding, risk adjustment, and related administrative services and, in doing so, provided Episource with access to Blue Shield CA Plaintiffs' and Blue Shield CA Subclass Members' non-public Private Information necessary to perform those services.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

342. Blue Shield CA had full knowledge of the sensitivity of the Private Information at issue, and the types of harm that Blue Shield CA Plaintiffs and Blue Shield CA Subclass Members could and would suffer if the Private Information was ever wrongfully disclosed.

343. By collecting, maintaining, and disclosing Blue Shield CA Plaintiffs' and Blue Shield CA Subclass Members' Private Information to third-party vendors, including Episource, Blue Shield CA owed a duty of reasonable care to safeguard that information and to prevent its unauthorized access, disclosure, or misuse.

344. Blue Shield CA had a duty to employ reasonable security measures, including but not limited to under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

345. Blue Shield CA also had a duty under HIPAA, 42 U.S.C. § 1302(d), *et seq.*, to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

346. Specifically, under HIPAA, Blue Shield CA had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

347. Blue Shield CA breached its duties of reasonable care by failing to adequately assess, vet, and monitor Episource's data-security practices before and after providing Episource with Blue Shield CA Plaintiffs' and Blue Shield CA Subclass Members' Private Information, and by failing to ensure that reasonable safeguards were in place to protect that information from unauthorized access.

348. Providing Blue Shield CA Plaintiffs' and Blue Shield CA Subclass Members' Private Information to Episource did not relieve Blue Shield CA of its own

duty to protect this Private Information. Nor did it relieve Blue Shield CA of its independent duty to adequately notify its affected members that the Private Information Blue Shield CA provided to Episource had been breached.

349.   Blue Shield CA owed Blue Shield CA Plaintiffs and Blue Shield CA Subclass Members a duty to ensure that reasonable security measures were implemented both within Blue Shield CA's own systems and by third-party vendors to whom Blue Shield CA entrusted sensitive Private Information.

350.   Blue Shield CA's duty to use reasonable security measures (and ensure Episource did the same) arose as a result of the special relationship that existed between them, on the one hand, and Blue Shield CA Plaintiffs and Blue Shield CA Subclass Members, on the other hand. That special relationship arose because Blue Shield CA Plaintiffs and the Blue Shield CA Subclass entrusted Blue Shield CA with their confidential Private Information, a necessary part of receiving services from Blue Shield CA.

351.   Blue Shield CA also had a duty to exercise appropriate clearinghouse practices to remove former customers and patients' Private Information they were no longer required to retain under regulations.

352.   Blue Shield CA had, and continues to have, duties to adequately disclose that Blue Shield CA Plaintiffs' and Blue Shield CA Subclass Members' Private Information within its and/or Episource's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Blue Shield CA Plaintiffs and Blue Shield CA Subclass Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

353.   Blue Shield CA breached its duties of reasonable care by failing to use reasonable measures to protect Blue Shield CA Plaintiffs' and Blue Shield CA Subclass Members' Private Information. These breaches include, but are not limited to:

a.    Failing to adequately vet, audit, monitor, or ensure the integrity of Episource's data security practices;

b.    Allowing unauthorized access to Blue Shield CA Subclass Members' Private Information through Episource;

c.    Failing to keep Blue Shield CA Subclass Members' Private Information in encrypted format when in Episource's possession;

d.    Failing to ensure Episource removed former Blue Shield CA insureds' Private Information that was no longer required to be retained under regulations; and

e.    Failing to timely and adequately notify Blue Shield CA Subclass Members about the Data Breach and its scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

354.    Blue Shield CA's conduct was particularly unreasonable given the nature and amount of Private Information it obtained, stored, and provided to vendors, including Episource, and the foreseeable consequences of the immense damages that would result to Blue Shield CA Plaintiffs and the Blue Shield CA Subclass if such information was not protected.

355.    Blue Shield CA Plaintiffs and Blue Shield CA Subclass Members were within the class of persons the provisions of the FTCA and HIPAA were intended to protect, and the type of harm that resulted from the Data Breach was the type of harm they were intended to guard against.

356.    A breach of security, unauthorized access, and resulting injury to Blue Shield CA Plaintiffs and the Blue Shield CA Subclass was reasonably foreseeable, particularly in light of Episource's inadequate security practices.

357.    It was foreseeable that Blue Shield CA's failure to use reasonable measures to protect Blue Shield CA Subclass Members' Private Information would result in injury to Blue Shield CA Subclass Members. Further, the breach of security

1  was reasonably foreseeable given the known high frequency of cyberattacks and data

2  breaches at large corporations.

3      358.  Blue Shield CA had full knowledge of the sensitivity of the Private

4  Information and the types of harm that Blue Shield CA Plaintiffs and the Blue Shield

5  CA Subclass could and would suffer if the Private Information was wrongfully

6  disclosed.

7      359.  Blue Shield CA Plaintiffs and the Blue Shield CA Subclass were the

8  foreseeable and probable victims of any inadequate security practices and procedures.

9  Blue Shield CA knew or should have known of the inherent risks in collecting and

10  storing the Private Information and providing sensitive data to vendors, including

11  Episource, who do not adequately protect the data, the critical importance of providing

12  adequate security of that data, and the necessity for encrypting the data stored on their

13  systems.

14      360.  It was therefore foreseeable that the failure to adequately safeguard Blue

15  Shield CA Subclass Members' Private Information, instead placing it in the hands of

16  a vendor, including Episource, that does not adequately safeguard sensitive data,

17  would result in one or more types of injuries to Blue Shield CA Subclass Members.

18      361.  Blue Shield CA Plaintiffs and the Blue Shield CA Subclass had no ability

19  to protect their Private Information that was in, and possibly remains in, Episource's

20  possession, and which Blue Shield CA handed over to Episource.

21      362.  Blue Shield CA was in a position to protect against the harm suffered by

22  Blue Shield CA Plaintiffs and the Blue Shield CA Subclass as a result of the Data

23  Breach, including through properly vetting their vendors to ensure such vendors

24  adequately protect Private Information.

25      363.  But for Blue Shield CA's wrongful and negligent breaches of duties

26  owed to Blue Shield CA Plaintiffs and the Blue Shield CA Subclass, the Private

27  Information of Blue Shield CA Plaintiffs and the Blue Shield CA Subclass would not

28  have been compromised.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

364.   There is a close causal connection between Blue Shield CA's failure to exercise reasonable care in selecting and overseeing vendors entrusted with Private Information and the unauthorized access to Blue Shield CA Plaintiffs' and Blue Shield CA Subclass Members' Private Information.

365.   As a direct and proximate result of Blue Shield CA's negligence, Blue Shield CA Plaintiffs and the Blue Shield CA Subclass have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised Private Information; (ii) invasion of privacy; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Blue Shield CA's (including Episource's) possession and is subject to further unauthorized disclosures so long as Blue Shield CA and Episource fail to undertake appropriate and adequate measures to protect the Private Information.

366.   Blue Shield CA Plaintiffs and Blue Shield CA Subclass Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

Blue Shield CA Plaintiffs and Blue Shield CA Subclass Members are also entitled to injunctive relief requiring Blue Shield CA to: (i) strengthen its data security systems and monitoring procedures; (ii) evaluate, audit, and improve its processes for vetting third-party vendors and the selection processes for vendors to which they provide sensitive data; (iii) submit to future annual audits of those systems and monitoring procedures; and (iv) continue to provide adequate credit monitoring to all Blue Shield CA Subclass Members.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## COUNT IV
## NEGLIGENCE
### (Against Innovacare on Behalf of Plaintiff Hernandez and the Innovacare Subclass)

367.   Plaintiff Hernandez restates and reallege the allegations in the preceding paragraphs as if fully set forth herein, and brings this claim against Innovacare.

368.   Innovacare contracted with Episource to perform medical coding, risk adjustment, and related administrative services and, in doing so, provided Episource with access to Plaintiff Hernandez's and Innovacare Subclass Members' non-public Private Information necessary to perform those services.

369.   Innovacare had full knowledge of the sensitivity of the Private Information at issue, and the types of harm that Plaintiff Hernandez and Innovacare Subclass Members could and would suffer if the Private Information was ever wrongfully disclosed.

370.   By collecting, maintaining, and disclosing Plaintiff Hernandez's and Innovacare Subclass Members' Private Information to third-party vendors, including Episource, Innovacare owed a duty of reasonable care to safeguard that information and to prevent its unauthorized access, disclosure, or misuse.

371.   Innovacare had a duty to employ reasonable security measures, including but not limited to under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

372.   Innovacare also had a duty under HIPAA, 42 U.S.C. § 1302(d), *et seq.*, to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

373.   Specifically, under HIPAA, Innovacare had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into

a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

374.    Innovacare breached its duties of reasonable care by failing to adequately assess, vet, and monitor Episource's data-security practices before and after providing Episource with Plaintiff Hernandez's and Innovacare Subclass Members' Private Information, and by failing to ensure that reasonable safeguards were in place to protect that information from unauthorized access.

375.    Providing Plaintiff Hernandez's and Innovacare Subclass Members' Private Information to Episource did not relieve Innovacare of its own duty to protect this Private Information. Nor did it relieve Innovacare of its independent duty to adequately notify its affected members that the Private Information Innovacare provided to Episource had been breached.

376.    Innovacare owed Plaintiff Hernandez and Innovacare Subclass Members a duty to ensure that reasonable security measures were implemented both within Innovacare's own systems and by third-party vendors to whom Innovacare entrusted sensitive Private Information.

377.    Innovacare's duty to use reasonable security measures (and ensure Episource did the same) arose as a result of the special relationship that existed between them, on the one hand, and Plaintiff Hernandez and Innovacare Subclass Members, on the other hand. That special relationship arose because Plaintiff Hernandez and the Innovacare Subclass entrusted Innovacare with their confidential Private Information, a necessary part of receiving services from Innovacare.

378.    Innovacare also had a duty to exercise appropriate clearinghouse practices to remove former customers and patients' Private Information they were no longer required to retain under regulations.

379.    Innovacare had, and continues to have, duties to adequately disclose that Plaintiff Hernandez's and Innovacare Subclass Members' Private Information within its and/or Episource's possession might have been compromised, how it was

compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff Hernandez and Innovacare Subclass Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

380.    Innovacare breached its duties of reasonable care by failing to use reasonable measures to protect Plaintiff Hernandez's and Innovacare Subclass Members' Private Information. These breaches include, but are not limited to:

  a.    Failing to adequately vet, audit, monitor, or ensure the integrity of Episource's data security practices;

  b.    Allowing unauthorized access to Innovacare Subclass Members' Private Information through Episource;

  c.    Failing to keep Innovacare Subclass Members' Private Information in encrypted format when in Episource's possession;

  d.    Failing to ensure Episource removed former Innovacare insureds' Private Information that was no longer required to be retained under regulations; and

  e.    Failing to timely and adequately notify Innovacare Subclass Members about the Data Breach and its scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

381.    Innovacare's conduct was particularly unreasonable given the nature and amount of Private Information it obtained, stored, and provided to vendors, including Episource, and the foreseeable consequences of the immense damages that would result to Plaintiff Hernandez and the Innovacare Subclass if such information was not protected.

382.    Plaintiff Hernandez and Innovacare Subclass Members were within the class of persons the provisions of the FTCA and HIPAA were intended to protect, and

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  the type of harm that resulted from the Data Breach was the type of harm they were
2  intended to guard against.

3       383.    A breach of security, unauthorized access, and resulting injury to Plaintiff
4  Hernandez and the Innovacare Subclass was reasonably foreseeable, particularly in
5  light of Episource's inadequate security practices.

6       384.    It was foreseeable that Innovacare's failure to use reasonable measures
7  to protect Innovacare Subclass Members' Private Information would result in injury
8  to Innovacare Subclass Members. Further, the breach of security was reasonably
9  foreseeable given the known high frequency of cyberattacks and data breaches at large
10 corporations.

11      385.  Innovacare had full knowledge of the sensitivity of the Private
12 Information and the types of harm that Plaintiff Hernandez and the Innovacare
13 Subclass could and would suffer if the Private Information was wrongfully disclosed.

14      386.    Plaintiff Hernandez and the Innovacare Subclass were the foreseeable
15 and probable victims of any inadequate security practices and procedures. Innovacare
16 knew or should have known of the inherent risks in collecting and storing the Private
17 Information and providing sensitive data to vendors, including Episource, who do not
18 adequately protect the data, the critical importance of providing adequate security of
19 that data, and the necessity for encrypting the data stored on their systems.

20      387.    It was therefore foreseeable that the failure to adequately safeguard
21 Innovacare Subclass Members' Private Information, instead placing it in the hands of
22 a vendor, including Episource, that does not adequately safeguard sensitive data,
23 would result in one or more types of injuries to Innovacare Subclass Members.

24      388.    Plaintiff Hernandez and the Innovacare Subclass had no ability to protect
25 their Private Information that was in, and possibly remains in, Episource's possession,
26 and which Innovacare handed over to Episource.

27      389.    Innovacare was in a position to protect against the harm suffered by
28 Plaintiff Hernandez and the Innovacare Subclass as a result of the Data Breach,

1  including through properly vetting their vendors to ensure such vendors adequately

2  protect Private Information.

3       390.   But for Innovacare's wrongful and negligent breaches of duties owed to

4  Plaintiff Hernandez and the Innovacare Subclass, the Private Information of Plaintiff

5  Hernandez and the Innovacare Subclass would not have been compromised.

6       391.   There is a close causal connection between Innovacare's failure to

7  exercise reasonable care in selecting and overseeing vendors entrusted with Private

8  Information and the unauthorized access to Plaintiff Hernandez's and Innovacare

9  Subclass Members' Private Information.

10      392.   As a direct and proximate result of Innovacare's negligence, Plaintiff

11 Hernandez and the Innovacare Subclass have suffered and will suffer injury, including

12 but not limited to: (i) the actual misuse of their compromised Private Information; (ii)

13 invasion of privacy; (iii) lost or diminished value of Private Information; (iv) lost time

14 and opportunity costs associated with attempting to mitigate the actual consequences

15 of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls,

16 texts, and/or emails; and (vii) the continued and certainly increased risk to their Private

17 Information, which: (a) remains unencrypted and available for unauthorized third

18 parties to access and abuse; and (b) remains backed up in Innovacare's (including

19 Episource's) possession and is subject to further unauthorized disclosures so long as

20 Innovacare and Episource fail to undertake appropriate and adequate measures to

21 protect the Private Information.

22      393.   Plaintiff Hernandez and Innovacare Subclass Members are entitled to

23 compensatory and consequential damages suffered because of the Data Breach.

24      394.   Plaintiff Hernandez and Innovacare Subclass Members are also entitled

25 to injunctive relief requiring Innovacare to: (i) strengthen its data security systems and

26 monitoring procedures; (ii) evaluate, audit, and improve its processes for vetting third-

27 party vendors and the selection processes for vendors to which they provide sensitive

28 data; (iii) submit to future annual audits of those systems and monitoring procedures;

1    and (iv) continue to provide adequate credit monitoring to all Innovacare Subclass
2    Members.

3                                        **COUNT V**
4                                      **NEGLIGENCE**
5             **(Against Elevance on Behalf of Plaintiff Holifield and**
                              **the Elevance Subclass)**
6

7         395.    Plaintiff Holifield restates and reallege the allegations in the preceding
8    paragraphs as if fully set forth herein, and brings this claim against Elevance.

9         396.    Elevance contracted with Episource to perform medical coding, risk
10   adjustment, and related administrative services and, in doing so, provided Episource
11   with access to Plaintiff Holifield's and Elevance Subclass Members' non-public
12   Private Information necessary to perform those services.

13        397.    Elevance had full knowledge of the sensitivity of the Private Information
14   at issue, and the types of harm that Plaintiff Holifield and Elevance Subclass Members
15   could and would suffer if the Private Information was ever wrongfully disclosed.

16        398.    By collecting, maintaining, and disclosing Plaintiff Holifield's and
17   Elevance Subclass Members' Private Information to third-party vendors, including
18   Episource, Elevance owed a duty of reasonable care to safeguard that information and
19   to prevent its unauthorized access, disclosure, or misuse.

20        399.    Elevance had a duty to employ reasonable security measures, including
21   but not limited to under Section 5 of the Federal Trade Commission Act, 15 U.S.C. §
22   45, which prohibits "unfair . . . practices in or affecting commerce," including, as
23   interpreted and enforced by the FTC, the unfair practice of failing to use reasonable
24   measures to protect confidential data.

25        400.    Elevance also had a duty under HIPAA, 42 U.S.C. § 1302(d), *et seq*., to
26   implement reasonable safeguards to protect Plaintiffs' and Class Members' Private
27   Information.

28

401.   Specifically, under HIPAA, Elevance had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

402.   Elevance breached its duties of reasonable care by failing to adequately assess, vet, and monitor Episource's data-security practices before and after providing Episource with Plaintiff Holifield's and Elevance Subclass Members' Private Information, and by failing to ensure that reasonable safeguards were in place to protect that information from unauthorized access.

403.   Providing Plaintiff Holifield's and Elevance Subclass Members' Private Information to Episource did not relieve Elevance of its own duty to protect this Private Information. Nor did it relieve Elevance of its independent duty to adequately notify its affected members that the Private Information Elevance provided to Episource had been breached.

404.   Elevance owed Plaintiff Holifield and Elevance Subclass Members a duty to ensure that reasonable security measures were implemented both within Elevance's own systems and by third-party vendors to whom Elevance entrusted sensitive Private Information.

405.   Elevance's duty to use reasonable security measures (and ensure Episource did the same) arose as a result of the special relationship that existed between them, on the one hand, and Plaintiff Holifield and Elevance Subclass Members, on the other hand. That special relationship arose because Plaintiff Holifield and the Elevance Subclass entrusted Elevance with their confidential Private Information, a necessary part of receiving services from Elevance.

406.   Elevance also had a duty to exercise appropriate clearinghouse practices to remove former customers and patients' Private Information they were no longer required to retain under regulations.

407.   Elevance had, and continues to have, duties to adequately disclose that Plaintiff Holifield's and Elevance Subclass Members' Private Information within its and/or Episource's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff Holifield and Elevance Subclass Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

408.   Elevance breached its duties of reasonable care by failing to use reasonable measures to protect Plaintiff Holifield's and Elevance Subclass Members' Private Information. These breaches include, but are not limited to:

    a.    Failing to adequately vet, audit, monitor, or ensure the integrity of Episource's data security practices;

    b.    Allowing unauthorized access to Elevance Subclass Members' Private Information through Episource;

    c.    Failing to keep Elevance Subclass Members' Private Information in encrypted format when in Episource's possession;

    d.    Failing to ensure Episource removed former Elevance insureds' Private Information that was no longer required to be retained under regulations; and

    e.    Failing to timely and adequately notify Elevance Subclass Members about the Data Breach and its scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

409.   Elevance's conduct was particularly unreasonable given the nature and amount of Private Information it obtained, stored, and provided to vendors, including Episource, and the foreseeable consequences of the immense damages that would result to Plaintiff Holifield and the Elevance Subclass if such information was not protected.

410.   Plaintiff Holifield and Elevance Subclass Members were within the class of persons the provisions of the FTCA and HIPAA were intended to protect, and the type of harm that resulted from the Data Breach was the type of harm they were intended to guard against.

411.   A breach of security, unauthorized access, and resulting injury to Plaintiff Holifield and the Elevance Subclass was reasonably foreseeable, particularly in light of Episource's inadequate security practices.

412.   It was foreseeable that Elevance's failure to use reasonable measures to protect Elevance Subclass Members' Private Information would result in injury to Elevance Subclass Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large corporations.

413.   Elevance had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff Holifield and the Elevance Subclass could and would suffer if the Private Information was wrongfully disclosed.

414.   Plaintiff Holifield and the Elevance Subclass were the foreseeable and probable victims of any inadequate security practices and procedures. Elevance knew or should have known of the inherent risks in collecting and storing the Private Information and providing sensitive data to vendors, including Episource, who do not adequately protect the data, the critical importance of providing adequate security of that data, and the necessity for encrypting the data stored on their systems.

415.   It was therefore foreseeable that the failure to adequately safeguard Elevance Subclass Members' Private Information, instead placing it in the hands of a vendor, including Episource, that does not adequately safeguard sensitive data, would result in one or more types of injuries to Elevance Subclass Members.

416.   Plaintiff Holifield and the Elevance Subclass had no ability to protect their Private Information that was in, and possibly remains in, Episource's possession, and which Elevance handed over to Episource.

417.   Elevance was in a position to protect against the harm suffered by Plaintiff Holifield and the Elevance Subclass as a result of the Data Breach, including through properly vetting their vendors to ensure such vendors adequately protect Private Information.

418.   But for Elevance's wrongful and negligent breaches of duties owed to Plaintiff Holifield and the Elevance Subclass, the Private Information of Plaintiff Holifield and the Elevance Subclass would not have been compromised.

419.   There is a close causal connection between Elevance's failure to exercise reasonable care in selecting and overseeing vendors entrusted with Private Information and the unauthorized access to Plaintiff Holifield's and Elevance Subclass Members' Private Information.

420.   As a direct and proximate result of Elevance's negligence, Plaintiff Holifield and the Elevance Subclass have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised Private Information; (ii) invasion of privacy; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Elevance's (including Episource's) possession and is subject to further unauthorized disclosures so long as Elevance and Episource fail to undertake appropriate and adequate measures to protect the Private Information.

421.   Plaintiff Holifield and Elevance Subclass Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

422.   Plaintiff Holifield and Elevance Subclass Members are also entitled to injunctive relief requiring Elevance to: (i) strengthen its data security systems and monitoring procedures; (ii) evaluate, audit, and improve its processes for vetting third-

1  party vendors and the selection processes for vendors to which they provide sensitive

2  data; (iii) submit to future annual audits of those systems and monitoring procedures;

3  and (iv) continue to provide adequate credit monitoring to all Elevance Subclass

4  Members.

**COUNT VI**
**BREACH OF IMPLIED CONTRACT**
**(Against Client Defendants on Behalf of Their Respective Plaintiffs and Classes)**

423.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein, and bring this claim against their respective Client Defendants only. Specifically, Molina Plaintiffs bring this claim against Molina on behalf of themselves and the Molina Subclass, Blue Shield CA Plaintiffs bring this claim against Blue Shield CA on behalf of themselves and the Blue Shield CA Subclass, Plaintiff Hernandez brings this claim against Innovacare on behalf of herself and the Innovacare Subclass, and Plaintiff Holifield brings this claim against Elevance on behalf of himself and the Elevance Subclass.

424.    Plaintiffs and Class Members were required to deliver their Private Information to Client Defendants as part of the process of obtaining insurance products or services provided by Client Defendants. Plaintiffs and Class Members paid money to Client Defendants in exchange for products or services and would not have paid for Client Defendants' products or services, or would have paid less for them, had they known that Client Defendants' data security practices were substandard.

425.    Client Defendants solicited, offered, and invited Class Members to provide their Private Information as part of Client Defendants' regular business practices.

426.    As an integral part of the insurer–member relationship, Client Defendants required Plaintiffs and Class Members to provide Private Information not merely for enrollment, but for ongoing eligibility determinations, claims processing,

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

risk adjustment, utilization review, and compliance with federal and state healthcare regulations—functions that necessarily required Client Defendants to retain, transmit, and safeguard that information.

427. At the time each Plaintiff became a member of, and began receiving medical insurance or healthcare services from, his or her respective Client Defendant, an implied contract was formed between that Plaintiff and that Client Defendant. Specifically:

    a. Plaintiffs Bartelt, Grimmett, Lower, Alcorn, and Dollar entered into implied contracts with Molina when they became Molina members and began receiving insurance services;

    b. Plaintiff Carter entered into an implied contract with Humana when she became a Humana member and began receiving insurance services;

    c. Plaintiffs Contreras, Haddad, Lewow, Altes, and Johnson entered into implied contracts with Blue Shield when they became Blue Shield members and began receiving insurance services;

    d. Plaintiff Holifield entered into an implied contract with Elevance when he became an Elevance member and began receiving insurance services; and

    e. Plaintiff Hernandez entered into an implied contract with InnovaCare when she became an InnovaCare member and began receiving insurance services.

428. Each implied contract was formed when the Plaintiff provided Private Information as a condition of enrollment and continued coverage, paid premiums for insurance services, and reasonably relied on the Client Defendant's privacy policies, notices, and course of conduct representing that Plaintiffs' Private Information—including information shared with vendors such as Episource—would be safeguarded and kept confidential.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

429.   The implied contracts alleged herein do not duplicate or contradict any express terms governing insurance coverage or benefits. Rather, they arise from obligations necessarily implied by the nature of the parties' relationship and the handling of Plaintiffs' Private Information—matters not fully addressed, if at all, by standardized insurance policy documents.

430.   Plaintiffs and the Class entrusted their Private Information to Client Defendants. In so doing, Plaintiffs and the Class entered into implied contracts with Client Defendants by which Client Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, to exercise reasonable care in the selection, oversight, and monitoring of third-party vendors entrusted with Plaintiffs' Private Information, including vendors engaged to perform core insurance-related functions, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

431.   In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Client Defendants' data security practices complied with relevant laws and regulations (including FTCA and HIPAA) and were consistent with industry standards.

432.   Implicit in the agreement between Plaintiffs and Class Members and Client Defendants to provide Private Information was Defendants' obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

433.    The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Client Defendants, on the other, is shown by their conduct and course of dealing.

434.    On information and belief, at all relevant times Client Defendants promulgated, adopted, and implemented written privacy policies whereby they promised Plaintiffs and Class Members that they would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

435.    On information and belief, Client Defendants further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' Private Information would remain protected.

436.    Plaintiffs and Class Members paid money to Client Defendants and entrusted their inherently valuable Private Information to them with the reasonable belief and expectation that Client Defendants would use part of the profits resulting therefrom to obtain and implement adequate data security, including costs required to adequately monitor their vendors. Client Defendants failed to do so.

437.    Plaintiffs and Class Members would not have entrusted their Private Information to Client Defendants in the absence of the implied contract between them and Client Defendants to keep their Private Information reasonably secure.

438.    Plaintiffs and Class Members would not have entrusted their Private Information to Client Defendants in the absence of their implied promise to monitor their computer systems and networks and vendors, including Episource, to ensure that reasonable data security measures were in place to protect the Private Information from compromise.

439.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Client Defendants.

440.    Client Defendants breached the implied contracts they made with Plaintiffs and the Class by failing to safeguard and protect their Private Information, by failing to delete (or require deletion of) Plaintiffs and Class Members' Private

Information once the relationship ended, and by failing to provide accurate notice to them that their Private Information was compromised as a result of the Data Breach.

441. Every contract has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual terms.

442. Client Defendants breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices, including vendor-monitoring practices, necessary to safeguard the Private Information, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members, and continued acceptance of Private Information and storage of other personal information after Client Defendants knew, or should have known, of the security vulnerabilities of the data security practices, procedures, and protocols that were exploited in the Data Breach.

443. As a direct and proximate result of Client Defendants' breach of the implied contracts, Plaintiffs and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) dissemination of the compromised Private Information on the dark web; (viii) experiencing an increase in spam calls, texts, and/or emails; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Client Defendants' possession and is subject to further unauthorized disclosures so long as Client Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

444.   Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

445.   Plaintiffs and Class Members are also entitled to injunctive relief requiring Client Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT VII
## QUASI-CONTRACT
**(Against Episource on Behalf of Plaintiffs and the National Class)**

446.   Plaintiffs restate and reallege the preceding paragraphs as if fully set forth herein.

447.   Plaintiffs and Class Members conferred a monetary benefit on Episource through payments made to Episource by the Client Defendants and other Episource health insurer clients on their behalf. In addition, they provided Episource with their Private Information. In exchange, Episource should have provided adequate data security for Plaintiffs' and Class Members' Private Information.

448.   Episource's entire business model depends on its receipt and use of highly sensitive Private Information, including that of Plaintiffs and other Class Members.

449.   Companies that receive and use Private Information in the course of their business have a duty to safeguard personal and medical information entrusted to them by customers, including by vetting contractors who are given access to the data. This duty is breached when such a company fails to properly maintain and safeguard that Private Information, as Episource did here.

450.   Episource knew that Plaintiffs and Class Members conferred a benefit on it in the form of payments made on their behalf by their healthcare organizations and through the receipt of their Private Information as a necessary part of providing its services. Episource appreciated and accepted that benefit. Episource profited from

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  these transactions and used the Private Information of Plaintiffs and Class Members
2  for business purposes.

3      451.   Episource understood that it had a duty to safeguard Plaintiffs' Privaty
4  Information.

5      452.   Plaintiffs understood that any company to which their providers or
6  insurers might disclose Plaintiffs' Private Information, in the course of such
7  company's business, would be obliged to safeguard that Private Information.

8      453.   Upon information and belief, Episource funds its data security measures
9  entirely from its general revenue, including payments on behalf of or for the benefit
10  of Plaintiffs and Class Members.

11      454.   As such, a portion of the payments made for the benefit of or on behalf
12  of Plaintiffs and Class Members is to be used to provide a reasonable level of data
13  security. The amount of the portion of each payment made that is allocated to data
14  security is known to Episource.

15      455.   Episource, however, failed to secure Plaintiffs' and Class Members'
16  Private Information and, therefore, did not provide adequate data security in return for
17  the benefit Plaintiffs and Class Members provided.

18      456.   Episource would not be able to carry out an essential function of its
19  regular business without the Private Information of Plaintiffs and Class Members and
20  derived revenue by using it for business purposes. Plaintiffs and Class Members
21  expected that Episource or anyone in Episource's position would use a portion of that
22  revenue to fund adequate data security practices.

23      457.   Episource acquired the Private Information through inequitable means in
24  that it failed to disclose the inadequate security practices previously alleged.

25      458.   If Plaintiffs and Class Members knew that Episource had not reasonably
26  secured their Private Information, they would not have allowed their Private
27  Information to be provided to Episource.

28      459.   Episource enriched itself by saving the costs it reasonably should have

expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Episource instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Episource's decision to prioritize their own profits over the requisite security and the safety of their Private Information.

460.   Under the principles of equity and good conscience, Episource should not be permitted to retain the money wrongfully obtained from Plaintiffs and Class Members, because Episource failed to implement appropriate data management and security measures mandated by industry standards.  For avoidance of doubt, Plaintiffs do not allege the existence of any express contract with Episource, and plead this claim in equity only, in the alternative to their tort claims, to prevent Episource's unjust retention of benefits conferred in the absence of contractual privity.

461.   Plaintiffs and Class Members have no adequate remedy at law. The full extent of Episource's unjust enrichment, including the amount of revenue attributable to Plaintiffs' and Class Members' data, the portion of those revenues that should have been allocated to data security, and the costs Episource avoided by underinvesting in reasonable security measures is uniquely within Episource's possession and control and cannot be readily ascertained through damages alone. Legal remedies would therefore be inadequate to fully restore Plaintiffs and Class Members to the position they occupied before Episource's misconduct or to disgorge the benefits Episource wrongfully retained.

462.   As a direct and proximate result of Episource's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

463.   Episource should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Episource should be compelled to refund the amounts that Plaintiffs and Class Members were underpaid by Episource.

## COUNT VIII
### CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, Cal. Civ. Code § 56, *et seq.*
### (Against California Defendants On Behalf of California Plaintiffs and the California Subclass)

464.   California Plaintiffs (for purposes of this Count, "Plaintiffs") restate and reallege the preceding paragraphs as if fully set forth herein.

465.   Plaintiffs bring this claim on behalf of themselves and the California Subclass against Defendant Episource and Client Defendant Blue Shield (collectively, "California Defendants").

466.   Plaintiffs are "patients" as defined in Cal. Civ. Code § 56.05(m), and California Defendants are each "a provider of health care," as defined in Cal. Civ. Code § 56.06; thus, California Defendants are subject to the requirements of the California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code §§ 56.36(b), 56.101(a) and (b).

467.   At all relevant times, Episource qualified as "a provider of health care subject to" the CMIA because it is and has been a "business organized for the purpose of maintaining medical information in order to make the information available . . . to a provider of health care . . . for purposes of . . . the diagnosis and treatment of the individual." Cal. Civ. Code § 56.06(a). This definition of "a provider of health care" is broader than, and not limited to, medical service providers. In performing these functions, Episource maintains, analyzes, and processes patients' diagnoses, treatment information, and clinical records, including medical chart data and encounter information, which are used by health care service plans and providers in connection with the evaluation, coding, and payment of medical care.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

468.   Independently and alternatively, Episource is subject to the CMIA as a recipient of medical information and as an "other entity" that obtained, maintained, and used confidential medical information with the express and implied understanding that such information would be safeguarded and kept confidential. Cal. Civ. Code §§ 56.11(c), 56.13. Episource received this medical information pursuant to contractual and regulatory requirements that it maintain the confidentiality and security of the information, and Episource held and used the information with the understanding that it would be protected from unauthorized access, use, or disclosure.

469.   Further in the alternative, Episource qualifies as a "contractor" under the CMIA because it operates as a medical service organization that provides non-clinical services reasonably necessary and appropriate to the provision and payment of medical care, including medical coding, risk adjustment, and encounter data processing. These services directly support health care providers and health care service plans in administering and paying for medical treatment, bringing Episource within the scope of entities regulated by the CMIA. Episource's services are not limited to general business administration but are directed specifically at processing and managing medical information necessary for determining health care coverage, reimbursement, and payment for medical services provided to Plaintiffs and California Subclass Members.[52]

470.   Excluding entities like Episource from the CMIA would contravene the statute's purpose by allowing companies that routinely possess, analyze, and store

---

[52] Although the CMIA does not define "medical service organization," that term it clearly encompasses the work that Episource does to facilitate the provision of, and payment for, medical services to Plaintiffs and other class members. Outside of the CMIA-specific context, the term "MSO" can be used to refer to Management Services Organizations, which provide services "reasonably necessary and appropriate for the management of the non-medical aspects of [a doctor's] medical practice." *Epic Medical Management, LLC v. Paquette*, 198 Cal. Rptr. 3d 28 (Cal. Ct. App. 2015).

confidential medical information as a core part of the health care system to evade the confidentiality obligations imposed on entities that originate that information.

471.    The Client Defendants were each a health care provider because they had the "purpose of maintaining medical information to make the information available to the individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manager her or her information, or for the diagnosis or treatment of the individual."

472.    Each Client Defendant is a "health care service plan" to the extent they are an "entity regulated pursuant to the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code)." Cal. Civ. Code § 56.05(f).

473.    Each Client Defendant is "contractor" to the extent it is a "person or entity that is a medical group, independent practice association, pharmaceutical benefits manager, or a medical service organization and is not a health care service plan or provider of health care. 'Contractor' does not include insurance institutions as defined in subdivision (k) of Section 791.02 of the Insurance Code or pharmaceutical benefits managers licensed under the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code).'" Cal. Civ. Code § 56.05(d).

474.    As a provider of health care, contractor, and/or recipient of medical information, Defendants were required by the CMIA to ensure that medical information regarding patients is not disclosed or disseminated or released without patient's authorization, and to protect and preserve the confidentiality of the medical information regarding a patient, under Cal. Civil Code §§ 56.06, 56.13, 56.245, 56.26, 56.36, and 56.101.

475.    Plaintiffs and California Subclass Members are "patients" as defined in Cal. Civ. Code § 56.05(m) ("'Patient' means a natural person, whether or not still

living, who received health care services from a provider of health care and to whom medical information pertains.").

476.   Plaintiffs and Class Members are "Enrollees" under Cal. Civil Code § 56.05(e) to the extent they are a "person who is enrolled in a plan and who is a recipient of services from the plan." *See* Cal. Health & Safety Code § 1345(c).

477.   Plaintiffs and Class Members are "Subscribers" under Cal. Civil Code § 56.05(q) to the extent they are a "person who is enrolled in a plan and who is a recipient of services from the plan." *See* Cal. Health & Safety Code § 1345(p).

478.   Furthermore, Plaintiffs and California Subclass Members, as patients and customers of Defendants, had their individually identifiable "medical information," within the meaning of Cal. Civ. Code § 56.05(j), created, maintained, preserved, and stored on Defendants' computer networks, and were patients on or before the date of the Data Breach.

479.   Defendants negligently created, maintained, preserved, stored, and then exposed Plaintiffs and California Subclass Members' individually identifiable "medical information," within the meaning of Cal. Civ. Code § 56.05(j), including Plaintiffs and California Subclass Members' names, cities, states, zip codes, emails, telephone numbers, dates of birth, gender, patient service dates, patient service locations, and next appointment dates, that alone or in combination with other publicly available information, reveals their identities.

480.   Defendants' negligence resulted in the release of individually identifiable medical information pertaining to Plaintiffs and California Subclass Members to unauthorized persons and the breach of the confidentiality of that information. Defendants' negligent failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiffs and California Subclass Members' medical information in a manner that preserved the confidentiality of the information contained therein, in violation of Cal. Civ. Code §§ 56.06 and 56.101(a).

481.  California Defendants also violated Sections 56.06 and 56.101 of the CMIA, which prohibit the negligent creation, maintenance, preservation, storage, abandonment, destruction or disposal of confidential personal medical information.

482.  Section 56.101(a) of the CMIA provides that "[e]very provider of health care, health care service plan, pharmaceutical company, or contractor who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." Section 56.101(b)(1)(A) further provides that "[a]n electronic health record system or electronic medical record system . . . [p]rotect and preserve the integrity of electronic medical information."

483.  Section 56.36(b) of the CMIA provides the following:

> In addition to any other remedies available at law, an individual may bring an action against a person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following:
>
> (1) Except as provided in subdivision (e), nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it is not necessary that the plaintiff suffered or was threatened with actual damages.
>
> (2) The amount of actual damages, if any, sustained by the patient.

484.  Defendants misused, disclosed, and/or otherwise allowed third parties to access and view Plaintiffs' and Class Members' personal medical information without their written authorization in violation of Cal. Civil Code §§ 56.13, 56.26, and 56.101.

485.   Plaintiffs and California Subclass Members' medical information was accessed, removed, and actually viewed by hackers and other unauthorized parties during and following the Data Breach.

486.   Plaintiffs and California Subclass Members' medical information that was the subject of the Data Breach included "electronic medical records" or "electronic health records" as referenced by Cal. Civil Code § 56.101(c) and defined by 42 U.S.C. § 17921(5).

487.   California Defendants' computer systems did not protect and preserve the integrity of electronic medical information in violation of Cal. Civ. Code § 56.101(b)(1)(A). As a direct and proximate result of California Defendants' above-noted wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, and violation of the CMIA, Plaintiffs and the California Subclass Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia, (a) present, imminent, immediate and continuing increased risk of identity theft, identity fraud and medical fraud—risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (b) invasion of privacy, (c) breach of the confidentiality of the PHI, (d) statutory damages under the CMIA, (e) deprivation of the value of their PHI, for which there is well-established national and international markets, and/or (f) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

488.   California Defendants violated the CMIA by (1) failing to implement reasonable administrative, physical and technical safeguards to protect, secure and prevent the unauthorized access to, and acquisition of, Plaintiffs' and Class Members' personal medical information; (2) failing to implement reasonable data security measures, such as intrusion detection processes that detect data breaches in a timely manner, to protect and secure Plaintiffs' and Class Members' personal medical information; (3) failing to use reasonable authentication procedures to track Plaintiffs'

1  and Class Members' personal medical information in case of a security breach; and

2  (4) allowing undetected and unauthorized access to servers, networks and systems

3  where Plaintiffs' and Class Members' personal medical information was kept, all in

4  violation of the CMIA.

5      489. Defendant further violated the CMIA by affirmatively sharing and

6  disclosing, and providing third parties with access to, Plaintiffs' and Class Members'

7  medical information.

8      490. As a direct and proximate result of California Defendants' wrongful

9  actions, inaction, omission, and want of ordinary care that directly and proximately

10  caused the release of Plaintiffs and California Subclass Members' Private Information,

11  Plaintiff and California Subclass Members' personal medical information was viewed

12  by, released to, and disclosed to third parties without Plaintiffs and California Subclass

13  Members' written authorization.

14      491. As a result of the Data Breach, unauthorized parties obtained personal

15  medical information, viewed it, and now have it available to them to sell to other bad

16  actors, including on the dark web, post the information on the dark web or otherwise

17  misuse.

18      492. As a further result of the Data Breach, the confidential nature of

19  Plaintiffs' and Class members' medical information was breached as a result of

20  California Defendants' negligence. Specifically, California Defendants knowingly

21  allowed and affirmatively acted in a manner that actually allowed unauthorized parties

22  to access and view Plaintiffs' and Class Members' Private Information, which was

23  viewed and used when the unauthorized parties engaged in the above-described

24  fraudulent activity.

25      493. California Defendants' negligent failure to maintain, preserve, store,

26  abandon, destroy, and/or dispose of Plaintiffs and California Subclass Members'

27  medical information in a manner that preserved the confidentiality of the information

28  contained therein violated the CMIA.

494.   California Defendants' failure to implement adequate data security measures to protect the PHI of Plaintiffs and Class Members was a substantial factor in allowing unauthorized parties to access California Defendants' computer systems and acquire the PHI of Plaintiffs and California Subclass Members.

495.   As a direct and proximate result of California Defendants' violation of the CMIA, California Defendants allowed the PHI of Plaintiffs and Class Members to (a) escape and spread from its normal place of storage through unauthorized disclosure or release; and (b) be accessed and acquired by unauthorized parties in order to, view, mine, exploit, use, and/or profit from their personal medical information, thereby breaching the confidentiality of their personal medical information. Plaintiffs and Class Members have accordingly sustained and will continue to sustain actual damages as set forth above.

496.   As a direct and proximate result of California Defendants' wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs' and Class Members' personal medical information was viewed by, released to, and disclosed to third parties without Plaintiffs' and Class Members' written authorization.

497.   Plaintiffs and the California Subclass Members were injured and have suffered damages, as described above, from California Defendants' illegal and unauthorized disclosure and negligent release of their medical information in violation of Cal. Civ. Code § 56.101, and Plaintiffs and Class Members are entitled to (i) actual damages, and (ii) nominal damages of $1,000 per Plaintiff and Class Member under California Civil Code § 56.36.

## COUNT IX
### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (Against California Defendants on Behalf of California Plaintiffs and the California Subclass)

498.   California Plaintiffs (for purposes of this Count, "Plaintiffs") restate and

116

1    reallege the preceding paragraphs as if fully set forth herein.

2        499.   Plaintiffs bring this claim on behalf of themselves and the California

3    Subclass against Defendant Episource and Client Defendants Molina and Blue Shield

4    (collectively, "California Defendants").

5        500.   The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200,

6    *et seq*. ("UCL"), prohibits any "unlawful," "fraudulent" or "unfair" business act or

7    practice and any false or misleading advertising, as defined by the UCL and relevant

8    case law.

9        501.   By reason of California Defendants' above-described wrongful actions,

10   inactions, and omissions, the resulting Data Breach, and the unauthorized disclosure

11   of Plaintiffs' and Class Members' Private Information, California Defendants engaged

12   in unfair, unlawful, and fraudulent business practices in violation of the UCL.

13       502.   The acts, omissions, and conduct complained of herein in violation of the

14   UCL were designed and emanated from California Defendants' corporate offices.

15       503.   Plaintiffs suffered injury, in fact, and lost money or property as a result

16   of California Defendants' alleged violations of the UCL.

17       504.   The acts, omissions, and conduct of California Defendants as alleged

18   herein constitute a "business practice" within the meaning of the UCL.

19   **Unlawful Prong**

20       505.   California Defendants violated the unlawful prong of the UCL by

21   violating, inter alia, violation of California's data breach statutes, Section 5 of the FTC

22   Act, FTC Act, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1302d, *et seq.*, CMIA, Cal. Civ.

23   Code § 56, *et seq.*, California Customer Records Act, Cal. Civil Code § 1798.81.5,

24   and HITECH, 42 U.S.C. § 17921, 45 C.F.R. § 160.103 as alleged herein.

25       506.   California Defendants violated the unlawful prong of the UCL by failing

26   to honor the terms of its implied contracts with Plaintiffs and Class Members, as

27   alleged herein.

28

507.    California Defendants' conduct also undermines California public policy—as reflected in statutes like the California Information Practices Act, Cal. Civ. Code §§ 1798, *et seq.*, the CCPA concerning consumer privacy, and the CCRA concerning customer records, and the CMIA concerning medical information—which seek to protect customer and consumer data and ensure that entities who solicit or are entrusted with personal data utilize reasonable security measures.

**Unfair Prong**

508.    Defendants' "unfair" acts and practices include: utilizing cheaper, ineffective security measures and diverting funds to their own profit, instead of providing a reasonable level of security that would have prevented the hacking incident; failing to follow industry standard and the applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data; failing to timely and adequately notify California Subclass Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and California Subclass Members' personal information.

509.    California Defendants' acts, omissions, and conduct also violate the unfair prong of the UCL because California Defendants' acts, omissions, and conduct, as alleged herein, offended public policy and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiffs and other California Class Members. The gravity of California Defendants' conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further California Defendants' legitimate business interests, other than Defendants' conduct described herein.

510.    California Defendants' failure to utilize, and to disclose that they do not utilize industry standard security practices, constitutes an unfair business practice under the UCL. California Defendants' conduct is unethical, unscrupulous, and

substantially injurious to the Class. While California Defendants' competitors have spent the time and money necessary to appropriately safeguard their products, service, and customer information, California Defendants have not—to the detriment of their customers and to competition.

511.  California Defendants' conduct was immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and California Subclass Members. Further, California Defendants' conduct narrowly benefited their own business interests at the expense of Plaintiffs' and California Subclass Members' fundamental property and privacy interests protected by the California Constitution and the common law.

**Fraudulent Prong**

512.  By failing to disclose that they do not enlist industry-standard security practices, all of which rendered Class Members particularly vulnerable to data breaches, California Defendants engaged in UCL-violative practices.

513.  A reasonable consumer would not have transacted with California Defendants if they knew the truth about their security procedures. By withholding material information about their security practices, California Defendants were able to obtain customers who provided and entrusted their Private Information in connection with transacting business with California Defendants. Had Plaintiffs known the truth about California Defendants' security procedures, Plaintiffs would not have done business with California Defendants.

514.  As a result of California Defendants' violations of the UCL, Plaintiffs and Class Members are entitled to injunctive relief including, but not limited to: (1) ordering that California Defendants use strong industry standard data security measures for the collection, storage, and retention of customer data; (2) ordering that California Defendants, consistent with industry standard practices, engage third party security auditors and penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on California

Defendants' systems on a periodic basis; (3) ordering that California Defendants engage third-party security auditors and internal personnel, consistent with industry standard practices, to run automated security monitoring; (4) ordering that California Defendants audit, test, and train their security personnel regarding any new or modified procedures; (5) ordering that California Defendants, consistent with industry standard practices, segment consumer data by, among other things, creating firewalls and access controls so that if one area of California Defendants' systems are compromised, hackers cannot gain access to other portions of those systems; (6) ordering that California Defendants purge, delete, and destroy in a reasonably secure manner Class Member's data not necessary for their provisions of services; (7) ordering that California Defendants, consistent with industry standard practices, conduct regular database scanning and security checks; (8) ordering that California Defendants, consistent with industry standard practices, evaluate all software, systems, or programs utilized for collection and storage of sensitive Private Information for vulnerabilities to prevent threats to customers; (9) ordering that California Defendants, consistent with industry standard practices, periodically conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and (10) ordering California Defendants to meaningfully educate their customers about the threats they face as a result of the loss of their Private Information.

515.  As a result of California Defendants' violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property, as detailed herein and including, but not limited to the out-of-pocket expenses Plaintiff Johnson incurred to improve his network security following the Data Breach.

516.  They agreed to transact with California Defendants or made purchases or spent money that they otherwise would not have made or spent, had they known the true state of affairs regarding California Defendants' data security policies. Class Members lost control over their Private Information and suffered a corresponding

diminution in value of that Private Information, which is a property right. Class Members lost money as a result of dealing with the fallout of and attempting to mitigate harm arising from the Data Breach.

517. Plaintiffs request that the Court issue sufficient equitable relief to restore Class Members to the position they would have been in had California Defendants not engaged in violations of the UCL, including by ordering restitution of all funds that California Defendants may have acquired from Plaintiffs and Class Members as a result of those violations.

518. Plaintiffs seek prospective injunctive relief, including improvements to California Defendants' data security systems and practices, in order to ensure that such security is reasonably sufficient to safeguard customers' Private Information that remains in California Defendants' custody, including but not limited to the following:

a. Ordering that California Defendants engage third-party security auditors and penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on California Defendants' systems on a periodic basis, and ordering California Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Ordering that California Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

c. Ordering that California Defendants audit, test, and train their security personnel regarding any new or modified procedures;

d. Ordering that California Defendants segment customers' Private Information by, among other things, creating firewalls and access controls so that if one area of California Defendants' systems is compromised, hackers cannot gain access to other portions of

California Defendants' systems;

  e. Ordering that California Defendants purge, delete, and destroy in a reasonably secure manner customers' Private Information not necessary for provisions of California Defendants' services;

  f. Ordering that California Defendants conduct regular computer system scanning and security checks;

  g. Ordering that California Defendants routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

  h. Ordering California Defendants to meaningfully educate their current, former, and prospective customers about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves;

  i. Ordering California Defendants to implement systems to ensure that Private Information is stored in an encrypted format; and

  j. Ordering that California Defendants ensure that the third parties to whom they provide access to their customers' Private Information have similar data security measures in place to adequately protect that information.

519. Unless such Class-wide injunctive relief is issued, Plaintiffs and Class Members remain at risk, and there is no other adequate remedy at law that would ensure that Plaintiffs (and other consumers) can rely on California Defendants' representations regarding their data security in the future.

520. California Defendants acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiffs' and Class Members' rights.

521.   California Defendants' actions caused damage to and loss of Plaintiffs' and California Subclass Members' property right to control the dissemination and use of their personal information and communications. California Defendants were in an exclusive position to protect the Private Information. Plaintiffs and California Subclass Members had no way of reasonably avoiding the injury.

522.   As a direct and proximate result of California Defendants' violation of the UCL, Plaintiffs and California Subclass Members lost money or property, including, but not limited to benefit of the bargain losses in the form of monies paid to California Defendants on their behalf and intended to be devoted to data security, lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, and actual misuse of the compromised data.

523.   California Defendants knew or should have known that California Defendants' computer systems and data security practices were inadequate to safeguard Plaintiffs' and California Subclass Members' Private Information and that the risk of a data breach or theft was highly likely. California Defendants' actions in engaging in the above-named unlawful and unfair practices and acts were knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and California Subclass Members.

524.   Under Cal. Bus. and Prof. Code §§ 17203, Plaintiffs and the California Subclass seek an order from this Court enjoining California Defendants from continuing to engage, use, or employ its unfair business practices.

525.   Plaintiffs and the California Subclass Members have suffered injury-in-fact and would not have done business with California Defendants if they had known that their association would put their Private Information at risk. Plaintiffs and the California Subclass would not have given California Defendants their Private Information had they known that their Private Information was vulnerable to a data breach. Likewise, Plaintiffs and California Subclass Members seek an order mandating that California Defendants implement adequate security practices to

protect California Subclass Members' Private Information. Additionally, Plaintiffs and the California Subclass Members seek and request an order awarding Plaintiffs and the Subclass restitution of the money wrongfully acquired by California Defendants by means of California Defendants' unfair and unlawful practices.

526. Plaintiffs and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution to Plaintiffs and Class Members of money or property that California Defendants may have acquired by means of California Defendants' unlawful, and unfair business practices; disgorgement of all profits accruing to California Defendants because of California Defendants' unlawful and unfair business practices; declaratory relief; reasonable attorney's fees and costs under Cal. Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief, including public injunctive relief.

**COUNT X**
**VIOLATION OF CALIFORNIA CONSUMERS**
**LEGAL REMEDIES ACT**
**Cal. Civ. Code § 1750,** *et seq.*
**(Against Episource on Behalf of California Plaintiffs and the California Subclass)**

527. California Plaintiffs (for purposes of this Count, "Plaintiffs") restate and reallege the preceding paragraphs as if fully set forth herein.

528. Plaintiffs bring this claim on behalf of themselves and the California Subclass against Defendant Episource.

529. This cause of action is brought under the California Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq*.

530. On or about September 26, 2025, Plaintiffs sent Episource notice under the CLRA.

531. Episource is the party with the most knowledge of the underlying facts giving rise to Plaintiffs' allegations and, thus, any pre-suit notice would not put Episource in a better position to evaluate those claims. To the extent additional notice is required, Plaintiffs will issue separate demands under Cal. Civ. Code § 1782(a).

1    Plaintiffs in the alternative seek only injunctive relief pursuant to Cal. Civ. Code §

2    1782(d), which provides that "[a]n action for injunctive relief brought under the

3    specific provisions of Section 1770 may be commenced without compliance with

4    subdivision (a)."

5        532.   Plaintiffs and Class Members are "consumers," as the term is defined by

6    Cal. Civil Code § 1761(d).

7        533.  Plaintiffs, Class Members, and Episource have engaged in

8    "transactions," as that term is defined by Cal. Civil Code § 1761(e).

9        534.   The conduct alleged in this Complaint constitutes unfair methods of

10   competition and unfair and deceptive acts and practices for the purpose of the CLRA,

11   and the conduct undertaken by Episource was likely to deceive consumers.

12       535.   Cal. Civ. Code § 1770(a)(5) prohibits one who is involved in a

13   transaction from "[r]epresenting that goods or services have sponsorship, approval,

14   characteristics, ingredients, uses, benefits, or quantities which they do not have."

15       536.   Episource violated this provision by representing that it took appropriate

16   measures to protect Plaintiffs and the Class Members' Private Information. Episource

17   improperly handled, stored, or protected either unencrypted or partially encrypted

18   data.

19       537.   Plaintiffs and Class Members were required by their medical providers

20   and insurers to enter into a relationship with Episource and provide their Private

21   Information to Episource. Had Plaintiffs been aware that the Private Information they

22   provided to Molina or Blue Shield would be shared to a vendor with inadequate data

23   security practices, they would have behaved differently, including by refusing to

24   provide such information and/or permit it to be shared with vendors with insufficient

25   security practices.

26       538.   As a result of engaging in such conduct, Episource violated Cal. Civil

27   Code § 1770.

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

539.   Under Cal. Civil Code § 1780(a)(2) and (a)(5), Plaintiffs seek an order of this Court that includes, but is not limited to, an order enjoining Episource from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

540.   Plaintiffs and Class Members suffered injuries caused by California Defendants' misrepresentations, because they provided their Private Information believing that California Defendants would adequately protect this information. These injuries include, but are not limited to privacy violations and out-of-pocket mitigation expenses (in the case of Plaintiff Johnson).

541.   Plaintiffs and Class Members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

542.   The unfair and deceptive acts and practices of Episource, as described above, present a serious threat to Plaintiffs and Class Members.

543.   Plaintiffs seeks prospective injunctive relief, including improvements to Episource's data security systems and practices, in order to ensure that such security is reasonably sufficient to safeguard patients' Private Information that remains in Episource's custody, including but not limited to the following:

      a.    Ordering that Episource engage third-party security auditors and penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Episource's systems on a periodic basis, and ordering Episource to promptly correct any problems or issues detected by such third-party security auditors;

      b.    Ordering that Episource engage third-party security auditors and internal personnel to run automated security monitoring;

      c.    Ordering that Episource audit, test, and train its security personnel regarding any new or modified procedures;

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1        d.     Ordering that Episource segment patient data by, among other things, creating firewalls and access controls so that if one area of Episource's systems is compromised, hackers cannot gain access to other portions of Episource's systems;

e.     Ordering that Episource not transmit Private Information via unencrypted email;

f.     Ordering that Episource not store Private Information in email accounts;

g.     Ordering that Episource purge, delete, and destroy in a reasonably secure manner patient data not necessary for provisions of Episource's services;

h.     Ordering that Episource conduct regular computer system scanning and security checks;

i.     Ordering that Episource routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

j.     Ordering Episource to implement systems to ensure that Private Information is stored in an encrypted format;

k.     Ordering Episource to meaningfully educate their current, former, and prospective patients about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves; and

l.     Ordering that Episource ensure that any third parties to whom Episource provides Plaintiffs' and Class Members' Private Information have similar and adequate systems identified above in place to ensure Plaintiffs' and Class Members' Private Information remains protected.

127

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

544.   Unless such Class-wide injunctive relief is issued, Plaintiffs and Class Members remain at risk, and there is no other adequate remedy at law that would ensure that Plaintiff Adams (and other consumers) can rely on Episource's representations regarding their data security in the future.

545.   Furthermore, in the alternative to all legal remedies sought herein, Plaintiffs, on behalf of the Class, seek monetary relief including but not limited to restitution to Plaintiffs and Class Members of money or property that Episource may have acquired by means of Episource's unlawful, and unfair business practices; restitutionary disgorgement of all profits accruing to Episource because of Episource's unlawful and unfair business practices; declaratory relief; and attorney's fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all other members of the Class, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants as follows:

A.    An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Classes requested herein, appointing the undersigned as Class Counsel, and finding that Plaintiffs are proper representatives of the Classes requested herein;

B.    Injunctive relief requiring Defendants to (1) strengthen their data security systems that maintain personally identifying information to comply with the applicable state laws alleged herein (including, but not limited to, the California Customer Records Act) and best practices under industry standards; (2) engage third-party auditors and internal personnel to conduct security testing and audits on Defendants' systems on a periodic basis; (3) promptly correct any problems or issues detected by such audits and testing; (4) implement systems to ensure that Private Information is

1    stored in an encrypted format;  and (5) routinely and continually conduct

2    training to inform internal security personnel how to prevent, identify and

3    contain a breach, and how to appropriately respond;

4    C.    An order requiring Defendants to pay all costs associated with class

5    notice and administration of class-wide relief;

6    D.    An award to Plaintiffs and all members of the Classes of compensatory,

7    consequential, incidental, nominal, and statutory damages, restitution,

8    and disgorgement, in an amount to be determined at trial;

9    E.    That the Court award statutory damages, trebled, and/or punitive or

10    exemplary damages, to the extent permitted by law, including but not

11    limited to the following:

12    1.    Nominal damages of one thousand dollars ($1,000) for each

13    violation under Cal. Civil Code § 56.36(b)(1);

14    2.    Actual damages suffered, according to proof, for each violation

15    under Cal. Civil Code § 56.36(b)(2);

16    3.    All other damages, injunctive relief, attorneys' fees, expenses and

17    costs permitted by law or statute.

18    F.    Under its authority under the Declaratory Judgment Act, 28 U.S.C. §

19    2201, *et seq*., a judgment declaring, among other things, the following:

20    1.    Defendants owe a legal duty to secure individuals' Private

21    Information and to timely notify them of a data breach under the

22    common law, HIPAA, and the FTCA;

23    2.    Defendants' existing security measures do not comply with their

24    explicit or implicit contractual obligations and duties of care to

25    provide reasonable security procedures and practices appropriate to

26    protect individuals' Private Information; and

27    3.    Defendants continue to breach this legal duty by failing to employ

28    reasonable measures to secure individuals' Private Information.

129

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1       G.    An award of credit monitoring and identity theft protection services to

2               Plaintiffs and all members of the Classes;

3       H.    An award of attorneys' fees, costs, and expenses, as provided by law or

4               equity;

5       I.     An award for equitable relief requiring restitution and disgorgement of

6               the revenues wrongfully retained as a result of Defendants' wrongful

7               conduct;

8       J.     An order requiring Defendants to pay pre-judgment and post-judgment

9               interest, as provided by law or equity; and

10      K.    Any such other and further relief as this Court may deem just and proper.

11               Certifying the Class as requested herein, designating Plaintiffs as Class

12               Representatives, and appointing Plaintiffs' counsel as Class Counsel;

13 Dated: January 30, 2026.             Respectfully submitted,

14

15                                         */s/ Tina Wolfson*

                                        Tina Wolfson (SBN 174806)

16                                         *twolfson@ahdootwolfson.com*

                                        **AHDOOT & WOLFSON, PC**

17                                         2600 West Olive Avenue, Suite 500

                                          Burbank, CA 91505

18                                         Tel: (310) 474-9111

19                                         Stephen G. Larson (SBN 145225)

20                                         *slarson@larsonllp.com*

                                        **LARSON LLP**

21                                         555 S. Flower Street, 30th Floor

                                          Los Angeles, CA 90071

22                                         Tel: (213) 436-4864

23                                         Daniel S. Robinson (SBN 244245)

24                                         *drobinson@robinsonfirm.com*

                                        **ROBINSON CALCAGNIE, INC.**

25                                         19 Corporate Plaza Drive

                                        Newport Beach, CA 92660

26                                         Tel: (949) 720-1288;

27                                         *Plaintiffs' Interim Co-Lead Counsel*

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Daniel L. Warshaw (SBN 185365)
*dwarshaw@pwfirm.com*
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Tel: (818) 788-8300

*Plaintiffs' Liaison Counsel*

131
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all claims herein so triable.

Dated: January 30, 2026.                    Respectfully submitted,

*/s/ Tina Wolfson*
Tina Wolfson
*twolfson@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel: (310) 474-9111

Stephen G. Larson (SBN 145225)
*slarson@larsonllp.com*
**LARSON LLP**
555 S. Flower Street, 30th Floor
Los Angeles, CA 90071
Tel: (213) 436-4864

Daniel S. Robinson
*drobinson@robinsonfirm.com*
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
Tel: (949) 720-1288

*Plaintiffs' Interim Co-Lead Counsel*

Daniel L. Warshaw
*dwarshaw@pwfirm.com*
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Tel: (818) 788-8300

*Plaintiffs' Liaison Counsel*

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT