UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Episource LLC Data Breach Litigation* | Case No. 2:25-cv-05330-SB-MBK<br><br>ORDER ON DEFENDANTS' MOTIONS TO DISMISS AND COMPEL ARBITRATION [DKT. NOS. 286, 287, 289, 292] |

This consolidated putative class action arises from a cyberattack on Defendant Episource, LLC, resulting in a data breach affecting the personal information of more than 5.4 million individuals. In their third round of pleading challenges, Defendants in four separate motions seek to dismiss the second amended consolidated complaint (SAC) for lack of Article III standing and failure to state a claim, and, as to some claims, to compel arbitration. The Court held a hearing on July 10, 2026, at which all parties submitted on the Court's tentative order. The Court concludes that Article III standing exists as to all claims, grants the motion to compel Farreece Grimmett to arbitrate his claims against Molina Healthcare, Inc., and grants the motions to dismiss the SAC for failure to state a claim.

I.

Episource is a California-based company that provides software and support services to health plans and medical providers to help them manage patient health information. Defendants Molina Healthcare, Inc. (MHI), InnovaCare, Inc. (InnovaCare), California Physicians' Service d/b/a Blue Shield of California (Blue Shield), and Elevance Health, Inc. (Elevance) (collectively, the Customer Defendants) are a group of health care service plans, insurers, and related health care companies that contracted with Episource and provided it with the identification and health information of their members and patients. Between January 27 and February 6, 2025, an unauthorized actor accessed and copied data from Episource's systems. Dkt. No. 280 ¶ 6 (SAC). Episource determined that more than 5 million individuals were affected and sent notification letters to them

about the breach, starting on June 6. The private information exposed in the breach included names, addresses, birthdates, emails, Social Security numbers, health insurance data (e.g., health plans, member and group insurance numbers, and payor ID numbers), and health data (e.g., medical record numbers, doctors, diagnoses, medicines, test results, images, and other treatment records). *Id.* ¶ 7. The type and quantity of information exposed varied across affected individuals.

Numerous plaintiffs filed 20 putative class actions that were consolidated into this action. In the consolidated complaint, 23 named plaintiffs asserted claims against Episource and 13 of its customers, alleging that the data breach was the result of Episource's failure to implement reasonable and industry-standard data security measures and that its customers negligently entrusted class members' sensitive data to Episource without proper vetting or monitoring. Dkt. No. 76. Defendants moved to dismiss, challenging Article III standing, personal jurisdiction, and the sufficiency of Plaintiffs' claims on the merits, while Molina Healthcare of California (MHC), an entity related to MHI, moved to compel arbitration. The Court found that: (1) only four named plaintiffs had standing, (2) the nonresident customer defendants were not subject to personal jurisdiction in California, (3) MHC had not shown the existence of an arbitration agreement as to the one MHC customer who had Article III standing, and (4) most of the remaining claims were dismissed for failure to state a claim. Dkt. No. 230. The Court granted Plaintiffs leave to amend their claims against the defendants over whom the Court had personal jurisdiction.

Thirteen plaintiffs then filed a first amended consolidated complaint (FAC) against the remaining defendants, who again moved to dismiss and compel arbitration. Several factors complicated adjudication of the motions. First, the FAC—which incorporated additional information produced by Defendants—abandoned some of the allegations on which the Court had based its finding of Article III standing when ruling on the prior pleading challenges. For example, the Court had found that Plaintiff Frederick Lower had the strongest basis for Article III standing because he was the only plaintiff who alleged that his Social Security number had been compromised, but in the FAC, he no longer alleged its disclosure. Second, Defendants in three separate motions challenged standing as to only some plaintiffs, without always identifying which plaintiffs were the subjects of their arguments. Third, Plaintiffs argued that they had not yet had time to fully review the ongoing discovery being produced by Defendants, some of which cast doubt on Defendants' earlier assertions that they had produced all the information relating to the disclosure of Plaintiffs' information. Fourth, it was not clear that any plaintiff had Article III standing, but "[g]iven Episource's unexplained decision not to challenge the standing of some plaintiffs (at least as to injunctive

relief), the Court decline[d] to adjudicate their standing without first giving Plaintiffs an opportunity to respond." Dkt. No. 276 at 5.

For all those reasons, the Court concluded that "the better course is to first allow Plaintiffs to amend their pleading before adjudicating standing, which avoids both the need for supplemental briefing on the unchallenged plaintiffs and the waste of evaluating one set of allegations only for Plaintiffs to replace them with another." *Id*. The Court denied Plaintiffs' request for additional time to obtain further discovery before their standing was adjudicated, explaining that "Plaintiffs have not identified any basis to doubt Episource's representation that it has produced all of *their* information that was compromised in the data breach." *Id*. at 5 n.3. The Court therefore ordered the parties to meet and confer to attempt to resolve any remaining factual disputes and for Plaintiffs to file their SAC, cautioning that "Plaintiffs should not expect another opportunity to amend to add allegations that could have been included in their SAC." *Id*. at 5–6.

In the SAC, 13 plaintiffs—David Bartelt, Angela Jo Carter, Farreece Grimmett, Frederick Lower, Jose Contreras, Michael Alcorn, Nesrin Haddad, Paul Lewow, Steve Altes, Tyrone Holifield, Wanda Hernandez, William Glenn Johnson, and Stephen Dollar—allege claims against Episource and the four Customer Defendants on behalf of a nationwide class, a California subclass, and four subclasses representing the members of each of the four Customer Defendants. Dkt. No. 280. The SAC alleges the following claims, which the Court sets forth in table format for clarity:

| **Cause of Action** | **Plaintiffs** | **Defendant(s)** |
|---|---|---|
| 1. Negligence | All | Episource |
| 2. Negligence | MHI subclass | MHI |
| 3. Negligence | Blue Shield subclass | Blue Shield |
| 4. Negligence | InnovaCare subclass | InnovaCare |
| 5. Negligence | Elevance subclass | Elevance |
| 6. Breach of Implied Contract | All Customer Defendant subclasses | All Customer Defendants |
| 7. Quasi-Contract | All | Episource |
| 8. Confidentiality of Medical Information Act (CMIA) | California subclass | Episource and Blue Shield |
| 9. Unfair Competition Law (UCL) | California subclass | Episource and Blue Shield |
| 10. Consumers Legal Remedies Act (CLRA) | California subclass | Episource |

Defendants again move to dismiss the claims for lack of Article III standing and failure to state a claim, and MHI moves to compel arbitration. Dkt. Nos. 286, 287, 289, 292. The Court first addresses jurisdiction and arbitrability before turning to the merits.

II.

In three separate motions, Defendants challenge Plaintiffs' Article III standing to bring their claims. Episource argues that no plaintiff has suffered concrete harm, that 10 of the 13 plaintiffs (those who do not allege that their Social Security numbers were disclosed) face no plausible risk of harm, and that no other asserted harms establish standing. Dkt. No. 289 at 2–10. The Customer Defendants incorporate Episource's standing arguments and raise additional facial standing challenges. Dkt. No. 288 at 1–4. Blue Shield incorporates both motions and also raises a factual challenge to the standing of five plaintiffs in the Blue Shield subclass. Dkt. No. 293 at 1–8.

A.

A complaint must be dismissed under Rule 12(b)(1) if the plaintiff lacks Article III standing to sue. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). The standing doctrine is derived from Article III's limitation on the judicial power of federal courts to hear only "actual cases or controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* at 338. Standing "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). "[T]he irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338 (cleaned up). The party invoking federal jurisdiction bears the burden of demonstrating that Article III is satisfied. *TransUnion*, 594 U.S. at 430–31.

As to the first element, an Article III injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quotation omitted). In a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm unless the risk of future harm materializes—i.e., the plaintiffs must establish that they were independently

and concretely injured by exposure to the risk. *TransUnion,* 594 U.S. at 437. For injunctive relief, the standing inquiry requires a plaintiff to "demonstrate that he has suffered or is threatened with a concrete and particularized harm, coupled with a sufficient likelihood that he will again be wronged in a similar way." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (cleaned up).

Jurisdictional challenges under Rule 12(b)(1) may be facial or factual. "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The court evaluates a facial attack "as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). On a factual attack, the court may review evidence outside the complaint. *Safe Air for Everyone*, 373 F.3d at 1039.

B.

Defendants raise a variety of standing arguments, many of which are tailored to specific plaintiffs based on the variations in the information disclosed. In their opposition to Blue Shield's motion, Plaintiffs argue that because the three plaintiffs whose Social Security numbers were disclosed have Article III standing, "the Court need not assess standing for the other Plaintiffs." Dkt. No. 301 at 6. To be sure, the Ninth Circuit has "consistently held that Article III's requirements are satisfied before a class is certified as long as at least one named plaintiff has standing." *Healy v. Milliman, Inc.*, 164 F.4th 701, 706 (9th Cir. 2026). But Plaintiffs' reliance on this principle oversimplifies the rule. More precisely, where multiple named plaintiffs bring the same claim on behalf of a class, courts may proceed to the merits after determining that one of them has Article III standing. On the other hand, when different claims are asserted on behalf of different subclasses by different named plaintiffs, "the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000); *accord Hoffman v. Blattner Energy, Inc.*, 315 F.R.D. 324, 333 (C.D. Cal. 2016) ("In a complaint involving multiple claims, at least one named plaintiff must have Article III standing for each asserted claim.") (citations and emphasis omitted). This conclusion follows from the foundational principle that "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431.

Here, the SAC asserts separate claims on behalf of five subclasses in addition to the nationwide class, and there is no single plaintiff who alleges all 10 causes of action. For example, Hernandez is the only representative of the InnovaCare subclass, and Holifield is the only representative of the Elevance subclass. Dkt. No. 280 ¶¶ 290–291. Whether other plaintiffs have Article III standing for their claims has no bearing on whether the negligence claims against InnovaCare and Elevance in Counts 4 and 5 can proceed. Thus, while Plaintiffs are correct that it is unnecessary to evaluate the standing of all 13 named plaintiffs, there must be at least one plaintiff with standing in each subclass to reach the merits of every claim.[1]

Plaintiffs Bartelt, Grimmett, and Dollar, whom the parties address together, are members of the MHI subclass; Holifield is a member of the California, Elevance, and Blue Shield subclasses; Hernandez is a member of the InnovaCare subclass; and they are all members of the nationwide class that alleges claims against Episource. *Id.* ¶¶ 286–91. Thus, if those five plaintiffs have Article III standing to pursue the claims they assert on behalf of the nationwide class and their respective subclasses, then there is at least one plaintiff with standing asserting each claim, making it unnecessary at the pleading stage to determine whether the remaining plaintiffs have standing. The Court therefore begins with those five plaintiffs.

C.

Bartelt, Grimmett, and Dollar all allege that their Social Security numbers were disclosed in the data breach, along with other identifying data including their names, genders, dates of birth, medical groups, and member IDs. *Id.* ¶¶ 131, 157, 280. The Court previously found that "Social Security numbers are the type of sensitive private information that gives rise to an imminent risk of future identity theft or fraud when misappropriated," and that "[c]osts incurred in mitigating that risk constitute concrete injury," such that Lower's allegation that his Social Security number had been compromised sufficiently demonstrated Article III standing for both prospective and retrospective relief. Dkt. No. 230 at 7. *See*

---

[1] Although the parties have not adequately addressed this issue and did not raise it in connection with the prior motions, the Court previously employed this approach, albeit with less explanation. *See* Dkt. No. 230 at 7 (explaining that finding standing for Plaintiff Lower "does not end the Court's Article III analysis, however, because different plaintiffs assert claims against different defendants and seek to represent different subclasses").

*Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1140, 1143 (9th Cir. 2010) (finding standing based on risk of future fraud where hackers obtained unencrypted names, addresses, and Social Security numbers); *Medoff v. Minka Lighting, LLC*, No. 2:22-CV-08885-SVW, 2023 WL 4291973, at *4 (C.D. Cal. May 8, 2023) ("[C]ourts across the country have recognized that harms that result as a consequence of a plaintiff's knowledge of a substantial risk of identity theft, including time and money spent responding to a data breach or emotion[al] distress can satisfy concreteness.") (collecting cases).

Defendants have not shown any reason not to apply that conclusion to Bartelt, Grimmett, and Dollar. *See* Dkt. No. 289-1 at 8 ("[I]f the Court entertains Plaintiffs' risk-of-harm theory, Episource does not challenge that theory at this stage for Plaintiffs Bartelt, Grimmett, and Dollar."). The Customer Defendants briefly argue, without citing authority, that because the Social Security numbers were embedded in different data elements, it would not necessarily be apparent to an unauthorized third party that they were Social Security numbers. Dkt. No. 288 at 2–3. At the pleading stage, Defendants have not shown that Bartelt, Grimmett, and Dollar's allegations of the risk of harm are implausible because their Social Security numbers were embedded. To the extent there is any doubt, the other information disclosed in the breach (e.g., Bartelt's name, medical group, member ID, date of birth, gender, and a file that may contain medical records) exacerbates the risk of harm posed by disclosure of their embedded Social Security numbers.

Moreover, notwithstanding Defendants' prior assurances that they had identified the full extent of the named plaintiffs' disclosed information—and the Court's reliance on those assurances, Dkt. No. 276 at 5 n.3 ("Plaintiffs have not identified any basis to doubt Episource's representation that it has produced all of *their* information that was compromised in the data breach.")—both Plaintiffs and Episource have continued to discover additional information that was not disclosed. Indeed, after Plaintiffs noted in the SAC that they had identified new information in the data Episource previously produced, Episource conducted a further investigation and found 17 additional data files associated with seven of the named plaintiffs, including new data elements that had not been disclosed for Grimmett, Dollar, and three other plaintiffs. Dkt. No. 289-2 ¶¶ 6–7 (declaration of Episource's counsel describing discovery of data and production to Plaintiffs in mid-April, weeks after the SAC was filed). As Episource acknowledges in its motion, this additional data includes provider information, diagnosis codes, medical chart IDs, and dates of service. Dkt. No. 289-1 at 5. At a minimum, Episource's continuing discovery of affected data 10 months after this case was filed, contrary to its prior representations that it had produced everything relevant to the named plaintiffs, undermines Defendants' criticism of Plaintiffs' shifting

allegations. To the extent there is any uncertainty about Plaintiffs' standing, the belated disclosure of additional compromised data after the SAC's filing supports giving Plaintiffs the benefit of the doubt at the pleading stage. In any event, Bartelt, Grimmett, and Dollar have adequately alleged Article III standing.[2]

D.

The SAC alleges that "at a minimum, Plaintiff Holifield's name, medical chart ID, member ID, date of birth, gender, physician name, and the identity of a file that may be medical records pertaining to him were exposed." Dkt. No. 280 ¶ 242. After the SAC was filed, Episource also learned that Holifield's health insurance claim number, provider address, dates of service, claim ID, and diagnosis codes were disclosed. This extensive information is similar to the information the Court previously found adequate to support Article III standing for Carter, Contreras, and Hernandez. Dkt. No. 230 at 7–9. Like the original consolidated complaint, the SAC contains extensive allegations explaining how the exposure of similar information may give rise to fraud and identity theft. Dkt. No. 280 ¶¶ 97–106. Defendants have not shown that the Court should depart from its prior conclusion that "[t]aking these allegations as true and drawing all inferences in Plaintiffs' favor, it is plausible that this type of information can give rise to an imminent right [sic] of fraud or identity theft." Dkt. No. 230 at 8. And just as with the original complaint, given a plausible risk of future harm, Holifield's allegation that he spent numerous hours attempting to mitigate the harms, including by researching the breach, reviewing account statements and credit reports, contacting his bank, changing passwords, and taking other protective steps, supports a finding of concrete injury. Dkt. No. 280 ¶ 243.

Holifield is alleged to be a member of the California subclass, the Blue Shield subclass, and the Elevance subclass. *Id*. ¶¶ 287, 289, 291.[3] Blue Shield's

---

[2] Because Bartelt, Grimmett, and Dollar all represent the MHI subclass, the Court's conclusion below that Grimmett's claims are subject to arbitration does not prevent the Court from reaching the merits of the claims against MHI brought by Bartelt and Dollar on behalf of the MHI subclass.

[3] The SAC alleges that Elevance "is a parent company to various health plans and subsidiaries, including those operating under the Blue Cross and Blue Shield names in multiple states," Dkt. No. 280 ¶ 37, so Holifield's inclusion in both the Elevance and Blue Shield subclasses does not appear to be inherently inconsistent. At the hearing, Blue Shield questioned whether Holifield in fact is a proper representative of the Blue Shield subclass but conceded that counsel had

factual standing challenge, however, only addresses the other five named plaintiffs in the Blue Shield subclass (Contreras, Haddad, Lewow, Altes, and Johnson), arguing that their asserted harms are not traceable to Blue Shield. Dkt. No. 293 at 1–8. Even assuming that Blue Shield's traceability argument applies to Holifield, Blue Shield has not shown that he lacks standing. Blue Shield produces evidence that it engaged Episource to provide services including risk adjustment and medical chart coding; that it "prepares and transmits files that contain only the minimum data elements Episource needs to request medical charts from providers, such as member names, dates of birth, subscriber identification numbers, provider information, and date ranges relevant to the chart retrieval"; that it transmits the files through a secure, encrypted site; and that Blue Shield does not itself send "information such as diagnoses, medicines, test results, care, images, treatment details, financial information, Social Security numbers, or any other unnecessary data." Dkt. No. 240-1 ¶¶ 6–9. Blue Shield argues that because Plaintiffs' most sensitive information disclosed in the data breach was sent to Episource by health care providers rather than directly by Blue Shield, Plaintiffs' injuries are not traceable to Blue Shield.

This argument misunderstands the nature of Plaintiffs' claims. The crux of the negligence claim alleged in Count 3 is that Blue Shield breached its duties of reasonable care by failing to adequately assess, vet, and monitor Episource's data-security practices before and after providing Episource with customer information. Dkt. No. 280 ¶ 376. The SAC alleges that Blue Shield "controlled the disclosure of insureds' personal and medical information to Episource," which included information provided by "health providers within its network," and that the health providers transmitted the information to Episource "pursuant to Blue Shield's agreements with Episource." *Id*. ¶¶ 24, 26–28, 31. Blue Shield's evidence acknowledges that it engaged Episource to perform services including medical chart coding and that it provided Episource with its members' data so that Episource would obtain the more sensitive member information from medical providers. Indeed, it appears to be undisputed—and consistent with Blue Shield's own evidence—that the only reason the medical providers sent Plaintiffs' sensitive information to Episource is because Blue Shield hired Episource to perform services including medical record retrieval and provided Episource the information it needed to obtain the medical records of Blue Shield customers (which Blue Shield needed Episource to obtain to provide the contracted services to Blue Shield). *See* Dkt. No. 240-1 ¶ 6 ("Blue Shield engaged [Episource] to perform . . .

---

overlooked the allegation including him in that subclass and submitted on the tentative order.

end-to-end risk adjustment solutions, including risk adjustment analytics, medical record retrieval, medical chart coding, and encounter submissions. To facilitate Episource's work, Blue Shield periodically transmits limited member information necessary for Episource to identify and retrieve medical records from healthcare providers."). Under these circumstances, Blue Shield has not shown why the fact that it did not directly send all of the affected data to Episource undermines its alleged liability for failing to vet and monitor Episource's security practices, where that failure allegedly led to the disclosure of Plaintiffs' information that Episource had obtained at Blue Shield's direction from the providers in Blue Shield's network.[4]

Accordingly, consistent with the Court's prior ruling, which Defendants have not shown should be disturbed, Holifield has plausibly alleged Article III standing.

E.

As to Hernandez, the SAC alleges that "at a minimum, [her] name, patient ID, date of birth, home address, gender, Subscriber ID, plan name, treating facility, provider information, and medical beneficiary identifier were exposed." *Id.* ¶ 254. This allegation is similar to the information identified in the original consolidated complaint, which the Court found adequate to allege standing as to Hernandez. *See* Dkt. No. 230 at 8 ("Carter, Contreras, and Hernandez allege that their health policies, ID numbers, and medical record numbers were exposed, along with their names, addresses, phone numbers, birthdates, and other information. Taking these allegations as true and drawing all inferences in Plaintiffs' favor, it is plausible that this type of information can give rise to an imminent right of fraud or identity theft."). Her standing is further bolstered by the allegation that, after the breach, someone attempted to obtain Medicare coverage using her identity. Dkt. No. 280 ¶ 255. Defendants have not shown a basis to depart from the Court's prior conclusion that Hernandez has adequately alleged standing at the pleading stage, especially given Episource's continuing discovery of additional disclosed data that it had previously represented did not exist.

* * *

[4] Plaintiffs' argument that Blue Shield's challenge raises a factual dispute that cannot be resolved on a pleading challenge is inapposite because they have not produced any evidence to create a dispute of fact.

Because Bartelt, Grimmett, Dollar, Holifield, and Hernandez have adequately alleged standing, and they collectively represent the nationwide class and every subclass alleging every claim in the SAC, the Court need not consider the standing of other named plaintiffs. *Healy*, 164 F.4th at 706; *Prado-Steiman*, 221 F.3d at 1279. Accordingly, Defendants' Rule 12(b)(1) motions are denied.

III.

MHI moves to compel Plaintiff Grimmett to arbitrate his claims against MHI and seeks discovery into whether the other MHI member plaintiffs (Bartelt, Alcorn, Dollar, and Lower) assented to an arbitration agreement. Dkt. No. 286.

A.

MHI argues that Grimmett should be compelled to arbitrate his claims against MHI because he accepted terms and conditions that included an arbitration agreement when he registered for an account on MHI's mobile application in November 2024. Plaintiffs dispute both MHI's evidence of assent and the enforceability of the agreement.

1.

It is undisputed that the Federal Arbitration Act (FAA) governs the analysis of the arbitration agreements here. The FAA requires courts to enforce agreements to arbitrate in line with a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). A court's involvement is generally limited to determining "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008). If both questions are answered in the affirmative, a court must compel arbitration. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022); 9 U.S.C. § 3.

Although courts must resolve disputes over the formation of an arbitration agreement, other gateway issues can be delegated to an arbitrator by agreement. *Ahlstrom v. DHI Mortg. Co.*, 21 F.4th 631, 634–35 (9th Cir. 2021). Where an arbitration agreement contains a delegation provision, a court need only resolve: (1) whether the parties entered into an agreement to arbitrate, and (2) any validity and enforceability challenges specific to the delegation provision. *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022). "[I]f the parties did form an agreement to arbitrate containing an enforceable delegation clause, all

arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance." *Id.*

2.

The party seeking to enforce an arbitration agreement bears the burden of proving by a preponderance of the evidence that a contract to arbitrate was formed. *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019). "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman*, 30 F.4th at 855.

MHI's terms and conditions in effect beginning in May 2021 state in relevant part: "Any controversy or claim between the parties or arising out of these Terms of Use or any use of the Site shall be determined by one disinterested arbitrator in binding arbitration pursuant to the JAMS Comprehensive Arbitration Rules & Procedures of the Judicial Arbitration and Mediation Services ('JAMS')." Dkt. No. 248-8 at 5 of 6. Grimmett does not dispute that these terms were in effect in November 2024, although he disputes agreeing to them, arguing that MHI offers no proof that he checked a box agreeing to the terms. But MHI produces uncontroverted evidence that since at least February 15, 2022, a member must complete the following form to register for an account on MHI's website or application:



Dkt. No. 248-2 ¶ 25. The checkbox next to the language "I've read and agree to the Molina Healthcare Terms of Use & Privacy Policy*" must be checked to sign up for an online account. *Id.* ¶ 26. MHI produces evidence that Grimmett registered for an account on the mobile application on November 15, 2024 and last signed into his account on February 6, 2026. *Id.* ¶¶ 28–29, 32.

In a prior declaration, which Plaintiffs cite in their opposition only for the proposition that he is unsophisticated, Grimmett stated that he downloaded the Molina app to his mobile device but does not recall setting up an account and does not recognize the screenshots in MHI's evidence. Dkt. No. 195-3 ¶¶ 7–8. To the extent Plaintiffs still intend to rely on those statements, Grimmett's lack of recollection does not controvert MHI's documentation recording that he signed up for an account and that in doing so he necessarily clicked the box agreeing to the terms and conditions. *See Blair v. Superpedestrian HQ*, No. 2:23-CV-02153-MCS, 2023 WL 12166122, at *3 (C.D. Cal. May 8, 2023) ("Where a user checks a box agreeing to a website's terms of service when he or she creates an account, the user's inability to recall reading or agreeing to the terms of service does not undermine his or her assent.") (collecting cases).

Clickwrap (or 'click-through') agreements, "in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use," are routinely enforced. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014); *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023) (cleaned up). Plaintiffs argue that this is like *Godun v. JustAnswer LLC*, in which one of the payment pages at issue had a checkbox purporting to accept the defendant's terms of service, but the checkbox was prechecked, and it was unclear whether the plaintiffs could uncheck it. 135 F.4th 699 (9th Cir. 2025). The court in *Godun* employed a "sign-in wrap"—rather than clickwrap—framework, which is applicable where a plaintiff is not required to separately indicate that he has read or agreed with the terms. Under this framework, a court looks to whether the plaintiff had inquiry notice of the terms and unambiguously manifested assent to those terms. *Id.* at 706–08.

The *Godun* court recognized, however, that "[i]f Plaintiffs were asked to affirmatively check or click the pre-checked box," this "would have created a 'clickwrap' agreement, and thus would have been presumptively enforceable." *Id.* at 712 n.6. That is exactly what happened here: the uncontroverted evidence is that the box was unchecked, and Grimmett had to affirmatively check it to sign up for an account. Thus, unlike *Godun*, this case involves clickwrap, not sign-in wrap. Plaintiffs' argument that clickwrap refers only to agreements that list the entire terms next to the checkbox, rather than providing a link, misstates the law.

*See Herzog v. Superior Ct.*, 101 Cal. App. 5th 1280, 1296 (2024) (describing clickwrap as "a form of internet agreement generally regarded as enforceable because it requires the user to manifest assent to a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available") (cleaned up); *accord Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463 (2021) ("In most instances [of clickwrap], the contractual terms were not actually displayed on the same screen as the 'I accept' button, but were instead provided via a hyperlink that, when clicked, took the user to a separate page displaying the full set of terms.").

Grimmett produces no authority suggesting that his affirmative act of checking the box stating "I've read and agree to the Molina Healthcare Terms of Use & Privacy Policy" is insufficient to establish his agreement to the terms of use containing an arbitration agreement. Nor has he shown any reason to depart from the well-established rule that clickwrap agreements are "routinely" enforced. *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024); *Oberstein*, 60 F.4th at 513; *Berman*, 30 F.4th at 856. The Court therefore finds that Grimmett manifested assent to be bound by the terms and conditions containing the arbitration agreement.

3.

Plaintiffs argue that even if they had notice of the arbitration agreement, it should not be enforced because (1) the terms and conditions are illusory since MHI may unilaterally modify them, (2) the terms purport to waive the right to seek public injunctive relief, and (3) the dispute is outside the scope of the agreement. MHI argues that these issues have been delegated to the arbitrator, and that Plaintiffs' arguments are meritless in any event.

The Ninth Circuit has held that "[i]ncorporation of the JAMS arbitration rules by reference"—which MHI's terms undisputedly do—"constitutes clear and unmistakable evidence that the parties agree to arbitrate arbitrability." *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 481 (9th Cir. 2024); *accord Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (same for AAA rules). Although *Patrick* and *Brennan* did not decide whether a plaintiff's lack of sophistication would alter that conclusion, this Court has examined the split in lower-court authority on that question and concluded that "[t]he thrust of the holding in *Brennan* logically extends to the sophisticated and unsophisticated alike." *Acosta v. Brave Quest Corp.*, 733 F. Supp. 3d 920, 928 (C.D. Cal. 2024). Plaintiffs have not shown that the Court should depart from that conclusion; the only post-*Acosta* decision they identify is an out-of-state district court decision that merely follows

the contrary approach with no new analysis. *Gamble v. Penney Opco LLC*, 791 F. Supp. 3d 1203, 1214 (D. Or. 2025). Accordingly, the Court finds that by agreeing to the JAMS arbitration rules, Grimmett and MHI delegated threshold questions of arbitrability to the arbitrator. The Court therefore does not reach Grimmett's challenges to arbitrability, which are not specific to the delegation provision, because "all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance." *Caremark*, 43 F.4th at 1030.

* * *

Accordingly, MHI's motion to compel arbitration is granted as to Grimmett, who must arbitrate his claims against MHI. Those claims are stayed pending completion of arbitration.

B.

MHI argues extensively that it has made a prima facie showing that the other MHI members also agreed to arbitrate their claims, but its only request as to those plaintiffs is for discovery into arbitrability, as it confirms in its reply. *See* Dkt. No. 286 at 21 ("MHI respectfully requests that the Court (i) compel the claims of Plaintiff Grimmett to arbitration and stay them pending arbitration; and (ii) permit discovery into whether Plaintiffs Bartelt, Alcorn, Dollar, and Lower assented to the Arbitration Agreement."); Dkt. No. 306 at 1 ("MHI seeks discovery regarding assent to arbitration, rather than requesting that this Court immediately compel those Plaintiffs to arbitration."). MHI's request is somewhat perplexing given that the Court issued a case management order in September 2025, and discovery has been ongoing for nearly 10 months. *See* Dkt. No. 253 at 4–9 (chart reflecting discovery completed as of February 2026). MHI identifies nothing that has prevented it from pursuing the discovery it seeks and no reason why it needs an order expressly permitting it to do so. *See* Dkt. No. 230 at 18–19 (noting that Molina would be free to depose Lower about agreement to arbitrate "in the normal course of discovery"). Regardless, as explained below, the request is relevant only to the extent it precludes the Court from reaching the Rule 12(b)(6) motions as to the MHI subclass members other than Grimmett. On this record, it does not.

MHI argues that the motion to compel arbitration should be decided before any other proceedings occur and that it has joined the motions to dismiss only in the alternative out of an abundance of caution. Dkt. No. 286 at 4–5 of 31. As to whether the pending discovery request precludes addressing the motions, however, MHI's position is not entirely clear for multiple reasons: (1) it states that the Court

has "discretion" to decide arbitrability before reaching the motions to dismiss but also that the motion to compel arbitration "must" stay other proceedings, while recognizing that courts are divided on the issue; (2) it does not clearly distinguish between the portion of its motion seeking to compel Grimmett to arbitrate (which plainly does require a stay when granted) and the portion seeking discovery; (3) its cited authorities address staying a case when a defendant moves to compel arbitration, not when a defendant moves for discovery that might allow it later to establish arbitrability, and (4) it asks the Court to "again (as it did with Plaintiff Lower) permit discovery into contract formation," but the Court's prior order merely recognized that Molina could depose Lower about contract formation "in the normal course of discovery" and did not stay proceedings. *Id*. at 4–5, 11 of 31. On this record, MHI has not shown that its pending request for discovery into contract formation precludes the Court from reaching the Rule 12(b)(6) motions it has joined. Because the Court concludes below that the remaining plaintiffs' claims against MHI must be dismissed for failure to state a claim, the request for discovery is therefore denied as moot.

IV.

Defendants move to dismiss the claims against them for failure to state a claim. Episource and the Customer Defendants each address the claims against them, and Blue Shield incorporates their motions and raises additional arguments for dismissal. All parties assume for purposes of the pleading challenges that California law applies.

A.

To survive a Rule 12(b)(6) motion, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the facts pleaded "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). All well-pleaded factual allegations must be accepted as true, but a court need not credit "[t]hreadbare recitals of the elements of a cause of action" or "a legal conclusion couched as a factual allegation." *Id.* (cleaned up). There is no plausible entitlement to relief "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.* at 679.

B.

Count 1 alleges that Episource negligently failed to use reasonable measures to protect Plaintiffs' data. Dkt. No. 280 ¶¶ 305–40. To state a claim for negligence under California law, a plaintiff must allege a legal duty to use due care and a breach of that duty that caused injury. *Ladd v. Cnty. of San Mateo*, 12 Cal. 4th 913, 917 (1996). In connection with the original consolidated complaint, the Court found that Plaintiffs had plausibly alleged duty, breach, and injury, but that the claim was barred by the economic loss rule (except as to one plaintiff for whom Defendants did not invoke the rule). Dkt. No. 230 at 22–26. The negligence claim against Episource in the SAC remains largely unchanged apart from the addition of a paragraph asserting that the economic-loss rule does not apply. *See* Dkt. No. 311 at 124–31 (redline reflecting changes between original consolidated complaint and SAC).

Episource no longer disputes that the SAC plausibly alleges duty and breach. It nevertheless renews its argument that Plaintiffs have not plausibly alleged injury. But Episource has not shown any reason for the Court to depart from its prior determination that Plaintiffs "plausibly allege that they were injured when they spent time and effort mitigating the nonspeculative risk of identity theft and addressing actual instances of fraud." Dkt. No. 230 at 25 (collecting cases). Accordingly, Episource is not entitled to dismissal on that ground.

The parties' principal dispute concerns the application of the economic-loss rule. The Court previously explained:

> The economic loss rule was created to prevent "the law of contract and the law of tort from dissolving one into the other." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004). The rule bars recovery in tort for "damages that are solely monetary, as opposed to damages involving physical harm to person or property" in the absence of a special relationship between the parties or some other common-law exception. *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007); *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803–04 (1979). Although some district courts have found lost time spent mitigating actual instances of fraud and future risk of fraud to be noneconomic, the California Court of Appeal has since rejected this approach. *Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 536–37 (2022) (declining to follow federal district courts and "reject[ing] appellants' contention that the asserted lost-time damages are non-economic losses and therefore exempt from the economic loss

> rule"). Plaintiffs' cited cases all predate *Moore*. *See In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990) (requiring federal courts to follow state intermediate appellate decisions absent convincing evidence that the state supreme court would decide the issue differently). While Plaintiffs attempted to distinguish *Moore* at oral argument by noting that the parties in *Moore* were in contractual privity, they conceded that they did not raise this argument in their briefs, and the Court does not consider it now.

*Id*. at 25–26 (footnote omitted). Plaintiffs now assert the argument they did not timely raise in connection with the prior motions, contending that *Moore* applies only when the parties are in contractual privity.[5]

Plaintiffs have not shown that the economic-loss rule applies only where the parties are in contractual privity. In the principal case on which *Moore* relied, the California Supreme Court explained that "[t]he economic loss rule has been applied in various contexts," and its application to parties in contractual privity is only one "strand of the economic loss rule," which "is sometimes referred to as the 'contractual economic loss rule,' 'contractual rule,' or 'consensual paradigm.'" *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 922–23 (2022). Indeed, the first context *Sheen* identified for the economic-loss rule did not involve contractual privity but rather situations "when courts are concerned about imposing 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.'" *Id.* at 922 (quoting *S. California Gas Leak Cases*, 7 Cal. 5th 391, 414 (2019) (applying economic-loss rule to reject recovery in negligence for economic losses suffered by businesses near gas leak)). Thus, to the extent that some district courts have suggested that the economic-loss rule categorically does not apply absent contractual privity, they do not accurately reflect California law as set forth by the California Supreme Court. *E.g.*, *Veterans Rideshare, Inc. v. Navistar Int'l Corp.*, No. 20-CV-01304, 2021 WL 2206479, at *4 (S.D. Cal. June 1, 2021) ("The

---

[5] Plaintiffs also suggest that Plaintiff Johnson has alleged an economic loss because he "spent $250 out-of-pocket to bolster his IT network security, as a result of concerns surrounding the Data Breach." Dkt. No. 280 ¶ 269. The SAC does not plausibly allege that this expense is a loss caused by any defendant's negligence. The data breach involved theft from Episource's system; there is no suggestion that Johnson's network was hacked or is in any danger of being compromised, nor does the SAC contain any allegations explaining how increasing security on his own network would protect him from the misuse of his stolen information in the possession of a bad actor to commit identity theft.

absence of privity between parties to a lawsuit has been found to preclude the application of the economic loss rule.") (collecting cases, many of which addressed other states' laws).

Nor did *Moore* suggest otherwise. Although the parties in *Moore* were in contractual privity, obviating the need to discuss other contexts for the economic-loss rule, *Moore* did not state that the rule applied *only* in that context; to the contrary, it stated that the rule "applies, *inter alia*, where the parties are in contractual privity and the plaintiff's claim arises from the contract." *Moore*, 83 Cal. App. 5th at 535 (emphasis added); *see also Inter Alia*, Black's Law Dictionary (12th ed. 2024) (defining "inter alia" as "[a]mong other things").

Plaintiffs identify only one case distinguishing *Moore*—namely, *Gerber v. Twitter, Inc.*, No. 4:23-CV-00186, 2024 WL 1354449, at *6 (N.D. Cal. Mar. 29, 2024). Like *Moore*, *Gerber* involved parties in privity, and it did not hold—or even suggest—that *Moore* was limited to that context. Instead, *Gerber* distinguished *Moore* based on a different ground, reasoning that lost time constitutes a personal injury rather than a "pure economic loss" and suggesting that the *Moore* plaintiffs had not alleged such an injury. *Id*. (citing *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019)). But, while framed as a factual distinction, this conclusion cannot be reconciled with *Moore* itself, which expressly rejected *Bass*:

> [W]e decline to follow *Bass*, the leading federal case on which appellants rely. In *Bass*, the court concluded the economic loss rule did not bar a negligence claim arising from a data breach, because the plaintiff alleged a noneconomic loss, viz., time spent sorting through phishing e-mails. But *Bass* neither articulated any reasoning for concluding the plaintiff's lost-time damages were non-economic, nor cited any authority for this conclusion. In fact, this conclusion was undermined by the very authority *Bass* cited in determining that the plaintiff's lost time was an injury in fact.

*Moore*, 83 Cal. App. 5th at 536–37 (cleaned up). *Gerber* does not address this tension and therefore does not provide a persuasive basis for disregarding *Moore*.

Finally, Plaintiffs argue that they have adequately alleged a special relationship that overrides the economic-loss rule. Plaintiffs' argument is entirely conclusory; they merely recite the six factors for a special relationship identified in *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (1979), and state that "Plaintiffs

plausibly allege each of these factors." Dkt. No. 303 at 14–15. Plaintiffs cite ¶ 287 of the SAC, but that paragraph is inapposite as it merely defines the California subclass. The relevant allegations are in paragraphs 315 and 316, which identify the six special-relationship factors and assert that each is satisfied. Dkt. No. 280 ¶¶ 315–316. Even assuming that Plaintiffs' one-line conclusion that they "plausibly allege each of these factors" is sufficient to preserve the argument, they have not shown that their allegations of a special relationship are plausible. For example, as to the first factor—the extent to which the transaction was intended to affect the plaintiff—Plaintiffs allege that "the transactions in which Plaintiffs provided their Private Information to Defendants were for the purpose of receiving healthcare services." *Id.* ¶ 316. But that allegation focuses on the interactions between Plaintiffs and their insurers, the Customer Defendants; there is no allegation that Plaintiffs had any transactions with Episource, nor that Episource obtained Plaintiffs' data to provide them with healthcare services. Similarly, Plaintiffs' assignment of moral blame to Episource—the fifth factor—ignores the third parties who illegally breached Episource's system and stole the data. Having failed to address, much less explain, how these allegations satisfy the *J'Aire* factors, Plaintiffs have not shown that they plausibly allege a special relationship.

Accordingly, Plaintiffs have not shown any basis to depart from the Court's conclusion that the economic-loss rule bars their negligence claim against Episource. That claim is therefore dismissed for failure to state a claim.

C.

Counts 2 through 5 allege negligence against MHI, Blue Shield, InnovaCare, and Elevance, respectively. The Court previously dismissed the negligence claims against the Customer Defendants because they did not plausibly allege a breach:

> Plaintiffs make no individualized allegations against Molina, Blue Shield, and InnovaCare, relying instead on generic, collective allegations against the Customer Defendants that are insufficient under Rule 8. *See, e.g.*, *Ewing v. Encor Solar, LLC*, No. 18-CV-2247, 2019 WL 277386, at *6 (S.D. Cal. Jan. 22, 2019) ("When suing multiple defendants, plaintiff must differentiate his allegations against each defendant and should not lump defendants together without distinguishing the alleged wrongs amongst defendants."). For example, Plaintiffs generally allege that the Customer Defendants failed to adequately vet or monitor vendor data-security practices, failed to encrypt and remove unnecessary data, and failed to timely notify Plaintiffs of the breach. Dkt. No. 76 ¶ 462. But they do not

> explain how any particular defendant engaged in this conduct, how any particular defendant violated federal data-privacy laws constituting negligence per se, and when and how the duty to notify arose. Thus, Plaintiffs do not allege facts that plausibly support a claim that Blue Shield, Molina, or InnovaCare breached a duty of care. *See PICC Prop. & Cas. Co. Ltd. v. UNIS, LLC*, No. 2:20-CV-07667-MCS, 2021 WL 939069, at *2 (C.D. Cal. Feb. 1, 2021) (dismissing negligence claim based on "conclusory allegation of breach uniformly applying to all Defendants" that did not include "any facts indicating how [the defendant's] acts or omissions breached any duty"); *cf. Johnson v. Yuma Reg'l Med. Ctr.*, 769 F. Supp. 3d 936, 954 (D. Ariz. 2024) (holding that breach of duty was insufficiently pleaded where plaintiff invoked "industry practices" but did not allege how defendant's systems failed to meet industry standards).

Dkt. No. 230 at 22–23. The SAC attempts to remedy this deficiency by splitting the negligence claim against the Customer Defendants into separate causes of action, each of which contains identical allegations apart from the names of the parties and subclasses. Dkt. No. 280 ¶¶ 341–451. The SAC still provides no individualized factual allegations about what each Customer Defendant knew, its interactions with Episource, and the circumstances under which it allegedly failed to act. It adds allegations about a prior data security incident at Episource in February 2023 and conclusorily alleges that the Customer Defendants "were directly aware, or at minimum should have been aware through reasonable diligence, of Episource's February 2023 data breach," but it contains no specific allegations about whether or when any particular Customer Defendant learned of the breach, how it responded, or why that response was inappropriate. *Id.* ¶¶ 76–91. Nor does the SAC address whether the February 2023 incident involved the same kind of security breach as the February 2025 breach or whether Episource resolved the particular security vulnerabilities that allowed the first breach (or represented to the Customer Defendants that they had) before the second breach. To the extent that Plaintiffs suggest that it is inherently negligent to do business with a company that has been the victim of a data breach, they neither produce authority requiring that conclusion nor reconcile that suggestion with their allegations about the widespread prevalence of data breaches. *Id.* ¶¶ 54–55. Plaintiffs' generalized boilerplate allegations in Counts 2 through 5 still fail to adequately allege that each Customer Defendant breached any duty to Plaintiffs.

Plaintiffs' negligence claims against the Customer Defendants also independently fail because the economic-loss rule applies with even greater force

to those claims, given that the Customer Defendants undisputedly were in privity with their respective members.[6] Thus, as to the Customer Defendants, *Moore* is directly on point. Plaintiffs' contrary authorities are all district court decisions that either predate or do not address *Moore*. *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1142 (C.D. Cal. 2021); *Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 913–14 (S.D. Cal. 2020); *In re Data Breach Sec. Litig. Against Caesars Ent., Inc.*, No. 2:23-CV-01447, 2025 WL 2393024, at *12 (D. Nev. Aug. 15, 2025); *Smallman v. MGM Resorts Int'l*, 638 F. Supp. 3d 1175 (D. Nev. 2022). Moreover, *Moore* forecloses Plaintiffs' reliance on an alleged special relationship to escape the economic-loss rule. *See Moore*, 83 Cal. App. 5th at 535 (where parties are in contractual privity and the claims are not independent of the contract, "there is no need to analyze the . . . special-relationship factors") (citing *Sheen*, 12 Cal. 5th at 915). As in *Moore*, Plaintiffs have not shown that their claims against the Customer Defendants are independent of their contracts with them because Plaintiffs "provided their PII to [the Customer Defendants] pursuant to the contracts establishing their [insurer]-patient relationships, and [Plaintiffs'] asserted injuries arose from [Defendants'] failure to provide data security allegedly promised in their contracts." *Id.*

Accordingly, Plaintiffs' negligence claims against the Customer Defendants are dismissed for failure to state a claim, and the Court need not reach their remaining arguments as to those claims.

D.

Count 6 alleges that the Customer Defendants breached their implied contracts with their respective members by which the Customer Defendants agreed to safeguard and protect Plaintiffs' private information, including by exercising due care in the selection and oversight of vendors. Dkt. No. 280 ¶¶ 452–74.

"An implied-in-fact contract requires proof of the same elements necessary to evidence an express contract: mutual assent or offer and acceptance,

---

[6] There is some confusion and disagreement about whether Plaintiffs received medical insurance directly from MHI or from its subsidiaries. Although MHI disputes its accuracy, the SAC alleges—and Plaintiffs argue—that Plaintiffs Bartelt, Grimmett, Lower, Alcorn, and Dollar were members of MHI, received medical insurance services from MHI, and provided their private information to MHI (defined as "Molina" in the SAC). Dkt. No. 280 ¶¶ 20, 22, 23, 25, 32; Dkt. No. 300 at 6.

consideration, legal capacity and lawful subject matter." *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1050–51 (9th Cir. 2015) (citation omitted). The existence and terms of an implied contract are manifested by conduct rather than words. Cal. Civ. Code § 1621. Otherwise, "there is no difference between an express and implied contract." *Pac. Bay Recovery, Inc. v. California Physicians' Servs., Inc.*, 12 Cal. App. 5th 200, 215 (2017). The elements of a breach of implied contract claim are the same as those for breach of a written contract. *Yari v. Producers Guild of Am., Inc.*, 161 Cal. App. 4th 172, 182 (2008).

The Court previously found that the consolidated complaint failed to state a claim for breach of implied contract because (1) the claim "improperly rests on generic, collective allegations against all Customer Defendants, asserting an implied contract arising from the 'conduct and course of dealing' of the parties without identifying any specific conduct by Lower, Contreras, and Hernandez or any particular course of dealing with Molina, Blue Shield, or InnovaCare," (2) "each Plaintiff entered into a written contract with the relevant Customer Defendant, and Plaintiffs do not identify the relevant terms of those contracts or show that they do not encompass the same subject as the purported implied contracts," (3) "absent specific allegations about the conduct and course of dealing between each Plaintiff and his or her respective Customer Defendant, Lower, Contreras, and Hernandez have not plausibly alleged the existence of an implied contract," and (4) "Plaintiffs' global, conclusory allegations are insufficient to plausibly establish a breach by Molina, Blue Shield, or InnovaCare." Dkt. No. 230 at 27–28.

The SAC does not cure these deficiencies. Other than adding that each plaintiff "entered into an implied contract with [the relevant Customer Defendant] when [he or she] became a [Customer Defendant] member and began receiving insurance services," the SAC contains no information specific to any Customer Defendant. Dkt. No. 280 ¶ 456. It alleges no specific facts about the conduct and course of dealing from which the existence of an implied contract reasonably could be inferred. Nor does the SAC plausibly allege that any implied contract exists alongside an express agreement. Although it now alleges that the implied contracts concern "matters not fully addressed, if at all, by standardized insurance policy documents," the SAC does not identify those documents, the relevant contractual terms, or explain how they leave room for an implied agreement governing the handling of private information. *Id.* ¶ 458. The remaining allegations in the SAC are materially unchanged. Plaintiffs have not added any additional allegations establishing breach by any Customer Defendant, and the allegations on which they rely in their opposition are identical to those the Court found deficient. *See* Dkt.

No. 300 at 20 (citing ¶¶ 461, 469, and 471 to argue that Plaintiffs have adequately alleged breach); Dkt. No. 311 at 154–59 (redline).

Accordingly, Plaintiffs still do not state a claim for breach of implied contract, and Count 6 is dismissed.

E.

Count 7 of the SAC alleges a quasi-contract claim against Episource. The Court previously dismissed Plaintiffs' unjust enrichment claim because under California law, "[u]just enrichment is not a cause of action, just a restitution claim." *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1307 (2011); *accord Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) ("[I]n California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.'"). However, as the Court recognized, the Ninth Circuit has allowed an unjust enrichment claim to proceed where it may be properly construed as a quasi-contract claim for restitution. *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1039 (9th Cir. 2016). The Court rejected Plaintiffs' "attempt to recast their unjust enrichment claim as a quasi-contract claim," both because the complaint alleged no such allegations and because Plaintiffs had "cited no authority suggesting that a quasi-contract claim can exist between two parties that have never interacted." Dkt. No. 230 at 26–27 (citing *Sugarfina, Inc. v. Sweet Pete's LLC*, No. 17-CV-4456-RSWL, 2017 WL 4271133, at *6, 8 (C.D. Cal. Sept. 25, 2017) (dismissing unjust enrichment claim and denying leave to amend because plaintiff had "no affiliation or connection with Defendants to invoke a quasi-contract theory of liability") (cleaned up)). In their SAC, Plaintiffs now restyle the claim as one for quasi-contract, which they plead "in equity only, in the alternative to their tort claims, to prevent Episource's unjust retention of benefits conferred in the absence of contractual privity." Dkt. No. 311 ¶ 489.

Plaintiffs still identify no authority permitting recovery on a quasi-contract theory under these circumstances. To the contrary, multiple courts have found unjust enrichment (construed as quasi-contract claims) unavailable in similar data breach cases where the defendant had no direct interaction with the plaintiff. *E.g.*, *Morales v. Conifer Revenue Cycle Sols., LLC*, No. 2:23-CV-01987-AB, 2025 WL 1096396, at *7 (C.D. Cal. Mar. 31, 2025) ("Plaintiffs' medical provider contracted with the Defendants; the Plaintiffs themselves they did not pay Defendants anything or provide them their personal information. Plaintiffs therefore cannot have a claim for unjust enrichment against Defendants."); *accord Wall v. Wescom Cent. Credit Union*, No. 5:23-CV-02293-CAS, 2024 WL 1158361, at *6 (C.D. Cal. Mar. 18, 2024); *see also Sugarfina*, 2017 WL 4271133, at *8 ("Because there is no

quasi-contractual relationship between the parties that Plaintiff could plead in an amended complaint, allowing leave to amend would be futile.").

Plaintiffs cite authority explaining that privity is not necessarily required for restitution under an unjust enrichment theory. *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 998 (2015). But *Hartford* involved an insurer's attempt to recoup excess funds it had paid to counsel for work on claims clearly outside the scope of coverage. Here, Plaintiffs have not paid Episource anything, either directly or indirectly. There is no suggestion that Plaintiffs sought to obtain Episource's services or that the Customer Defendants acted as Plaintiffs' agents when contracting with Episource. To the extent that the Customer Defendants overpaid for Episource's services, it is the Customer Defendants, and not Plaintiffs, who conferred the benefit. *See Munoz v. MacMillan*, 195 Cal. App. 4th 648, 661 (2011) ("Common law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient; a typical cause of action involving such remedy is 'quasi-contract.'"). Under these circumstances, Plaintiffs have not stated a plausible claim for quasi-contract against Episource.

F.

Next, the California Plaintiffs allege in Count 8 that Episource and Blue Shield violated various provisions of the CMIA. Defendants raise a series of challenges to this claim, which the Court previously dismissed as to Episource and found adequately pleaded as to Blue Shield.

1.

Episource first argues that it is not subject to the CMIA. The SAC primarily argues that Episource is a "provider of health care" under the statute, which applies to "[a]ny business organized for the purpose of maintaining medical information in order to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care, for purposes of allowing the individual to manage the individual's information, or for the diagnosis and treatment of the individual." Cal. Civ. Code § 56.06(a). During the course of briefing, the California Supreme Court reversed the principal decision on which Plaintiffs had relied and held that a defendant that used students' medical records to help educators assess and meet students' educational needs was not a "provider of health care" within the meaning of § 56.06(a). *J.M. v. Illuminate Educ., Inc.*, 19 Cal. 5th 705 (2026). The court explained that the definition requires that the entity must maintain an individual's medical information for one of two purposes: (1) to

allow the individual to manage his or her information or (2) for the diagnosis and treatment of the individual. *Id*. at 715. Because the complaint did not plausibly allege that the defendant maintained the plaintiff's medical information for either purpose, it failed to establish that the defendant was a provider of health care. *Id*. at 716.

Here, too, the SAC does not plausibly allege that Episource maintains Plaintiffs' data to allow them to manage their information or for their diagnosis and treatment. Instead, Episource is allegedly a provider of risk adjustment services that uses Plaintiffs' medical records to "translate medical care into payment and reimbursement determinations." Dkt. No. 280 ¶ 2; *see also id.* ¶ 496 (alleging that the records are "used by health care service plans and providers in connection with the evaluation, coding, and payment of medical care"). Accordingly, the facts alleged do not support a plausible allegation that Episource is a provider of health care within the meaning of the CMIA.

The SAC also alleges three alternative bases for subjecting Episource to CMIA liability. First, it alleges that Episource was a "recipient of medical information" under § 56.13. Dkt. No. 280 ¶ 497. Section 56.13 provides that someone who receives medical information pursuant to certain authorizations "may not further disclose that medical information except in accordance with a new authorization that meets the requirements of Section 56.11, or as specifically required or permitted by other provisions of this chapter or by law." Cal. Civ. Code § 56.13. Plaintiffs do not mention § 56.13 in their opposition or respond to Episource's argument that the SAC fails to allege facts suggesting a violation of § 56.13, so that theory is dismissed as abandoned. *See also In re BetterHelp, Inc. Data Disclosure Cases*, No. 23-CV-01033, 2024 WL 3416511, at *3 (N.D. Cal. July 15, 2024) ("Section 56.13 does not apply because plaintiffs do not allege that BetterHelp received any medical information through a CMIA authorization or from a provider of health care for one of the purposes set out in the statute.").

Second, the SAC alleges that Episource was an "other entity" under § 56.11(c), which provides that "[i]f a provider of health care, health care service plan, pharmaceutical company, contractor, or any other entity seeks an authorization from an individual for a use or disclosure of protected health information, [it] shall provide the individual with a copy of the signed authorization, and instructions on how to access additional copies or a digital version of the signed authorization." Dkt. No. 280 ¶ 497. The SAC, however, does not allege a violation of § 56.11. Plaintiffs do not suggest that Episource sought authorization from them to use or disclose protected health information. Nor have they shown why Episource's status as an "other entity" for purposes of

§ 56.11 would have any bearing on its liability under other provisions. In their opposition, Plaintiffs cite § 56.10(c)(3), which discusses disclosure of information to entities that provide billing service, but that provision does not reference § 56.11, and § 56.10(c) applies to disclosure of medical information care by "[a] provider of health care or a health care service plan." Cal. Civ. Code § 56.10(c). Thus, Plaintiffs have not shown any basis for imposing liability on Episource under §§ 56.10(c) or 56.11.

Finally, the SAC alleges that "Episource qualifies as a 'contractor' under the CMIA because it operates as a medical service organization that provides non-clinical services reasonably necessary and appropriate to the provision and payment of medical care, including medical coding, risk adjustment, and encounter data processing." Dkt. No. 280 ¶ 498; *see also id.* ("These services directly support health care providers and health care service plans in administering and paying for medical treatment, bringing Episource within the scope of entities regulated by the CMIA."). The CMIA defines "contractor" as "a person or entity that is a medical group, independent practice association, pharmaceutical benefits manager, or a medical service organization and is not a health care service plan or provider of health care." Cal. Civ. Code § 56.05(d).[7] The CMIA does not define "medical service organizations," but the parties agree that the term is sometimes used interchangeably with "management services organizations." Dkt. No. 280 ¶ 502 n.59; Dkt. No. 289 at 15. That term, in turn, is defined in another California statute as "an entity that provides management and administrative support services for a provider in support of the delivery of health care services, excluding the direct provision of health services. Management and administrative support services shall include provider rate negotiation, revenue cycle management, or both." Cal. Health & Safety Code § 127500.2(*o*).

Plaintiffs have not shown that Episource is plausibly alleged to be a medical services organization within the meaning of the CMIA. They cite no legal authority supporting that conclusion, and their two-paragraph discussion in their opposition is devoted to arguing that Episource has not conclusively shown that it is *not* a medical services organization. Dkt. No. 301 at 18–19. There is no suggestion that Episource performs work similar to that of "a medical group, independent practice association, [or] pharmaceutical benefits manager"—the other entities listed in the definition of a contractor—and Plaintiffs' broad

---

[7] As the Court previously noted, the CMIA's definitions of "contractor" and "provider of health care" are mutually exclusive. Dkt. No. 230 at 29 n.12. Plaintiffs make their conflicting allegations in the alternative.

interpretation of "medical service organization" to encompass any entity that provides services tangentially related to medical care would expand CMIA liability well beyond the narrow categories identified in the statute. *See In re Corrine W.*, 45 Cal. 4th 522, 531 (2009) (under the doctrine of *ejusdem generis*, "when a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope"). Even assuming the Court may look to the definition of a different term in a different statute based on their purported interchangeability, the examples of management and administrative support services provided in § 127500.2(*o*) are "provider rate negotiation" and "revenue cycle management," and Plaintiffs do not allege that Episource provides those services. Accordingly, Plaintiffs have not plausibly alleged that Episource is a contractor subject to the CMIA.

Because the California Supreme Court's new decision in *J.M.* forecloses Plaintiffs' primary argument that Episource is a provider of health care and Plaintiffs have not plausibly alleged that Episource is subject to the CMIA under any of their alternative theories, the CMIA claim is dismissed as to Episource.

2.

Blue Shield raises several arguments for dismissal of the CMIA claim, including that Plaintiffs have not plausibly alleged negligence. Plaintiffs' CMIA claim turns on § 56.101(a), which imposes liability on "[a]ny provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information." Cal. Civ. Code § 56.101(a). The CMIA's negligent release provision incorporates the common-law elements of negligence. *Vigil v. Muir Med. Grp. IPA, Inc.*, 84 Cal. App. 5th 197, 215 (2022), *disapproved on other grounds by J.M.*, 19 Cal. 5th 705; *see also Regents of Univ. of Cal. v. Superior Ct.*, 220 Cal. App. 4th 549, 570 (2013) (§ 56.101(a) claim requires "that the confidential nature of the plaintiff's medical information was breached as a result of the health care provider's negligence"), *disapproved on other grounds by J.M.*, 19 Cal. 5th 705.[8]

---

[8] The California Supreme Court disapproved of *Vigil* and *Regents* "to the extent they are inconsistent with" its holding that a CMIA violation occurs when medical information is exposed to a significant risk of unauthorized access or use, even if

The parties therefore agree that Plaintiffs' CMIA claim against Blue Shield fails if they have not alleged a plausible negligence claim, although Plaintiffs contend that their negligence claim is viable. *See* Dkt. No. 301 at 14 ("While the parties agree that a negligent release claim under § 56.101 is predicated on general negligence principles, Plaintiffs adequately stated a negligence claim against Blue Shield."). For the reasons already explained in connection with the common-law negligence claims, Plaintiffs' vague, conclusory allegations against the Customer Defendants, which do not provide any specifics about what Blue Shield knew or the circumstances around its selection and oversight of Episource, do not plausibly allege a breach of any duty of care to Plaintiffs. Accordingly, Plaintiffs' CMIA claim against Blue Shield likewise must be dismissed for failure to state a claim.

G.

Count 9 alleges that Episource and Blue Shield—the "California Defendants"[9]—violated the UCL, which prohibits unlawful, unfair, or fraudulent business acts or practices, with each prong providing a separate theory of liability. Cal. Bus. & Prof. Code § 17200; *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). The Court previously considered the UCL claim as brought by Plaintiff Contreras, dismissing it for lack of statutory standing as to Episource but denying Blue Shield's motion to dismiss. *Id.* at 31–34. Each now raises separate arguments for dismissal.

---

not "actually viewed by an unauthorized person." *J.M.*, 19 Cal. 5th at 723. It did not disturb their incorporation of the general negligence principles into the CMIA.

[9] The SAC also names MHI as a defendant in the UCL claim. In its tentative order, the Court noted that this appeared to be an error because none of the plaintiffs alleging that claim were part of the MHI subclass. The Court stated that "the UCL claim against MHI will be dismissed unless Plaintiffs at the hearing (1) confirm that they intended to name MHI in the cause of action and (2) provide authority permitting plaintiffs who were not MHI members to pursue claims against MHI. Failure to do so will be deemed consent to the dismissal of the UCL claim against MHI." Plaintiffs did not suggest at the hearing that they intended to bring the UCL claim against MHI but submitted on the tentative order. They are therefore deemed to consent to the dismissal of the UCL claim against MHI as erroneously included.

1.

Episource once again argues that the UCL claim against it must be dismissed for lack of statutory standing. As the Court previously explained, standing under the UCL is "substantially narrower" than Article III standing and "requires that a plaintiff have 'lost money or property'"—i.e., the plaintiff must "demonstrate some form of economic injury." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 323–24 (2011).

Plaintiffs do not address the Court's prior order dismissing the UCL claim against Episource for lack of statutory standing. Their sole response to Episource's argument is the assertion that "Plaintiff Johnson alleges he spend $250 to secure his own network due to concerns surrounding the Data Breach," and "[n]othing more is required at this stage." Dkt. No. 303 at 20. Plaintiffs cite *Huynh v. Quora, Inc.* for the proposition that "payments toward enhanced credit monitoring that arise from a data breach . . . constitute economic injury, sufficient to confer UCL standing." 508 F. Supp. 3d 633, 661 (N.D. Cal. 2020) (cleaned up). Johnson did not pay for enhanced credit monitoring, however, and, as discussed above, the SAC does not plausibly allege that his payment to upgrade his network security is a loss caused by any defendant's negligence. UCL standing "requires that a plaintiff's economic injury come 'as a result of' the unfair competition." *Kwikset*, 51 Cal. 4th at 326. There is no suggestion that Johnson's network was hacked in connection with the data breach or is in any danger of being compromised as a result of the breach, nor does the SAC contain any allegations explaining how increasing Johnson's network security would prevent the third parties who stole his information from using it to commit identity theft. Accordingly, Johnson's expenditure to improve his network security is not an economic injury that was caused by any misconduct by Episource. *See id.* ("The phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of a causal connection or reliance on the alleged misrepresentation.") (citations omitted). Accordingly, Plaintiffs have still not alleged statutory standing for their UCL claim against Episource, and the claim is therefore dismissed for failure to state a claim.

2.

In connection with the original amended complaint, the Court found that Plaintiff Contreras had plausibly alleged statutory standing for his UCL claim against Blue Shield (which the Court mistakenly referenced as Blue Cross once) based on a benefit-of-the bargain theory. Dkt. No. 230 at 32. Because Blue Shield had not shown it was entitled to dismissal of Contreras's CMIA claim (not having raised the argument on which the Court now dismisses that claim), the Court found

that it necessarily was not entitled to dismissal of his UCL claim based on the unlawful prong and did not address the viability of the other prongs. *Id.* at 33.

Blue Shield now raises several challenges to the UCL claim in the SAC, including that Plaintiffs fail to state a claim under any of the UCL prongs. The Court agrees. The UCL claim spans nine pages but makes no allegations specific to Blue Shield, instead grouping Blue Shield together with Episource as the "California Defendants." Dkt. No. 280 ¶¶ 527–57. Most of the collective allegations are also alleged conclusorily at such a high level of generality that they provide no notice as to what acts—or even which defendant's acts—are being challenged. *E.g.*, *id.* ¶ 538 ("California Defendants' acts, omissions, and conduct also violate the unfair prong of the UCL because California Defendants' acts, omissions, and conduct, as alleged herein, offended public policy and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiffs and other California Class Members."). None of the three prongs states a plausible claim.

First, Plaintiffs allege that "California Defendants" violated the unlawful prong of the UCL by violating the CMIA, HIPAA, the FTC Act, and HITECH. The Court has already determined that the SAC does not plausibly allege a violation of the CMIA, and Plaintiffs do not identify any facts alleged that show violations of the other identified statutes, some of which cannot be predicates for UCL liability in any event. *See, e.g.*, *In re Sequoia Benefits & Ins. Data Breach Litig.*, No. 22-CV-08217, 2024 WL 1091195, at *8 (N.D. Cal. Feb. 22, 2024) ("[T]he FTC Act does not provide individuals with a private right of action and cannot be used as a predicate for a UCL claim.") (cleaned up) (collecting cases). Moreover, for the same reasons that Plaintiffs have not plausibly alleged a breach by Blue Shield for purposes of their negligence claim, their generalized allegations repeated as to each Customer Defendant—which say nothing about the specific circumstances involved in Blue Shield's interactions with Episource—do not plausibly establish wrongdoing by Blue Shield. Accordingly, Plaintiffs' bare assertion that the "California Defendants" violated various statutes does not plausibly establish a UCL violation by Blue Shield.

Second, Plaintiffs have not identified specific acts by Blue Shield that violate the unfair prong of the UCL. The SAC alleges:

> Defendants' "unfair" acts and practices include: utilizing cheaper, ineffective security measures and diverting funds to their own profit, instead of providing a reasonable level of security that would have prevented the hacking incident; failing to follow industry standard and

> the applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data; failing to timely and adequately notify California Subclass Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and California Subclass Members' personal information.

Dkt. No. 280 ¶ 537. Although the group pleading obscures Plaintiffs' intended theories, at least the references to ineffective security measures appear to refer to conduct by Episource—the victim of the data breach. As for the allegation of untimely notification, Plaintiffs identify no allegations in the SAC describing when Blue Shield learned of the breach, the circumstances and contents of its communications with its members, and how the disclosures were deficient. Again, Plaintiffs' conclusory group pleadings do not state a plausible claim that Blue Shield engaged in unfair conduct in violation of the UCL.

Third, under the fraud prong, Plaintiffs allege that "[b]y failing to disclose that they do not enlist industry-standard security practices, all of which rendered Class Members particularly vulnerable to data breaches, California Defendants engaged in UCL-violative practices." *Id.* ¶ 541. This group pleading, which appears to focus on Episource's security practices, plainly does not plead a fraud-based claim against Blue Shield with the particularity required by Rule 9(b). *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (Rule 9(b) applies to UCL claims based on fraud). Claims for nondisclosure—i.e., fraud by omission—must still be pleaded with particularity, *id.* at 1127, although courts have adopted a lower burden than for an affirmative misrepresentation. *See, e.g.*, *In re NJOY, Inc. Consumer Class Action Litig.*, No. 14-CV-00428-MMM, 2014 WL 12586074, at *6 (C.D. Cal. Oct. 20, 2014) ("To plead the circumstances of the omission with specificity, plaintiff must describe the content of the omission and where the omitted information should or could have been revealed, as well as provide representative samples of advertisements, offers, or other representations that plaintiff relied on to make her purchase and that failed to include the allegedly omitted information.") (cleaned up). Here, Plaintiffs' UCL claim identifies no specific communications between Blue Shield and any of its members, nor does it identify the specific information Blue Shield should have disclosed and the circumstances in which it should have made the disclosure. The SAC's conclusory group allegations against the "California Defendants" do not satisfy Rule 9(b).

Because the SAC does not state a claim against Blue Shield under any of the UCL prongs, Plaintiffs' UCL claim against Blue Shield is dismissed.

H.

Finally, the SAC alleges a claim against Episource for violation of the CLRA. As the Court previously explained—and Plaintiffs do not dispute—"the standing requirements of the CLRA are essentially identical to those of the UCL." *Veera v. Banana Republic, LLC*, 6 Cal. App. 5th 907, 916 (2016). The Court's conclusion that Plaintiffs have not plausibly alleged statutory standing for their UCL claim against Episource therefore also compels dismissal of their CLRA claim.

V.

Plaintiffs have already amended their consolidated complaint twice in response to extensive pleading challenges, and the Court warned them when it authorized the SAC that "Plaintiffs should not expect another opportunity to amend to add allegations that could have been included in their SAC." Dkt. No. 276 at 6. Plaintiffs neither request leave for a further amendment nor present any basis to suggest that amendment would not be futile. Accordingly, the Court declines to grant leave to file yet another amended complaint. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (leave to amend may be denied for reasons such as "repeated failure to cure deficiencies by amendments previously allowed" or "futility of amendment").

VI.

Defendants' motions to dismiss under Rule 12(b)(1) for lack of Article III standing are denied. MHI's motion to compel arbitration is granted as to Plaintiff Grimmett, and his claims against MHI are stayed pending completion of the arbitration. As to all other claims, Defendants' motions to dismiss under Rule 12(b)(6) are granted, and Plaintiffs' claims (other than Grimmett's claims against MHI) are dismissed on the merits with prejudice.

The Court expects Grimmett and MHI to cooperate in good faith to engage in the arbitration process pursuant to their agreement. They shall file a joint report on the status of the arbitration by January 15, 2027, with a supplemental joint status report due every 60 days thereafter until they notify the Court that arbitration is complete or until further order of the Court. The Court sets an in-person status conference on March 26, 2027 at 8:30 a.m. in Courtroom 6C.

If the parties fail to timely file a joint report, Grimmett's claims against MHI will be dismissed without prejudice for lack of prosecution. Alternatively, if the parties wish to avoid the need for status reports and conferences, they may file a stipulation agreeing to dismiss Grimmett's claims against MHI without prejudice, which relieves the Court of the obligation to monitor the status of the case, and which the Court will treat as functionally indistinguishable from a stay in terms of their ability to seek confirmation, modification, or vacatur of an arbitration award.

Date: July 13, 2026

Stanley Blumenfeld, Jr.
United States District Judge